## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA de Maryland, Inc.
8151 15th Avenue
Hyattsville, MD 20528
Prince George's County,

ANGEL AGUILUZ and MONICA CAMACHO
PEREZ,[1]

                Plaintiffs,

   v.

DONALD J. TRUMP, in his official
capacity as President of the United States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20016,

KEVIN K. McALEENAN, in his
official capacity as Acting Secretary
of Homeland Security
3801 Nebraska Avenue, N.W.
Washington, D.C. 20016,

U.S. DEPARTMENT OF
HOMELAND SECURITY
3801 Nebraska Avenue, N.W.
Washington, D.C. 20016,

KENNETH T. CUCCINELLI II, in his
official capacity as Acting Director, U.S.
Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Room 4210, MS 2120
Washington, D.C. 20529,

Civil Action No. 8:19-cv-2715

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

---

[1] Both individual plaintiffs concurrently move to waive their obligations under Local Rule 102.2(a) to provide addresses, on the basis of their objectively reasonable fear that publicizing their home addresses would subject them to harassment (potentially including violence) and threats.

U.S. CITIZENSHIP AND
IMMIGRATION SERVICES
20 Massachusetts Avenue, N.W.,
Room 4210, MS 2120
Washington, D.C. 20529,

                       Defendants.

## I.     INTRODUCTION

1.     Plaintiffs CASA de Maryland (CASA) and two of its members, Angel Aguiluz

and Monica Camacho Perez, bring this action seeking declaratory and injunctive relief with

respect to the final rule issued on August 14, 2019, by the U.S. Department of Homeland

Security (DHS).  Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14,

2019) (to be codified at 8 C.F.R. pts. 103, 212–14, 245, 248) [hereinafter "Public Charge Rule"

or "Final Rule"].  This Rule purports to interpret the term "public charge" as it is used in § 212

of the Immigration and Nationality Act (INA) (codified at 8 U.S.C. § 1182(a)(4)(A)) in a way

that is contrary to the term's plain meaning, historical interpretation, and congressional intent

and, moreover, that violates constitutional due process and equal protection guarantees.  The

Rule imposes a new and fatally flawed decisional framework for the U.S. Citizenship and

Immigration Services (USCIS) to determine whether noncitizens seeking admission to the

United States and applicants for lawful-permanent-resident (LPR) status who are living in the

United States are likely to become public charges at any point in the future.[2]  Although DHS

casts this framework as better aligning public-charge determinations with Congress's intent, the

opposite is true.  Instead, the Rule gives cover to virtually unfettered decision-making and is

---

[2] Plaintiffs challenge the Public Charge Rule primarily as it applies to noncitizens residing in the
United States who apply for adjustment of status (i.e., to become LPRs).

designed to disproportionately harm non-European immigrants.

2.      DHS's new Rule defines the phrase "likely at any time to become a public

charge" to mean "more likely than not at any time in the future" to "receive[ ] one or more" of an

enumerated list of government benefits "for more than 12 months in the aggregate within any 36-

month period."  84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(a)–(c)).

3.      This definition cannot be reconciled with what Congress has long understood the

term "public charge" to mean.  The public-charge ground of inadmissibility first appeared in

U.S. immigration statutes in 1882.  Since that time, courts and administrative agencies

consistently have understood the term as excluding only individuals who are likely to become

primarily dependent on the government for subsistence, and Congress has never altered this

definition.  The Department of Justice (DOJ) recognized that accepted meaning in 1999 by

issuing Field Guidance that defined "public charge" as a noncitizen "who is likely to become . . .

primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt

of public cash assistance for income maintenance or (ii) institutionalization for long-term care at

government expense."  Field Guidance on Deportability and Inadmissibility on Public Charge

Grounds, 64 Fed. Reg. 28,689, 28,689 (Mar. 26, 1999) (internal quotation marks omitted).

DHS's new Public Charge Rule sharply breaks with how the term has been understood for over a

century.

4.      DHS's extreme and unprecedented interpretation of the INA's public-charge

provision will do great harm to immigrant families.  Already, fearing the Rule's effects on their

ability to remain in the United States, noncitizens have disenrolled themselves and other

members of their households, including U.S. citizen children and family members, from public

benefits to which they are lawfully entitled—and that support important public purposes like

promoting child health and welfare and preventing homelessness.

5.      Moreover, on the basis of inherently speculative projections about whether noncitizens will obtain even small amounts of public benefits for a brief period of time at some point in their entire lifetimes, DHS's new Public Charge Rule would deny noncitizens who are living in the United States LPR status that would allow them to remain lawfully in the United States and, perhaps, one day become naturalized citizens.  The Rule therefore would split apart families (including those with U.S.-citizen children), effectively coerce noncitizens into living in the shadows, and transform the public-charge inadmissibility ground by administrative fiat into a catchall provision empowering immigration officials to deny any noncitizen deemed undesirable the ability to remain lawfully in the United States.  In short, the Rule would fundamentally alter this nation's immigration system without Congress's input.

6.      Several legal infirmities afflict DHS's new Public Charge Rule.  First, the meaning of "public charge" is clear from the INA's text and structure and the historical context in which Congress introduced the term into U.S. immigration law.  As evidenced by over a century of consistent application, "public charge" means "primarily dependent on the government for subsistence."  Because the meaning of the term is unambiguous, DHS lacks the statutory authority to reinterpret public-charge inadmissibility in a way that is contrary to that definition.  But that is exactly what DHS has attempted to do in its new Rule.

7.      Second, the Public Charge Rule is arbitrary and capricious.  In promulgating the Public Charge Rule, DHS failed to provide a reasonable explanation for departing from the government's longstanding understanding of the meaning of the term "public charge."  DHS also ignored or failed to adequately consider important aspects of the problem before it—including the full range of costs imposed by the Rule on noncitizens, their families, and the communities in

which they live; the racially disparate impact of the Rule; and the fact that the test the Rule would impose is so vague as to invite arbitrary and discriminatory enforcement.  Additionally, the Rule reflects no effort by DHS to consult the agencies that have actual expertise in administering public benefits, as DOJ did when it promulgated its proposed rule and guidance in 1999.  Because DHS has no expertise in the administration of public benefits, its failure to seek out and meaningfully take into account the views of expert agencies is arbitrary and capricious.  Finally, the proposed threshold for deeming a noncitizen "likely at any time to become a public charge" is so de minimis and difficult to apply that it is irrational.

8.      Third, DHS's new Public Charge Rule is unconstitutionally vague. The Rule's confusing medley of purportedly relevant factors and its unclear weighting scheme is especially problematic for those whose income and assets do not place them at one extreme or another of the nation's socioeconomic distribution.  Combined with the nearly de minimis definition of "likely at any time to become a public charge," the vagueness of the Rule invites arbitrary and discriminatory enforcement by USCIS.  And it fails to give most noncitizens fair notice as to how to accord their conduct to avoid serious adverse immigration consequences.

9.      Finally, the Public Charge Rule disproportionately would deny LPR status to non-European immigrants.  This is no coincidence.  President Trump's and his advisers' track record of explicitly and consistently denigrating immigrants from Latin American, African, and Asian countries whose populations are majority nonwhite demonstrates that the Rule was motivated by discriminatory animus toward the race, ethnicity, and national origin of immigrants from non-European countries.  The Rule therefore denies equal protection of the law to noncitizens who originate from non-European countries.

10.     Accordingly, Plaintiffs seek a declaration that the Public Charge Rule violates the

Administrative Procedure Act, the Fifth Amendment's Due Process Clause, and the equal-protection component of the Fifth Amendment and an order setting it aside.  Absent relief, Plaintiffs Aguiluz and Camacho and thousands of other noncitizens like them, including Plaintiff CASA de Maryland's members, will be unlawfully and discriminatorily denied a pathway to remain in the United States and build a future here.

## II.      JURISDICTION AND VENUE

11.      Jurisdiction is proper under 28 U.S.C. § 1331.

12.      This action arises under the Fifth Amendment to the United States Constitution; the Immigration and Naturalization Act, 8 U.S.C. §§ 1101 *et seq.*, and its implementing regulations; and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

13.      Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States and Plaintiffs reside in Maryland.

## III.      THE PARTIES

14.      Plaintiff CASA de Maryland, Inc. is a nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania. Founded in 1985, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 100,000 members.  CASA's mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities.  In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, and Pennsylvania.

15.      CASA is committed to helping its members remain lawfully in the United States, which is their home.  CASA provides its members assistance in applying for a variety of

immigration benefits before USCIS.  In response to the anticipated issuance of the Public Charge

Rule, CASA has devoted significant resources to educating its members about the Rule and its

expected impacts on immigrant families.

16.     Many of CASA's members, like Plaintiffs Aguiluz and Camacho, reside in the

United States with deferred action or lawful immigration status that either is temporary or could

one day be stripped from them.  As recent arrivals to the United States, many of CASA's

members also work in relatively low-wage occupations, such as childcare, home health care, and

building maintenance, and live in mixed-status households, with U.S.-citizen children and other

citizen or LPR family members.  Since earlier iterations of the Public Charge Rule were first

reported in the media, some of CASA's members have disenrolled themselves and their children

from public benefits to which they are lawfully entitled because of fear and confusion about what

public benefits may affect their ability to stay in the United States and become LPRs and, one

day, U.S. citizens.

17.     Plaintiff Angel Aguiluz is a 22-year-old resident of Silver Spring, Maryland.  In

June 2005, at the age of eight, Angel was brought to the United States from Honduras by his

parents, who were seeking medical treatment for his older brother.  Angel applied for and

received protection from removal in 2013 under the Deferred Action for Childhood Arrivals

(DACA) program, and has since maintained his DACA status.  In June 2016, Angel obtained

advance parole from USCIS before leaving the United States to visit his ailing grandmother in

Honduras.  *See* 8 C.F.R. § 212.5(f).  Having obtained advance parole, Angel was able to re-enter

the United States lawfully after his visit to Honduras.  Angel therefore is not barred from

adjusting status, and he intends to do so in the future.  *See* 8 U.S.C. § 1255(a) (requiring that

applicants for adjustment of status have been "inspected and admitted or paroled into the United

States").  Angel is a student at Montgomery College, where he has almost completed an associate's degree in mathematics, and he hopes to pursue a bachelor's degree in physics in the next academic year.  In addition to pursuing his studies, Angel works at a restaurant and as an interpreter to support not only himself, but also his father, who lives in Honduras; and his mother, with whom he lives in Silver Spring.  Angel is concerned that the Public Charge Rule will prevent him from adjusting status.

18.     Plaintiff Monica Camacho Perez is a 25-year-old resident of Baltimore, Maryland. In April 2002, at the age of seven, Monica was brought from Mexico to the United States by her mother, where the two reunited with Monica's father and older siblings.  Monica applied for DACA in 2012, received the protection the following year, and has since maintained her DACA status.  Before traveling to Mexico in November 2016, Monica obtained advance parole, allowing her to re-enter the United States lawfully.  Because of her subsequent re-entry, Monica's unlawful entry in 2002 no longer bars her from adjusting status, and she intends to do so.  Monica works as an English for Speakers of Other Languages (ESOL) instructor in the Baltimore City Public Schools, while she also pursues an associate's degree at Baltimore City Community College.  After completing her associate's degree, she intends to pursue a bachelor's degree in education.  Monica is concerned that the Public Charge Rule will prevent her from adjusting status.

19.     Defendant Donald J. Trump is the President of the United States.  He is the head of the executive branch and oversees the cabinet agencies and heads, including DHS and the Secretary of Homeland Security.

20.     Defendant U.S. Department of Homeland Security is a cabinet agency of the United States Government headquartered in Washington, D.C., at 245 Murray Lane, S.W.

21.     Defendant Kevin K. McAleenan is sued in his official capacity as Acting Secretary of the U.S. Department of Homeland Security.  McAleenan is charged with, among other things, implementing the INA and is authorized to delegate certain powers and authority to DHS's subordinate agencies.

22.     Defendant U.S. Citizenship and Immigration Services is a subordinate agency of DHS headquartered in Washington, D.C., at 20 Massachusetts Avenue, N.W.

23.     Defendant Kenneth T. Cuccinelli II is sued in his official capacity as Acting Director of the U.S. Citizenship and Immigration Services.  Cuccinelli is charged with, among other things, adjudicating applications for adjustment of status, extensions of nonimmigrants visas, and changes from one nonimmigrant status to another.

## IV.     BACKGROUND

### A.     Inadmissibility on Public-Charge Grounds

24.     This case involves the process by which noncitizens who are present in the United States apply for LPR status, as well as the Trump Administration's efforts to restrict that process for noncitizens who—according to immigration officials—might use even a de minimis amount of public benefits at some point in the future.

25.     LPR status (also referred to as having a "green card") allows noncitizens to reside and work in the United States indefinitely.  Green cards are highly coveted immigration benefits because of the stability they provide to persons who obtain them, as well as to those persons' family members.  Moreover, because immigrants may be eligible to naturalize after five years as an LPR, obtaining a green card is a crucial juncture in the process by which foreign-born individuals obtain U.S. citizenship.  8 U.S.C. § 1427(a).

26.     Section 212 of the INA specifies certain categories of noncitizens who are

inadmissible to the United States.  *Id.* § 1182(a).  For example, the statute denies admission to noncitizens who have committed certain crimes, *id.* § 1182(a)(2), or who pose a national-security risk to the United States, *id.* § 1182(a)(3).  Admissibility is a prerequisite for noncitizens to obtain green cards.  *Id.* §§ 1182(a), 1255(a).

27.     Noncitizens who are deemed by immigration officials "likely at any time to become a public charge" are also inadmissible under § 212.  *Id.* § 1182(a)(4)(A).  Although the term "public charge" is not defined by statute, § 212 instructs consular officials[3] (who make admissibility determinations outside the United States) and USCIS (which makes admissibility determinations on U.S. soil) to consider, in rendering public-charge determinations: noncitizens' (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.  *Id.* § 1182(a)(4)(B)(i).  The statute also authorizes immigration officials to consider as part of the public-charge determination affidavits submitted by sponsors who pledge to provide financial support to the noncitizen if admitted.  *Id.* § 1182(a)(4)(B)(ii).

28.     Satisfaction of the admissibility requirements is also necessary for "adjustment of status"—a process by which some noncitizens present in the United States can apply for and obtain LPR status without returning to their respective countries of origin.  8 U.S.C. § 1255(a).  Thus, most noncitizens who reside in the United States but who have not yet secured LPR status cannot avoid undergoing a public-charge determination if they wish to obtain a green card.[4]

---

[3] This lawsuit addresses only DHS's new Rule regarding the public-charge ground of inadmissibility.  In January 2018, the U.S. Department of State amended the Foreign Affairs Manual's (FAM's) guidelines regarding public-charge determinations.  9 FAM § 302.8-2.  The FAM's public-charge rule is the subject of a different lawsuit before this Court.  *See* Complaint, *Mayor & City Council of Baltimore v. Trump*, No. 1:18-cv-3636-ELH (D. Md. Nov. 28, 2018).

[4] A few, limited categories of noncitizens, such as refugees and asylees, are statutorily exempted from the public-charge inadmissibility ground when adjusting status.  *See* Final Rule, 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R. § 212.23(a)).  These categories make up a minority of the total population seeking LPR status.

29.     The INA charges the Secretary of Homeland Security with administration and enforcement of the statute, including the public-charge provision.  *See id.* § 1103(a).  Pursuant to that authority, DHS issued the Public Charge Rule.  That Rule redefines the term "public charge" far beyond its ordinary meaning and imposes an exceptionally vague decisional framework for USCIS to determine whether applicants for adjustment of status are inadmissible on public-charge grounds.  Together, these changes are intended to fundamentally alter U.S. immigration policy and to disproportionately affect non-European immigrants.

### *Historical Development of the Public-Charge Provision*

30.     The history of the INA's public-charge provision demonstrates that only noncitizens who are likely to become *primarily dependent on the government for subsistence* are inadmissible on public-charge grounds.

31.     Congress first adopted the public-charge ground of inadmissibility in an 1882 immigration statute that prohibited entry to the United States of "any convict, lunatic, idiot, or any other person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214, 214.  Because the public-charge ground of inadmissibility in the 1882 immigration statute was included alongside the terms "convict," "lunatic," and "idiot"—three categories of people who, as those terms were understood at the time, generally required institutionalization, often at public expense—the term "public charge" should be understood in that context.  *See Gegiow v. Uhl*, 239 U.S. 3, 10 (1915) ("Presumably [the phrase 'public charge'] is to be read as generically similar to the others mentioned before and after.").  The 1882 statute was modeled on state passenger laws that similarly equated the term "public charge" with a complete inability to provide for oneself.  *See, e.g.*, Act of Mar. 20, 1850, ch. 105, § 1, 1850 Mass. Acts 338, 339 (authorizing shipmasters to pay a head tax in lieu

of a bond for any noncitizen who was not, in the opinion of state immigration officials, "a pauper, lunatic, or idiot, or maimed, aged, infirm or destitute, or incompetent to take care of himself or herself, without becoming a public charge as a pauper").

32.     The 1882 federal immigration statute also imposed on each noncitizen who entered the United States a 50-cent head tax for the purpose of creating of an "immigrant fund." Act of Aug. 3, 1882, ch. 376, § 1, 22 Stat. at 214.  Among other things, this fund financed "care of immigrants arriving in the United States," including "relief of such [immigrants] as are in distress."  *Id.*

33.     In a case that unsuccessfully challenged the constitutionality of this head tax, the Supreme Court described the immigrant fund as "highly beneficial to the poor and helpless immigrant" and "essential to the protection of the people in whose midst they [immigrants] are deposited" because of the fund's ability to "preserve them from starvation[] and its concomitant sufferings."  *Head Money Cases*, 112 U.S. 580, 590–91 (1884).  Congress therefore anticipated that some immigrants who would be admitted under the 1882 Act—and, thus, who would have been deemed unlikely to become public charges—nevertheless would require assistance from the government as they resettled in the United States.

34.     Between 1882 and the INA's enactment in 1952, the public-charge inadmissibility ground continued to appear in U.S. immigration statutes.  *See* Act of Mar. 8, 1891, ch. 551, § 1, 26 Stat. 1084, 1084 (denying admission to "[a]ll idiots, insane persons, paupers or persons likely to become a public charge"); Act of Feb. 20, 1907, ch. 1134, § 13, 34 Stat. 898, 902 (charging shipmasters with verifying under oath that each noncitizen passenger was not "an idiot, or imbecile, or a feeble-minded person, or insane person, or a pauper, or . . . likely to become a public charge"); Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 874, 875–76 (denying admission to

"[a]ll idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . paupers;

professional beggars; vagrants; persons not comprehended within any of the foregoing excluded

classes who are found to be and are certified by the examining surgeon as being mentally or

physically defective, such physical defect being of a nature which may affect the ability of such

alien to earn a living; [and] . . . persons likely to become a public charge").

35.     As originally enacted, the 1952 INA specified 28 classes of inadmissible

noncitizens.  These included several classes related to the present-day public-charge provision:

(1) noncitizens with "a physical defect, disease, or disability . . . of such a nature that it may

affect the ability of the [noncitizen] to earn a living"; (2) "paupers, professional beggars, or

vagrants"; and (3) noncitizens "who, in the opinion of the consular officer at the time of

application for a visa, or in the opinion of the Attorney General at the time of application for

admission, [are] likely at any time to become a public charge."  Immigration and Nationality Act,

Pub. L. No. 82-414, § 212(a)(7)–(8), (15), 66 Stat. 163, 182–83 (1952).

36.     Congress amended the INA in 1990 to drop the "physical defect, disease, or

disability" and "paupers, professional beggars, or vagrants" grounds of inadmissibility, but

retained the public-charge inadmissibility ground.  *See* Immigration Act of 1990, Pub. L. No.

101-649, § 601(a)(4), 104 Stat. 4978, 5072 (codified as amended at 8 U.S.C. § 1182).

37.     When the House of Representatives took up the Conference Report on the

Immigration Act of 1990, the ranking member of the House Committee on the Judiciary,

Representative Hamilton Fish IV, explained the elimination of the "paupers, professional

beggars, or vagrants" inadmissibility ground as replacing an "antiquated and unused exclusion[]"

with  "one generic standard which exclude[s] aliens who are 'likely to become a public charge.'"

136 Cong. Rec. 36,844 (1990).

38.     The term "public charge" therefore must be understood in light of the related terms that were subsumed within it in the Immigration Act of 1990, each of which applied implicitly or explicitly to noncitizens who have no means of providing for themselves.  *Cf. Gegiow*, 239 U.S. at 10; *see also* Immigration and Nationality Act, § 212(a)(7), 66 Stat. at 182; *Definition of Pauper*, Merriam-Webster's Online Dictionary, https://perma.cc/XH5X-QNZH ("[A] person destitute of means except such as are derived from charity."); *Definition of Vagrant*, Merriam-Webster's Online Dictionary, https://perma.cc/6KBC-ZGCU ("[O]ne who has no established residence and wanders idly from place to place *without lawful or visible means of support*." (emphasis added)).

39.     In 1996, Congress made changes to the public-charge inadmissibility ground but did not redefine the term "public charge."  The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) codified the factors that immigration officials already were using to make public-charge determinations.  *Compare* 8 U.S.C. § 1182(a)(4)(B)(i), *with Matter of A-*, 19 I. & N. Dec. 867, 869 (BIA 1998).  IIRIRA also authorized immigration officials to consider, in making public-charge determinations, an enforceable affidavit of support—a contractual commitment obligating the affiant to maintain a sponsored noncitizen at an annual income of 125 percent of the Federal Poverty Guidelines (FPG) and to repay federal, state, or local governments for any means-tested public benefits that the sponsored alien receives.  8 U.S.C. §§ 1182(a)(4)(B)(ii), 1183a(a).  Affidavits of support are required for family-based petitions for adjustment of status and employment-based petitions if the employer is related to the sponsored alien.  *Id.* § 1182(a)(4)(C), (D).

40.     During the legislative effort that culminated in IIRIRA, Congress considered and

rejected a bill that would have expanded the term "public charge" in the deportation context.[5]

This bill—which was similar to the Public Charge Rule that DHS has now adopted for the

admission context—would have rendered deportable any noncitizen who, within 7 years of entry,

had received benefits from any of the following programs for an aggregate period of more than

12 months: Supplemental Security Income (SSI), Aid to Families with Dependent Children

(AFDC, which has since been replaced with Temporary Assistance for Needy Families (TANF)),

food stamps (known today as the Supplemental Nutrition Assistance Program (SNAP)), state

cash assistance (often called "General Assistance"), and housing assistance.  H.R. Rep. 104-828,

at 137–40 (1996) (Conf. Rep.).

41.     In 2013, Congress rejected a bill that would have "expanded the definition of

'public charge' such that people who received non-cash benefits could not become" LPRs.

S. Rep. No. 113-40, at 63 (2013).  The fact that Congress considered expanding the definition of

"public charge" and declined to do so indicates that Congress's understanding of the term is

more limited than the definition DHS now puts forth.

### *Judicial and Administrative Interpretation of the Public-Charge Inadmissibility Ground*

42.     Administrative and judicial decisions have long demonstrated a consensus

understanding of the term "public charge": one who is primarily dependent on the government

for subsistence.  These interpretations—which emphasize noncitizens' ability and willingness to

---

[5] The INA authorizes the deportation of any noncitizen "who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry."  8 U.S.C. § 1227(a)(5).  The Public Charge Rule at issue in this case interprets only the public-charge ground of inadmissibility and not the related deportation ground.  84 Fed. Reg. at 41,295 ("This rule does not interpret or change DHS's implementation of the public charge ground of deportability.").

work—are directly at odds with DHS's Public Charge Rule.

43.     Early court cases construing the term "public charge" focused on noncitizens' ability and inclination to work.  *See Ex parte Sakaguchi*, 277 F. 913, 916 (9th Cir. 1922) (holding that "an able-bodied woman of the age of 25 years, with a fair education, with no mental or physical disability, with some knowledge of English, skilled as a seamstress and a manufacturer of artificial flowers, with a disposition to work and support herself, and having a well-to-do sister and brother-in-law, domiciled in this country, who stand ready to receive and assist her" was not likely to become a public charge); *Howe v. United States ex rel. Savitsky*, 247 F. 292, 293–94 (2d Cir. 1917) (holding that a "physically []fit" noncitizen could not be denied admission on public-charge grounds because "Congress meant the act to exclude persons who were likely to become occupants of almshouses"); *United States v. Petkos*, 214 F. 978, 979 (1st Cir. 1914) (holding that a noncitizen who suffered from psoriasis could not be excluded on public-charge grounds because there was no "lawful evidence[] that his disease necessarily affected his ability to earn a living"); *United States ex rel. Barlin v. Rodgers*, 191 F. 970, 973–77 (3d Cir. 1911) (holding that noncitizens were inadmissible on public-charge grounds due to physical limitations or agedness that, in the judgment of immigration officials, would have prevented them from earning a living); *Ex parte Mitchell*, 256 F. 229, 230–31 (N.D.N.Y. 1919) (holding that "a woman [who was] 42 years of age, in good health, a nurse on occasion, a preacher of the gospel, and . . . able to earn her own living and always ha[d] done so" could not be denied admission on public-charge grounds based on speculation that she might one day be sued or charged with a crime).

44.     Decisions by the Board of Immigration Appeals (BIA) and the Attorney General have interpreted the public-charge provision similarly.[6]

---

[6] The BIA is "an appellate body charged with the review of . . . administrative adjudications under the [INA]."  8 C.F.R. § 1003.1(d)(1).  BIA decisions and the Attorney General decisions

45.     In a 1962 decision, the BIA held that a 22-year-old native of Mexico was not

inadmissible on public-charge grounds, noting that the man was of "sound body," had no

"specialized training" but had 10 years of farming experience, spoke no English but planned to

work among people who spoke Spanish, had only $50 in assets, and had previously worked in

the United States as an agricultural worker and in a cannery. *Matter of Martinez-Lopez*, 10

I. & N. Dec. 409, 411 (BIA 1962).

46.     The Attorney General affirmed that decision, holding that:

> [T]he [INA] requires more than a showing of a possibility that the alien will
> require public support. Some specific circumstance, such as mental or physical
> disability, advanced age, or other fact reasonably tending to show that the burden
> of supporting the alien is likely to be cast on the public, must be present. *A
> healthy person in the prime of life cannot ordinarily be considered likely to
> become a public charge . . . .*

*Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (Att'y Gen. 1964) (emphasis added).

47.     Later BIA decisions reflect a similar interpretation of the statute. *See Matter of

A-*, 19 I. & N. Dec. 867, 870 (BIA 1988) (holding that a 33-year-old woman's "age and ability to

earn a living" rendered her unlikely to become a public charge despite her having temporarily

left the workforce to care for her children and struggled to find work thereafter); *Matter of

Vindman*, 16 I. & N. Dec. 131, 132 (BIA 1977) (finding inadmissible on public-charge grounds

66- and 54-year-old noncitizens who respectively had been accepting SSI and General

Assistance for three years and showed no prospect of future employment); *Matter of Perez*,

15 I. & N. Dec. 136, 137–38 (BIA 1974) (holding that although a noncitizen had received

---

that modify or overrule them are "binding on all officers and employees of DHS or immigration
judges in the administration of the immigration laws of the United States." *Id.* § 1003.1(g)(1);
*see also* U.S. Dep't of Homeland Sec., U.S. Customs & Immigration Enforcement, Adjudicator's
Field Manual ch. 14.4 (2014) ("Published BIA decisions designated as precedent by the Board
are binding on all USCIS officers and immigration judges unless modified or overruled by the
Attorney General or a Federal court.").

welfare benefits, she was not ineligible for a visa on public-charge grounds because she was "28 years old, in good health, and capable of finding employment"); *Matter of Harutunian*, 14 I. & N. Dec. 583, 584, 589–90 (BIA 1974) (holding that an elderly applicant for LPR status who had been granted "old age assistance" by the California State Department of Social Welfare was inadmissible on public-charge grounds because she was "incapable of earning a livelihood").

48.     After the enactment of the 1986 Immigration Reform and Control Act (IRCA), DOJ, which administered and enforced the INA prior to the creation of DHS, explained that immigrants covered by IRCA would not be excluded as likely to become public charges if they had "a history of employment in the United States evidencing self-support without receipt of public *cash* assistance."  Adjustment of Status for Certain Aliens, 52 Fed. Reg. 16,205, 16,211 (May 1, 1987) (emphasis added).  "Public cash assistance" was defined as "income or needs-based monetary assistance . . . designed to meet subsistence levels" and did not include "food stamps, public housing, or other non-cash benefits."  *Id.* at 16,209.

### 1999 Notice of Proposed Rulemaking and Field Guidance

49.     In 1999, DOJ issued a notice of proposed rulemaking and corresponding interim field guidance that adopted the longstanding definition of the term "public charge." Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (proposed May 26, 1999) (to be codified at 8 C.F.R. pts. 212 & 237) [hereinafter "1999 Proposed Rule"]; Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (Mar. 26, 1999) [hereinafter "Field Guidance"].[7]

50.     DOJ issued the 1999 Proposed Rule and Field Guidance in the wake of

---

[7] The *Federal Register* incorrectly states that the Field Guidance was published on March 26, 1999; it actually was published in conjunction with the Proposed Rule on May 26, 1999.  84 Fed. Reg. at 41,294–95 n.8.

Congress's enactment of IIRIRA and the Personal Responsibility and Work Opportunity

Reconciliation Act of 1996 (the "Welfare Reform Act"), Pub. L. No. 104-193, Title IV, 110 Stat.

2260 (codified as amended at 8 U.S.C. § 1601 *et seq.*).  With certain exceptions, the Welfare

Reform Act precludes non-LPRs and undocumented immigrants from receiving most types of

public benefits funded in whole or in part by the federal government and requires states that wish

to provide benefits to undocumented immigrants to do so through legislation enacted after the

Welfare Reform Act.  *See* 8 U.S.C. §§ 1611, 1621(a), (d), 1641(b).

51.     These changes to immigration and public-benefits law sparked fear among

noncitizens that accepting benefits for which they or their family members were eligible might

result in adverse immigration consequences.  Studies show that individuals who remained

eligible for public benefits after the Welfare Reform Act nonetheless withdrew from public-

benefit programs in large numbers in the years following the law's enactment because of fear of

adverse immigration consequences, even though neither that Act nor IIRIRA changed the

longstanding definition of "public charge."[8]  By clarifying the scope of the public-charge ground

of inadmissibility in the 1999 Proposed Rule and Field Guidance, DOJ intended to combat this

chilling effect on benefits enrollment.

52.     In issuing the Proposed Rule and Field Guidance, DOJ explained that its

discretion to interpret this statutory term was cabined by "the plain meaning of the word

'charge'" and "the historical context of public dependency when the public charge immigration

provisions were first adopted more than a century ago."  64 Fed. Reg. at 28,677.  DOJ therefore

relied on ordinary tools of statutory interpretation in issuing its guidance.

---

[8] *See* Jeanne Batalova et al., Migration Policy Inst., *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use* 14–15 (2018), https://perma.cc/99EL-Z3T8.

53.     As DOJ noted, the ordinary meaning of the word "charge," as used in the INA, is "a person or thing committed or entrusted to the care, custody, management, or support of another"—in this case, the government.  *Id.* (quoting *Webster's Third New International Dictionary* 337 (1986)).  An individual who receives only supplemental public assistance is not "committed" to the government's "care" or "custody," because, by definition, she receives much of her basic needs from non-governmental sources.  *See id.*

54.     Moreover, DOJ observed that nineteenth-century state and federal governments had not created "the array of limited-purpose public benefits" available today and instead institutionalized individuals who faced chronic poverty in asylums or "almshouses" that were meant to provide—however imperfectly—all that was necessary for human subsistence.  *Id.* Thus, when Congress first enacted the statutory public-charge inadmissibility ground, public assistance to the poor usually entailed complete provision of an indigent person's needs.

55.     Based on the plain meaning of the word "charge," the historical context in which Congress enacted the 1882 Act, and the long line of decisions by courts, the BIA, and the Attorney General, DOJ explained that the term "public charge" means a noncitizen who "is likely to become primarily dependent on the Government for subsistence."  *Id.* at 28,677, 28,681 (proposed 8 C.F.R. § 212.102); *see also* Field Guidance, 64 Fed. Reg. at 28,689.  DOJ further specified that "primarily dependent" means "complete or nearly complete dependence on the Government rather than the mere receipt of some lesser level of financial support."  1999 Proposed Rule, 64 Fed. Reg. at 28,677.[9]

56.     The 1999 Proposed Rule and Field Guidance also identified specific categories of

---

[9] The Final Rule mischaracterizes the "primarily dependent" standard as entailing reliance on the government for more than 50 percent of what one needs to subsist.  *See* 84 Fed. Reg. at 41,304 n.45.

public benefits that would be relevant to the public-charge determination: (1) "public cash assistance for income maintenance" in the form of (i) Temporary Assistance for Needy Families (TANF) benefits, (ii) Supplemental Security Income (SSI), or (iii) state and local cash assistance, often called "General Assistance"; and (2) "[i]nstitutionalization for long-term care at Government expense."  *Id.* at 28,681–82 (proposed 8 C.F.R. §§ 212.102, .103); *see also* Field Guidance, 64 Fed. Reg. at 28,689, 28,692.  These were the only types of benefits to be considered among the other factors required by statute in determining whether a noncitizen was likely to become a public charge.  *See* 1999 Proposed Rule, 64 Fed. Reg. at 28,682 (proposed 8 C.F.R. §§ 212.104, .105); Field Guidance, 64 Fed. Reg. at 28,689, 28,692–93.  Supplemental non-cash benefits like SNAP, housing assistance, and Medicaid (to the extent that it did not support long-term institutionalization) were excluded from the Proposed Rule and Field Guidance.

57.     As with its definition of the term "public charge," DOJ did not rely on its own expertise to identify the public benefits relevant to a public-charge determination.  Instead, it "sought the advice and relied on the expertise of the various Federal agencies that administer a wide variety of public benefits."  1999 Proposed Rule, 64 Fed. Reg. at 28,677.  The U.S. Department of Health and Human Services, which administers TANF and Medicaid, among other benefits programs, opined:

> The best available evidence of whether someone is primarily dependent on government assistance for subsistence is whether that individual is receiving *cash assistance for income maintenance purposes*[ ] (i.e., cash assistance under the Temporary Assistance to Dependent [*sic*] Families program (TANF)), the Supplemental Security Income (SSI), and state general assistance programs), or is institutionalized in a long-term care facility at government expense.

Letter from Kevin Thurm, Deputy Sec'y, Dep't of Health & Human Servs., to Doris Meissner, Comm'r, Immigration & Naturalization Serv. (Mar. 25, 1999), *reprinted in* 1999 Proposed Rule,

64 Fed. Reg. at 28,686.

58.     HHS reached that conclusion because (1) "nearly all individuals or families receiving cash assistance for purposes of income maintenance are also receiving other non-cash support benefits and services as well"; (2) "it is extremely unlikely that an individual or family could subsist on a combination of non-cash support benefits or services alone," which explains why "virtually all families receiving non-cash support benefits, *but not receiving cash assistance*, must rely on other income (usually earned income) in order to meet their subsistence needs"; and (3) "non-cash services often have a primary objective of supporting the overall community or public health," and they "generally have more generous eligibility rules so as to be available to individuals and families with incomes well above the poverty line." *Id.*

59.     The Social Security Administration (SSA) and U.S. Department of Agriculture (USDA), which respectively administer SSI and SNAP among other benefit programs, concurred with HHS's advice.  Letter from Susan M. Daniels, Deputy Comm'r, Disability & Income Sec. Programs, to Dr. Robert L. Bach, Exec. Assoc. Comm'r, Office of Policy & Planning, Immigration & Naturalization Serv. (May 14, 1999), *reprinted in* 1999 Proposed Rule, 64 Fed. Reg. at 28,687–88; Letter from Shirley R. Watkins, Under Sec'y, Food, Nutrition, & Consumer Servs., to Doris Meissner, Comm'r, Immigration & Naturalization Serv. (Apr. 15, 1999), *reprinted in* 1999 Proposed Rule, 64 Fed. Reg. at 28,688.

60.     DOJ never promulgated a final version of the 1999 Proposed Rule, but the Field Guidance has governed DOJ—and, subsequently, DHS—in enforcing the INA's public-charge provision for the past 20 years.

### The *"Primarily Dependent"* Standard Allowed for Predictable and Consistent Public-Charge Determinations.

61.     The "primarily dependent" standard, as developed for over a century and

formalized by DOJ's Field Guidance, provides a clear and administrable framework for immigration officials and fair notice for affected noncitizens about how to accord their conduct to avoid adverse immigration-related consequences.  For the same reason, the standard leaves little room for arbitrary public-charge determinations by immigration officials.

62.    For example, by identifying nursing homes and mental health institutions as examples of long-term care facilities, the DOJ Field Guidance directed focus by immigration officials on readily identifiable serious physical or mental conditions that were likely to require long-term institutionalized care at government expense.[10]

63.    Similarly, an individual deemed likely to receive SSI would possess an identifiable attribute that would make him or her a candidate for such aid.  SSI is available only to individuals who both (1) have very little income and (2) are 65 or older, blind, or "unable to engage in any substantial gainful activity" due to disability.  42 U.S.C. §§ 1382(a), 1382c(a).  Thus, an individual who is likely to be eligible for SSI in the future must, in addition to having very little income, either be advanced in age—and thus unlikely to continue to work—or must suffer from impaired sight or a disability that renders the individual unable to work.

64.    Although no comparable objective attributes govern eligibility for TANF, in HHS's letter issued in advance of the 1999 Proposed Rule, the agency noted that 82 percent of families that received TANF benefits at that time had no earned income.  Letter from Kevin Thurm to Doris Meissner, *supra*.  Nationally, in 2017, 87 percent of families that received TANF benefits earned no income, as did 92 percent of Maryland families who received such benefits.

---

[10] *See* 1999 Proposed Rule, 64 Fed. Reg. at 28,678 (stating that "a short period of institutionalization necessary for rehabilitation purposes does not demonstrate that an individual is, or is likely to become, primarily dependent on the Government for public charge purposes," and identifying nursing homes and mental health institutions as examples of long-term-care facilities).

Office of Family Assistance, U.S. Dep't of Health & Human Servs., *Characteristics and Financial Circumstances of TANF Recipients, Fiscal Year 2017*, tbl. 40 (2018), https://perma.cc/P7J6-9FNC. An individual who is likely to receive TANF benefits therefore presumably would have a history of sustained unemployment.[11]

65.     In sum, the "primarily dependent" standard prevented immigration officials from making uncertain predictions about how noncitizens might interact with a broad array of federal, state, and local social-service systems at some point in the indeterminate future. Instead, the standard charged immigration officials with making an objective assessment about whether noncitizens displayed readily observable attributes that would make them completely or almost completely reliant on government support to meet their basic needs. In contrast, the new Public Charge Rule is so vague that it invites uncertain and arbitrary application and enforcement.

**B.     DHS's Public Charge Rule**

*The Mechanics of the Public Charge Rule*

66.     Departing from the Field Guidance's "primarily dependent" standard—and the longstanding common meaning of the term "public charge"—the Final Rule classifies as inadmissible any noncitizen who is "more likely than not at any time in the future" to "receive[] one or more" of an enumerated list of public benefits "for more than 12 months in the aggregate within any 36-month period," with multiple benefits received within a single month counting as multiple months of benefits. 84 Fed. Reg. at 41,401 (to be codified at 8 C.F.R. § 212.21(a)–(c)).

---

[11] Because TANF and subnational General Assistance programs serve similar purposes, recipients of such aid likely exhibit similar characteristics. *See* Randal S. Jeffrey, *Facilitating Welfare Rights Class Action Litigation: Putting Damages and Attorney's Fees to Work*, 69 Brook. L. Rev. 281, 288 (2003) ("In addition to TANF-funded programs, many state and local governments run general assistance programs. These programs serve households with little or no income or resources that are ineligible for TANF-funded benefits, primarily because the households lack children.").

67.     Under the Rule, DHS would consider noncitizens' likelihood of receiving the following benefits: (1) federal, state, or local cash assistance, including TANF, SSI, or General Assistance; (2) SNAP benefits; (3) federal housing assistance, including (i) voucher and project-based assistance under Section 8 of the Housing Act of 1937 and (ii) public housing under the Housing Act of 1937; and (4) Medicaid.[12]  *Id.* (to be codified at 8 C.F.R. § 212.21(b)).

68.     The non-cash benefits that the Final Rule would newly consider in a public-charge determination are, by design, temporary supports for low-wage working families.  Indeed, 93 percent of immigrants in one study who had used any of the covered benefits were also employed a majority of the time or had an employed spouse.[13]  Moreover, about half of U.S. citizens are expected to use one of the enumerated programs at some point in their lifetimes— and therefore could be considered "public charges" under DHS's definition.[14]

69.     The combination of the broad expansion of covered benefits and the de minimis threshold for benefits-receipt would result in an unwarranted expansion of the public-charge inadmissibility ground.  For example, under the Final Rule, if an immigration official were to

---

[12] Under the Rule, DHS would not deem a noncitizen inadmissible based on her likelihood of receiving Medicaid benefits before she reaches 21 years of age, during a pregnancy, or within 60 days after the end of a pregnancy.  *Id.* (to be codified at 8 C.F.R. § 212.21(b)(5)(iv)). Additionally, the Rule clarifies that emergency medical services covered by Medicaid, services or benefits provided under the Individuals with Disabilities Education Act (IDEA) but funded through Medicaid, and other school-based services funded through Medicaid do not count as Medicaid benefits for purposes of public-charge determinations.  *Id.* (to be codified at 8 C.F.R. § 212.21(b)(5)(i)–(iii)).  However, the Final Rule would consider pregnant women's and children's use of any other enumerated benefit, including SNAP benefits.

[13] Arloc Sherman et al., Ctr. on Budget & Policy Priorities, *Immigrants Contribute Greatly to U.S. Economy, Despite Administration's "Public Charge" Rule Rationale* (Aug. 15, 2019), https://perma.cc/2LQN-HCZB.

[14] Danilo Trisi, Ctr. on Budget & Policy Priorities, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means the Chance to Come to or Stay in the U.S.* (May 30, 2019), https://perma.cc/4J72-GF6P ("Approximately 43 to 52 percent of U.S.-born individuals present in the PSID survey in 2017 participated in either SNAP, Medicaid, TANF, SSI, or housing assistance over the 1997-2017 period.").

deem a noncitizen likely to receive SNAP, Medicaid, and federal housing benefits for just over

four months—at any point in that person's life and regardless of the amount received—that

person could be denied a green card as "likely to become a public charge." To illustrate further,

the average monthly SNAP benefit per person in 2018 was $126.96,[15] meaning that a noncitizen

could be denied a green card if a USCIS officer were to deem her likely to receive little more

than $1,500 in SNAP benefits within a 36-month period.

70. This framework defies common sense. The new public-charge definition would

render noncitizens inadmissible based on their perceived likelihood of receiving from the

government a mere fraction of what they need to subsist. Moreover, there is simply no way for a

USCIS officer to predict with any precision whether a noncitizen is likely at some point in the

future to accept such minimal levels of benefits.

71. To assess whether noncitizens are likely to "become a public charge," the Public

Charge Rule instructs USCIS officers to evaluate individuals using a totality-of-the-

circumstances test that assesses several "minimum factors," without precluding officers from

considering other evidence they deem relevant to the inquiry.[16] 84 Fed Reg. at 41,502 (to be

codified at 8 C.F.R. § 212.22(a), (b)). Factors that weigh in favor of a determination that a

noncitizen will *not* become a public charge are labeled "positive factors," while those that weigh

in the opposite direction are called "negative factors."

72. The Rule also provides instructions on what USCIS should consider in evaluating

---

[15] U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program Participation and Costs* (Aug. 2, 2019), https://perma.cc/BA8N-4GZ3.

[16] The 1999 Field Guidance also instructed immigration officials to conduct public-charge determinations using a totality-of-the-circumstances test, 64 Fed. Reg. at 28,690, as did preexisting BIA precedent, *Perez*, 15 I. & N. Dec. at 137. But the new totality-of-the-circumstances test departs to a far greater extent from the statutorily prescribed factors and imposes a confusing, yet rigid, weighting scheme on the various listed factors.

each factor and mandates that certain factors be weighted "heavily" in the totality-of-the-circumstances test. *Id.* (to be codified at 8 C.F.R. § 212.22(b), (c)); *see also* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,211–15, tbl. 33 (proposed Oct. 10, 2018) (to be codified at 8 C.F.R. pts. 103, 212–14, 245, 248) [hereinafter "2018 Proposed Rule"]. This framework is summarized in table form below:

| | Heavy Negative | Negative | Positive | Heavy Positive |
|---|---|---|---|---|
| Age | | Younger than 18 or older than 61. | Between the ages of 18 and 61. | |
| Health | Diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the noncitizen's ability to provide for herself, <u>and</u> the noncitizen does not have health insurance or resources sufficient to cover reasonably foreseeable medical costs related to that condition. | Diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the noncitizen's ability to provide for herself. | Absence of any such serious medical conditions. | |
| Family Status | | Large household size.[17] | Small household size. | |

---

[17] For purposes of the Public Charge Rule, the size of a noncitizen's "household" requires a complicated determination. For a noncitizen who is 21 or older, her household includes: (1) herself; (2) her children who reside with her; (3) any other individuals for whom she provides or is required to provide at least 50 percent of their financial support or whom she lists as a dependent on federal income tax returns; and (4) any individual who provides the noncitizen with at least 50 percent of her financial support or who lists her as a dependent on federal tax returns. 84 Fed. Reg. at 41,501–02 (to be codified at 8 C.F.R. § 212.21(d)(1)). The household of a noncitizen who is younger than 21 includes: (1) the noncitizen; (2) her children who reside with her; (3) her children who reside elsewhere and for whom she is required to provide at least 50 percent of their financial support; (4) her parents, legal guardians, or any other individual who provides her with at least 50 percent of her financial support; (5) the children of the noncitizen's

| Financial Status | | Annual gross household income below 125 percent FPG for the noncitizen's household size <u>and</u> insufficient assets to cover any shortfall.[18] | Annual gross income between 125 and 250 percent FPG for the noncitizen's household size.<br><br><u>or</u><br><br>Sufficient household assets and resources to cover any shortfall in annual gross household income below 125 percent FPG for the noncitizen's household size.[19] | Annual gross household income, assets, or resources above 250 percent FPG for the noncitizen's household size. |
|---|---|---|---|---|

parents or legal guardians who reside with the noncitizen or for whom her parents or legal guardians provide or are required to provide at least 50 percent of their financial support; and (6) any other individuals for whom the noncitizen's parents or legal guardians provide or are required to provide at least 50 percent of their financial support or whom they list as dependents on federal tax returns. *Id.* at 41,502 (to be codified at 8 C.F.R. § 212.21(d)(2)).

[18] The Rule is internally contradictory about whether USCIS will treat income below 125 percent FPG with insufficient assets to cover the shortfall as a *heavily weighted* negative factor or simply as a negative factor. Although such financial circumstances are not specified as a heavily weighted negative factor in the regulatory text, *see* 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R. § 212.22(c)(1)), the preamble to the Final Rule states that, "if the alien has income below [125 percent FPG], it will generally be a heavily weighed negative factor in the totality of the circumstances," 84 Fed. Reg. at 41,323.

[19] DHS sets forth a complex framework for assessing the sufficiency of a noncitizen's assets. An orphan who will be adopted after she acquires a green card must demonstrate assets in excess of the difference between 125 percent FPG and the noncitizen's household income. 84 Fed. Reg. at 41,503 (to be codified at 8 C.F.R. § 212.22(b)(4)(i)(B)(1)). A spouse or child of a U.S. citizen must demonstrate assets in excess of three times the difference between 125 percent FPG and the noncitizen's household income. *Id.* (to be codified at 8 C.F.R. § 212.22(b)(4)(i)(B)(2)). All other noncitizens must demonstrate assets in excess of five times the difference between 125 percent FPG and the noncitizen's household income. *Id.* (to be codified at 8 C.F.R. § 212.22(b)(4)(i)(B)(3)).

| | Has received, or has been certified or approved to receive, one or more of the enumerated benefits for more than 12 months in the 36 months prior to submitting an application for LPR status.[20] | Applied for, been certified to receive, or received any of the enumerated benefits. | Has not applied for, been certified to receive, or received any of the enumerated benefits.<br><br>or<br><br>Has withdrawn application for or disenrolled from an enumerated benefit.<br><br>or<br><br>Is not or would not be eligible for an enumerated benefit.[21] | |

---

[20] DHS will consider as a negative factor, but *not* a heavily weighted negative factor, the receipt of any amount of cash assistance for income maintenance, such as SSI, TANF, and state General Assistance programs, and programs supporting long-term institutionalized care, if received or certified for receipt before October 15, 2019.  84 Fed. Reg. at 41,504 (to be codified at 212.22(d)).  DHS will not consider as a negative factor any other public benefits received or certified for receipt before October 15, 2019.  *Id.*

[21] The burden is on the applicant to produce "evidence from a Federal, State, local, or tribal agency administering a public benefit" that she "does not qualify or would not qualify for such public benefit by virtue of, for instance, the alien's annual gross household income or prospective immigration status or length of stay."  Final Rule, 84 Fed. Reg. at 41,503 (to be codified at 8 C.F.R. § 212.22(b)(4)(ii)(E)(3)).  This showing likely would be nearly impossible for applicants for LPR status, as obtaining LPR status would make them eligible for many benefits and their income-eligibility for benefits may change over their lifetimes—as it does for many U.S. citizens.

| | | Applied for, been certified to receive, or received a fee waiver for an immigration benefit (e.g., a visa) for which a public-charge determination is required after the Rule's effective date. | Has not applied for, been certified to receive, or received a fee waiver for a visa or other immigration benefit for which a public-charge determination is required since the Rule's effective date. | |
| | | Bad credit history/score or other evidence of financial liabilities. | Good credit history/score. | |
| | | No non-Medicaid health insurance or household assets or resources sufficient to cover any reasonably foreseeable medical costs. | Health insurance (other than Medicaid but including ACA-subsidized insurance) or sufficient household assets or resources to cover any reasonably foreseeable medical costs. | Private health insurance that is not subsidized under the ACA. |
| **Education & Skills** | Authorized to work and not in school, but not currently employed and no reasonable prospect of future employment. | | History of employment/ school. | |

| | | | | |
|---|---|---|---|---|
| | | | Unemployed and primary caregiver for a child or elderly, ill, or disabled person in the noncitizen's household. | |
| | | No high school degree or equivalent. | High school or equivalent and/or higher education degree. Occupational skills, certifications, or licenses. | |
| | | Not proficient in English. | Proficient in English. Proficient in other languages *in addition to* English. | |
| **Affidavit of Support** | When affidavit is required pursuant to 8 U.S.C. § 1182(a)(4)(C), (D), a noncitizen is inadmissible if the sponsor lacks assets/resources greater than 125 percent FPG for the sponsor's household size. | Unlikely that the sponsor would provide financial support to the applicant based on the sponsor's income, relationship to the applicant, and/or submission of affidavits of support for other noncitizens. | Sponsor is likely to support the applicant based on the sponsor's income, relationship to the applicant, and/or nonsubmission of affidavits of support for other noncitizens. | |
| **Other** | Previously found inadmissible or deportable on public-charge grounds. | | | |

73.     How exactly a USCIS officer is supposed to weigh the myriad, arbitrary factors outlined above, or any nonenumerated factors deemed relevant, against one another—and come to a determination about whether a person is likely to need some public benefits for a brief period of time at some point in the future—is inscrutable.  As DHS explains,

> [T]he weight given to an individual factor not designated a heavily weighted factor depends on the particular facts and circumstances of each case and the relationship of the individual factor to other factors in the analysis. Multiple factors operating together will carry more weight to the extent those factors in tandem show that the alien is more or less likely to become a public charge.

Final Rule, 84 Fed. Reg. at 41,397. A noncitizen's possession of more negative than positive factors does not necessarily dictate an unfavorable public-charge determination, but positive factors also are not guarantors of a favorable outcome for a noncitizen. *Id.* at 41,399–401. Operating under such imprecise guidance, immigration officials are likely to vary widely in how they implement the new standard for public-charge determinations.

74.     Moreover, illustrating how arbitrary the weighting system is, the "heavily weighted" negative factor of current or past receipt of the enumerated benefits would be inapplicable to most noncitizens. Federal law—with limited and narrow exceptions—bars most noncitizens who lack LPR status (i.e., noncitizens who are subject to public-charge determinations) from receiving most of the public benefits that DHS's Public Charge Rule considers. *See* 8 U.S.C. §§ 1611, 1621(a), (d), 1641(b); Final Rule, 84 Fed. Reg. at 41,313 ("Aliens who are unlawfully present and nonimmigrants physically present in the United States . . . are generally barred from receiving federal public benefits other than emergency assistance."). Those categories of noncitizens who are eligible for the public benefits at issue in the Rule—e.g., refugees and asylees—are exempt from public-charge determinations. *See, e.g.*, *id.* § 1157(c)(3) (exempting refugees from the public-charge provision for admission purposes); *id.* § 1159(c) (exempting asylees and refugees who seek adjustment of status from the public-charge provision; *id.* §§ 1612(a)(2)(A), (b)(2)(A), 1613(b)(1), 1622(b)(1) 1641(b)(2), (3) (exceptions making public benefits available to refugees and asylees). Given the inapplicability of this heavily weighted factor in most cases, its inclusion can serve only to confuse both

noncitizens and the USCIS officers tasked with making public-charge determinations.

75.     The Rule therefore requires immigration officials to assess noncitizens'

likelihood of receiving public benefits at some point in the indeterminate future based on a

jumble of circumstances that, according to DHS, supposedly distinguish people who are likely to

accept public benefits during their lifetimes from those who are not.

### DHS's Definition of the Term "Public Charge" is Rooted in the Agency's Unsubstantiated "Beliefs" and Does Not Accord with the Term's Meaning.

76.     The Public Charge Rule fails to explain adequately why the "primarily

dependent" standard that has governed public-charge determinations for over a century does not

accurately reflect the plain meaning of the term.  Instead, the agency asserts a number of

unsubstantiated "beliefs" about noncitizens' self-sufficiency as the basis for the new standard.

77.     First, the Public Charge Rule rejects the 1999 Proposed Rule's textual analysis of

the word "charge" because "DHS does not believe that these definitions suggest or require a

primary dependence on the Government in order for someone to be a public charge."  2018

Proposed Rule, 83 Fed. Reg. at 51,158.[22]  Without elaborating on what informs that newfound

"belief" on the government's part, the Rule puts forward its own battery of dictionary definitions,

all of which are entirely consistent with the 1999 Proposed Rule's analysis of the question.  *Id.*

78.     Second, although the Public Charge Rule acknowledges the historical context that

informed DOJ's analysis in 1999, DHS concludes without explanation that it is "immaterial" that

the term "public charge" first appeared in federal immigration statutes during a time when

federal, state, and local governments did not provide limited-purpose public benefits.  Final Rule,

84 Fed. Reg. at 41,350.  Even though the nature of public benefits at the genesis of the public-

---

[22] The Final Rule states that "[t]he rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid, except as described in [the Final Rule's] regulatory preamble."  84 Fed. Reg. at 41,304.

charge provision supports the "primarily dependent" standard, DHS, for unexplained reasons, does not believe that this historical evidence "forecloses" its definition. *Id.* at 41,350 n.310.

79.    Third, the new standard adopted by DHS for public-charge determinations is rooted in the agency's view that even a noncitizen's temporary, isolated receipt of a small amount of benefits renders her not self-sufficient.  DHS rejects the "primarily dependent" standard in favor of its de minimis threshold for even non-cash benefits because "it is possible and likely probable that many individuals" who receive public benefits in amounts far less than would be required to make them "primarily dependent on the government" under the 1999 standard would "lack self-sufficiency." Final Rule, 84 Fed. Reg. at 41,349.  DHS does not attempt to justify its basis for imposing such a draconian understanding of "self-sufficiency," nor does it explain why this notion of self-sufficiency should be the proper threshold for deeming someone a "public charge."

80.    Tellingly, unlike the 1999 Proposed Rule, DHS's Public Charge Rule reflects no input from benefit-granting agencies.  In its 2018 Proposed Rule, DHS indicated that it had "consulted with the relevant Federal agencies regarding the inclusion and consideration of certain . . . public benefits." 83 Fed. Reg. at 51,218.  But DHS never disclosed the nature of the feedback that it received, and it instead relied primarily on its own beliefs and speculation to justify the new policy.  Moreover, neither the 2018 Proposed Rule nor the Final Rule includes letters of support from these expert agencies, as the 1999 Proposed Rule did, suggesting that those agencies do not support the Final Rule or its understanding of these key concepts.

81.    Fourth, DHS rejects the "primarily dependent" standard as "insufficiently protective of the public budget," 2018 Proposed Rule, 83 Fed. Reg. at 51,164, and estimates that the federal government will save $1.46 billion annually from people disenrolling from or

forgoing enrollment in public-benefit programs on account of the Public Charge Rule, Final

Rule, 84 Fed. Reg. at 41,487.[23]  But the downstream fiscal impacts of immigration policy have

nothing to do with the proper construction of the term "public charge."  Moreover, DHS's duty is

to enforce U.S. immigration law as written, not to reshape the law with an eye toward guarding

the public fisc.  *See* 8 U.S.C. § 1103(a).

82.     Finally, DHS fails to explain why such a dramatic shift in policy is justified.  The

Public Charge Rule does not, for example, document increased reliance on public benefits by

noncitizens or naturalized citizens.

### Contrary to 7 U.S.C. § 2017(b), the Rule Treats SNAP Benefits as Income.

83.     The SNAP statute prohibits "consider[ation]" of "[t]he value of [SNAP] benefits

that may be provided . . . [as] income or resources for any purpose under any Federal, State, or

local laws."  7 U.S.C. § 2017(b).

84.     The Public Charge Rule authorizes USCIS to consider noncitizens' past

application or certification for or receipt of SNAP benefits in determining whether their "assets,

resources, and financial status" weigh in favor or against exclusion of noncitizens on public-

charge grounds.  Final Rule, 84 Fed. Reg. at 41,502–03 (to be codified at 8 C.F.R.

§ 212.22(b)(4)(ii)(E)).  The Rule therefore impermissibly treats SNAP benefits as either

"income" or a "resource."

85.     In addition, the Rule renders noncitizens inadmissible based on the likelihood that

---

[23] This estimate is based on the percentage of the foreign-born noncitizen population that adjusts status each year.  2018 Proposed Rule, 83 Fed. Reg. at 51,266.  This is a poor proxy for disenrollment.  As explained above, few non-LPR noncitizens who are subject to a public-charge determination are eligible for the enumerated public benefits.  And, in reality, the Public Charge Rule is likely to lead to an even larger reduction in federal spending on public benefits due to disenrollment or nonenrollment by noncitizens' family members (including LPRs and U.S. citizens) because of the fear and confusion engendered by the Rule—a reality that DHS acknowledges but does not meaningfully attempt to quantify.

they might receive SNAP benefits in the future.  *Id.* at 41,501 (to be codified at 212.21(a), (b)(2),

(c)).  The Rule therefore requires immigration officials unlawfully to take into account the

possibility that noncitizens might one day receive SNAP benefits at a "value" other than zero.

86.     In these respects, the Public Charge Rule is contrary to 7 U.S.C. § 2017(b).

**D.     The Public Charge Rule is Exceptionally Vague.**

87.     DHS's Public Charge Rule requires USCIS officials to divine whether a person is

more likely than not to receive as little as one public benefit for more than 12 months out of any

36-month period for the rest of that person's life.[24]  In making that determination, officers must

look at a medley of personal circumstances, grant them differing weights, and then make a

prediction about the entire course of a person's life—all while being provided almost no

guidance as to how to conduct that analysis.

88.     Such a vague scheme inevitably would lead to arbitrary results, and it fails to

afford noncitizens notice as to how to accord their conduct to avoid a determination that they are

likely to become a public charge.

89.     Even DHS admits that public-charge determinations under the Rule will be

"inherently subjective," "will vary," and will "not [be] governed by clear data regarding whether

any given alien subject to [the] determination is more likely than not to receive public benefits"

for more than 12 months.  Final Rule, 84 Fed. Reg. at 41,315, 41,397.  DHS even disavows any

obligation to interpret the public-charge inadmissibility ground in a manner that provides fair

notice to noncitizens or prevents arbitrary enforcement.  Instead, DHS simply states that,

"fundamentally, as it relates to vagueness, [critics'] quarrel is with Congress, not with DHS."  *Id.*

---

[24] Alternatively, the official could be predicting whether a person would receive two benefits for six months, three benefits for four months, and the like.  As noted above, all are equivalent under the Rule's definition of "public charge."

at 41,321.

90.     DHS is correct that its new standard for public-charge determinations is "inherently subjective."  For several reasons, the Public Charge Rule's framework would lead to admissibility determinations that will not be consistent or predictable:

a.     Application of the Public Charge Rule depends on subjective and unpredictable guesswork by immigration officials because admissibility determinations under the Rule would not in most instances be based on noncitizens' current benefit usage.  As mentioned previously, the Welfare Reform Act bars most noncitizens without LPR status (i.e., the types of people who might be subject to a public-charge determination) from receiving most, if not all, of the enumerated public benefits.  *See* 8 U.S.C. §§ 1611, 1621(a), (d), 1641(b).  The Public Charge Rule therefore would require USCIS officials to project whether and how noncitizens would live their lives differently from how they currently do *if and when* they obtain LPR status or U.S. citizenship.  Immigration officials would vary widely in how they engage in this inherently speculative analysis.

b.     The Rule's extensive list of factors of different weights exacerbates the potential arbitrariness of the public-charge determination.  The Rule fails to provide a meaningful framework for how "negative" and "positive" factors may weigh against one another, as well as how many non-heavily-weighted factors a person must have (or how strong those factors must be) to outweigh a "heavily weighted" factor.  With so many disparate factors at play, immigration officials largely would be left to their own discretion anytime an applicant exhibits a mix of positive and negative factors.

c.     Several of the enumerated benefits programs have income-eligibility thresholds above the 125-percent-FPG income level that the Public Charge Rule considers a positive

factor.[25]  The Rule, however, offers no guidance on how USCIS should assess a

noncitizen's likelihood of becoming a public charge when her income qualifies as a

positive factor but she nonetheless would be financially eligible for some of the

enumerated benefits.

      d.      Setting the ultimate threshold for being deemed a "public charge" at a de minimis

level compounds the arbitrariness of the Rule.  Sudden changes in individual

circumstances have the potential to cause both citizens and noncitizens in the United

States to rely on public-benefit programs temporarily, and DHS's framework does not

cabin officials' discretion to hypothesize such scenarios.[26]  A noncitizen who earns an

income above 125 percent FPG at the time that he or she attempts to adjust status might

lose that job during subsequent economic downturns and struggle to find new work for a

period of time.  A serious illness that arises after a noncitizen becomes an LPR could

quickly deplete assets that were adequate for that noncitizen's needs when he or she was

---

[25] *See* 7 U.S.C. § 2014(c) (households with income up to 130 percent FPG may receive SNAP
benefits); Md. Code Ann., Health-Gen. § 15-103(a)(2); Md. Code Regs. 10.09.24.07(G)(4)(b)
(adults with incomes up to 138 percent FPG may receive benefits from Maryland's Medicaid
program, the Maryland Medical Assistance Program); *FY 2018 Income Limits Documentation
System: Statewide Income Limits for Maryland*, HUD User, https://perma.cc/PPZ2-T5GP (last
visited Mar. 3, 2019) (federal housing assistance is available to Marylanders with incomes equal
to up to 400 percent FPG).

[26] Indeed, 78 percent of workers in the United States—including nearly one in ten who make
$100,000 or more—live paycheck to paycheck.  Press Release, CareerBuilder, Living Paycheck
to Paycheck is a Way of Life for Majority of U.S. Workers, According to New Career Builder
Survey (Aug. 24, 2017), https://perma.cc/XGL4-FT6U (national survey of a representative
sample of more than 2,000 full-time employers and more than 3,000 full-time workers from
varied industries and company sizes); *see also* Judy T. Lin et al., FINRA Investor Educ. Found.,
*The State of U.S. Financial Capability* 6 (2019), https://perma.cc/72FQ-XNG5 (finding that 55
percent of Americans spend an amount equal to or more than their income); Prosperity Now,
*Vulnerability in the Face of Economic Uncertainty: Key Findings from the 2019 Prosperity Now
Scorecard* 1 (2019), https://perma.cc/AFG7-BEKK (finding that 40 percent of American
households are "liquid asset poor," meaning that they lack "enough savings to make ends meet at
the *poverty level* for three months if their income was interrupted").

in good health.[27]  The Rule lacks any guideposts for immigration officials in considering

how applicants' financial circumstances might oscillate over their lifetimes, instead

leaving individual officials to consult their own imaginations.

e.       The Public Charge Rule provides no guidance to assist immigration officials in

determining the likelihood that individuals who might be eligible for public benefits at

some point in the future will actually apply for and receive them.  In 2016, 15 percent of

individuals who were eligible for SNAP did not receive benefits under the program,[28] and

11.4 percent of Medicaid-eligible parents did not enroll.[29]  Sixty-eight percent of low-

income households spend more than half of their income on housing but receive no

federal housing assistance.[30]  In 2012, only 28 percent of people who were eligible for

TANF received benefits.[31]  DHS's failure to address the reasons for nonparticipation in

public-benefit programs makes it likely that some USCIS officials would overestimate

noncitizens' likelihood of receiving public benefits in the future.

f.       The rigidity of the factors and evidence officials may consider fails to allow for

---

[27] As structured, the Public Charge Rule would not preclude a USCIS official from concluding that an employed, able-bodied 40-year-old noncitizen is sufficiently likely to receive Medicaid in old age due to a future long-term medical issue—as many U.S. citizens do—and that she is therefore inadmissible as likely "at any time" to become a public charge.  *See Medicaid's Role in Nursing Home Care*, Henry J. Kaiser Family Found. (June 20, 2017), https://perma.cc/DJ5M-HYZP (noting that Medicaid covers 62 percent of all nursing home residents).

[28] U.S. Dep't of Agric., *Trends in Supplemental Nutrition Assistance Program Participation Rates: Fiscal Year 2010 to Fiscal Year 2016*, at 1 (July 2018), https://perma.cc/M56S-BGAP.

[29] Jennifer Haley et al., Urban Inst., *Uninsurance and Medicaid/CHIP Participation Among Children and Parents* 5 (Sept. 2018), https://perma.cc/E3CF-HXNF.

[30] Ctr. on Budget & Policy Priorities, *United States Fact Sheet: Federal Housing Assistance* (Aug. 17, 2017), https://perma.cc/F9TC-6FGF.

[31] Gene Falk, Cong. Research Serv., R44724, *Temporary Assistance for Needy Families (TANF): Size of the Population Eligible for and Receiving Cash Assistance* 6 (2017), *available at* https://perma.cc/ULY8-CUCK.

the more realistic, holistic assessment the public-charge statute actually requires.  For example, by requiring immigration officials to factor in only current income, the Rule fails to acknowledge that immigrant wages tend to grow over time and leaves immigration officials free to take an unrealistically pessimistic view of noncitizens' future earnings.  Research by the Cato Institute shows that, after controlling for gender, race, education level, industry and occupation, and other factors, immigrants who entered the United States between 1995 and 1999 had wages 13.5 percent lower than native-born workers in their first 5 years in the United States.  After 6 to 10 years, however, that gap had shrunk to 8.6 percent, and, after 21 to 23 years, it had fallen to 1.5 percent.[32]  A public-charge determination that uses a noncitizen's current income and assets to predict her future socioeconomic status would substantially overestimate the likelihood that a noncitizen will be eligible for, let alone apply for and receive, government benefits.

91.     Because no precise forecast of a noncitizen's future use of government-benefit programs is possible, different USCIS officials viewing similar fact patterns are apt to reach wildly divergent conclusions about whether noncitizens are likely to become public charges. Accordingly, USCIS's enforcement of the Rule necessarily would be arbitrary and unpredictable.

92.     For the same reason, noncitizens who will have to undergo a public-charge determination at some point in order to continue residing in the United States will struggle to self-assess their likelihood of being deemed inadmissible on public-charge grounds and to accord their conduct to avoid adverse immigration consequences.

93.     For example, to guard against being deemed a public charge, a noncitizen might:

   a.     choose a job based primarily on whether the employer offers health

---

[32] Andrew Forrester & Alex Nowraseth, Cato Inst., *Immigrant Wages Converge with Those of Native Born Americans* (2018), https://perma.cc/CHE4-CTV6.

insurance, regardless of whether the position is in a field of interest or has potential for income growth, Final Rule, 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R. § 212.22(c)(2)(iii));

   b.  delay having children to prevent USCIS from concluding that her expanded household size renders her more likely to become a public charge or makes her income and assets a negative factor, *id.* at 41,502–03 (to be codified at 8 C.F.R. § 212.22(b)(3), (4)(i)(B)); *see also id.* at 41,501–02 (to be codified at 8 C.F.R. § 212.21(d)) (defining "household" for purposes of the Rule);

   c.  refrain from providing financial assistance to parents, children, or other individuals who do not live with her to avoid USCIS treating her as having a larger household size, *see id.* at 41,502 (to be codified at 8 C.F.R. § 212.21(d)(1)(iv), (v)) (defining a noncitizen's household as including children and other individuals for whom the noncitizen provides or is required to provide 50 percent or more of their financial support);

   d.  decline financial assistance from parents or other individuals to avoid USCIS treating her as having a larger household size, *see id.* at 41,502 (to be codified at 8 C.F.R. § 212.21(d)(1)(vi), (2)(iv)) (defining a noncitizen's household as including individuals who provide or are required to provide the noncitizen with 50 percent or more of her financial support);

   e.  avoid taking on student loans or non-emergency medical debt that might be counted against her in assessing her financial status, *id.* at 41,503 (to be codified at 8 C.F.R. § 212.22(b)(4)(i)(D));

   f.  decide to expend some of her savings on classes to improve her English

proficiency, even though it is not required for her job or in her community, *id.* at 41,504

(to be codified at 8 C.F.R. § 212.22(b)(5)(ii)(D));

g.      refrain from requesting fee waivers when applying for immigration

benefits because they might later be counted against her in assessing her financial status,

even if her financial status later improves, *id.* at 41,503 (to be codified at 8 C.F.R.

§ 212.22(b)(4)(ii)(F)).

94.     The vague contours of the Public Charge Rule will therefore cause noncitizens to

make important life decision based not on what is best for them and their families, but based on

minimizing their exposure to an adverse public-charge determination.

95.     Noncitizens might also make the rational choice to live in the country unlawfully

rather than pursue LPR status because applying for adjustment of status under this vague scheme

will increase the risk of being found inadmissible on public-charge grounds, thereby exposing

the applicants to deportation.  *See* 8 U.S.C. § 1227(a)(1)(A).

96.     The wide discretion that the Rule gives USCIS to bar noncitizens from obtaining

LPR status is also likely to lead to the separation of many families when a family member is

deemed likely to become a public charge while other family members remain in the United

States.

**E.     Animus Toward Non-European Immigrants Motivated the Public Charge Rule.**

97.     DHS's promulgation of the Public Charge Rule was driven by animus toward

non-European immigrants.  This bias is apparent from the disparate impact that the policy will

have on non-European immigrants; from President Trump's long history of making statements

that reflect racial and ethnic animus toward non-European immigrants; and from DHS's

departure, without reasoned explanation, from both ordinary rulemaking procedures and the

government's own longstanding interpretation of the public-charge inadmissibility ground.

### *The Public-Charge Rule Will Have a Disparate Impact on Non-European Immigrants.*

98.     Research by the Migration Policy Institute (MPI), which was submitted to DHS during the notice and comment period, demonstrates that the Public Charge Rule will disproportionately prevent noncitizens who originate from Latin American, African, and Asian countries from obtaining LPR status.  *See* Randy Capps et al., Migration Policy Inst., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration* 9 (2018), *available at* https://perma.cc/GS7E-DUHW.

99.     MPI used American Community Survey data to model the population of noncitizens who obtained LPR status in recent years and to estimate the percentage of that population that exhibits one or more of the "negative factors" from the Public Charge Rule's totality-of-the-circumstances test.  *Id.* at 7.

100.     Overall, MPI estimates that 69 percent of recent LPRs had at least one or more negative factor, and 43 percent had two or more.  *Id.* at 8.

101.     But the presence of negative factors was not equally distributed among the recent LPR population.  According to MPI, 60 percent of recent LPRs from Mexico and Central America, 40 percent from Asia, and 34 percent from Africa had two or more negative factors. *Id.* at 9.  In contrast, only 27 percent of recent LPRs from Europe, Canada, and Oceania (i.e., Australia and New Zealand) had two or more negative factors.  *Id.*

102.     Focusing on the 250-percent-FPG income level that constitutes a "heavily weighed positive factor," MPI estimates that 55 percent of recent LPRs from Europe, Canada, and Oceania had incomes that high, while only 23 percent of recent LPRs from Mexico and Central America, 45 percent from Asia, and 33 percent from Africa did.  *Id.* tbl. B-3.

103.    At the other end of the income spectrum, 26 percent of recent LPRs from Europe, Canada, and Oceania had incomes below the 125-percent-FPG income level that constitutes a "negative factor."  *Id.*  In contrast, 41 percent of recent LPRs from Mexico and Central America, 30 percent from Asia, and 37 percent from Africa had incomes that low.  *Id.*

104.    Some of the other factors that DHS's Public Charge Rule includes as part of its totality-of-the-circumstances test also disproportionately would affect non-European immigrants. For example, research shows that credit scores are lower among blacks and Hispanics than among non-Hispanic whites and Asians.[33]  Similarly, 57 percent of immigrants from Mexico and 49 percent of immigrants from Central America have not obtained a high school degree, while only 11 percent of immigrants from Europe or Canada have not obtained one.[34]

105.    In January 2018, the U.S. Department of State amended the Foreign Affairs Manual's (FAM's) guidelines regarding public-charge determinations to impose a similarly restrictive test for individuals seeking visas from U.S. consulates abroad.  Since that time, immigrant visa denials based on the public-charge inadmissibility ground have skyrocketed.  The increases disproportionately have affected visa applicants from predominantly nonwhite countries: immigrant visa denials on public-charge grounds for Mexican nationals rose from 7 in fiscal year 2016 to 5,343 in the current fiscal year; for Haitian nationals, from 2 denials in 2016 to 1,109 denials in fiscal year 2018; and for Bangladeshi nationals, from no denials in 2016 to 1,502 denials in 2018.  By contrast, only 3 Canadian immigrant visa applicants were denied on

---

[33] Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit*, at O-25 (2008), https://perma.cc/2FPK-DF4S.

[34] Gustavo Lopez et al., *Key Findings About U.S. Immigrants*, Pew Research Ctr. (Nov. 30, 2018), https://perma.cc/PF5A-JX53.

public-charge grounds in fiscal year 2018.[35]

### *President Trump and his Advisers Repeatedly Have Made Disparaging Statements About Non-European Immigrants.*

106.     Throughout his campaign and presidency, President Trump repeatedly has made statements that reflect animus toward immigrants based on race, ethnicity, and national origin. These statements demonstrate that the disparate impact of the Public Charge Rule is the product of intentional discrimination.

107.     President Trump has made comments that embrace demeaning stereotypes about immigrants from developing countries.  In a June 2017 Oval Office meeting, President Trump complained that immigrants from Haiti "all have AIDS" and that people from Nigeria should not be allowed into the United States on a temporary basis because they would never "go back to their huts."[36]  A dramatically altered policy that excludes people from the United States based on their perceived likelihood of receiving government benefits is a means of operationalizing these stereotyped views of non-European immigrants.

108.     In January 2018, in rejecting a proposed immigration deal that would have allowed Temporary Protected Status (TPS) beneficiaries from El Salvador, Haiti, and African countries to remain in the United States, President Trump said, "Why are we having all these people from shithole countries come here?"  In the same meeting, the President stated that the United States should prioritize immigration from countries such as Norway, which has an overwhelmingly white population, and from certain Asian countries that he considers

---

[35] *See* Ted Hesson, *Visa Denials to Poor Mexicans Skyrocket Under Trump's State Department*, Politico (Aug. 6, 2019), https://perma.cc/96Y6-58AH.

[36] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times, Dec. 23, 2017, https://perma.cc/D5HN-WL2P.

economically beneficial to the United States.[37]  It is therefore unsurprising that the Public Charge

Rule will make it harder for noncitizens from Latin American, African, and Asian countries to

enter the United States and obtain LPR status as compared to noncitizens from European

countries.

109.    In recent remarks that echoed his derision for TPS beneficiaries, President Trump

criticized Reps. Alexandria Ocasio-Cortez (a woman of Puerto Rican heritage who was born in

the United States), Rashida Tlaib (a woman of Palestinian heritage who was born in the United

States), Ayanna Pressley (an African American woman who was born in the United States), and

Ilhan Omar (a woman who was born in Somalia but immigrated to the United States as a

teenager and became a naturalized U.S. citizen) of "telling the people of the United States . . .

how our country should be run" and questioned why the Congresswomen "don't . . . go back and

help fix the totally broken and crime infested places from which they came" and "[t]hen come

back and show us how . . . it is done."[38]  These remarks underscore the President's disdain for

non-European countries and his refusal to consider people living in the United States who have

ties to such countries to be part of the American polity.  Given those views, the Public Charge

Rule's effect of disproportionately preventing non-European immigrants from remaining in the

United States cannot be considered coincidental.

110.    Other statements made by President Trump as a candidate reinforce the

conclusion that his immigration policies—including the Public Charge Rule—are motivated and

---

[37] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post, Jan. 12, 2018, https://perma.cc/M8LF-HXTL; Cent. Intelligence Agency, *The World Factbook: Norway*, https://perma.cc/GD98-29CE (last updated Feb. 18, 2019) (stating that Norway's population is 83.3 percent ethnically Norwegian and 8.3 percent of another European ethnicity).

[38] Donald J. Trump (@realDonaldTrump), Twitter (July 14, 2019, 5:27 A.M.), https://perma.cc/9AB5-Z78H.

infected by racial and ethnic animus:

     a.      Announcing his presidential campaign on June 16, 2015, Candidate

Trump said: "When Mexico sends its people, they're not sending their best. . . . They're

sending people that have lots of problems, and they're bringing those problems with us

[sic].   They're bringing drugs.   They're bringing crime.   They're rapists. . . . They're

sending us not the right people.  It's coming from more than Mexico.  It's coming from

all over South and Latin America, and it's coming probably—probably—from the Middle

East."[39]

     b.      During the campaign, two men urinated on a homeless Latino man and

then beat him with a metal pole.  Following the arrest of two suspects, one of the alleged

assailants said, "Donald Trump was right; all these illegals need to be deported."  When

asked about the incident, Candidate Trump said, "I will say that people who are following

me are very passionate.  They love this country and they want this country to be great

again.  They are passionate."[40]

     c.      Prior to the election, U.S. District Judge Gonzalo Curiel was presiding

over a civil suit against the defunct Trump University.  Candidate Trump asserted that

Judge Curiel's "Mexican heritage" and membership in a Latino lawyers' association

presented "an absolute conflict" in light of Trump's campaign promise to "build[] a

wall."[41]

---

[39] Wash. Post Staff, *Full Text: Donald Trump Announces a Presidential Bid*, Wash. Post., June 16, 2015, https://perma.cc/F3BN-NZ89.

[40] Adrian Walker, *'Passionate' Trump Fans Behind Homeless Man's Beating?*, Bos. Globe, Aug. 21, 2018, https://perma.cc/39RB-8BPK.

[41] Brent Kendall, *Trump Says Judge's Mexican Heritage Presents 'Absolute Conflict'*, Wall St. J. Online, June 3, 2016, https://perma.cc/2KGY-JZU6.

111.    Members of President Trump's administration share his animus toward non-European immigrants.  For example, Senior Adviser to the President for Policy Stephen Miller reportedly told a former White House communications aide, "I would be happy if not a single refugee foot ever touched American soil."[42]  People from Europe, Canada, and Oceania make up a small fraction of the U.S. refugee and asylee population.  Of all individuals granted refugee or asylee status in the United States in 2017, only eight percent came from those regions.[43]  Miller's statement therefore reflects deep hostility toward immigrants from non-European countries.

112.    The President and his advisers have been actively involved in pressing for the Public Charge Rule.  In 2019, President Trump removed the leadership of immigration-related agencies, including USCIS, in part out of a belief that the prior leadership had not done enough to finalize the Rule.

113.    Miller in particular is an ardent backer of the Public Charge Rule and has criticized DHS officials for what he considers the agency's slow pace of finalizing the rule.[44] Miller reportedly had "been agitating for" the removal of L. Francis Cissna, the former head of USCIS, "for months" prior to Cissna's forced resignation because Cissna was "moving too slowly in implementing" the Public Charge Rule.[45]  According to one report, Miller berated the former Acting Director of U.S. Immigration and Customs Enforcement, Ronald Vitiello, saying, "You ought to be working on this regulation all day every day . . . . It should be the first thought

---

[42] Cliff Sims, *Team of Vipers: My 500 Extraordinary Days in the Trump White House* 191 (2019).

[43] *See* Dep't of Homeland Sec'y, *Refugees & Asylees 2017 Tables*, tbls. 14, 17, 19 (2019), https://perma.cc/54BZ-BCXV.

[44] Michael D. Shear & Emily Baumgaertner, *Trump Administration Aims to Sharply Restrict New Green Cards for Those on Public Aid*, N.Y. Times, Sept. 22, 2018, https://perma.cc/3FHY-RZRC (stating that Miller "has pushed hard" for the Public Charge Rule).

[45] Nick Miroff et al., *Trump to Place Ken Cuccinelli at the Head of the Country's Legal Immigration System*, Wash. Post, May 24, 2019, https://perma.cc/6W5Y-2WKF.

you have when you wake up.  And it should be the last thought you have before you go to bed.  And sometimes you shouldn't go to bed."[46]  One reasonably can infer a connection between Miller's zeal for the Public Charge Rule and his antipathy toward non-European immigrants.

114.    In recent days, Defendant Cuccinelli, the Acting Director of USCIS, has defended the Public Charge Rule by distinguishing the national origins of modern-day immigrants from those of nineteenth-century immigrants.  In a television interview with CNN's Erin Burnett, he argued that the Rule is not at odds with the message of Emma Lazarus's sonnet that adorns the Statue of Liberty's pedestal because the "tired," "poor," "wretched," and "homeless" "huddled masses yearning to breathe free" depicted in the poem were "coming from Europe where they had class-based societies, where people were considered wretched if they weren't in the right class."[47]

115.    Defendant Cuccinelli has a history of advocating for discriminatory anti-immigrant policies.  As a Virginia state senator, he supported efforts to restrict birthright citizenship and introduced a bill to allow employers to fire employees who spoke a language other than English on the job and to deny those workers unemployment benefits.[48]

116.    Several courts, including this one, have held that statements like those detailed above indicate racial animus toward non-European immigrants.  *See CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325–26 (D. Md. 2018) ("One could hardly find more direct

---

[46] Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting His Way on Immigration: His Own Officials*, N.Y. Times, Apr. 14, 2019, https://perma.cc/V5R5-UFH5.

[47] Devan Cole & Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN, Aug. 13, 2019, https://perma.cc/2CJF-42XZ.

[48] Scott Bixby, *Ken Cuccinelli Wanted to End Birthright Citizenship & Militarize Border—Now He's Trump's Immigration Chief*, The Daily Beast, June 10, 2019, https://perma.cc/7TKC-G3Q4.

evidence of discriminatory intent toward Latino immigrants.").[49]  Moreover, this court has held

that such discriminatory rhetoric places the burden of persuasion on DHS to demonstrate that its

immigration policies are not infected by animus.  *See id.* at 325 (citing *Staub v. Proctor Hospital*,

562 U.S. 411, 413 (2011)).

> ### DHS Departed Substantively and Procedurally from its Past Interpretation of the Public-Charge Inadmissibility Ground.

117.    As detailed above, DHS's new Rule is at odds with how the public-charge

inadmissibility ground has been interpreted for over a century.  The Department rushed through

the rule-making process, despite receiving 266,077 comments, the vast majority of which were

negative.  And the Department failed to rely on the expertise of benefit-granting agencies in

drafting the rule, as DOJ did in drafting the 1999 Proposed Rule and Field Guidance.

Discriminatory animus can be inferred from these substantive and procedural departures from

past agency practice.

---

[49] *See also, e.g.*, *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 518–19 (9th Cir. 2018) (affirming the district court's denial of a motion to dismiss an equal-protection challenge to the Trump Administration's rescission of the Deferred Action for Childhood Arrival (DACA) program and relying, in part, on "a history of animus toward persons of Hispanic descent evidenced by both pre-presidential and post-presidential statements by President Trump"), *cert. granted*, 139 S. Ct. 2779 (2019); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1100–01 (N.D. Cal. 2018) (granting a preliminary injunction to halt DHS's termination of TPS status for immigrants from El Salvador, Haiti, Nicaragua, and Sudan because the plaintiffs had plausibly stated an equal-protection claim based in part on "evidence that President Trump harbors an animus against non-white, non-European aliens"), *appeal docketed*, No. 18-16981 (9th Cir. Oct. 12, 2018); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (finding that plaintiffs plausibly alleged that discriminatory purpose was a motivating factor in the decision to rescind TPS); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (finding that plaintiffs alleged sufficient facts to make a plausible claim that the decision to rescind DACA was motivated by discriminatory animus), *cert. granted*, 139 S. Ct. (2019).  *But see CASA de Maryland v. DHS*, 284 F. Supp. 3d 758, 775 (D. Md. 2018) (rejecting an equal-protection challenge to DHS's decision to rescind DACA), *aff'd in part and rev'd in part*, 924 F.3d 684 (4th Cir. 2019) (declining to reach equal-protection claim).

**F.** **The Public Charge Rule Harms CASA and Its Members.**

118.     In combination with the Trump Administration's broader efforts to intimidate

immigrant populations and the varying iterations of the Public Charge Rule that have been made

public, the vague and complicated terms of the Rule have engendered much confusion and fear

among CASA's membership, leading members to disenroll from or forgo public benefits to

which they or their family members (including U.S. citizen children) are entitled.  Although the

majority of these benefits would not be held against them in public-charge determinations—at

least according to the Public Charge Rule's text—CASA's members nonetheless have been

chilled from using federal, state, and local benefits that provide important food, health, and

housing supports for their families.  It also has caused some of CASA's members to terminate

health insurance purchased with subsidies under the Affordable Care Act due to concern that the

insurance would be considered a public benefit and could lead to an adverse pubic-charge

determination.

119.     In drafting the Public Charge Rule, DHS fully anticipated that the policy would

affect noncitizen and mixed-status households in this manner.  The agency assumed that

"individuals intending to apply for adjustment of status or individuals who have adjusted status

within the past five years" are "likely to disenroll from or forego enrollment in public benefits

programs" because "[r]esearch shows that when eligibility rules change for public benefits

programs there is evidence of a 'chilling effect' that discourages immigrants from using public

benefits programs for which they are still eligible."  2018 Proposed Rule, 83 Fed. Reg. at 51,266.

120.     DHS estimates a $1.46 billion annual reduction in transfer payments due to

disenrollment and forgone enrollment.  Final Rule, 84 Fed. Reg. at 41,487.  This figure likely

significantly underestimates the broad reach of the Rule's chilling effect, as it is based on an

assumption that only those noncitizens seeking to adjust status in a given year would disenroll from public benefits.  As explained above, that assumption makes little sense.  *See supra* n.23. And in CASA's experience, many more noncitizens have been, and will continue to be, chilled by the Public Charge Rule.

121.    CASA has incurred significant costs in advising its members on the immigration consequences that might flow from applying for or accepting public benefits for themselves or their family members, and it will continue to incur such costs as long as the unlawful and discriminatory Public Charge Rule remains in effect.

122.    During the pendency of the Public Charge Rule, CASA has had to allocate significant resources to combating the Rule's chilling effects through public education and to counseling and assisting its members about whether to accept public benefits.  CASA has devoted 15 part-time health promoters and 15 to 20 community organizers to answering questions, correcting misinformation, and raising awareness about the Rule.  These outreach efforts have directly reached over 1,000 individuals, and CASA's members have conducted additional outreach about the Rule after being trained by CASA staff members.

123.    Because responding to the effects of the Rule have taken up, and will continue to take up, significant resources, CASA has had to shift its organizational focus from an affirmative posture—seeking to improve conditions for immigrant families—to a defensive one—seeking to mitigate the harm of the Public Charge Rule on the communities it serves.  For example, CASA has had to reduce its advocacy for health-care expansion efforts at the state level in Maryland and at the local level in Prince George's County, Maryland.  These political efforts are necessarily time-sensitive, as they are dependent on political will and the legislative cycle. They cannot simply be undertaken with equal efficacy at a different time.

124.    Moreover, DHS's estimate fails to account for the fact that, by deterring participation in public benefit programs, DHS is imposing additional costs on local service providers, health providers of last resort, and the community at large.  CASA will need to redirect its resources to ensure that its members who are chilled from participating in public benefits programs have access to the supportive services they need to thrive.

125.    DHS also recognizes that immigrant rights groups like CASA are likely to incur "familiarization costs" to understand the Rule so that they can "provide information to those foreign-born non-citizens that might be affected by" the policy.  Final Rule, 84 Fed. Reg. at 41,467.  CASA has spent significant time and resources on training its staff to better understand the Public Charge Rule so that they may advise CASA's members whether they and their families should enroll in public benefits.

126.    In addition, DHS recognizes that the Public Charge Rule will impose financial burdens on noncitizens, estimating that, in the aggregate, it will cost noncitizens who apply for adjustment of status an additional $35 million annually in opportunity costs associated with filling out additional forms.  *Id.* at 41,485.  Some of those costs will be passed on to immigrant rights groups like CASA, which will assist their members in filling out the forms associated with the Rule.

127.    Because the Public Charge Rule does not give noncitizens fair notice as to whether their individual circumstances are likely to result in an adverse public-charge determination, the Rule forces noncitizens to alter their conduct—perhaps unnecessarily and at significant personal expense—to minimize any "negative factors" that they might exhibit and to maximize their "positive factors."

128.    Plaintiff Aguiluz's income is between 125 and 250 percent FPG for his household

of one, and he does not have private health insurance.  He therefore lacks any "heavily weighted positive factor" under the Public Charge Rule, although he does not have any "heavily weighted negative factors" either.  Given the vague and "inherently subjective" nature of public-charge determinations under the Rule, Plaintiff Aguiluz is unsure whether he will be deemed inadmissible, and thus be prevented from adjusting status, given his particular mix of positive factors (e.g., his history of employment and near-completion of his associate's degree) and negative factors (e.g., his lack of health insurance, poor credit score, and existing financial liabilities).  This uncertainty makes him reluctant to make choices that would make him more likely to be considered a public charge.  For example, although he would like to attend a private university like Johns Hopkins or an Ivy League school to pursue his bachelor's degree, Plaintiff Aguiluz is applying only to public colleges because he is concerned about the impact that taking on extra student loan debt or reducing his work hours to attend school full-time will have on any future public-charge determination.  The Public Charge Rule will also factor into his decisions about who to marry, whether and when to have children, and how much support to provide to his parents, given the impact that those decisions have on his household size and its related effects on his income and assets calculations under the Rule.

129.    Plaintiff Camacho's income is between 125 and 250 percent FPG for her household of one.  She is currently pursuing her associate's degree while employed by Baltimore City Public Schools, which provides her health insurance.  Lacking income that is considered a "heavily weighted positive factor" under the Public Charge Rule, and given the vague and "inherently subjective" nature of determinations under the Rule, Plaintiff Camacho is concerned that she will be deemed inadmissible on public-charge grounds and thus be prevented from adjusting status.  This uncertainty makes her reluctant to make choices that would make her more

likely to be considered a public charge.  For example, the Public Charge Rule gives Plaintiff

Camacho concern about whether she could return to school full-time to pursue her bachelor's

degree, thereby forgoing her employer-provided health insurance, and whether she should take

on student loans to finance her education.  The Public Charge Rule will also factor into her

decisions about who to marry and whether and when to have children, given the impact that

those decisions have on her household size and its related effects on her income and assets

calculations under the Rule.

## CLAIMS FOR RELIEF

### Count One
### Administrative Procedure Act, 5 U.S.C. § 706 – Not in Accordance with Law and Beyond Statutory Authority

130.    Plaintiffs repeat and incorporate by reference each of the allegations set forth in

each of the preceding paragraphs of this Complaint.

131.    The Public Charge Rule is a "final agency action for which there is no other

adequate remedy in court" and is "subject to judicial review."  5 U.S.C. § 704; *see also id.* § 702.

132.    Under the Administrative Procedure Act (APA), a "reviewing court shall . . . hold

unlawful and set aside agency action . . . found to be . . . not in accordance with law . . . [and] in

excess of statutory . . . authority."  *Id.* § 706(2)(A), (C).

133.    As detailed above, the Public Charge Rule's interpretation of the term "public

charge" is contrary to the plain meaning of the term as used in the INA.  Moreover, because the

meaning of the term is clear based on the INA's text and structure and the history of the public-

charge inadmissibility ground, DHS has no statutory authority to give the term a conflicting

interpretive gloss.  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

843 & n.9 (1984).

134.    The Public Charge Rule also treats SNAP benefits as income or a resource for purposes of public-charge determinations in violation of 7 U.S.C. § 2017(b).

135.    The Public Charge Rule must be set aside as not in accordance with law and in excess of statutory authority.

## Count Two
## Administrative Procedure Act, 5 U.S.C. § 706 – Arbitrary and Capricious

136.    Plaintiffs repeat and incorporate by reference each of the allegations set forth in each of the preceding paragraphs of this Complaint.

137.    Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary[ and] capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

138.    An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

139.    An agency acts arbitrarily and capriciously when it fails to "provide [a] reasoned explanation" for a change in its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

140.    The Final Rule is arbitrary and capricious because it departs from over a century of prior practice without adequate explanation for this change in policy.

141.    In promulgating the Final Rule, DHS ignored or failed to adequately consider important aspects of the problem before it:

a.      DHS failed to meaningfully consider the full range of harms and costs

imposed by the Rule on noncitizens, their families, and the communities in

which they live;

b.      DHS failed to meaningfully consider the disparate impact that the Public

Charge Rule will have on noncitizens who are nonwhite and from non-

European countries;

c.      DHS failed to meaningfully consider that the test it has imposed is so

vague as to invite arbitrary and discriminatory enforcement.

142.    The proposed threshold for deeming a noncitizen "likely at any time to become a

public charge" is so de minimis and difficult to apply that it is irrational.  The Public Charge

Rule's purported rationales for these changes are arbitrary, not supported by the evidence in the

record, and a pretext to conceal the true motivation for the policy change.  DHS's failure to rely

on the expert agencies charged with administering public benefits—and its reliance instead on its

own unsubstantiated "beliefs" about noncitizens' "self-sufficiency"—establish the arbitrary and

capricious nature of the Public Charge Rule.

143.    The Public Charge Rule therefore must be set aside as arbitrary and capricious.

**Count Three**
**Due Process Clause of the Fifth Amendment to the U.S. Constitution**

144.    Plaintiffs repeat and incorporate by reference each of the allegations set forth in

each of the preceding paragraphs of this Complaint.

145.    The Due Process Clause prohibits laws or regulations that are so vague that they

(1) fail to give persons of ordinary intelligence fair notice of how to accord their conduct to

avoid adverse legal consequences or (2) permit arbitrary enforcement.  *Sessions v. Dimaya*, 138

S. Ct. 1204, 1212 (2018).

146.    Only by maintaining eligibility for adjustment to LPR status can a noncitizen

avoid the grave consequences of deportation.  *See* 8 U.S.C. § 1227(a)(1)(A) (authorizing

deportation of noncitizens found inadmissible at the time of adjustment of status), (B), (C)(i)

(authorizing deportation of noncitizens who are "present in the United States in violation of" the

INA or who have "failed to maintain the[ir] nonimmigrant status").  The Public Charge Rule is

therefore inextricably linked to noncitizens' ability to avoid deportation and is thus subject to

"the most exacting vagueness standard."  *See Dimaya*, 138 S. Ct. at 1213.

147.    The Public Charge Rule's vague factors and unclear weighting scheme provide

insufficient guidance for USCIS officials to make non-arbitrary determinations about whether

applicants for adjustment of status are likely to receive one or more of the government benefits

enumerated by the Public Charge Rule for a brief period of time at some point in their lives.

This is particularly true for noncitizens who have the ability and inclination to earn an income.

Accordingly, individual Plaintiffs and other noncitizens like them will struggle to know how to

accord their conduct to avoid adverse immigration consequences, and immigration officials are

almost certain to enforce the Rule in an arbitrary and discriminatory manner.

148.    The Public Charge Rule is therefore void for vagueness under the Fifth

Amendment's Due Process Clause.

### Count Four
### Equal Protection Component of the Fifth Amendment to the U.S. Constitution

149.    Plaintiffs repeat and incorporate by reference each of the allegations set forth in

each of the preceding paragraphs of this Complaint.

150.    The Equal Protection Clause as incorporated by the Fifth Amendment prohibits

the federal government from taking action for which discriminatory intent or purpose is a

motivating factor.  *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

265–66 (1977); *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

151.    Defendants' promulgation of the Public Charge Rule was motivated at least in part by the Trump Administration's intent to discriminate on the basis of race, ethnicity, and national origin.

152.    This discriminatory intent is evidenced by, among other things:

   a.    the disparate impact that the Public Charge Rule will have on noncitizens who are nonwhite and from non-European countries;

   b.    President Trump's statements reflecting animus toward non-European immigrants and stereotyped views about such immigrants' socioeconomic status and health; and

   c.    Defendants' departure, without reasoned explanation, from ordinary rulemaking procedures and from how the public-charge inadmissibility ground has been interpreted for over a century.

153.    The Public Charge Rule therefore violates the Fifth Amendment's guarantee of equal protection.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court:

1.    Declare unlawful and set aside the Public Charge Rule;

2.    Enjoin Defendants and all those acting on their behalf from enforcing the Public Charge Rule;

3.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412;

4.      Award such additional relief as the interests of justice may require.


                                        Respectfully submitted,

                                        /s/ *Jonathan L. Backer*
                                        Jonathan L. Backer (D. Md. 20000)
                                        Amy L. Marshak*
                                        Joshua A. Geltzer*
                                        Mary B. McCord*
                                        INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                          AND PROTECTION
                                        Georgetown University Law Center
                                        600 New Jersey Ave., N.W.
                                        Washington, D.C. 20001
                                        (202) 662-9835
                                        jb2845@georgetown.edu

                                        *Attorneys for Plaintiffs*

                                        *\*Pro hac vice motions forthcoming*

Dated:  September 16, 2019