**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CASA de Maryland, Inc., et al.,

                              Plaintiffs,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
et al.,

                              Defendants.

Civil Action No. 8:19-cv-2715

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    LPR Status is a Critical Immigration Benefit for Noncitizens Living
           in the United States .......................................................................................... 3

    B.    Admissibility is a Statutory Prerequisite for Adjustment of Status ................. 4

    C.    The Public-Charge Ground of Inadmissibility .............................................. 4

    D.    DHS's Public Charge Rule ............................................................................. 7

LEGAL STANDARD........................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
         STATUTORY AND CONSTITUTIONAL CLAIMS ................................... 10

      A.    The Public Charge Rule is Contrary to the INA's Plain Meaning............................. 10

        1.    The Final Rule's Definition of "Public Charge" Contravenes the Term's Ordinary
            Meaning ................................................................................................ 10

        2.    Congress, Courts, and Administrative Bodies Have Long Accepted
            the Plain Meaning of "Public Charge".......................................................... 13

      B.    DHS Acted Arbitrarily and Capriciously in Adopting the Public Charge Rule ......... 18

        1.    The Final Rule Fails to Adequately Explain Its Change in Policy ............................ 19

        2.    The Final Rule's Definition of "Likely at Any Time to Become a Public Charge" Is
            Arbitrary and Irrational .................................................................................. 21

        3.    DHS ignored or failed to adequately consider important aspects
            of the problem before it.................................................................................. 23

      C.    The Public Charge Rule Is Unconstitutionally Vague ............................................... 26

      D.    The Public Charge Rule Is Motivated by Animus Toward
          Non-European, Non-White Immigrants.......................................................... 33

    II.    PLAINTIFFS WILL SUFFER IRREPRABLE HARM WITHOUT A
         PRELIMINARY INJUNCTION................................................................... 38

    III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
         FAVOR OF INJUNCTIVE RELIEF ........................................................... 42

    IV.    A NATIONWIDE INJUNCTION IS APPROPRIATE IN THIS CASE...................... 43

CONCLUSION.................................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

*Batalla Vidal v. Nielsen*,
 291 F. Supp. 3d 260 (E.D.N.Y. 2018) .................................................................. 37

*Boston v. Capen*,
 61 Mass. 116 (1851) ........................................................................................... 12

*CASA de Maryland v. DHS*,
 284 F. Supp. 3d 758 (D. Md. 2018) .................................................................... 37

*CASA de Maryland, Inc. v. Trump*,
 355 F. Supp. 3d 307 (D. Md. 2018) .................................................................... 37

*Centro Presente v. DHS*,
 332 F. Supp. 3d 393 (D. Mass.  2018) ................................................................ 37

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
 467 U.S. 837 (1984)............................................................................................. 17

*Connally v. Gen. Constr. Co.*,
 269 U.S. 385 (1926)....................................................................................... 26, 33

*Encino Motorcars, LLC v. Navarro*,
 136 S. Ct. 2117 (2016) ........................................................................................ 19

*Ex parte Sakaguchi*,
 277 F. 913 (9th Cir. 1922) .................................................................................. 13

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009)............................................................................................. 20

*FDIC v. Meyer*,
 510 U.S. 471 (1994)............................................................................................. 10

*Forest Grove Sch. Dist. v. T.A.*,
 557 U.S. 230 (2009)............................................................................................. 14

*Freeman v. Quicken Loans, Inc.*,
 566 U.S. 624 (2012)............................................................................................. 11

*Gegiow v. Uhl*,
 239 U.S. 3 (1915)................................................................................................. 11

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972)....................................................................................... 26, 27

*Head Money Cases*,
 112 U.S. 580 (1884)............................................................................................. 13

*Howe v. United States ex rel. Savitsky*,
 247 F. 292 (2d Cir. 1917) ................................................................................... 13

*Johnson v. United States*,
 135 S. Ct. 2551 (2017)................................................................................... 31, 33

*Kenny v. Wilson*,
 885 F.3d 280 (4th Cir. 2018) ......................................................................... 40, 41

ii

*Kravitz v. U.S. Dep't of Commerce*,
366 F. Supp. 3d 681 (D. Md. 2019) .................................................................. 9, 42

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................................. 40

*Manning v. Caldwell*,
930 F.3d 265 (4th Cir. 2019) .................................................................. passim

*Michigan v. EPA*,
135 S. Ct. 2699 (2015) .................................................................. 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................. 18, 23

*N.C. State Conf. of the NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .................................................................. 6, 33

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .................................................................. 43

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) .................................................................. 43

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) .................................................................. 9

*Ramos v. Nielsen*,
336 F. Supp. 3d 1075 (N.D. Cal. 2018) .................................................................. 37

*Real Truth About Obama, Inc. v. FEC*,
575 F.3d 342 (4th Cir. 2009) .................................................................. 9

*Regents of the Univ. of Cal. v. DHS*,
908 F.3d 476 (9th Cir. 2018) .................................................................. 37, 43

*Ross v. Meese*,
818 F.2d 1132 (4th Cir. 1987) .................................................................. 42

*Rusu v. INS*,
296 F.3d 316 (4th Cir. 2002) .................................................................. 26, 33

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018) .................................................................. passim

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) .................................................................. 43, 44

*The Japanese Immigrant Case*,
189 U.S. 86 (1903) .................................................................. 26, 28, 33

*United States ex rel. Barlin v. Rodgers*,
191 F. 970 (3d Cir. 1911) .................................................................. 13

*United States v. Petkos*,
214 F. 978 (1st Cir. 1914) .................................................................. 13

*United States v. Simms*,
914 F.3d 229 (4th Cir. 2019) .................................................................. 33

*Util. Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014)......................................................................................... 11, 18

*Valle de Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ................................................................................ 40

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).................................................................................... 33, 34, 38

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982).......................................................................................... 27, 32

*Washington v. Davis*,
   426 U.S. 229 (1976)............................................................................................... 35

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................................... 9

## Constitution

U.S. Const. amend. V............................................................................................... 26

## Federal Statutes

5 U.S.C. § 705.................................................................................................... 1, 44

5 U.S.C. § 706................................................................................................. 10, 18

7 U.S.C. § 2014..................................................................................................... 22

8 U.S.C. § 1103..................................................................................................... 20

8 U.S.C. § 1182............................................................................................... passim

8 U.S.C. § 1183................................................................................................. 4, 16

8 U.S.C. § 1227............................................................................................... 27, 29

8 U.S.C. § 1255....................................................................................................... 4

8 U.S.C. § 1601..................................................................................................... 17

8 U.S.C. § 1611................................................................................................. 8, 30

8 U.S.C. § 1621................................................................................................. 8, 30

8 U.S.C. § 1641................................................................................................. 8, 30

Act of Aug. 3, 1882,
   ch. 376, 22 Stat. 214.................................................................................. 4, 10, 12

Act of Mar. 8, 1891,
   ch. 551, 26 Stat. 1084........................................................................................... 10

Immigration Act of 1990,
   Pub. L. No. 101-649, 104 Stat. 4978 ................................................................... 15

Immigration and Nationality Act,
   Pub. L. No. 82-414, 66 Stat. 163 (1952)........................................................ passim

## Federal Regulations, Rules, and Guidance

Adjustment of Status for Certain Aliens,
   52 Fed. Reg. 16,205 (May 1, 1987) ..................................................................... 15

Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,
64 Fed. Reg. 28,689 (Mar. 26, 1999) ................................................................. passim

Inadmissibility and Deportability on Public Charge Grounds,
64 Fed. Reg. 28,676 (proposed May 26, 1999) .......................................... passim

Inadmissibility on Public Charge Grounds,
83 Fed. Reg. 51,114 (proposed Oct. 10, 2018) ........................................ passim

Inadmissibility on Public Charge Grounds,
84 Fed. Reg. 41,292 (Aug. 14, 2019) ............................................................. passim

**Administrative Decisions**

*Matter of Martinez-Lopez*,
10 I. & N. Dec. 409 (Att'y Gen. 1964) ................................................................... 14

*Matter of A-*,
19 I. & N. Dec. 867 (BIA 1988) ................................................................... 15, 16

*Matter of Harutunian*,
14 I. & N. Dec. 583 (BIA 1974) ................................................................... 15

*Matter of Perez*,
15 I. & N. Dec. 136 (BIA 1974) ................................................................... 15

*Matter of Vindman*,
16 I. & N. Dec. 131 (BIA 1977) ................................................................... 15

**Legislative History**

136 Cong. Rec. 36,844 (1990) ................................................................... 15

142 Cong. Rec. S11872 (1996) ................................................................... 16

H.R. Rep. 104-828 (1996) (Conf. Rep.) ................................................................... 16

S. Rep. No. 113-40 (2013) ................................................................... 16

**State Statutes**

Act of Mar. 20, 1850,
ch. 105, § 1, 1850 Mass. Acts 338 ................................................................... 12

Md. Code Ann., Health-Gen. § 15-103 ................................................................... 22

Md. Code Regs. 10.09.24.07(G)(4)(b) ................................................................... 22

Va. Code § 4.1-322 ................................................................... 29

Va. Code Ann. § 4.1-333 ................................................................... 29

**Other Authorities**

Am. Public Health Ass'n, Comment Letter on Proposed Rule (Dec. 10, 2018) .......... 24

Andrew Forrester & Alex Nowraseth, Cato Inst., *Immigrant Wages Converge with Those of Native Born Americans* (2018) ................................................................... 31

Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit* (2008) ................................ 34

Cent. Intelligence Agency, *The World Factbook: Norway* ......................................... 35

*Charge*, Webster's Dictionary (1828 online ed.) ......................................................... 10

*Charge*, Webster's Dictionary (1886 ed.) .................................................................. 11

Child Care Law Center, Comment Letter on Proposed Rule (Nov. 20, 2018) ............................ 24

City of Chicago et al., Comment Letter on Proposed Rule (Dec. 10, 2018) ............................... 25

Cliff Sims, *Team of Vipers: My 500 Extraordinary Days in the Trump White House* (2019) ..... 36

Danilo Trisi, Ctr. on Budget & Policy Priorities, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means the Chance to Come to or Stay in the U.S.* (May 30, 2019) .................................................................................. 21

Dep't of Homeland Sec'y, *Refugees & Asylees 2017 Tables* (2019) ........................................... 36

Devan Cole & Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019) ........................................................... 36

Donald J. Trump (@realDonaldTrump), Twitter (July 14, 2019, 5:27 A.M.) ............................. 36

*FY 2018 Income Limits Documentation System: Statewide Income Limits for Maryland*, HUD User ................................................................................................................................ 22

Gene Falk, Cong. Research Serv., R44724, *Temporary Assistance for Needy Families (TANF): Size of the Population Eligible for and Receiving Cash Assistance* (2017) ........................... 31

Gustavo Lopez et al., *Key Findings About U.S. Immigrants*, Pew Research Ctr. (Nov. 30, 2018) .................................................................................. 35

Historians' Comment on Proposed Rule 2–3 (Oct. 23, 2018) .................................................... 11

John Higham, *Strangers in the Land: Patterns of American Nativism, 1860-1925* (2002).......... 12

Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018) ........................................................................................ 35

Legal Aid Society of the District of Columbia, Comment Letter on Proposed Rule (Dec. 10, 2018) ................................................................................................................................ 25

*Medicaid's Role in Nursing Home Care*, Henry J. Kaiser Family Found. (June 20, 2017) ........................................................... 31

Michael D. Shear & Emily Baumgaertner, *Trump Administration Aims to Sharply Restrict New Green Cards for Those on Public Aid*, N.Y. Times, Sept. 22, 2018 ...................................... 36

Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017) .................................................. 35

Press Release, CareerBuilder, Living Paycheck to Paycheck is a Way of Life for Majority of U.S. Workers, According to New Career Builder Survey (Aug. 24, 2017) ............................. 31

Randy Capps et al., Migration Policy Inst., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration* (2018) ................................................................. 34

Scott Bixby, *Ken Cuccinelli Wanted to End Birthright Citizenship & Militarize Border—Now He's Trump's Immigration Chief*, The Daily Beast, June 10, 2019 ...................................... 37

State of Virginia et al, Comment Letter on Proposed Rule (Dec. 10, 2018) ............................... 25

U.S. Citizenship & Immigration Servs., *Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens* (July 28, 2018) ............................................................................................................. 28

U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program Participation and Costs* (Aug. 2, 2019) ............................................................................................................ 21

UnidosUS, Comment Letter on Proposed Rule (Nov. 27, 2018) .................................................. 24

On August 14, 2019, the Department of Homeland Security (DHS) issued a rule that

provides a new standard and adjudicatory framework for its sub-agency, the U.S. Customs and

Immigration Services (USCIS), to enforce the Immigration and Nationality Act (INA)'s public-

charge ground of inadmissibility.  Inadmissibility on Public Charge Grounds, 84 Fed. Reg.

41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 212–14, 245, 248) [hereinafter

Public Charge Rule or Final Rule].  The Rule's effective date is October 15, 2019.  *Id.*  For the

reasons set forth in the memorandum below, Plaintiffs move under Rule 65(a) of the Federal

Rules of Civil Procedure for a preliminary injunction barring the Public Charge Rule from taking

effect during the pendency of this lawsuit.  In the alternative, Plaintiffs move under 5 U.S.C.

§ 705 for the Public Charge Rule's effective date to be postponed pending judicial review.

## INTRODUCTION

The Public Charge Rule dramatically and unlawfully expands USCIS's power to deny

noncitizens who live in the United States a pathway to remain lawfully in this country.[1]

Noncitizens who reside in the United States depend upon a process called "adjustment of status"

to obtain lawful-permanent-resident (LPR) status (i.e., a green card) without returning to their

respective countries of origin.  But noncitizens are ineligible for adjustment of status if they

would be inadmissible at a port of entry.  Among other inadmissibility grounds, § 212 of the INA

denies admission—and therefore LPR status—to any noncitizen who is "likely at any time to

become a public charge."  8 U.S.C. § 1182(a)(4)(A).

For over a century, courts and administrative agencies have consistently interpreted the

term "likely at any time to become a public charge" in line with its plain language to apply to

---

[1] The Final Rule also expands USCIS's power to deny admission to noncitizens at ports of entry.
But this lawsuit focuses on the Final Rule's impact on noncitizens who reside in the United
States and the nonprofit organizations that serve them.

noncitizens who are likely to become *primarily dependent* on the government for subsistence. But through the Public Charge Rule, DHS would redefine that term to reach any noncitizens deemed likely to receive, even temporarily, a small amount of public benefits at any point over their lifetimes. By broadening the definition of "public charge" in such a dramatic way, the Public Charge Rule effectively transforms that inadmissibility ground by administrative fiat from a limited exemption for a small class of immigrants into a mechanism for immigration officials to deny any noncitizen deemed undesirable the ability to remain lawfully in the United States.

The Public Charge Rule is riddled with legal infirmities and should be enjoined. The Public Charge Rule cannot be reconciled with the INA's text and structure or the historical context in which Congress introduced the term "public charge" into federal immigration law over a century ago. And DHS's efforts to justify this sweeping change fail to provide adequate reasons or consider the full range of costs the Rule will impose on noncitizens and their communities. The Public Charge Rule is also unconstitutionally vague and discriminatory. By combining an extremely low threshold to be deemed a "public charge" with a confusing medley of factors and an undefined weighting scheme, the Rule empowers USCIS to cloak arbitrary and discriminatory admissibility determinations with the guise of administrative regularity. DHS does not enjoy discretion to reject the longstanding and correct interpretation of the public-charge ground of inadmissibility in favor of a new one that is contrary to the INA, unconstitutionally vague, and a license for immigration officials to discriminatorily deny noncitizens the ability to remain in the United States.

In the absence of immediate judicial intervention, Plaintiffs will suffer serious and irreparable harm. Because of the Public Charge Rule's complexity and vagueness, widespread confusion has taken root in immigrant communities. Fears about the Rule have caused members

of Plaintiff CASA de Maryland, Inc. (CASA) to disenroll from or to refrain from enrolling in

public benefits to which they and their family members are legally entitled and which do not

factor into public-charge determinations under the Rule.  This chilling effect caused by the Rule

has caused immediate and irreparable harm to those families, to CASA, and to the broader

community.  CASA as an organization will continue to be forced to redirect its limited resources

to educate, counsel, and support its members as those members seek to minimize the risk of

jeopardizing their immigration status.  And Plaintiffs Aguiluz and Camacho will be forced to

make countless day-to-day decisions under the specter of the Public Charge Rule, as they seek to

preserve their ability to obtain LPR status in the future.  Moreover, the public interest favors an

injunction.

A nationwide injunction of the Rule or an order delaying its effective date is therefore

warranted during the pendency of this case.

## BACKGROUND

### A.      LPR Status is a Critical Immigration Benefit for Noncitizens Living in the United States

LPR status is an immigration benefit of utmost importance because it allows noncitizens

to reside and work in the United States indefinitely and to eventually apply for U.S. citizenship.

Noncitizens who reside lawfully or with deferred action in the United States but who lack LPR

status have a tenuous foothold in this country.  Some noncitizens' lawful status is tied to

nonimmigrant visas that authorize stays of limited duration for specific purposes such as work,

study, or tourism.  Other noncitizens' ability to remain in the United States depends on

Temporary Protected Status or Deferred Action for Childhood Arrivals (DACA), protections that

the federal government has the power to strip away.  Accordingly, for noncitizens who form

strong bonds while living in the United States and come to view this country as their home,

maintaining their eligibility for LPR status is of paramount importance.

**B.      Admissibility is a Statutory Prerequisite for Adjustment of Status**

Adjustment of status is a process through which noncitizens who live in the United States can obtain LPR status without returning to their respective countries of origin.  8 U.S.C. § 1255(a).  To be eligible for adjustment of status, a noncitizen must be "admissible to the United States."  *Id.* § 1255(a)(2).  Section 212 of the INA specifies certain categories of noncitizens as inadmissible to the United States.  8 U.S.C. § 1182(a).  For example, the statute denies admission to—and therefore renders ineligible for adjustment of status—noncitizens who have committed certain crimes, *id.* § 1182(a)(2), or who pose a national-security risk to the United States, *id.* § 1182(a)(3).  A noncitizen who is "likely at any time to become a public charge" is also inadmissible and ineligible for adjustment of status.  *Id.* § 1182(a)(4).

**C.      The Public-Charge Ground of Inadmissibility**

The public-charge ground of inadmissibility first appeared in U.S. immigration statutes in 1882.  Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214, 214 (denying admission to "any convict, lunatic, idiot, or any other person unable to take care of himself or herself without becoming a public charge").  Congress has never defined the term "public charge" by statute.  However, the current statute requires USCIS officers deciding whether a noncitizen is "likely at any time to become a public charge" to consider the applicant's (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.  8 U.S.C. § 1182(a)(4)(B)(i).  Some applicants for adjustment of status must file an affidavit of support obligating a sponsor to provide financial assistance to the applicant if the need arises and to reimburse federal, state, or local governments upon request for any means-tested public benefit that the applicant receives.  *Id.* §§ 1182(a)(4)(C)(ii), (D), § 1183(a)(1)(A), (b).  The INA permits but does not require USCIS

to consider such affidavits of support in rendering public-charge determinations.  *Id.*

§ 1182(a)(4)(B)(ii).

Since 1999, immigration officials making public-charge determinations have operated

under Field Guidance issued by DHS's regulatory predecessor, the Department of Justice (DOJ).

That guidance was issued in conjunction with a Notice of Proposed Rulemaking that was never

finalized.  Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676

(proposed May 26, 1999) (to be codified at 8 C.F.R. pts. 212, 237) [hereinafter 1999 Proposed

Rule].  The Field Guidance and 1999 Proposed Rule define the term "public charge" as a

noncitizen "who is likely to become . . . primarily dependent on the government for subsistence,

as demonstrated by either (i) the receipt of public cash assistance for income maintenance or

(ii) institutionalization for long-term care at government expense."  Field Guidance on

Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,689 (Mar.

26, 1999) [hereinafter Field Guidance] (internal quotation marks omitted).[2]  As DOJ explained in

the 1999 Proposed Rule, the primarily dependent standard was not a new interpretation of the

public-charge ground of inadmissibility, but was dictated by "the plain meaning of the word

'charge'" and "the historical context of public dependency when the public charge immigration

provisions were first enacted more than a century ago."  64 Fed. Reg. at 28,677.

The Field Guidance further specified a limited list of government benefits relevant to

public-charge determinations: (1) Supplemental Security Income (SSI); (2) Temporary

Assistance for Needy Families (TANF) cash assistance; (3) state and local cash assistance, often

but not always called "General Assistance"; and (4) long-term care (e.g., in a nursing home or a

mental health institution) paid for by the government through programs such as Medicaid.  64

---

[2] The *Federal Register* incorrectly states that the Field Guidance was published on March 26, 1999, when it actually was published on May 26, 1999.

Fed. Reg. at 28,692.  In identifying these benefits as appropriate proxies for "complete, or nearly complete dependence on the Government, DOJ "sought the advice and relied on the expertise of the various Federal agencies that administer a wide variety of public benefits."  1999 Proposed Rule, 64 Fed. Reg. at 28,677.  In response to that request for guidance, the U.S. Department of Health and Human Services (HHS), which administers TANF and Medicaid, among other benefits programs, opined that benefits that provide "cash assistance for income maintenance" and those that support "institutionalization for long-term care at government expense" provide "the best available evidence of whether someone is primarily dependent on government assistance for subsistence."[3]  HHS reached that conclusion because (1) "nearly all individuals or families receiving cash assistance for purposes of income maintenance are also receiving other non-cash support benefits and services"; (2) "it is extremely unlikely that an individual or family could subsist on a combination of non-cash support benefits or services alone," as "virtually all families" that receive only non-cash benefits "must rely on other income (usually earned income) in order to meet their subsistence needs"; and (3) non-cash services are generally "available to individuals and families with incomes well above the poverty line" because those programs "have a primary objective of supporting the overall community or public health."[4]  The Social Security Administration (SSA) and U.S. Department of Agriculture (USDA), which respectively administer SSI and the Supplemental Nutrition Assistance Program (SNAP) among other benefit programs, concurred with HHS's advice.[5]

---

[3] Letter from Kevin Thurm, Deputy Sec'y, Health & Human Servs., to Doris Meissner, Comm'r, Immigration & Naturalization Serv. (Mar. 25, 1999), *reprinted in* 1999 Proposed Rule, 64 Fed. Reg. at 28,686.

[4] *Id.*

[5] Letter from Susan M. Daniels, Deputy Comm'r, Disability & Income Sec. Programs, to Dr. Robert L. Bach, Exec. Assoc. Comm'r, Office of Policy & Planning, Immigration & Naturalization Serv. (May 14, 1999), *reprinted in* 1999 Proposed Rule, 64 Fed. Reg. at

D.      **DHS's Public Charge Rule**

The Public Charge Rule breaks sharply with the longstanding interpretation of the public-charge ground of inadmissibility that the Field Guidance formalized.  DHS's new Rule defines "public charge" as "an alien who receives one or more" of an enumerated set of public benefits "for more than 12 months in the aggregate within a 36-month period," with multiple benefits received in a single month counting as multiple months of benefits.  Final Rule, 84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(a)).  Those enumerated benefits are: (1) any federal, state, or local cash benefit, including SSI, TANF, and General Assistance; (2) SNAP benefits; (3) federal housing assistance including voucher- and project-based assistance under Section 8 of the Housing Act of 1937 and public housing under the Housing Act of 1937; and (4) non-emergency Medicaid benefits, excluding those received by a noncitizen before she reaches 21 years of age, during a pregnancy, or in the 60 days after the end of a pregnancy.[6]  *Id.* (to be codified at 8 C.F.R. § 212.21(b)).

Because the public-charge provision is forward-looking, USCIS's task under the Final Rule would not be to determine whether an applicant for adjustment of status has in fact received one or more of those benefits for more than 12 months within a 36-month period, but, rather, to assess whether she is "more likely than not" to do so at any point over the rest of her life.  *Id.* (to be codified at 8 C.F.R. § 212.21(c)).  Indeed, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Welfare Reform Act") bars most noncitizens who lack LPR

---

28,687–88; Letter from Shirley R. Watkins, Under Sec'y, Food, Nutrition, & Consumer Servs., to Doris Meissner, Comm'r, Immigration & Naturalization Serv. (Apr. 15, 1999), *reprinted in* 1999 Proposed Rule, 64 Fed. Reg. at 28,688.

[6] The Public Charge Rule also would not deem a noncitizen inadmissible based on her likelihood of receiving Individuals with Disabilities Education Act ("IDEA") benefits or other school-based benefits funded through Medicaid.  Final Rule, 84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(b)(5)(ii), (iii)).

status (i.e., the very people who would be subject to a public-charge determination if they apply to adjust status) from receiving most if not all of the enumerated public benefits.  *See* 8 U.S.C. §§ 1611, 1621(a), (d), 1641(b).  Thus, under the Rule, a noncitizen could receive an unfavorable public-charge determination based on a prediction that she is likely to experience a temporary, isolated need for only a small amount of benefits in the near or distant future.

In addition to redefining the term "public charge" to encompass receipt of cash and non-cash benefits beyond a de minimis threshold, the Public Charge Rule sets forth an extensive list of "minimum factors" for immigration officials to consider in rendering public-charge determinations.  Final Rule, 84 Fed. Reg. at 41,502–04 (to be codified at 8 C.F.R. § 212.22(b), (c)).  Some of the listed factors draw more directly from the statutory factors, such as gross household income and education level, while others are more attenuated, like credit score and English proficiency.  Each listed factor is categorized as either "negative" (i.e., tipping the balance toward a noncitizen being deemed likely to become a public charge) or "positive" (i.e., tipping in the opposite direction).  *Id.*  Some factors are further classified as weighing "heavily" in one direction or the other.  *Id.* at 41,504 (to be codified at 8 C.F.R. § 212.22(c)).  **Exhibit A** sets forth these numerous enumerated factors in greater detail.  *See* Pls.' Mot. & Mem. Ex. A.  Immigration officials are also free to consider any other evidence they deem relevant to a public-charge determination that is not enumerated among the "minimum factors."  *See id.* at 41,502 (to be codified at 8 C.F.R. § 212.22(a), (b)) (stating that public-charge determinations "must be based on the totality of the alien's circumstances by weighing *all factors that are relevant . . .* [and] must *at least* entail consideration of" the minimum factors" (emphasis added)).

From the myriad factors outlined in **Exhibit A**, and any other evidence deemed relevant, USCIS officers are supposed to divine noncitizens' future likelihood of receiving the listed

public benefits beyond the Final Rule's de minimis threshold.  As DHS explains:

> [T]he weight given to an individual factor not designated a heavily weighted factor depends on the particular facts and circumstances of each case and the relationship of the individual factor to other factors in the analysis.  Multiple factors operating together will carry more weight to the extent those factors in tandem show that the alien is more or less likely to become a public charge.

*Id.* at 41,397.  A noncitizen's possession of more negative than positive factors does not necessarily dictate an unfavorable public-charge determination, but a preponderance of positive factors does not guarantee a favorable outcome either.  *Id.* at 41,399–41,401.  As DHS admits, determinations under the Rule will be "inherently subjective," "will vary," and will "not [be] governed by clear data."  *Id.* at 41,315; 41,397.

## LEGAL STANDARD

The purpose of a preliminary injunction is "to maintain the status quo and prevent irreparable harm while a lawsuit remains pending."  *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013).  To obtain a preliminary injunction, Plaintiffs must establish each of the following factors: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated and remanded on other grounds*, 559 U.S. 1089 (2010).  Where the government is a party, the final two factors merge.  *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (quoting *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

**ARGUMENT**

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR STATUTORY AND CONSTITUTIONAL CLAIMS**

**A.    The Public Charge Rule is Contrary to the INA's Plain Meaning**

Plaintiffs are entitled to a preliminary injunction enjoining the Public Charge Rule from going into effect because it is "not in accordance with law."  5 U.S.C. § 706(2)(A).  For over 100 years, Congress, courts, and administrative agencies have understood the term "public charge" as used in U.S. immigration statutes to include only individuals who are permanently and primarily dependent on the government for subsistence.  DHS has drastically departed from this longstanding meaning by redefining "public charge" to include any noncitizens who receive *any* amount of cash or non-cash public benefits for even a brief period of time.  The Court's intervention is warranted to prevent DHS from departing from the INA's plain language.

**1.    The Final Rule's Definition of "Public Charge" Contravenes the Term's Ordinary Meaning**

Congress first adopted the public-charge ground of inadmissibility in the Immigration Act of 1882.  That statute prohibited entry to the United States of "any convict, lunatic, idiot, or any other person unable to take care of himself or herself without becoming a public charge."  Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214, 214.  Congress amended that exclusion in 1891 to deny admission to "[a]ll idiots, insane persons, paupers or persons likely to become a public charge."  Act of Mar. 8, 1891, ch. 551, § 1, 26 Stat. 1084, 1084.

"In the absence of" a statutory definition of a term, courts "construe a statutory term in accordance with its ordinary or natural meaning," including by looking to relevant dictionary definitions.  *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).  At the time of the enactment of the public-charge ground of inadmissibility, dictionaries defined the word "charge" as a "person or thing committed to another[']s custody, care or management; a trust."  *Charge*, Webster's

10

Dictionary (1828 online ed.), https://perma.cc/T3CB-5HUT; *see also Charge*, Webster's

Dictionary (1886 ed.), https://perma.cc/WJ9Y-CHFG ("person or thing committed or intrusted to

the care, custody, or management of another; a trust").  In ordinary usage, therefore, a "public

charge" was a person entrusted to the public's care—one who was so incapable of providing for

himself that he depended on the public for his long-term subsistence.

      The meaning of "public charge" also is also informed by the related statutory terms that

surrounded it at the time of enactment.  As the Supreme Court has explained, the phrase "public

charge" should "be read as generically similar to the others mentioned" in the same statutory

exclusion.  *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915); *see also Freeman v. Quicken Loans, Inc.*, 566

U.S. 624, 634–35 (2012) (explaining that the "normal usage" of the relevant term was

"confirmed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given

more precise content by the neighboring words with which it is associated" (internal quotation

marks omitted)).  Each of the accompanying categories—e.g., "lunatic[s]," "idiots," and

"paupers"—referred to a group of persons who possess "permanent personal objections,"

*Gegiow*, 239 U.S. at 10, and who, at that time, were commonly housed in public charitable

institutions, such as almshouses, charitable hospitals, and asylums, *see* Historians' Comment on

Proposed Rule 2–3 (Oct. 23, 2018), Ex. 4 to Backer Decl.  These categories did not include the

many poor immigrants who came to the United States during that time period and who, at some

point, might require some temporary aid.

      That the public-charge inadmissibility ground was not intended to apply to those who

might experience a short-term need for assistance is also clear from the statutory context of the

1882 Act.  *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[R]easonable

statutory interpretation must account for both 'the specific context in which . . . language is used'

and 'the broader context of the statute as a whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S.

337, 341 (1997))).  In addition to establishing grounds for exclusion, the 1882 Act imposed on

each noncitizen who entered the United States a 50-cent head tax for the purpose of creating an

"immigrant fund."  Act of Aug. 3, 1882, ch. 376, § 1, 22 Stat. at 214.  Among other things, this

fund financed "care of immigrants arriving in the United States," including "relief of such

[immigrants] as are in distress."  *Id.*; *see also Head Money Cases*, 112 U.S. 580, 590–91 (1884)

(describing the fund as "highly beneficial to the poor and helpless immigrant" who fell on hard

times).  Congress therefore anticipated that some admissible immigrants nevertheless might

require some public assistance as they resettle in the United States.

Moreover, the 1882 statute was modeled on earlier state passenger laws that similarly

equated the term "public charge" with a complete inability to provide for oneself.  *See, e.g.*, Act

of Mar. 20, 1850, ch. 105, § 1, 1850 Mass. Acts 338, 339 (requiring a bond for any passenger

deemed "a pauper, lunatic, or idiot, or maimed, aged, infirm or destitute, or incompetent to take

care of himself or herself, without becoming a public charge as a pauper").  These statutes

imposed bond requirements on those immigrants who "by reason of some permanent disability,

[were] unable to maintain themselves, or who had actually been a public charge in another

country," but only a head tax on those who might need "relief or support" but were "not

permanently disabled."  *Boston v. Capen*, 61 Mass. 116, 121–22 (1851).  Under these state

passenger laws, once immigrants arrived in the United States, private emigrant societies provided

social services to "help[] those in temporary difficulty."  John Higham, *Strangers in the Land:*

*Patterns of American Nativism, 1860-1925*, at 43 (2002).  In adopting an analogous approach—

requiring exclusion of those likely to become a permanent public charge but providing a separate

fund for temporary aid—Congress likewise accepted these laws' definition of "public charge."

2.      **Congress, Courts, and Administrative Bodies Have Long Accepted the Plain Meaning of "Public Charge"**

Since the enactment of the "public charge" ground of inadmissibility in the 1880s, courts and administrative agencies consistently have understood the term, in accordance with its plain meaning, to apply to those noncitizens who are unable to provide for themselves and who therefore are primarily dependent on the government for subsistence.  Congress, in turn, repeatedly has reenacted the public-charge exclusion without supplying an alternative definition, demonstrating its acceptance of the widely understood meaning of the term.  What is more, Congress repeatedly has rejected attempts to redefine "public charge" in ways similar to the way that the Final Rule does, indicating its conscious rejection of DHS's radical new definition.

Judicial opinions reviewing public-charge determinations have long focused on a noncitizen's ability and willingness to work as it relates to that person's capacity to avoid becoming primarily dependent on the government for support.  *See, e.g.*, *Ex parte Sakaguchi*, 277 F. 913, 916 (9th Cir. 1922) (holding that "an able-bodied woman of the age of 25 years, with a fair education, with no mental or physical disability, with some knowledge of English, skilled as a seamstress and a manufacturer of artificial flowers, with a disposition to work and support herself, and having a well-to-do sister and brother-in-law" in the United States who would assist her was not likely to become a public charge); *Howe v. United States ex rel. Savitsky*, 247 F. 292, 293–94 (2d Cir. 1917) (holding that a "physically []fit" noncitizen could not be denied admission on public-charge grounds because "Congress meant the act to exclude persons who were likely to become occupants of almshouses"); *United States v. Petkos*, 214 F. 978, 979 (1st Cir. 1914) (holding that a noncitizen who suffered from psoriasis could not be excluded on public-charge grounds because there was no "lawful evidence[] that his disease necessarily affected his ability to earn a living"); *United States ex rel. Barlin v. Rodgers*, 191 F. 970, 973–77 (3d Cir. 1911)

13

(holding that noncitizens were inadmissible on public-charge grounds due to physical limitations or agedness that, in the judgment of immigration officials, would have prevented them from earning a living).

When it enacted the INA in 1952, Congress retained a public-charge ground of inadmissibility.  *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 212(a)(15), 66 Stat. 163, 182–83 (1952) (rendering inadmissible noncitizens "who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, [are] likely at any time to become a public charge").  Congress did not define the term "public charge," so it must be understood to have incorporated the prior judicial interpretations that focused on whether noncitizens would be primarily dependent on the government.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (quoting *Lorillard v. Pons,* 434 U.S. 575, 580 (1978))).

Following enactment of the INA, DOJ continued to define the term "public charge" to encompass only noncitizens who are likely to be permanently and primarily dependent on the government for subsistence.  In *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (Att'y Gen. 1964), the Attorney General stated that the public-charge inadmissibility ground "requires more than a showing of a possibility that the alien will require public support" and established a presumption that "[a] healthy person in the prime of life"—a person who is likely to work, but who undoubtedly could face unforeseen, temporary financial difficulties necessitating some aid—"cannot ordinarily be considered likely to become a public charge."  Likewise and in contrast to the definition in DHS's Public Charge Rule, decisions of the Board of Immigration

Appeals reflect an understanding that temporary setbacks do not render an individual likely to become a public charge.[7] *See, e.g.*, *Matter of A-*, 19 I. & N. Dec. 867, 870 (BIA 1988) (holding that a 33-year-old woman's "age and ability to earn a living" rendered her unlikely to become a public charge despite her having temporarily left the workforce to care for her children and struggling to find work thereafter); *Matter of Perez*, 15 I. & N. Dec. 136, 137–38 (BIA 1974) (holding that although a noncitizen had received welfare benefits, she was not likely to become a public charge because she was "28 years old, in good health, and capable of finding employment").[8]

In 1990, Congress amended the INA and again did not include a new definition of public charge. Rather, it subsumed various "antiquated" inadmissibility grounds, like "physical defect, disease, or disability" and "paupers, professional beggars, or vagrants," into the public-charge provision. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 601(a)(4), 104 Stat. 4978, 5072 (codified as amended at 8 U.S.C. § 1182); *see also* 136 Cong. Rec. 36,844 (1990) (statement of

---

[7] In 1987, DOJ created a safe harbor from being deemed a public charge for immigrants covered by the 1986 Immigration Reform and Control Act. Adjustment of Status for Certain Aliens, 52 Fed. Reg. 16,205 (May 1, 1987). Under that rule, covered immigrants would not be found inadmissible as likely to become public charges if they had "a history of employment in the United States evidencing self-support without receipt of public *cash* assistance," *id.* at 16,211 (emphasis added), defined as "income or needs-based monetary assistance . . . designed to meet subsistence levels," *id.* at 16,209. DOJ therefore understood that only cash assistance "designed to meet subsistence levels" was relevant to the public-charge inquiry.

[8] DHS is incorrect that *Matter of Vindman*, 16 I. & N. Dec. 131 (BIA 1977), and *Matter of Harutunian*, 14 I. & N. Dec. 583 (BIA 1974), support its new definition of public charge. *See* 2018 Proposed Rule, 83 Fed. Reg. at 51,122 nn.10–11. Although the BIA ultimately found the noncitizens in those cases to be inadmissible on public-charge grounds, it applied the same test as in other BIA decisions—whether the applicants would be able to earn a livelihood and avoid becoming primarily dependent on the government. *See Vindman*, 16 I. & N. Dec. at 132 (finding inadmissible noncitizens who had been accepting SSI and General Assistance for three years and showed no prospect of future employment); *Harutunian*, 14 I & N. Dec. at 584, 589–90 (holding that an elderly applicant for LPR status who had been granted "old age assistance" was inadmissible on public-charge grounds because she was "incapable of earning a livelihood").

Rep. Hamilton Fish IV) (explaining the change).  Both choices—to incorporate the related terms into the public-charge provision and to tacitly accept nearly a century of judicial and administrative interpretations of the statute—indicate that Congress shared the common understanding of the term "public charge."

Not only has Congress repeatedly reenacted the public-charge provision without displacing the longstanding understanding of the key term, but it also has rejected multiple attempts to adopt a definition of "public charge" similar to the one DHS now seeks to impose by administrative fiat.  First, in the lead-up to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress considered and *rejected* a bill that would have rendered deportable as a public charge any noncitizen who, within seven years of entry, had received any of a list of public benefits nearly identical to the list that appears in the Final Rule. *See* H.R. Rep. 104-828, at 137–40 (1996) (Conf. Rep.); *see also* 142 Cong. Rec. S11872, S11882 (1996) (statement of Sen. Kyl, the bill's floor manager, that "in order to ensure passage," certain provisions "have been deleted," including the one changing "the definition of 'public charge'"). Congress chose to make different, more limited changes to the public-charge inadmissibility ground, namely, codifying the factors that immigration officials already were using to make public-charge determinations, *compare* 8 U.S.C. § 1182(a)(4)(B)(i), *with Matter of A-*, 19 I & N. Dec. 867, 869 (BIA 1998), and authorizing immigration officials to consider, in making public-charge determinations, enforceable affidavits of support from immigrants' sponsors, *see* 8 U.S.C. §§ 1182(a)(4)(B)(ii), 1183a(a).  And, in 2013, Congress rejected a bill that would have "expanded the definition of 'public charge' such that people who received non-cash benefits could not become" LPRs.  S. Rep. No. 113-40, at 63 (2013).  Congress's rejection of proposed expansions of the definition of "public charge" indicates that its understanding of the term

precludes the definition DHS now puts forth.

Finally, DOJ's 1999 Proposed Rule and Field Guidance adopted the longstanding definition of the term "public charge," concluding that the term applies to a noncitizen who "is likely to become primarily dependent on the Government for subsistence." 64 Fed. Reg. at 28,677, 28,681 (proposed 8 C.F.R. § 212.102); *see also* Field Guidance, 64 Fed. Reg. at 28,689. DOJ further specified that "primarily dependent" means "complete or nearly complete dependence on the Government rather than the mere receipt of some lesser level of financial support." 1999 Proposed Rule, 64 Fed. Reg. at 28,677.  In issuing the Proposed Rule and Field Guidance, DOJ explained that its discretion to interpret this statutory term was cabined by "the plain meaning of the word 'charge'" and "the historical context of public dependency when the public charge immigration provisions were first adopted more than a century ago." *Id.*  DOJ therefore relied on ordinary tools of statutory interpretation in issuing its guidance. *Cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) (courts "must reject administrative constructions which are contrary to clear congressional intent" ascertained through "traditional tools of statutory construction").

DHS's Public Charge Rule seeks to wipe away this long history and make "self-sufficiency" the lodestar of public-charge determinations.  Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,122–23 (proposed Oct. 10, 2018) (to be codified at 8 C.F.R. pts. 103, 212–14, 245, 248) [hereinafter 2018 Proposed Rule].  Although the term "self-sufficiency" appears nowhere in the public-charge statute, DHS relies on that term's appearance in the prefatory language of a completely different statute—the Welfare Reform Act—as justification for breaking radically from the longstanding interpretation of the public-charge ground of inadmissibility.  *Id.*; *see also* 8 U.S.C. § 1601.  But the Welfare Reform Act facilitated

17

Congress's stated objective of noncitizen "self-sufficiency" by imposing new limitations on the categories of immigrants eligible for public benefits and, in many cases, a five-year waiting period before a noncitizen may obtain benefits.  The Act did *not* modify the public-charge inadmissibility ground.  And, in any event, even if a self-sufficiency standard could be gleaned from the historical interpretation of the term "public charge," the Public Charge Rule's standard—grounded on the likelihood of receipt of only a de minimus amount of benefits over a lifetime—is not a reasonable implementation of the concept of self-sufficiency.

In sum, prior to DHS's current rulemaking, Congress, the courts, and the agencies administering the public-charge inadmissibility ground all adopted the plain meaning of the term "public charge"—a person who is permanently and primarily dependent on the government for support.  DHS has acted contrary to law in issuing its overly broad definition of "public charge." *See Util. Air Regulatory Grp.*, 573 U.S. at 321 ("[A]gencies must operate 'within the bounds of reasonable interpretation.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013))).  It should not be permitted to misconstrue this unambiguous term to adopt a new, exclusionary immigration policy that Congress has rejected.

### B.  DHS Acted Arbitrarily and Capriciously in Adopting the Public Charge Rule

Plaintiffs also are likely to succeed on their claim that the Public Charge Rule should be set aside as arbitrary and capricious.  5 U.S.C. § 706(2)(A).  An agency rule is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Where, as here, an agency departs from its prior policy, it must provide a

"reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," and a more "detailed justification" is required where "serious reliance interests" are at stake. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)).

**1.      The Final Rule Fails to Adequately Explain Its Change in Policy**

The Final Rule is arbitrary and capricious because it departs from over a century of prior practice without adequate explanation for the change in policy. Ignoring the historical context of the public-charge inadmissibility ground, DHS asserts a number of unsubstantiated "beliefs" about noncitizens' self-sufficiency and irrelevant factors as the bases for imbuing the term "public charge" with an arbitrarily low threshold of benefits use and a broad expansion of covered benefits. And, unlike the 1999 Field Guidance from which DHS departs, DHS does not rely on expert benefits-granting agencies in imposing its new standard. For these reasons and because those aspiring to LPR status have come to rely on the longstanding understanding of the public-charge inadmissibility ground, DHS has failed to adequately justify its change in policy.

In establishing its de minimis definition of "public charge," DHS relies primarily on its own unsubstantiated "beliefs" about noncitizens' "self-sufficiency." The Public Charge Rule claims to reject the 1999 Proposed Rule's textual analysis of the word "charge" because "DHS does not believe that these definitions suggest or require a primary dependence on the Government in order for someone to be a public charge." 2018 Proposed Rule, 83 Fed. Reg. at 51,158. DHS never explains what informs this belief. Moreover, although the Public Charge Rule acknowledges the historical context that informed DOJ's analysis in 1999, DHS concludes without explanation that it is "immaterial" that the term "public charge" first appeared in federal immigration statutes during a time when federal, state, and local governments rarely provided

limited-purpose public benefits.  Final Rule, 84 Fed. Reg. at 41,350.  Even though the nature of

public benefits at the genesis of the public-charge provision supports the primarily dependent

standard, DHS, for unexplained reasons, does not believe that this historical evidence

"forecloses" its definition.  *Id.* at 41,350 n.310.

In selecting the public benefits to be considered in making a public-charge determination,

moreover, DHS relies on considerations that are entirely irrelevant to the statutory public-charge

inquiry.  DHS rejects the primarily dependent standard as "insufficiently protective of the public

budget" and selects the benefits to be included based in part on their impact on the federal

budget.  2018 Proposed Rule, 83 Fed. Reg. at 51,164.  But the downstream fiscal impacts of

immigration policy have nothing to do with the proper construction of the meaning of the term

"public charge."  DHS's duty is to enforce U.S. immigration law as written, not to reshape the

law with an eye toward guarding the public fisc.  *See* 8 U.S.C. § 1103(a).

Unlike the 1999 Proposed Rule, DHS's Public Charge Rule reflects no input from

benefit-granting agencies as to which benefits are relevant to a public-charge determination.  In

its 2018 Proposed Rule, DHS indicated that it had "consulted with the relevant Federal agencies

regarding the inclusion and consideration of certain . . . public benefits."  83 Fed. Reg. at 51,218.

But DHS has never disclosed the nature of the feedback that it received, and it instead relies

primarily on its own beliefs and speculation to justify the new policy.  Moreover, neither the

2018 Proposed Rule nor the Final Rule includes letters of support from these expert agencies, as

the 1999 Proposed Rule did, suggesting that those agencies do not support the Final Rule or its

understanding of these key concepts.

In sum, DHS offers no "good reasons for [its] new policy" dramatically altering the

threshold to be considered a public charge.  *Fox Television Stations*, 556 U.S. at 515.  Its basic

premises are based solely on unsubstantiated beliefs and irrelevant factors, demonstrating the arbitrary and capricious nature of the Public Charge Rule.

> **2.      The Final Rule's Definition of "Likely at Any Time to Become a Public Charge" Is Arbitrary and Irrational**

Not only is the Final Rule's definition of "public charge" contrary to the plain meaning of the term and unjustified, but the Rule's threshold for deeming a noncitizen "likely at any time to become a public charge" is so de minimis and difficult to apply that it is arbitrary and irrational.

Under the Public Charge Rule, an applicant for adjustment of status is "likely at any time to become a public charge" if she is "more likely than not at any time in the future" to "receive[] one or more" of the enumerated list of benefits "for more than 12 months in the aggregate within any 36-month period." 84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(a)–(c)). The combination of the broad expansion of covered benefits and a de minimis threshold to be deemed a "public charge" makes this definition irrational in practical application. For example, if an immigration official were to speculate that a noncitizen is likely to receive SNAP, Medicaid, and federal housing benefits for a period as short as four months (with each benefit counting as a separate month)—at any point in that person's life and regardless of the amount received—that person could be denied a green card as "likely to become a public charge."[9] To illustrate further, the average monthly SNAP benefit per person in 2018 was $126.96,[10] meaning that a noncitizen

---

[9] This is not an unrealistic prospect. About half of U.S.-born citizens have received the listed public benefits at some point in their lives. *See* Danilo Trisi, Ctr. on Budget & Policy Priorities, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means the Chance to Come to or Stay in the U.S.* 4–5 (May 30, 2019), https://perma.cc/4J72-GF6P ("Approximately 43 to 52 percent of U.S.-born individuals present in the PSID survey in 2017 participated in either SNAP, Medicaid, TANF, SSI, or housing assistance over the 1997-2017 period."); *id.* at 6 (stating that 16 percent of U.S. workers currently receive one or more of the enumerated benefits).

[10] U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program Participation and Costs* (Aug. 2, 2019), https://perma.cc/BA8N-4GZ3.

could be denied a green card if a USCIS officer deemed her likely to receive little more than $1,500 in SNAP benefits within a 36-month period. This threshold defies common sense. Noncitizens could be denied LPR status as likely to become a public charge based on their perceived likelihood of receiving a mere fraction of what they need to subsist.

Moreover, there is no way for a USCIS officer to predict with any precision whether a noncitizen is likely at some point in the future to accept such minimal levels of benefits. In light of the unreasonably low benefits-receipt threshold, the Rule lacks any guideposts for immigration officials to look to in considering whether individuals may face temporary setbacks over their lifetimes—e.g., whether an employed immigrant's savings will be insufficient to cover a period of unemployment following an economic downturn—instead leaving this question to the discretion of individual officials. Even DHS admits that public-charge determinations under the Rule will be "inherently subjective," "will vary," and will "not [be] governed by clear data regarding whether any given alien subject to [the] determination is more likely than not to receive public benefits" for 12 months or more. Final Rule, 84 Fed. Reg. at 41,315; 41,397.

Nor does the list of factors specified as part of the Rule's totality-of-the-circumstances test meaningfully help with that determination. For example, several of the enumerated benefits programs have income-eligibility thresholds above the 125-percent-Federal Poverty Guideline (FPG) income level that the Public Charge Rule considers a positive factor.[11] The Rule, however, offers no guidance on how USCIS should assess a noncitizen's likelihood of becoming

---

[11] *See* 7 U.S.C. § 2014(c) (households with income up to 130 percent FPG may receive SNAP benefits); Md. Code Ann., Health-Gen. § 15-103(a)(2); Md. Code Regs. 10.09.24.07(G)(4)(b) (adults with incomes up to 138 percent FPG may receive benefits from Maryland's Medicaid program, the Maryland Medical Assistance Program); *FY 2018 Income Limits Documentation System: Statewide Income Limits for Maryland*, HUD User, https://perma.cc/PPZ2-T5GP (last visited Mar. 3, 2019) (federal housing assistance is available to Marylanders with incomes equal to up to 400 percent FPG).

a public charge when her income qualifies as a positive factor but she nonetheless would be financially eligible for some of the listed benefits.

DHS attempts to justify its de minimis threshold based on its assertion that "it is possible and likely probable that many individuals" who receive public benefits in amounts far less than would be required to make them "primarily dependent on the government" would nonetheless "lack self-sufficiency."  Final Rule, 84 Fed. Reg. at 41,349.  But even assuming that some notion of "self-sufficiency" is an appropriate yardstick for a public-charge determination—despite its lack of a statutory basis and inconsistency with a century of interpretation—DHS fails to justify why its draconian conception of "self-sufficiency" should be the proper threshold.  There is a long distance between someone who is barely less than primarily dependent on the government for subsistence and someone who might receive a few months of minimal benefits over a lifetime.  The result is a standard that is arbitrary in theory and wholly unworkable in practice.

### 3. DHS ignored or failed to adequately consider important aspects of the problem before it

In promulgating the Final Rule, DHS ignored or failed to adequately consider important aspects of the problem before it.  *See State Farm*, 463 U.S. at 43.  In particular, DHS failed to meaningfully consider the full range of harms and costs imposed by the Rule on noncitizens, their families, and the communities in which they live, as well as the arbitrary and discriminatory impacts of the Rule.

DHS's estimate of the costs and benefits of the Public Charge Rule ignores important costs brought to its attention during the notice and comment period.  First, DHS estimates a $1.46 billion annual reduction in transfer payments based on the flawed assumption that noncitizens who intend to adjust status will be the ones most affected by the Rule's chilling effect, even though the Welfare Reform Act bars such individuals from receiving most of the

public benefits at issue in the Rule.  Final Rule, 84 Fed. Reg. at 41,487; 2018 Proposed Rule, 83

Fed. Reg. at 51,266.  In actuality, while likely overestimating the disenrollment of adjustment-of-

status applicants, this figure also grossly underestimates the Rule's broader chilling effect.  As

numerous comments demonstrated, the Rule will cause noncitizens to disenroll from or not

enroll in programs that are not considered in public-charge determinations under the Rule and to

disenroll or not enroll family members, like U.S.-citizen children, whose receipt of benefits also

will not be factored into a public-charge determination.[12]

In CASA's experience, many noncitizens and their U.S. citizen family members have

been, and will continue to be, discouraged from using public benefits because of the Public

Charge Rule.  Escobar Decl. ¶¶ 10–15, Ex. 1 to Backer Decl.  Due to fear and uncertainty created

by the confusing and opaque terms of the Public Charge Rule, many noncitizens have already

disenrolled themselves and their family members from public benefits to which they are lawfully

entitled.  They also have disenrolled (or declined to enroll) themselves and members of their

household from benefits not covered by the Public Charge Rule out of fear that accepting *any*

benefits will harm their immigration status.  *See infra* Part II.

DHS recognized this chilling effect, *id.* at 41,300, but it refused to even attempt to

quantify the magnitude of the harm because it "believes it would be unwarranted for U.S.

citizens and aliens exempt from public charge inadmissibility to disenroll from a public benefit

program or forego enrollment in response to this rule when such individuals are not subject to

this rule," *id.* at 41,313.  Regardless of whether DHS believes this response is "warranted," it is a

known cost of the Rule, and "reasonable regulation ordinarily requires paying attention to the

---

[12] *See, e.g.*, Am. Public Health Ass'n, Comment Letter on Proposed Rule (Dec. 10, 2018), Ex. 5
to Backer Decl.; Child Care Law Center, Comment Letter on Proposed Rule (Nov. 20, 2018),
Ex. 6 to Backer Decl.; UnidosUS, Comment Letter on Proposed Rule (Nov. 27, 2018), Ex. 7 to
Backer Decl.

advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).

Second, the administrative record—including numerous public comments from state and local governments, social service providers, immigrant rights organizations and others—provides evidence that the Public Charge Rule will harm public health, healthcare systems, state and local administration of benefits, and local economies.[13]  DHS failed to meaningfully account for these significant costs in its cost-benefit analysis of the Rule.  *See* 84 Fed. Reg. at 41,302–03. Tellingly, DHS asserts as part of its response to these concerns that it "believes" that the Rule will "ultimately strengthen public safety, health, and nutrition" without any explanation as to how this end will be achieved—and in the face of substantial evidence to the contrary.  *Id.* at 41,314.  This conclusion also fails to account for the 1999 Field Guidance's recognition that disenrollment from public benefits has "an adverse impact not just on the potential recipients, but on public health and the general welfare."  64 Fed. Reg. at 28,692.  DHS's unreasonable failure to meaningfully engage with these critical costs makes the Public Charge Rule arbitrary and capricious.

Additionally, as explained below, *see infra* sections I.C and I.D, the Public Charge Rule discriminates against noncitizens who are nonwhite and from non-European countries, and the test it imposes is so vague as to invite arbitrary and discriminatory enforcement.  In the Final Rule, DHS failed to meaningfully grapple with these critical issues.  With respect to the discriminatory impact of the Rule, DHS merely asserts, without explanation, that "it did not codify this final rule to discriminate."  84 Fed. Reg. at 41,309.  With respect to vagueness, DHS

---

[13] *See, e.g.*, State of Virginia et al, Comment Letter on Proposed Rule (Dec. 10, 2018), Ex. 8 to Backer Decl.; City of Chicago et al., Comment Letter on Proposed Rule (Dec. 10, 2018), Ex. 9 to Backer Decl.; Legal Aid Society of the District of Columbia, Comment Letter on Proposed Rule (Dec. 10, 2018), Ex. 10 to Backer Decl.

disavowed any obligation to interpret the public-charge inadmissibility ground in a manner that

provides fair notice to noncitizens or prevents arbitrary enforcement, stating that "fundamentally,

as it relates to vagueness, [critics'] quarrel is with Congress, not with DHS." *Id.* at 41,321.

These pro forma responses demonstrate that DHS failed to meaningfully consider these

important issues in issuing its Final Rule.

### C.    The Public Charge Rule Is Unconstitutionally Vague

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be

deprived of life, liberty, or property, without due process of law."  U.S. Const. amend V.  A

noncitizen "who has entered the country, and has become subject in all respects to its

jurisdiction, and a part of its population" has a due-process liberty interest that protects her right

"to be heard upon the questions involving [her] right to be and remain in the United States." *The

Japanese Immigrant Case*, 189 U.S. 86, 101 (1903); *see also Rusu v. INS*, 296 F.3d 316, 321–22

& n.8 (4th Cir. 2002) (holding that asylum hearings must comply with due-process standards on

account of the liberty interest recognized in *The Japanese Immigrant Case*).  That right to be

heard would be a hollow one if the government lacked a concomitant obligation to provide

noncitizens with fair notice of how to avoid being barred from remaining in the United States.

Because the Public Charge Rule fails to provide fair notice of what might render a noncitizen

inadmissible as likely to become a public charge and accords virtually unbridled discretion to

immigration officials in making that determination, Plaintiffs are likely to succeed on their claim

that the Public Charge Rule is unconstitutionally vague.

As the Supreme Court has recognized, "[i]t is a basic principle of due process that an

enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of

Rockford*, 408 U.S. 104, 108–09 (1972); *accord Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391

(1926) (stating that vague laws "violate[] the first essential of due process").  "Vague laws may

trap the innocent by not providing fair warning" and raise the risk of "arbitrary and

discriminatory application."  *Grayned*, 408 U.S. at 108–09.  Under the void-for-vagueness

doctrine, regulations must (1) "give the person of ordinary intelligence a reasonable opportunity

to know what is prohibited, so that he may act accordingly" and (2) "provide standards for those

who apply them" so as to prevent "arbitrary and discriminatory enforcement."  *Id.* at 109.

Immigration statutes and regulations are not exempt from the Due Process Clause's

prohibition against vague laws.  In *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Supreme

Court held that an INA provision that rendered noncitizens deportable based on their commission

of certain violent crimes was unconstitutionally vague.  *Id.* at 1223.  Although immigration

statutes are civil laws, which courts typically review under a less stringent vagueness standard

than criminal laws, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489,

498 (1982), the *Dimaya* Court held that because of "'the grave nature of deportation,'" which

"often amount[s] to lifelong 'banishment or exile,'" immigration removal statutes must meet "the

most exacting vagueness standard," 138 S. Ct. at 1213 (plurality op.) (quoting *Jordan v. De

Jorge*, 341 U.S. 223, 229 (1951)); *see also id.* at 1231 (Gorsuch, J., concurring in part and

concurring in the judgment) (agreeing that the case called for rigorous vagueness review, and

arguing that there is no good reason to "single . . . out for special treatment" deportation

provisions among other "civil laws [that] impose . . . similarly severe sanctions").

For a noncitizen living in the United States, the consequence of being found inadmissible

is as grave as the consequence of being found deportable.  A noncitizen may be deportable at the

time that she attempts to adjust status if she is found to be inadmissible through that process.

8 U.S.C. § 1227(a)(1)(A).  The INA also classifies as deportable noncitizens who remain in the

United States beyond the time that they are legally authorized to be in the country.  *Id.* § 1227(a)(1)(B) (classifying as deportable "[a]ny alien who is present in the United States in violation of" the INA), *id.* § 1227(a)(1)(C)(i) (classifying as deportable "[a]ny alien who was admitted as a nonimmigrant and who failed to maintain [her] nonimmigrant status").  A noncitizen who is unable to adjust status on account of the public-charge ground of inadmissibility therefore will become deportable either immediately upon being deemed inadmissible or once her nonimmigrant visa or other immigration status lapses.[14]

The INA's admissibility and deportability provisions are thus inextricably entwined.  Indeed, admissibility determinations are functionally equivalent to deportation proceedings for noncitizens who live in the United States.  An unfavorable determination of either variety exposes noncitizens to "lifelong banishment or exile."  *See Dimaya*, 138 S. Ct. at 1213 (plurality op.) (internal quotation marks omitted).  Accordingly, there is no logical reason for a less stringent form of void-for-vagueness review to apply to the INA's admissibility provisions (as applied to noncitizens living in the United States) than *Dimaya* requires of the INA's deportation provisions.  Anything less would render a noncitizen's due-process right "to be heard upon the questions involving [her] right to be and remain in the United States" an empty formality.  *The Japanese Immigrant Case*, 189 U.S. at 101.

*Dimaya*'s applicability to the INA's admissibility provisions is reinforced by the Fourth Circuit's recent en banc decision invalidating on void-for-vagueness grounds a "series of interrelated Virginia statutes" that regulated excessive consumption of alcohol.  *Manning v.*

---

[14] *See* U.S. Citizenship & Immigration Servs., *Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens* (July 28, 2018), https://perma.cc/937S-EYR4 (explaining that USCIS will begin deportation proceedings "where, upon issuance of an unfavorable decision on an application, petition, or benefit request, the alien is not lawfully present in the United States.").

*Caldwell*, 930 F.3d 265, 268 (4th Cir. 2019).  Prior to *Manning*, Virginia law allowed a state circuit court to enter a civil-interdiction order "prohibiting the sale of alcoholic beverages" to a person who "has shown himself to be an habitual drunkard."  Va. Code Ann. § 4.1-333(A).  A separate statute made it a crime for a person subject to such an interdiction order to "possess any alcoholic beverages" or to "be drunk in public."  Va. Code Ann. § 4.1-322.  The court held that the entire "challenged scheme" (i.e., the civil-interdiction statute and the related criminal statute) was unconstitutionally vague due to "the lack of any guidelines or standards regarding who qualifies as an 'habitual drunkard.'"  *Manning*, 930 F.3d at 274.

The principal dissent, by contrast, evaluated the civil and criminal components of the scheme separately.  *Id.* at 301 (Wilkinson, J., dissenting).  Because the term "habitual drunkard" appeared in the interdiction statute, a civil law, the dissenting judges argued that the term should have been analyzed under a lax void-for-vagueness standard.  *Id.* at 303.  And because any individual subject to an interdiction order would be on notice that possession of alcohol or public drunkenness could expose her to criminal sanction, the dissent explained, the criminal component was not vague.  *Id.* at 301.  The majority rejected this myopic approach to void-for-vagueness review because "persons informed that they can no longer possess alcohol because they are an 'habitual drunkard' are not thereby put on notice about what conduct led to that adjudication in the first place."  *Id.* at 274 (maj. op.).

For similar reasons, the Public Charge Rule must be analyzed under "the most exacting vagueness standard."  *See Dimaya*, 138 S. Ct. at 1213 (plurality op.).  Once labeled "likely . . . to become a public charge" during an admissibility determination, 8 U.S.C. § 1182(a)(4), a noncitizen might be on notice that she is deportable, or will inevitably become so, under one of the INA's applicable provisions.  *See* 8 U.S.C. § 1227(a)(1)(A), (B), (C)(1).  But *Dimaya*

demands that noncitizens be given fair notice about what they must do to avoid the "severe penalty" of deportation, not merely notice that they are deportable. *See* 138 S. Ct. at 1213 (plurality op.) (quoting *Jae Lee v. United States*, 137 S. Ct. 1958, 1968 (2017)). As in *Manning*, the entire scheme that regulates noncitizens' ability to remain in the United States—which encompasses both the INA's admissibility and deportability provisions—is subject to void-for-vagueness review. *See Manning*, 930 F.3d at 274.

The notice provided by the Public Charge Rule is anything but fair. According to DHS itself, determinations under the Rule will be "inherently subjective," "will vary," and will "not [be] governed by clear data." Final Rule, 84 Fed. Reg. at 41,315; 41,397. DHS is right. There is simply no way for USCIS to prophesy a noncitizen's likelihood of experiencing a temporary, isolated need for even a small quantity of benefits at any point in her life—and *certainly not* under the enigma that is the Rule's totality-of-the-circumstances framework. For several reasons, the combination of the Public Charge Rule's de minimis "public charge" threshold, opaque medley of purportedly relevant factors, and unclear weighting scheme fails to provide sufficient guidance to constrain immigration officials' discretion in making forward-looking projections of future benefits receipt—or to provide noncitizens with sufficient notice of what could make a USCIS officer deem them "likely at any time to become a public charge."

First, because the Welfare Reform Act bars non-LPRs from receiving most, if not all, of the enumerated benefits, 8 U.S.C. §§ 1611, 1621(a), (d), 1641(b), the Rule requires USCIS to prognosticate about how noncitizens will live their lives in the United States differently than they already do if and when they obtain LPR status. Second, because sudden changes in individual circumstances can quickly erode a once-secure financial foundation, the Rule permits immigration officials to hypothesize about misfortune that might befall a noncitizen in the future

such as spells of unemployment, unexpected illness, or financial insecurity in advanced age.[15]

Third, because not all individuals who qualify for public benefits apply for or receive them—

indeed, to take one example, only 28 percent of individuals who were eligible for TANF in 2012

received the benefit[16]—the Rule requires immigration officials to surmise not just whether an

individual will qualify for enumerated benefits in the future, but also whether she actually will

apply for and receive them.  Fourth, because income-eligibility requirements for several of the

enumerated benefits exceed the threshold for what DHS considers "positive" income (125

percent of the FPG), the Rule forces immigration officials to determine how to interpret at least

one factor that is at odds with the Rule's overarching inquiry.  Finally, because immigrant wages

grow significantly over time, USCIS officials must project how an immigrant's financial

circumstances are likely to improve from what is, in most circumstances, a low point on a

positive trajectory.[17]  These and other immeasurable characteristics—for which the Public

Charge Rule provides absolutely no guidance—ensure that public-charge determinations under

the Rule will "devolv[e] into guesswork and intuition," inviting arbitrary and even

discriminatory enforcement.  *Johnson v. United States*, 135 S. Ct. 2551, 2559 (2017).

---

[15] Because 78 percent of workers in the United States—including nearly one-in-ten who make $100,000 or more—live paycheck to paycheck, even an income above 250 percent FPG (i.e., what DHS considers to be a "heavily weighted positive factor") is far from a guarantor of future financial security.  Press Release, CareerBuilder, Living Paycheck to Paycheck is a Way of Life for Majority of U.S. Workers, According to New Career Builder Survey (Aug. 24, 2017), https://perma.cc/XGL4-FT6U.  Moreover, there is little in the Rule precluding an immigration official from concluding that any given person might require Medicaid assistance in old age—as many U.S. residents do.  *Medicaid's Role in Nursing Home Care*, Henry J. Kaiser Family Found. (June 20, 2017), https://perma.cc/DJ5M-HYZP (Medicaid covers 62 percent of all nursing home residents).

[16] Gene Falk, Cong. Research Serv., R44724, *Temporary Assistance for Needy Families (TANF): Size of the Population Eligible for and Receiving Cash Assistance* 6 (2017), *available at* https://perma.cc/ULY8-CUCK.

[17] Andrew Forrester & Alex Nowraseth, Cato Inst., *Immigrant Wages Converge with Those of Native Born Americans* (2018), https://perma.cc/CHE4-CTV6.

31

The mind-numbing complexity of the Public Charge Rule's totality-of-the-circumstances framework only aggravates the arbitrariness created by the Rule's low threshold and broad range of benefits considered.  No meaningful instructions are provided about how to weigh the myriad enumerated factors—or any nonenumerated factors deemed relevant—against one another or how that balancing act bears upon the ultimate question:  Is a noncitizen likely at any point to experience a temporary, isolated need for even a small amount of one or more of the listed benefits?  The Rule permits immigration officials to give decisive weight to a single "negative" factor even in the face of a preponderance of "positive" factors, or the other way around.  *See* Final Rule, 84 Fed. Reg. at 41,399–41,401.  Accordingly, even noncitizens like Plaintiffs Aguiluz and Camacho who exhibit several identifiable "positive" factors—but also some "negative" factors—cannot be confident that they are safe from the threat of an unfavorable public-charge determination.  *See* Aguiluz Decl. ¶¶ 14–21, Ex. 2 to Backer Decl.; Camacho Decl. ¶¶ 12–18, Ex. 3 to Backer Decl.  With such unchanneled discretion accorded to USCIS, the outcome of each public-charge determination will "depend 'entirely upon the [immigration enforcement] philosophy of the particular' individual enforcing the scheme at that moment." *Manning*, 930 F.3d at 276 (quoting *Booth v. Commonwealth*, 88 S.E.2d 916, 917 (Va. 1955)).

DHS disputes none of this.  It simply disavows any obligation to interpret the public-charge ground of inadmissibility with clarity.  Blaming the INA's text for the Public Charge Rule's vagueness, *see* Final Rule, 84 Fed. Reg. at 41,321, DHS thus shirks its responsibility as the agency charged with interpreting the INA to provide a limiting construction for the public-charge determination.  *See Hoffman Estates*, 455 U.S. at 494 n.5 (stating that courts "must, of course, consider any limiting construction . . . [an] enforcement agency has proffered" in conducting void-for-vagueness review).  But even were DHS correct that it is the statutory

32

scheme, not the Rule, that is at the heart of the Public Charge Rule's vagueness, that is no

answer.  A vague statute that cannot be clarified through limiting construction has but one

remedy: invalidation.  *See Dimaya*, 138 S. Ct. at 1210; *Johnson*, 135 S. Ct. at 2563 (holding

unconstitutional the Armed Career Criminal Act's residual clause); *Manning*, 930 F.3d at 278;

*United States v. Simms*, 914 F.3d 229, 237 (4th Cir. 2019) (holding unconstitutional 18 U.S.C.

§ 924(c)(1)'s residual clause).  Any law—whether statute, regulation, or rule—that deprives

noncitizens living in the United States of "the first essential of due process" cannot stand.

*Connally*, 269 U.S. at 391; *see also The Japanese Immigrant Case*, 189 U.S. at 101; *Rusu*, 296

F.3d at 321–22.

### D.     The Public Charge Rule Is Motivated by Animus Toward Non-European, Non-White Immigrants

Plaintiffs are likely to succeed on their claim that the Public Charge Rule violates the

equal protection component of the Fifth Amendment's Due Process Clause. The Fifth

Amendment prohibits the federal government from taking action for which discriminatory intent

or purpose is a "motivating factor."  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 265–66 (1977); *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220

(4th Cir. 2016).  "[D]iscriminatorily motivated . . . laws are just as abhorrent, and just as

unconstitutional, as laws that expressly discriminate on the basis of race."  *N.C. State Conf. of*

*the NAACP*, 831 F.3d at 220.  To determine whether a facially neutral law like the Public Charge

Rule is motivated by discriminatory animus, courts consider, among other things, whether (1) the

law has a disparate impact—i.e., whether it "'bears more heavily on one race [or other protected

class] or another'"; (2) the law's 'historical background," including "contemporary statements"

by the relevant decisionmakers; (3) "the specific sequence of events leading up to the challenged

decision," including whether the law departs from longstanding prior practice; (4) "[d]epartures

from normal procedural sequence"; and (5) "substantive departures, . . . particularly if the factors usually considered by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 266–68 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Research by the Migration Policy Institute (MPI) demonstrates that the Public Charge Rule will disproportionately prevent noncitizens who originate from Latin American, African, and Asian countries from obtaining LPR status.  *See* Randy Capps et al., Migration Policy Inst., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration* 9 (2018), https://perma.cc/GS7E-DUHW.  MPI used American Community Survey data to model the population of noncitizens who obtained LPR status in recent years and to estimate the percentage of that population that exhibits one or more of the "negative factors" from the Rule's totality-of-the-circumstances test.  *Id.* at 7.  Overall, MPI estimates that 69 percent of recent LPRs had at least one or more negative factor, and 43 percent had two or more.  *Id.* at 8.

The presence of negative factors was not equally distributed among the recent LPR population.  According to MPI, 60 percent of recent LPRs from Mexico and Central America, 40 percent from Asia, and 34 percent from Africa had two or more negative factors.  *Id.* at 9.  In contrast, only 27 percent of recent LPRs from Europe, Canada, and Oceania (i.e., Australia and New Zealand) had two or more negative factors.  *Id.*  Twenty-six percent of recent LPRs from Europe, Canada, and Oceania had income below the 125-percent-FPG income level that constitutes a "negative factor."  *Id.*  In contrast, 41 percent of recent LPRs from Mexico and Central America, 30 percent from Asia, and 37 percent from Africa had incomes that low.  *Id.* Some of the Public Charge Rule's other enumerated factors also will also disproportionately affect non-European immigrants.  For example, research shows that credit scores are lower

among blacks and Hispanics than among non-Hispanic whites and Asians.[18]  Similarly, 57

percent of immigrants from Mexico and 49 percent of immigrants from Central America have

not obtained a high school degree, while only 11 percent of immigrants from Europe or Canada

have not obtained one.[19]  Accordingly, the Public Charge Rule would "bear[] more heavily" on

non-European, non-white immigrants.  *See Davis*, 426 U.S. at 242.

Statements by President Trump and other administration officials confirm that the Public

Charge Rule's disparate impact is the product of intentional discrimination.  President Trump has

made no secret that he harbors negative stereotyped views of non-European immigrants.  In a

June 2017 Oval Office meeting, President Trump complained that immigrants from Haiti "all

have AIDS" and that people from Nigeria should not be allowed into the United States on a

temporary basis because they would never "go back to their huts."[20]  He also has justified his

favored immigration policies in terms that reify those stereotyped views.  Rejecting a proposed

immigration deal that would have allowed Temporary Protected Status (TPS) beneficiaries from

El Salvador, Haiti, and some African countries to remain in the United States, President Trump

said, "Why are we having all these people from shithole countries come here?"  In the same

meeting, the President stated that the United States should prioritize immigration from countries

such as Norway, which has an overwhelmingly white population, and certain Asian countries

that he considers economically beneficial to the United States.[21]  The President recently echoed

---

[18] Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit*, at O-25 (2008), https://perma.cc/2FPK-DF4S.

[19] Gustavo Lopez et al., *Key Findings About U.S. Immigrants*, Pew Research Ctr. (Nov. 30, 2018), https://perma.cc/PF5A-JX53.

[20] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://perma.cc/D5HN-WL2P.

[21] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018), https://perma.cc/M8LF-HXTL; Cent. Intelligence Agency, *The World*

these sentiments when he said that three Congresswomen—one a woman of Palestinian heritage who was born in the United States, another an African American woman who was born in the United States, and another who was born in Somalia but immigrated to the United States as a teenager and became a naturalized U.S. citizen—should "go back and help fix the totally broken and crime infested places from which they came."[22]

Members of President Trump's administration share his animus toward non-European immigrants.  For example, Senior Adviser to the President for Policy Stephen Miller—who was actively involved in drafting the Public Charge Rule and pushed USCIS officials to enact the Rule on an expedited schedule[23]—reportedly told a former White House communications aide, "I would be happy if not a single refugee foot ever touched American soil."[24]  People from Europe, Canada, and Oceania make up a small fraction of the U.S. refugee and asylee population.[25]  Miller's statement therefore reflects deep hostility toward immigrants from non-European countries.

In recent days, Defendant Cuccinelli, the Acting Director of USCIS, also has defended the Rule by distinguishing the national origin of modern-day immigrants from that of 19th century immigrants, stating that the Rule is not inconsistent with the values represented by the

---

*Factbook: Norway*, https://perma.cc/GD98-29CE (last updated Feb. 18, 2019) (Norway's population is 83.3 percent ethnically Norwegian and 8.3 percent of another European ethnicity).
[22] Donald J. Trump (@realDonaldTrump), Twitter (July 14, 2019, 5:27 A.M.), https://perma.cc/9AB5-Z78H.

[23] Michael D. Shear & Emily Baumgaertner, *Trump Administration Aims to Sharply Restrict New Green Cards for Those on Public Aid*, N.Y. Times, Sept. 22, 2018, https://perma.cc/3FHY-RZRC (stating that Miller "has pushed hard" for the Public Charge Rule).

[24] Cliff Sims, *Team of Vipers: My 500 Extraordinary Days in the Trump White House* 191 (2019).

[25] *See* Dep't of Homeland Sec'y, *Refugees & Asylees 2017 Tables*, tbls. 14, 17, 19 (2019), https://perma.cc/54BZ-BCXV.

poem on the Statue of Liberty's pedestal because those immigrants were "coming from Europe where they had class-based societies, where people were considered wretched if they weren't in the right class."[26]  Cuccinellli has a history of supporting policies that discriminate against non-European immigrants, including introducing a bill as a Virginia state senator that would have allowed employers to fire employees who spoke a language other than English on the job.[27]

Several courts, including this one, have held that statements like those detailed above indicate racial animus toward non-European immigrants.  *See CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325–26 (D. Md. 2018) ("One could hardly find more direct evidence of discriminatory intent toward Latino immigrants.").[28]  Moreover, this court has held that such discriminatory rhetoric places the burden of persuasion on DHS to demonstrate that its immigration policies are not infected by animus.  *See id.* at 32 (citing *Staub v. Proctor Hospital*,

---

[26] Devan Cole & Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019), https://perma.cc/2CJF-42XZ.

[27] Scott Bixby, *Ken Cuccinelli Wanted to End Birthright Citizenship & Militarize Border—Now He's Trump's Immigration Chief*, The Daily Beast, June 10, 2019, https://perma.cc/7TKC-G3Q4.

[28] *See also, e.g.*, *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 518–19 (9th Cir. 2018) (affirming the district court's denial of a motion to dismiss an equal-protection challenge to the Trump Administration's rescission of the Deferred Action for Childhood Arrival (DACA) program and relying, in part, on "a history of animus toward persons of Hispanic descent evidenced by both pre-presidential and post-presidential statements by President Trump"), *cert. granted* 139 S. Ct. 2779 (2019); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1100–01 (N.D. Cal. 2018) (granting a preliminary injunction to halt DHS's termination of TPS status for immigrants from El Salvador, Haiti, Nicaragua, and Sudan because the plaintiffs had plausibly stated an equal-protection claim based in part on "evidence that President Trump harbors an animus against non-white, non-European aliens"), *appeal docketed*, No. 18-16981 (9th Cir. Oct. 12, 2018); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (finding that plaintiffs plausibly alleged that discriminatory purpose was a motivating factor in the decision to rescind TPS); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (finding that plaintiffs alleged sufficient facts to make a plausible claim that the decision to rescind DACA was motivated by discriminatory animus), *cert. granted*, 139 S. Ct. (2019).  *But see CASA de Maryland v. DHS*, 284 F. Supp. 3d 758, 775 (D. Md. 2018) (rejecting an equal-protection challenge to DHS's decision to rescind DACA), *aff'd in part and rev'd in part*, 924 F.3d 684 (4th Cir. 2019) (declining to reach equal-protection claim).

562 U.S. 411, 413 (2011)).

As detailed above, the Public Charge Rule is at odds with how the public-charge inadmissibility ground has been interpreted for over a century, and DHS failed to rely on the expertise of benefit-granting agencies in drafting the Rule, as DOJ did in drafting the 1999 Proposed Rule and Field Guidance.  Such substantive and procedural departures also confirm the discriminatory animus underlying the Rule.  *See Arlington Heights*, 429 U.S. at 267.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

Plaintiffs will be irreparably harmed if the Public Charge Rule is permitted to go into effect on October 15, 2019.  CASA's members have been and will continue to be discouraged by the Rule from obtaining important public benefits for themselves and their families, and CASA as an organization will be harmed by having to redirect its efforts to address the effects of the Public Charge Rule at an important time for immigration policy advocacy.  Moreover, CASA's members, including the individual Plaintiffs, are harmed by the Public Charge Rule's vagueness, as it directly affects their daily decision-making, and by the discriminatory effects of the Rule.

The vague and complicated terms of the Rule have engendered confusion and fear among CASA's membership, leading many members to disenroll from or forgo public benefits to which they or their family members, including U.S. citizen children, are entitled.  Escobar Decl. ¶¶ 10–12.  Although receipt of many of these benefits would not affect a public-charge determination under the Rule (e.g., benefits received only by eligible family members and benefit programs not covered by the Rule), CASA's members are not always aware of these distinctions and therefore have been chilled from using federal, state, and local benefits that provide important food, health, and housing supports for their families.  Escobar Decl. ¶ 12.  Even DHS has acknowledged that this harm is likely to occur.  *See* 2018 Proposed Rule, 83 Fed. Reg. at 51,266 ("Research shows

that when eligibility rules change for public benefits programs there is evidence of a 'chilling effect' that discourages immigrants from using public benefits programs for which they are still eligible."). CASA's members will be irreparably harmed by forgoing benefits that improve child and family nutrition, support positive health outcomes, and ensure stable housing.

For example, noncitizen members of CASA have disenrolled their U.S. citizen children from SNAP benefits out of fear that their children's receipt of benefits will be counted against them, and these families are struggling to obtain sufficient, nutritious food absent these benefits. Escobar Decl. ¶ 14. Members have also given up Medicaid benefits, insurance provided under the Children's Health Insurance Program, and health insurance purchased with subsidies under the Affordable Care Act for themselves or their children out of fear of the Public Charge Rule.[29] Absent health insurance, our members are forced to miss additional days of work, struggle to manage chronic illnesses, and fail to get their children preventive health care that helps them thrive. Escobar Decl. ¶ 15.

CASA has incurred significant costs in advising its members on the immigration consequences that might flow from applying for or accepting public benefits for themselves or their family members, and it will incur even higher costs if the Public Charge Rule is permitted to go into effect. CASA already has reallocated significant resources to combating the Rule's chilling effects through public education and counseling, including devoting the work of numerous employees and volunteers to conducting educational outreach about the Rule. Escobar

---

[29] In a cruel twist, this effort to avoid receiving *any* benefit could actually have the effect of harming a noncitizen's balance of positive and negative factors in a public-charge determination. Although health insurance purchased with a subsidy under the Affordable Care Act is not given the same "heavy" positive weight as private insurance, *see* 84 Fed. Reg. 41,504 (to be codified at 8 C.F.R. § 212.22(c)(2)(iii)), having any non-Medicaid health insurance might be a positive factor, whereas having no insurance at all might be a negative factor, *id.* at 41,503 (to be codified at 8 C.F.R. § 212.22(b)(4)(ii)(H)).

Decl. ¶¶ 16–20.  CASA has had to take additional time in counseling individual members about

whether to enroll in public benefits because of the Rule, reducing the number of individuals it is

able to serve on a daily basis.  Escobar Decl. ¶ 19.  Moreover, as members disenroll from public

benefits, CASA will be forced to redirect its resources to ensure that its members who are chilled

from participating in public benefits programs have access to the supportive services they need.

Escobar Decl. ¶ 21.  In these ways, CASA's "mission[] ha[s] been frustrated and [its] resources

diverted as a result of" the Public Charge Rule on an ongoing basis, demonstrating irreparable

harm.  *Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1019, 1029 (9th Cir. 2013).

 Because responding to the effects of the Rule have taken up, and will continue to take up,

significant resources, CASA has had to shift its organizational focus from an affirmative

posture—seeking to improve conditions for immigrant families—to a defensive one—seeking to

mitigate the harm of the Public Charge Rule on the communities it serves.  For example, CASA

has had to reduce its advocacy for health-care expansion efforts at the state level in Maryland

and at the local level in Prince George's County, Maryland.  These political efforts are

necessarily time-sensitive, as they are dependent on political will and the legislative cycle.  They

cannot simply be undertaken with equal efficacy at a different time.  Escobar Decl. ¶¶ 22–23.

*Cf. League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (organizations

are irreparably harmed if defendant's conduct impairs the organization's activities, making it

more difficult to carry out the organization's mission).

 The individual Plaintiffs also will be irreparably harmed if the Final Rule goes into effect.

Both individual Plaintiffs would be subject to a public-charge determination when and if they

apply to adjust status to become LPRs, and both Plaintiffs exhibit a mix of positive and negative

characteristics under the Rule.  *See* Aguiluz Decl. ¶¶ 7–8, 15–19; Camacho Decl. ¶¶ 7–8, 13–16.

This mix makes it impossible for them to predict whether they will be deemed likely to become public charges and also makes them hesitant to make any decisions that could result in acquiring additional negative factors.  Although they have not yet applied to adjust status, both individual Plaintiffs intend to do so, and the nature of the broad inquiry required by the Final Rule means that their current financial and personal choices will affect their ultimate ability to do so.  *Cf. Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) (finding allegations sufficient for prospective relief "if plaintiffs allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder'" (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).  The uncertainty engendered by the Rule inevitably will force them to alter their conduct—perhaps unnecessarily and at significant personal expense—to minimize their "negative factors" and maximize their "positive factors."

Mr. Aguiluz's income is between 125 and 250 percent FPG for his household of one, and he does not have private health insurance.  Aguiluz Decl. ¶¶ 15, 18.  He therefore lacks any "heavily weighted positive factor" under the Public Charge Rule, although he does not have any "heavily weighted negative factors" either.  Given the vague nature of the public-charge determination under the Rule, Mr. Aguiluz is unsure whether he will be deemed inadmissible, and thus be prevented from adjusting status, given his particular mix of positive factors (e.g., his history of employment and near-completion of his associate's degree) and negative factors (e.g., his lack of health insurance, poor credit score, and existing financial liabilities).  Aguiluz Decl. ¶¶ 14–20.  In the next few months, this uncertainty will affect his decisionmaking as he finishes his associate's degree and decides whether, how, and where to pursue his bachelor's degree. While he would like to attend a private university like Johns Hopkins or an Ivy League school,

he is concerned about taking on extra student loan debt or reducing his work hours to attend school full-time. Aguiluz Decl. ¶¶ 21–23. These decisions will have an irrevocable impact on Mr. Aguiluz's future.

Ms. Camacho's income is between 125 and 250 percent FPG for her household of one. Camacho Decl. ¶ 13. She is currently pursuing her associate's degree while employed by Baltimore City Public Schools, which provides her health insurance. Camacho Decl. ¶¶ 9–10, 14. Lacking income that is considered a "heavily weighted positive factor" under the Public Charge Rule, and given the vague nature of determinations under the Rule, Plaintiff Camacho is concerned that she will be deemed inadmissible on public-charge grounds and thus be prevented from adjusting status. Camacho Decl. ¶ 17. This uncertainty makes her reluctant to take actions that would make her more likely to be considered a public charge. Camacho Decl. ¶ 18. Ms. Camacho must factor a future public-charge determination into all her current decisionmaking, such as whether to take out student loans as she works toward her degree and whether she should build up her savings or use some of her discretionary income to improve and furnish her new home. Camacho Decl. ¶¶ 19–20.

Finally, both CASA and the individual Plaintiffs have demonstrated that the Public Charge Rule will violate the due process and equal protection components of the Fifth Amendment, and "the denial of a constitutional right" itself "constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987).

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF INJUNCTIVE RELIEF

Where the government is a party, analysis of the balance of the equities and the public interest merge. *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (quoting *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). Here, the harms

caused by allowing the Public Charge Rule to go into effect will be severe, while the harms to

DHS are virtually nonexistent.  Allowing the Rule to go into effect would exacerbate the already

existing fear and confusion among CASA's members and would lead to a greater chilling effect

on benefits participation.  This will hurt the immigrant communities that CASA serves and force

CASA to devote even more resources to educational campaigns, counseling, and benefits

assistance during the pendency of the litigation.  Letting the Rule go into effect also would harm

the individual Plaintiffs by forcing them to make different life choices than they otherwise

would, some of which may not be in their personal interest.  By contrast, enjoining the Rule from

going into effect pending this litigation will merely preserve the status quo.  The federal

government has been operating under the 1999 Field Guidance for 20 years, and it will not be

harmed by continuing to do so pending a final determination on the merits of this case.

Moreover, as explained above, the Public Charge Rule represents a drastic policy change,

without sanction by Congress, and it is in the public interest to protect the "separation of powers

by curtailing unlawful executive action."  *Texas v. United States*, 809 F.3d 134, 187 (5th Cir.

2015).  And, as the Fourth Circuit has recognized, a governmental entity "is in no way harmed

by issuance of a preliminary injunction which prevents it from enforcing a regulation,

which . . . is likely to be found unconstitutional. . . .  Surely, upholding constitutional rights

serves the public interest."  *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249,

261 (4th Cir. 2003).  Because the Rule is both unconstitutional and unlawful under the APA,

both the balance of the equities and the public interest weigh in favor of an injunction.

## IV.    A NATIONWIDE INJUNCTION IS APPROPRIATE IN THIS CASE

The Court should exercise its discretion to issue a nationwide preliminary injunction.

First, when a reviewing court determines that an agency action is unlawful under the APA, "the

ordinary result is that the rule[] [is] vacated—not that [its] application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 512 (9th Cir. 2018) (concluding that a nationwide injunction was appropriate because "[s]uch relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress"). Because this case ultimately seeks vacatur of the Public Charge Rule, a nationwide preliminary injunction is likewise appropriate.

Second, a nationwide injunction is necessary to provide Plaintiffs with complete redress. CASA's membership spans three federal circuits—the Third, Fourth, and D.C. Circuits—and a geographically limited injunction is likely to generate only more confusion, requiring CASA to expend further efforts to address its members' concerns. Furthermore, a nationwide injunction is particularly appropriate in immigration cases: as the Fifth Circuit has recognized, "the Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'" *Texas*, 809 F.3d at 187–88 (5th Cir. 2015) (footnotes omitted). Accordingly, the Court should exercise its authority to issue a nationwide injunction to ensure the uniform application of the INA's public-charge provision and provide Plaintiffs with complete relief.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted. In the alternative, the Public Charge Rule's effective date of October 15, 2019, should be postponed under 5 U.S.C. § 705.

44

Respectfully submitted,

/s/ *Jonathan L. Backer*
Jonathan L. Backer (D. Md. 20000)
Amy L. Marshak*
Joshua A. Geltzer*
Mary B. McCord*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
  AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-9835
jb2845@georgetown.edu

*Attorneys for Plaintiffs*

*Pro hac vice motions forthcoming*

Dated:  September 16, 2019