# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA de Maryland, Inc., et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>                Defendants. | Civil Action No. |

## DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES FOR CASA DE MARYLAND

I, George Escobar, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief of Programs and Services of CASA de Maryland, Inc. (CASA). I have worked at CASA for nine years.

2. CASA is a non-profit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania.

3. Founded in 1985, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 100,000 members. CASA's members are predominantly noncitizens with a variety of immigration statuses. The vast majority of our membership comes from Central America, Mexico, and West Africa.

4. CASA's mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities. At CASA, we envision a future with diverse and thriving communities living free from discrimination and fear, working together with

mutual respect to achieve human rights for all.

5. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, and Pennsylvania. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of immigration benefits before the U.S. Customs and Immigration Services (USCIS).

6. In my role as Chief of Programs and Services, I oversee CASA's portfolio of community-facing, direct services, including its health, legal, and education services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

7. On August 14, 2019, the U.S. Department of Homeland Security (DHS) issued a Final Rule that sets forth a new interpretation of the Immigration and Nationality Act's (INA) public-charge ground of inadmissibility (hereinafter Public Charge Rule).

8. It is my understanding that the Public Charge Rule enacts a new standard for public-charge determinations that, if allowed to go into effect, will deny noncitizens living in the United States the ability to obtain lawful-permanent-resident (LPR) status based on an inherently subjective prediction about whether they are likely at any point in the rest of their lives to receive even a small amount of public benefits.

9. In February 8, 2018, the website Vox.com published an early, leaked draft of the Public Charge Rule. That version differed in certain respects from the final version. In

particular, that version would have covered a greater array of public benefits and benefits received by household members, including U.S. citizen children, in the public-charge determination.

10. That leaked draft sparked fear and confusion among CASA's members. After the draft was released, members began coming into CASA's offices in larger numbers, expressing fear about what the Rule would mean for them. They sought advice about whether they should sign up for or disenroll from public benefits, including free and reduced-price lunches for their children, Medicaid coverage, and subsidized health insurance under the Affordable Care Act.

11. In October 2018, DHS published a Notice of Proposed Rulemaking for what would become the Public Charge Rule. The proposed rule differed from both the earlier leaked draft and from the final version of the Rule. As the Rule has evolved into its final form, the expectation of its enactment has continued to spark significant confusion and fear among CASA's members.

12. CASA's members are worried that their or their family members' receipt of public benefits will jeopardize their ability to remain in the United States. The Rule has caused many of CASA's members to disenroll from or forgo public benefits to which they or their family members, including U.S. citizen family members, are entitled. Although some of these benefits would not affect a public-charge determination under the Rule (e.g., benefits received only by family members and benefit programs not covered by the Rule), the vague and complicated terms of the Rule, as well as the shifting contours of the policy between the first leaked draft and the final version, have generated understandable confusion among CASA's members. Many of CASA's members therefore have been chilled from using federal, state, and local benefits that provide important food, health, and housing supports for their families.

13. CASA's members are being immediately and irreparably harmed by forgoing these benefits.

14. Members of CASA have disenrolled their U.S. citizen children from benefits under the Supplemental Nutrition Assistance Program (SNAP, formerly "food stamps") out of fear that their children's receipt of benefits will be counted against them. These families are struggling to obtain sufficient, nutritious foods absent these benefits, and their children's school performance and health development will suffer in turn.

15. CASA members have given up Medicaid and health insurance they purchased under the Affordable Care Act. Parents have disenrolled their children from Medicaid coverage and health insurance under the Children's Health Insurance Program (CHIP). Absent health insurance, our members attend fewer days of work, struggle to manage chronic illnesses, and fail to get their children preventive health care that helps them thrive.

16. Since February 2018, CASA has diverted significant resources to combatting the Rule's chilling effects through public education and media engagement, counseling its members about whether to obtain benefits, and assisting its members who intend to apply for adjustment of status in the future.

17. As anticipated by DHS, CASA staff members have also incurred substantial "familiarization costs" in reading the Rule and attempting to understand its many complexities and ambiguities. CASA has invested time and resources into training its staff to better understand the Public Charge Rule in order to be able to provide sound advice about whether noncitizens and their families should enroll in public benefits. Such efforts have consumed time that could have been spent providing direct services to CASA's members during a period of increased need for such services.

18. CASA already has devoted 15 part-time health promoters and 15 to 20 community organizers to answering questions, correcting misinformation, and raising public awareness about the Rule. These outreach efforts have directly reached over 1,000 individuals, and CASA's members have conducted additional outreach about the Rule after being trained by CASA's staff.

19. Through extensive counseling, CASA's staff has helped members decide whether to enroll themselves or their children in public benefit programs. Because of the Rule's complexity, these counseling efforts are time intensive and have reduced the number of members CASA is able to serve on a daily basis.

20. CASA has devoted many of its legal services hours to advising its members on the immigration consequences that might flow from applying for or accepting public benefits for themselves or their family members. It will continue to have to devote its limited resources in this way if the Public Charge Rule is permitted to go into effect.

21. As CASA's members continue to disenroll from public benefits, CASA will be forced to redirect more of its resources to ensure that those who are chilled from participating in public-benefit programs have access to the supportive services they need to thrive.

22. Because responding to the effects of the Rule has consumed, and will continue to consume, significant resources, CASA has had to shift its organizational focus from an affirmative posture—seeking to improve conditions for immigrant families—to a defensive one—seeking to mitigate the harm of the Public Charge Rule on the communities it serves.

23. For example, CASA has had to reduce its advocacy for local health-care expansion efforts at the state level in Maryland and at the local level in Prince George's County, Maryland. These efforts are time-sensitive, as they depend on political momentum and the

legislative cycle. They cannot simply be undertaken with equal efficacy at a different time.

24. CASA's members are also concerned about whether the countless financial and lifestyle decisions that they make on a day-to-day basis will be held against them in future public-charge determinations.

25. Named Plaintiffs Angel Aguiluz and Monica Camacho Perez are but two examples of CASA's many members who intend to apply for LPR status in the future and whose pathway to doing so is now encumbered by the Public Charge Rule. Both Plaintiff Aguiluz and Plaintiff Camacho exhibit some attributes that are considered "positive factors" under the Public Charge Rule and that would weigh in their favor in future public-charge determinations. But, given the vague contours of the Public Charge Rule and its inherent subjectivity, CASA cannot advise them that they are safe from the prospect of unfavorable public-charge determinations. Because of the uncertainty that hangs over Plaintiffs Aguiluz and Camacho and other similarly situated CASA members, CASA will need to continue counseling them about how to minimize their risk of being deemed likely to become public charges, requiring an increased allocation of CASA resources.

26. Other CASA members exhibit fewer "positive factors" than Plaintiffs Aguiluz and Camacho and will demand the expenditure of even more of CASA's resources as it counsels them about how to maximize their chances of receiving favorable public-charge determinations in the future.

27. As stated above, the vast majority of CASA's members are people of color who originate from non-European countries. As CASA members apply for adjustment of status with the Public Charge Rule in place, they will be harmed by being subjected to a rule that will have the intended discriminatory impact of disproportionately blocking immigrants from non-

European countries from obtaining LPR status.

28. Accordingly, the Public Charge Rule has had and will continue to have a significant negative impact on CASA's mission, as CASA's members attempt to thrive despite forgone public benefits, struggle to determine how to avoid adverse public-charge determinations, and seek to preserve their ability to seek LPR status in the future.

I hereby declare under penalty of perjury that the foregoing is true and correct.

DATED: September 13, 2019

_____
George Escobar
Chief of Programs and Services
CASA de Maryland