**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

———————————————————

CASA de Maryland, Inc., *et al.*,        )
                                         )
        Plaintiffs,                      )
                                         )
        v.                               )        No. 8:19-cv-2715-PWG
                                         )
DONALD J. TRUMP, in his official         )
capacity as President of the United States,  )
*et al.*,                                )
                                         )
        Defendants.                      )
———————————————————

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND.....................................................................................................................3

STANDARD OF REVIEW ....................................................................................................6

ARGUMENT...........................................................................................................................6

I.     Plaintiffs Cannot Establish A Substantial Likelihood Of Success Because Of Jurisdictional And Other Justiciability Bars. ........................................................6

     A.     Standing And Ripeness Are Lacking. .........................................6

     B.     Plaintiffs Fall Outside The Zone Of Interests. ..................................11

II.     Plaintiffs Cannot Establish A Substantial Likelihood Of Success Because Their Substantive Claims Are Meritless............................................................13

     A.     The Rule Is Consistent With The Plain Meaning Of Public Charge. ............13

     B.     The Plain Meaning Of Public Charge Does Not Require Permanent Receipt Of Government Benefits. ......................................................18

     C.     The Rule Exercises Interpretive Authority That Congress Delegated to the Executive Branch, A Delegation Congress Has Maintained.....................20

     D.     The Rule Is Not Arbitrary and Capricious.........................................24

          1.     The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking. ..............................................................24

          2.     The 12/36 Standard And The Factors Set Forth In The Rule Are Reasonable.........................................................26

          3.     DHS Reasonably Responded To Comments And Considered The Aspects Of The Problem Identified By Plaintiffs. ....................28

     E.     The Rule Provides Fair Notice And Comports With Due Process................31

     F.     The Rule Does Not Discriminate Unlawfully Among Aliens. .........................33

III.     Plaintiffs Have Not Demonstrated Irreparable Harm.......................................36

A.      Casa de Maryland Cannot Establish Irreparable Harm .....................................36

B.      The Individual Plaintiffs Cannot Establish Irreparable Harm........................37

C.      None of the Plaintiffs Can Establish Irreparable Harm on the Basis
        of Alleged Constitutional Violations. ................................................................39

IV.     The Remaining Equitable Factors Require Denial of Plaintiffs' Motion....................40

V.      Any Injunction Should Be Narrowly Tailored To Any Irreparable Harms
        Suffered By The Plaintiffs In This Action.......................................................................41

CONCLUSION....................................................................................................................................42

## TABLE OF AUTHORITIES

**CASES**

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013)..........................................................................................................7

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
  452 U.S. 490 (1981) .......................................................................................................29

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
  724 F.3d 243 (D.C. Cir. 2013) ......................................................................................28

*Ameur v. Gates,*
  759 F.3d 317 (4th Cir. 2014) ........................................................................................33

*Appiah v. INS,*
  202 F.3d 704 (4th Cir. 2000) .................................................................................. 33, 34

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ......................................................................................27

*Baker v. Johnston,*
  21 Mich. 319 (Mich. 1870) ...........................................................................................14

*Batalla Vidal v. Duke,*
  295 F. Supp. 3d 127 (E.D.N.Y. 2017)...........................................................................12

*Benitez v. King,*
  298 F. Supp. 3d 530 (W.D.N.Y. 2018)..........................................................................35

*Blunt v. Lower Merion Sch. Dist.,*
  767 F.3d 247 (3d Cir. 2014)..........................................................................................37

*Boston v. Capen,*
  61 Mass. 116 (Mass. 1851)............................................................................................16

*Buchanan v. Consol. Stores Corp.,*
  125 F. Supp. 2d 730 (D. Md. 2001) ................................................................................9

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ........................................................................................42

*Carcano v. Cooper,*
  350 F. Supp. 3d 388 (M.D.N.C. 2018).................................................................... 34, 35

*Chevron, U.S.A., Inc. v. NRDC,*
    467 U.S. 837 (1984) ................................................................................................*passim*

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...........................................................................................................7

*Clarke v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) .........................................................................................................11

*Competitive Enter. Inst. v. U.S. Dep't of Transp.,*
    863 F.3d 911 (D.C. Cir. 2017) .........................................................................................22

*Consumer Elecs. Ass'n v. FCC,*
    347 F.3d 291 (D.C. Cir. 2003) ...........................................................................28, 29, 30

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013) ........................................................................................9, 10

*Ctr. For Auto Safety v. Peck,*
    751 F.2d 1336 (D.C. Cir. 1985) .......................................................................................28

*Defs. of Wildlife v. Zinke,*
    856 F.3d 1248 (9th Cir. 2017) .........................................................................................29

*Dekoladenu v. Gonzales,*
    459 F.3d 500 (4th Cir. 2006), *overruled on other grounds,*
    *Dada v. Mukasey,* 554 U.S. 1 (2008) ........................................................................31, 32

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) .....................................................................................36, 38

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
    952 F.2d 802 (4th Cir. 1991) ...........................................................................................36

*Doe v. Va. Dep't of State Police,*
    713 F.3d 745 (4th Cir. 2013) .....................................................................................10, 11

*E. Bay Sanctuary Covenant v. Barr,*
    934 F.3d 1026 (9th Cir. 2019) ....................................................................................41, 42

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009) .........................................................................................................28

*Ex Parte Horn,*
    292 F. 455 (W.D. Wash. 1923) ........................................................................................17

*Ex Parte Hosaye Sakaguchi,*
   277 F. 913 (9th Cir. 1922) ................................................................................................23

*Ex Parte Pugliese,*
   209 F. 720 (W.D.N.Y. 1913) ............................................................................................21

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .........................................................................................................24

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) ...........................................................................................12

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.,*
   19 F. Supp. 3d 111 (D.D.C. 2014), *vacated on other grounds,* 799 F.3d 1065 (D.C. Cir. 2015) ..............28

*Gasner v. Bd. Of Supervisors,*
   103 F.3d 351 (4th Cir. 1996) ...........................................................................................11

*Gegiow v. Uhl,*
   239 U.S. 3 (1915) .............................................................................................................17

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .....................................................................................................41

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) .........................................................................................................31

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,*
   700 F. App'x 251 (4th Cir. 2017) ............................................................................... 38, 39

*Harris v. FCC,*
   776 F.3d 21 (D.C. Cir. 2015) ...........................................................................................19

*Henderson v. Bluefield Hosp. Co., LLC,*
   902 F.3d 432 (4th Cir. 2018) ...........................................................................................36

*Hohe v. Casey,*
   868 F.2d 69 (3d Cir. 1989) ..............................................................................................40

*Howe v. U.S. ex rel. Savitsky,*
   247 F. 292 (2d Cir. 1917) ................................................................................................23

*Igwebuike v. Caterisano,*
   230 Fed. App'x 278 (4th Cir. 2007) ........................................................................... 31, 32

*In re Feinknopf,*
   47 F. 447 (E.D.N.Y. 1891) ...............................................................................................16

*Inhabitants of Guilford v. Inhabitants of Abbott,*
17 Me. 335, 335-36 (Me. 1840) ........................................................................................16

*INS v. Jong Ha Wang,*
450 U.S. 139 (1981) ........................................................................................................20

*INS v. Legalization Assistance Project,*
Proj., 510 U.S. 1301 (1993) .............................................................................................12

*Inv. Co. Inst. v. CFTC,*
720 F.3d 370 (D.C. Cir. 2013) .........................................................................................29

*Jurek v. Texas,*
428 U.S. 262 (1976) ........................................................................................................33

*Kenneson v. Kenneson,*
36 N.Y.S. 2d 676 (N.Y. Dom. Rel. Ct. 1942) ..................................................................18

*Kenny v. Wilson,*
885 F.3d 280 (4th Cir. 2018) ...........................................................................................39

*Knowledge Ecology Int'l v. Nat'l. Insts. of Health,*
No. PJM 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019) ....................................9, 37

*Lam Fung Yen v. Frick,*
233 F. 393 (6th Cir. 1916) ...........................................................................................15, 16

*Landon v. Plasencia,*
459 U.S. 21 (1982) ..........................................................................................................31

*Lane v. Holder,*
703 F.3d 668 (4th Cir. 2012) ..........................................................................................8, 9

*Lewis v. Thompson,*
252 F.3d 567 (2d Cir. 2001) .........................................................................................33, 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ........................................................................................................11

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .......................................................................................................6, 7

*Madden v. Kentucky,*
309 U.S. 83 (1940) ..........................................................................................................34

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ........................................................................................................41

*Manning v. Caldwell,*
   930 F.3d 264 (4th Cir. 2019) ...................................................................................32

*Marks v. United States,*
   430 U.S. 188 (1977) ...............................................................................................32

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ...............................................................................................11

*Matter of A——,*
   19 I & N Dec. 867 (BIA 1988) .........................................................................23, 24

*Matter of Harutunian,*
   14 I. & N. Dec. 583 (BIA 1974) .......................................................................21, 24

*Matter of Martinez-Lopez,*
   10 I. & N. Dec. 409 (A.G. 1962) ..........................................................................23

*Matter of Perez,*
   15 I. & N. Dec. 136 (BIA 1974) .......................................................................22, 24

*Matter of Vindman,*
   16 I. & N. Dec. 131 (BIA 1977) ............................................................................21

*Metro. Life Ins. Co. v. Bucsek,*
   919 F.3d 184 (2nd Cir. 2019) ...............................................................................40

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) ............................................................................28

*Miller v. Brown,*
   462 F.3d 312 (4th Cir. 2006) .............................................................................8, 10

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015)...........................................................................................29

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell,*
   915 F.3d 197 (4th Cir. 2019) ...........................................................................36, 39

*Mountaintn. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship,*
   918 F.3d 353 (4th Cir. 2019) *reh'g en banc denied sub nom.*
   *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell,*
   915 F.3d 197 (4th Cir. 2019) ..................................................................................6

*Munaf v. Geren,*
   553 U.S. 674 (2008) .................................................................................................6

*NAACP v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) ........................................................................37

*Nat'l Audubon Soc'y, Inc. v. Wheeler,*
   163 F. App'x 594 (9th Cir. 2006) ............................................................... 7, 8

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005) .......................................................................................24

*Nguyen v. Reynolds,*
   131 F.3d 1340 (10th Cir. 1997) ....................................................................33

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998) .......................................................................................10

*Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.,*
   23 N.J.L. 169 (N.J. 1851) ..............................................................................14

*People ex rel. Durfee v. Comm'rs of Emigration,*
   27 Barb. 562 (N.Y. Gen. Term 1858)...........................................................19

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville,*
   5 Pa. Super. 516 (Pa. Super. Ct. 1897) ........................................................19

*Pub. Citizen, Inc. v. FAA,*
   988 F.2d 186 (D.C. Cir. 1993) ......................................................................27

*Ramos v. Nielsen,*
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) ........................................................35

*Real Truth About Obama, Inc. v. FEC,*
   575 F.3d 342 (4th Cir. 2009) *vacated on other grounds & remanded*, 559 U.S. 1089 (2010),
   *standard reaffirmed in* 607 F.3d 355 (4th Cir. 2010)....................................35

*Red Wolf Coal. v. U.S. Fish and Wildlife Serv.,*
   210 F. Supp. 3d 796 (E.D.N.C. 2016) ..........................................................40

*Rescue Army v. Mun. Court of L. A.,*
   331 U.S. 549 (1947) .........................................................................................9

*Robledo v. Chertoff,*
   658 F. Supp. 2d 688 (D. Md. 2009) ..............................................................13

*Ross v. Meese,*
   818 F.2d 1132 (4th Cir. 1987) ......................................................................39

*Rusu v. INS,*

296 F.3d 316 (4th Cir. 2002) ...........................................................................................32

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*
713 F.3d 175 (4th Cir. 2013) ....................................................................................... 8, 37

*Scoggins v. Lee's Crossing Homeowners Ass'n,*
718 F.3d 262 (4th Cir. 2013) .........................................................................................10

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018)....................................................................................................32

*Siegel v. LePore,*
234 F.3d 1163 (11th Cir. 2000) ................................................................................ 39, 40

*SIFMA v. CFTC,*
67 F. Supp. 3d 373 (D.D.C. 2014)..................................................................................29

*Sigram Schindler Beteiligungsgesellschaft MBH v. Kappos,*
675 F. Supp. 2d 629 (E.D. Va. 2009).............................................................................7

*Smith v. Ashcroft,*
295 F.3d 425 (4th Cir. 2002) .........................................................................................32

*State ex rel. Currie v. Currie,*
No. 01-A-01-9303-JV00084, 1993 WL 339304 (Tenn. Ct. App. 1993)...............18

*Stuller, Inc. v. Steak N Shake Enters.,*
695 F.3d 676 (7th Cir. 2012) .........................................................................................36

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) .................................................................................................... 6, 8

*Taing v. Napolitano,*
567 F.3d 19 (1st Cir. 2009) ...........................................................................................13

*Taniguichi v. Kan Pac. Saipan, Ltd.,*
566 U.S. 560 (2012) .......................................................................................................13

*Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016) .................................................................................... 6, 42

*Town of Chester v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017)....................................................................................................41

*Town of Hartford v. Town of Hartland,*
19 Vt. 392 (Vt. 1847) .....................................................................................................16

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ..................................................................................................... 33, 34

*United States v. Halstead*,
  634 F.3d 270 (4th Cir. 2011) .......................................................................................................32

*United States v. Lipkis*,
  56 F. 427 (S.D.N.Y. 1893) ........................................................................................................ 15, 16

*United States v. Carona*,
  660 F.3d 360 (9th Cir. 2011) .................................................................................................... 13, 17

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) .......................................................................................................9

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) .......................................................................................................39

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ................................................................................................................. 34, 35

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) .......................................................................................................29

*Wallis v. U.S. ex rel. Mannara*,
  273 F. 509 (2d Cir. 1921) .......................................................................................................21

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................................................................. *42*

*Whitmore v. Arkansas.*,
  495 U.S. 149 (1990) .......................................................................................................7

*Winter v. NRDC*,
  555 U.S. 7 (2008) ................................................................................................................. *passim*

*Wisc. Central, Ltd. V. United States*,
  138 S. Ct. 2067 (2018) .......................................................................................................13

*Yamataya v. Fisher*,
  189 U.S. 86 (1903) .......................................................................................................32

## CONSTITUTION

U.S. Const. amend. V .......................................................................................................31

## STATUTES

5 U.S.C. § 705........................................................................................................................42

6 U.S.C. § 542..........................................................................................................................3

6 U.S.C. § 557 .........................................................................................................................3

8 U.S.C. § 1103......................................................................................................................21

8 U.S.C. § 1182.................................................................................................................passim

8 U.S.C. § 1227......................................................................................................................24

8 U.S.C. § 1252...............................................................................................................11, 12

8 U.S.C. § 1255......................................................................................................................13

8 U.S.C. § 1551........................................................................................................................3

8 U.S.C. § 1601.................................................................................................................passim

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),
    Pub. L. No. 104-208, 110 Stat. 3009 (1996).................................................................1

Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"),
    Pub. L. No. 104-193, 110 Stat. 2105 (1996) ................................................................4

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 (2002)................................................................3

Immigration Act of 1882, 47th Cong. ch. 376, 22 Stat. 214 (1882) ....................................3, 4

Immigration Act of 1891, 51st Cong. ch. 551, 26 Stat. 1084 (1891)........................3, 4, 14, 15

Immigration Act of 1903, 57th Cong. ch. 1012, 32 Stat. 1213 (1903)...............................3, 18

Immigration Act of 1917, 64th Cong. ch. 29, 39 Stat. 874 (1917) ........................3, 14, 15, 17

Immigration and Nationality Act of 1952, 82nd Cong. ch. 477, 66 Stat. 163 (1952) ........1, 3

## LEGISLATIVE MATERIALS

26 Cong. Rec. 657 (1894)........................................................................................................15

H.R. Doc. No. 64-886 (1916) ..................................................................................................17

H.R. Rep. No. 104-828 (1996) (Conf. Rep.) ........................................................................1

S. Rep. 64-352 (1916) ..............................................................................................................17

S. Rep. No. 81-1515 (1950) .......................................................................................20, 21, 22

## EXECUTIVE MATERIALS & REGULATIONS

Exec. Order No. 12866, 58 Fed. Reg. 51725 (Sept. 30, 1993) ....................................28

Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) .....................................28

Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017) .....................................28

*Inadmissibility and Deportability on Public Charge Grounds* ("1999 NPRM"),
    64 Fed. Reg. 28676 (May 26, 1999) ......................................................................*passim*

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"),
    64 Fed. Reg. 28689 (May 26, 1999) ......................................................................*passim*

*Inadmissibility on Public Charge Grounds* ("NPRM"),
    83 Fed. Reg. 51114 (Oct. 10, 2018) ......................................................................*passim*

*Inadmissibility on Public Charge Grounds* ("Rule")
    84 Fed. Reg. 41292 (Aug. 14, 2019) ......................................................................*passim*

## OTHER AUTHORITIES

Arthur Cook, *et al.*, Immigration Laws of the U.S. (1929) ...........................................  14, 15

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions
    of Terms Used in the Law, with References to Authorities (1882) ...................................14

Century Dictionary & Cyclopedia (1911) ............................................................................14

E. P. Hutchinson, Legislative History of American Immigration Policy,
    1798-1965 (1981) .................................................................................................................4

Frederic Jesup Stimson, Glossary of the Common Law (1881) ...............................................14

Immigration Laws and Rules of January 1, 1930 with Amendments
from January 1, 1930 to May 24, 1934 (1935) ................................................................................. 17

Kate M. Manuel, Cong. Research Serv., *Public Charge Grounds of Inadmissibility
and Deportability: Legal Overview*, Summary (Jan. 5, 2016) ........................................................24

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ........................................................... 13, 14

# INTRODUCTION

For over 135 years, Congress has restricted the admissibility of aliens who are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public. For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustment of status to lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. No. 104-828, at 240-241 (1996); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the INS with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective immigrants, and the public with nothing more than an

interim guidance document to specify how the factors are being implemented.

The Rule revises an anomalous definition of "public charge," set forth for the first time in that 1999 interim guidance, to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for determining whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. Finally, the Rule has a limited scope: it does not apply to naturalization applications for lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—an organization and two individuals who are currently unlawfully present in the U.S. with their removal deferred as an exercise of prosecutorial discretion under "DACA"—nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs cannot meet basic jurisdictional requirements, and Plaintiffs' claims are even more sweeping and aggressive than those of other litigants challenging the Rule. Plaintiffs' vagueness theory brooks no principled limitation and would inexorably create a new right in aliens worldwide to be admitted to the United States or adjust status without any consideration of their financial status or the likely need to support them at public expense. Plaintiffs' theory of standing is no less radical, contending that Plaintiffs' receipt of DACA—a generous grant of Executive Branch prosecutorial forbearance of pursuit of the alien's removal for a designated period—can be wielded as a sword by those who, but for DACA would be unlawfully present in the United States, to attack any provision of immigration law with which they disagree.  Because the Rule accords with the longstanding meaning of "public charge," and complies with the APA, other relevant statutes and the Constitution, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a sweeping overhaul of core immigration law principles.

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* Relatedly, "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id.* 1601(2)(B).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A).[1] An unbroken line of predecessor statutes going back to at least 1882 have contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, 47th Cong. ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1903, 57th Cong. ch. 1012, 32 Stat. 1213, 1214; Immigration Act of 1917, 64th Cong. ch. 29 § 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, 82nd Cong. ch. 477, section 212(a)(15), 66 Stat. 163, 183. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch to determine who constitutes a public charge.

---

[1] As of March 1, 2003, references to the Attorney General in the INA "shall be deemed to refer to the Secretary" of Homeland Security where they describe functions transferred to DHS by the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002). See 6 U.S.C. § 557 (2003); 6 U.S.C. § 542 note; 8 U.S.C. § 1551 note.

The longstanding denial of admission of aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act at 214 (excluding any immigrant "unable to take care of himself or herself without becoming a public charge"); 1891 Act § 11 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened the enforcement of the public charge inadmissibility ground in several ways. Besides codifying mandatory factors for immigration officers to consider, *see supra*, it raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship obligations and requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in formal rulemaking to guide immigration officers, aliens, and the public in understanding public charge determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("Field Guidance"). The Interim Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge"

as a person "primarily dependent on the government for subsistence," *id.*, and by barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See* 1999 NPRM at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of its decision. Among the Rule's major components are provisions defining "public charge" and "public benefit" (which are not defined in the statute), an enumeration of factors to be considered in the totality of the circumstances when making a public charge determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining nonimmigrant status. The Rule supersedes the Interim Field Guidance in its entirety, establishing a new definition of "public charge" based on a minimum duration threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within a 36-month period. *Id.* at 41297. Such "public benefits" are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Medicaid, and public housing programs may now be considered as part of the public charge inadmissibility determination. *Id.* at 41501-02. The Rule also enumerates a non-exclusive list of factors for assessing whether an alien is likely at any time to become a public charge and explains how DHS

officers should apply these factors as part of a totality-of-the-circumstances determination.[2]

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mtn. Valley Pipeline v. W. Pocahontas Properties, L.P.*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. NRDC*, 555 U.S. 7, 22, 24 (2008)). "In order to receive a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." *Id.* Where, as here, there are serious questions as to the Court's jurisdiction, it is "more *unlikely*" that the plaintiff can establish a "'likelihood of success on the merits.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).[3]

## ARGUMENT

### I.    Plaintiffs Cannot Establish A Substantial Likelihood Of Success Because Of Jurisdictional And Other Justiciability Bars.

#### A.    Standing And Ripeness Are Lacking.

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be certainly impending to constitute

---

[2] A proposed correction to the Rule is scheduled to be published in the Federal Register on October 2, 2019.  *See* https://www.federalregister.gov/documents/2019/10/02/2019-21561/inadmissibility-on-public-charge-grounds-correction.

[3]  As an alternative to a preliminary injunction, Plaintiffs seek a stay of the effective date of the Rule under Section 705 of the APA. *See* Mot. at 1, 3. Although Plaintiffs omit any discussion of the standard for such relief, the standard for a stay under § 705 is the same as the standard for a preliminary injunction. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016).

injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). Neither the individual plaintiffs, nor CASA, meet this standard.

The individual plaintiffs cannot establish standing because they allege no facts indicating they will certainly and imminently be subject to an adverse public charge determination or an adverse decision on an extension of stay or change of status application based on the public benefits condition under the Rule. First, neither individual plaintiff alleges that he or she will imminently be subject to a public charge determination. They assert only that they "intend" to apply for an adjustment of status, provide no facts that indicate they are even on a path that would permit them to adjust status, but nevertheless claim they will be subject to the Rule "when and if" this happens. *See* Mot. at 40-41. "Such 'some day' intentions . . . do not support a finding of . . . 'actual or imminent' injury." *Lujan*, 504 U.S. at 564 (1992). Second, even if either were to be subject to an inquiry regarding the public charge ground of inadmissibility at the time they apply for adjustment, they have presented no evidence that they are now eligible for adjustment of status – being a DACA recipient is not a basis for adjustment of status. And there is no indication that it would likely—much less "certainly"—result in an adverse decision even if they were to be eligible to file for adjustment. To the contrary, plaintiffs affirmatively allege that it is unclear whether they'll be deemed "public charges," since they both possess a mix of "positive" and "negative" factors, and the Rule does not lend itself to a mechanical application. Mot. at 41-42; *cf. Sigram Schindler v. Kappos*, 675 F. Supp. 2d 629, 642 (E.D. Va. 2009) (alleged harm based on potential "adverse decision" of Patent Appeal Board was impermissibly "contingent and speculative").

Plaintiffs argue that they will suffer other harms since they may make particular decisions in light of the Rule, such as forgoing student loans.[4] Mot. at 42. But plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). The Rule does not require a public charge finding

---

[4] Importantly, the individual plaintiffs do not claim that they were chilled from enrolling in any public benefits. The Rule's definition of public benefit does not include student loans, and therefore receipt of student loans would not be considered for purposes of a public charge inadmissibility determination.

of inadmissibility based on receipt of student loans, and plaintiffs identify no other specific benefit they have foregone that would be taken into account in a public charge inadmissibility determination. "[T]he fact that" plaintiffs "may base decisions on 'conjectural or hypothetical' speculation does not give rise to the sort of 'concrete' and 'actual' injury necessary to establish Article III standing." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 97 (2013). In addition, the burdens of complying with a law do not constitute an injury sufficient for Article III standing. *Cf. Nat'l Audubon Soc'y, Inc. v. Wheeler*, 163 F. App'x 594, 595-96 (9th Cir. 2006) ("the Trappers argue that their voluntary decision to comply with Proposition 4 . . . constitutes a sufficient injury in fact . . . . the voluntary cessation of their preferred method of trapping," however, "does not support Article III standing."). Indeed, if any person that adjusted his or her behavior in response to a law had standing to challenge it, the "case or controversy" requirement of Article III would be a nullity.

CASA likewise does not have standing. CASA alludes to two different standing theories. First, it indicates that its members will be harmed by the Rule (representational standing). An organization may have standing to remedy harms towards its members if "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). "[T]o show that its members would have standing, an organization must make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* Here, CASA does not specifically identify any of its members that have or will suffer some harm aside from the individual named plaintiffs. Compl. ¶ 16. Thus, since the individual member plaintiffs lack standing, *see supra*, CASA cannot satisfy the first requirement for representational standing (that its members have standing in their own right).

CASA also suggests that it may have standing due to its alleged injuries (organizational standing). An organization may have standing to sue in its own right if the challenged conduct impedes its activities. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) ("An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission."). But "an injury to

organizational purpose, without more, does not provide a basis for standing." *S. Walk*, 713 F.3d at 183. Nor does a diversion of funds constitute an injury when that diversion results from an organization's "own budgetary choices." *Lane*, 703 F.3d at 674. Here, CASA does not allege that any of its current activities is directly impeded by the Rule.[5] For example, it does not allege that the Rule directly interfered with the provision of its current social, health, or employment programs. Escobar Decl. ¶ 5. CASA instead argues that it voluntarily diverted resources into other projects due to the Rule, such as "educational outreach about the Rule." Mot. at 39. But this was CASA's own budgetary choice. "To determine that an organization that decides to spend its money on educating members" in "response to [a regulation] suffers a cognizable injury would be to imply standing for organizations with merely abstract concern[s] with a subject." *Lane*, 703 F.3d at 675; *see also Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 737 (D. Md. 2001) ("[Plaintiff] chose to investigate Defendant's policy . . . [plaintiff] cannot now claim that because it chose to channel its funds this way, Defendant's [policy] has caused it injury in fact sufficient to satisfy Article III standing requirements."). Moreover, and more fundamentally, CASA has not alleged a genuine diversion of funds. CASA is in the business of educating immigrant communities about relevant immigration laws, and providing legal education services. Escobar ¶¶ 5-6. Plaintiffs' "core purpose as an organization is" providing the precise services it committed resources to following the Rule,  and so "[a]ny resources [CASA] spent…seem very much in line with [CASA's] core mission rather than a diversion of resources away from it." *Knowledge Ecology Int'l v. Nat'l Insts. of Health*, No. PJM 18-1130, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019).

Ripeness, another prerequisite of justiciability, "prevents judicial consideration of issues until a

---

[5] This case is thus distinguishable from the sole case on which CASA relies in support of its diversion of resources theory, *see* Mot. at 40, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013). There, certain organizations challenged an Arizona law criminalizing, under certain circumstances, the transportation or harboring of unauthorized aliens. *See id.* at 1012-13. The plaintiff organizations—whose volunteers helped transport and shelter aliens—submitted declarations stating that they had to divert resources into educating their volunteers over the law, lest they "be deterred from conducting these functions." *Id.* at 1018. They had shown that the challenged policy would interfere with their activities by creating staffing shortages. *See id.* CASA, by contrast, does not make any comparable allegations about services that its staff cannot perform.

controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (quoting R*escue Army v. Mun. Court of L. A.*, 331 U.S. 549, 584 (1947)). "The burden of proving ripeness falls on the party bringing suit," *id.*, and the inquiry "is inextricably linked to [the] standing inquiry." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) "Ripeness concerns the appropriate timing of judicial intervention." *Id.* To make a ripeness determination, courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.*

"A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties" whereas a claim is not ripe when "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (cleaned up). Fitness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). When an injury is "contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). To the extent CASA's alleged injuries, both direct and representational, can be considered injuries at all, they are premised on the future independent decisions of its members who are not parties to this suit and thus cannot state a ripe claim. Plaintiffs have not demonstrated that these third parties will act as they anticipate, and therefore the Court would benefit from further factual development before attempting to resolve these claims. The individual Plaintiffs' claims are similarly uncertain, because they have not yet taken nor expressed a specific intent to take any action that would cause them to sustain any injuries related to the Rule. S*ee supra.* Moreover, because these Plaintiffs are individuals to whom the public charge determination could be applied directly, there is a better time at which the Court could assess their claims with full factual development and a concrete application, namely when and if they apply to adjust status or when and if they are denied adjustment of status on the basis of a public charge determination.

Further, withholding judicial consideration of Plaintiffs' claims will not cause them any significant hardship. The hardship prong "is measured by the immediacy of the threat and the burden imposed on the [plaintiffs.]" *Miller*, 462 F.3d at 319. In addition to CASA's alleged harms being

-10-

speculative, the Rule "do[es] not create adverse consequences of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm," on the part of non-profit organizations, and therefore cannot serve as the basis for a ripe claim. *Ohio Forestry Ass'n*, 523 U.S. at 733. Instead, the harms alleged are possible cumulative side effects of third party individuals' decisions to take action not required by the Rule. As for the individual Plaintiffs, they have not even tried to allege that they have taken or have immediate or concrete future plans to take any actions that would cause them cognizable injuries as a result of the Rule, such as applying for adjustment or disenrolling from public benefits. *See supra*. "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe*, 713 F.3d at 758 (quoting *Gasner v. Bd. Of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)).

**B.      Plaintiffs Fall Outside The Zone Of Interests.**

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interests are . . . marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds. By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not an organization, who "fall within the zone of interests protected" by

any limitations implicit in § 1182(a)(4)(A) and § 1183, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on, *inter alia*, a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them). The purported harms to Plaintiff CASA of "reallocat[ing] . . . resources," Mot. at 39, are not those of an alien seeking to demonstrate that the "public charge" inadmissibility ground has been improperly applied to his detriment. *See INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal help to immigrants]," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

Although *some* individuals—those challenging a final order of removal—are expected litigants regarding the limits of the meaning of the "public charge" ground of inadmissibility, the two individual plaintiffs here do not fall within the zone of interests. Those plaintiffs acknowledge that they are DACA recipients. *See* Compl., ECF No. 1, ¶¶ 17, 18. DACA was created by a 2012 Memorandum directing DHS components "to consider exercising prosecutorial discretion with respect to individuals without lawful immigration status" who meet certain guidelines. *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 137 (E.D. N.Y. 2017), *cert. before judgment granted*, 139 S. Ct. 2773 (2019). The 2012 DACA Memorandum stated that it "conferred no substantive right, immigration status or pathway to citizenship." *Id.* at 138 (cleaned up). By statute, current law does not grant a lawful immigration status for those who are unlawfully present in the United States while their removal is deferred as an exercise of prosecutorial discretion under DACA. *See* 8 U.S.C. § 1182(a)(6)(A)(i) (making illegal entrants and immigration violators inadmissible); (a)(9)(B) (making an alien who was "unlawfully

present in the United States" for more than 180 days after age 18 inadmissible for at least 3 years, depending on the length of his unlawful stay).[6] Further, because Congress has generally provided a separate ground of inadmissibility for individuals who accrue more than 180 days of unlawful presence after age 18, and such ground of inadmissibility is often readily determinable, such persons would not be among the expected litigants regarding the public charge ground of inadmissibility.

## II.    Plaintiffs Cannot Establish A Substantial Likelihood Of Success Because Their Substantive Claims Are Meritless.

### A.    The Rule Is Consistent With The Plain Meaning Of Public Charge.

The definition of "public charge" in the Rule is consistent with the "plain language of the statute," which is to be determined based on the "common, ordinary meaning of the words of the statute at the time of enactment." *Robledo v. Chertoff*, 658 F. Supp. 2d 688, 696 (D. Md. 2009) (interpreting term "spouse" in the INA and citing *Taing v. Napolitano*, 567 F.3d 19, 24 (1st Cir. 2009)); *see Wisc. Central, Ltd. v. U.S.*, 138 S. Ct. 2067, 2070 (2018) (statutory terms to be "interpret[ed] . . . consistent with their ordinary meaning . . . at the time Congress enacted the statute"). Such analysis begins with the "dictionary definition at the time the statute was enacted." *United States v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011); *see Taniguichi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Here, it is undisputed that since 1882, Congress has consistently provided for the exclusion of indigent aliens determined by the Executive Branch as likely to become "public charges." *Compare* Mot. at 1-2, 13, *with* NPRM at 51125.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English

---

[6] The individual plaintiffs assert that their entry into the United States on "advance parole" satisfies 8 U.S.C. § 1255(a) and that they are therefore eligible for an adjustment of status to lawful permanent resident. But advance parole or parole in and of itself is not a basis for adjustment of status, and individual plaintiffs have not identified a basis for adjustment of status. Any person seeking adjustment of status must generally be the beneficiary of an approved immigrant visa petition, a visa must be currently available, and the individual must otherwise be eligible for adjustment and warrant a favorable exercise of discretion.

Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," such dictionaries explain the term "public" as meaning "[t]he whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community." Rapalje 1888.[7] Together, these early definitions make clear that an alien becomes a "public charge" when his inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body of the citizens" to provide for his basic necessities, as reflected in early legal sources addressing the term "public charge." *See* Arthur Cook *et al.*, Immigration Laws of the U.S., § 285 (1929) ("Public charge means any maintenance, or financial assistance, rendered from public funds").[8]

Nothing about the plain meaning of this term suggests that a person must be "permanently and primarily dependent on the government," as Plaintiffs contend. Mot. at 10. When Congress originally enacted the public charge inadmissibility ground, the term "pauper" was in common use for a destitute person in extreme poverty. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"); *see also Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). And for nearly 100 years through numerous revisions of the statute, Congress provided a *separate* inadmissibility ground for paupers. *See, e.g.*, 1891 Act; 1917 Act.[9] Congress thereby made "clear that the term 'persons likely to become a public charge' is *not*

---

[7] *See also* C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References . . ., 501 (1882) ("Public" means "not any corporation like a city, town, or county but the body of the people at large." (quoting *Baker v. Johnston*, 21 Mich. 319 (Mich. 1870)).

[8] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online version "of the Merriam-Webster Dictionary defines public charge simply as 'one that is supported at public expense.'" NPRM at 51158 (quoting "Public Charge", http://www.merriam-webster.com/dictionary/public%20charge (last visited Oct. 1, 2019)). Similarly, "Black's Law Dictionary (6th ed.) . . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" *Id.*

[9] The 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering

limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (emphasis added).[10]

Remarkably, although Plaintiffs contend that "courts and administrative agencies consistently" have defined the plain meaning of public charge as those "primarily dependent on the government" since the 1880s, Mot. at 13, they identify no source that defines "public charge" using these words (or using the similar phrase "primary dependence") prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means any maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285; *see also* 26 Cong. Rec. 657 (1894) (statement of Rep. Warner) (explaining that under the public charge inadmissibility ground, "[i]t will not do for [an alien] [to] earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge"). Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment

---

from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes." 1891 Act at 1094. The 1917 Act listed, *inter alia*, "idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability . . . to earn a living; [felons]; polygamists . . . ; anarchists, or persons . . . who advocate . . . the unlawful destruction of property; prostitutes . . .; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons deported [within the previous year]; stowaways," and others. 1917 Act at 875-76.

[10] Plaintiffs note that Congress removed the separate inadmissibility ground of "pauper" in 1990. *See* Mot. at 15. This provides no indication, however, that "public charge" and "pauper" are identical in meaning. Rather, it is indicative of the fact that, by abolishing poorhouses and almshouses, society has revised public services in a way that negates the former distinctions among types of public support provided to individuals needing different amounts of aid.

to an insane asylum); *see also In re Feinknopf*, 47 F. 447, 447 (E.D.N.Y. 1891) (determining that an alien was not likely to become a public charge after considering, as distinct evidence, whether the alien "received public aid or support" or had been an "inmate of an almshouse"). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute. This interpretation of "public charge" conforms with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

Plaintiffs' reliance on *Boston v. Capen*, 61 Mass. 116 (Mass. 1851), for the suggestion that 19th century state law supports their view is misplaced. *See* Mot. at 9. As an initial matter, the court's analysis in *Capen* equated "paupers" with "public charges" under state law: "Secondly, for those who have been paupers in a foreign land; that is, for those who have been a public charge in another country; and not merely destitute persons, who, on their arrival here, have no visible means of support; the word 'paupers' being used . . . in its legal, technical sense." 61 Mass. at 121. Congress's separate exclusions for "paupers" and "public charges," *Frick*, 233 F. at 396, by contrast, demonstrates that Congress did not adopt a definition equating "pauper" and "public charge." Plaintiffs also assert that other unspecified state laws support their position, but many states recognized a broader definition of "public charge" than Plaintiffs' constricted view. The Maine Supreme Court, for example, identified as "likely to become chargeable" to a town to which he had travelled a person who required only "a small amount" of assistance, based on his "age and infirmity." *Inhabitants of Guilford v. Inhabitants of Abbott*, 17 Me. 335, 335-36 (Me. 1840) (reaching conclusion despite recognizing that, at "the time of filing the complaint he . . . had strength to perform some labor, . . . was abundantly able to travel from town to town," and had a "house provided for him" in another town). And the Vermont Supreme Court recognized that receipt of public aid, not complete destitution, was the standard for chargeability. *See Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (Vt. 1847) (widow and children with a house, furniture, and a likely future income of $12/year from the lease of a cow were nonetheless public charges after receiving relief in "the amount of some five dollars").

Nor are Plaintiffs correct in their contention that the "canon of *noscitur a sociis*" (providing for

interpretation of a statutory term based on its neighbors) requires imposing Plaintiffs' cramped meaning of the term "public charge." *See* Mot. at 11. When the Supreme Court case Plaintiffs cite employed this canon to overrule the exclusion of aliens based on the (un)availability of jobs in their intended destination city, *see Gegiow v. Uhl*, 239 U.S. 3 (1915), Congress acted decisively to overrule this interpretation. In the 1917 Act, Congress relocated the term "public charge" in the statute and explained why: "The purpose of this change is to overcome recent decisions of the courts limiting the meaning of the description of the excluded class because of its position between other descriptions conceived to be of the same general and generical nature. (See especially Gegiow v. Uhl)." S. Rep. 64-352 at 5 (1916)[11]; *see also* 1917 Act § 3 n.5; *reprinted in* Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935) (explaining that "[t]his clause . . . has been shifted . . . to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons" and "overcoming the decision of the Supreme Court in *Gegiow*"). Subsequent cases recognized that this alteration negated the Court's interpretation in *Gegiow* by underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"). Neither the structure of the statute nor any other factor provides any evidence that Congress intended to cabin "public charge" more narrowly than the plain meaning of the term.[12]

---

[11] During the drafting of the 1917 Act, in a letter to the House Committee on Immigration and Naturalization, the Secretary of Labor defined "public charge" as "the fact that such applicant may be a charge (an economic burden) upon the community to which he is going." Letter from the Sec. of Labor, H.R. Doc. No. 64-886, at 3-4 (1916). He then requested that Congress amend the statute to address the "defect in . . . the arrangement of the wording" identified in *Gegiow*, which, if maintained, would "materially reduce[] the effect of the clause" as the "chief measure of protection in the law . . . . intended to reach economic . . . objections to the admission" of aliens. *Id.*

[12] Cases cited by Plaintiffs from other contexts, such as state family law and *in forma pauperis* cases, *see* Mot. at 12-13, n.5, & n.6, have no bearing on the interpretation of the public charge ground of inadmissibility. These sources do not analyze the meaning of "public charge "at the time the [inadmissibility] statute was enacted." *Carona*, 660 F.3d at 367. Nor do they reflect the particular interests at issue in the immigration context. And in any event, other cases from these same contexts

Plaintiffs also err in their assertion that Congress's creation of a fund for the support of aliens in 1882 demonstrates that Congress intended that "public charge" not reach "the poor and helpless immigrant." Mot. at 11-12. To the contrary, the fund is a logical complement to the inadmissibility of public charges regardless of how such persons are defined and has no bearing on the statute's plain text meaning. This is because Congress's adoption for the first time of a federal exclusion of public charges in 1882 did nothing to assist states, localities, and private charities with support for aliens who had already entered the United States and who required support, and so creation of a fund made eminent sense. Further, a judgment that an alien is likely to become a public charge is necessarily predictive, and Congress has long recognized that such predictions cannot be made perfectly. Congress thus provided not only for the exclusion of aliens likely to become public charges, but the removal of aliens who do become public charges. *See, e.g.*, 1903 Act § 20 (providing for removal of those who become a public charge within 2 years of landing).

### B.   The Plain Meaning Of Public Charge Does Not Require Permanent Receipt Of Government Benefits.

An alien's temporary receipt of public benefits also constitutes an obligation on the public to support the basic necessities of life, and is therefore encompassed by the plain meaning of public charge. Both administrative practice and the analysis in early cases confirm that the plain meaning of "public charge" is not limited to an alien who is "permanently" dependent on Government assistance, as Plaintiffs assert. *See* Mot. at 10, 14, 18.

First, as the NPRM in this case explained, short-term receipt has been "a relevant factor under the [previous] guidance with respect to covered benefits." NPRM at 51165 & n.304 ("In assessing the probative value of past receipt of public benefits, 'the length of time . . . is a significant factor'")

---

recognize that partial or temporary dependence on public services satisfies the definition of public charge. *See, e.g.*, *Kenneson v. Kenneson*, 36 N.Y.S. 2d 676, 686 (N.Y. Dom. Rel. Ct. 1942) (awarding $6 per week in domestic support to substitute teacher during school summer vacation to ensure that she did not become a "public charge" due to lack of "liquid assets for food and other essential needs," notwithstanding teacher's ownership of home and rental income from portion thereof); *State ex rel. Currie v. Currie*, No. 01-A-01-9303-JV00084, 1993 WL 339304 at *5 (Tenn. Ct. App. 1993) (rejecting argument that "receipt of [public welfare] payments on only an intermittent basis . . . shows a lack of need to be a public charge").

(quoting 1999 Interim Field Guidance at 28690). In fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash benefits for an extended period for the totality of the circumstances to trigger a public charge determination and set no minimum period below which the receipt of such benefits would be less meaningful. 1999 Interim Field Guidance at 28690. Nothing in the 1999 standard would ensure that an alien who received, in the previous 36 months, 12 months of a public benefit considered relevant under that guidance (such as Supplemental Security Income) would not be treated as a public charge.  And nothing in the plain meaning of "public charge" precludes DHS from clarifying the standard by adopting a recognizable and meaningful threshold for receipt of public benefits in a given period. *Cf. Harris v. FCC*, 776 F.3d 21, 28–29 (D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule.").

DHS's treatment of recurring, but non-permanent, receipt of public relief is also consistent with early case law. For example, a lower court in New York in the mid-nineteenth century recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." *People ex rel. Durfee v. Comm'rs of Emigration*, 27 Barb. 562, 569-70 (N.Y. Gen. Term 1858). Similarly, in *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. 516, 520-24 (Pa. Super. Ct. 1897). Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under the specific facts of the case, she was "without notice or knowledge" that receipt even of limited assistance would "place[] [her] on the poor book." *Id.* at 527-28.[13]

---

[13] Plaintiffs' motion does not contend that the plain meaning of public charge bars consideration of non-cash benefits, as the 1999 Interim Field Guidance required. Nor could they plausibly do so, having recognized that their definition sweeps in those who were housed in "almshouses" and received numerous non-cash benefits. Mot. at 11.

Plaintiffs' interpretation of "public charge" as excluding short-term reliance on public benefits is also undercut by the text of the INA, which provides that the public charge ground of inadmissibility applies to an alien "likely *at any time* to become a public charge," 8 U.S.C. § 1182(a)(4) (emphasis added). Plaintiffs' interpretation of "at any time" as meaning "permanent," *see* Mot. at 11, is an unnatural reading of the statute. Further, Congress has decided to leave undefined the minimum period that would qualify an individual as a public charge. As the Rule explains, "public benefit receipt for more than 12 cumulative months over a 36-month period is indicative of a lack of self-sufficiency." Rule at 41359, *id.* at 41360 (citing Census Bureau evidence contrasting "the significant portion of the benefits-receiving population [who] ended their participation within a year [31.2 percent]," and the much larger share who could not achieve self-sufficiency in the long run, remaining as public charges for three years or longer). There is no basis to believe that the plain meaning of public charge excludes such dependency.

### C. The Rule Exercises Interpretive Authority That Congress Delegated to the Executive Branch, A Delegation Congress Has Maintained.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws." Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the reasonable limits of the plain meaning of the statutory term. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). Congress has long recognized this implicit delegation of authority to interpret the meaning of "public charge." *See, e.g.*, S. Rep. No. 81-1515, at 349 (1950) (recognizing that because "there is no definition of the term [public charge] in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). The delegation is supplemented by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). This expansive delegation of authority grants DHS wide latitude to interpret "public charge" within the reasonable limits set by the broad, plain meaning of the term

itself.[14]

Congress's comprehensive delegation of interpretive authority is well-established in precedent dating back to the early public charge statutes. *See, e.g., Ex Parte Pugliese*, 209 F. 720, 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even if "evidence to the contrary [is] very strong"). It is also recognized in Executive Branch practice. Administrative decisions have explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied." *Matter of Harutunian*, 14 I. & N. Dec. 583, 588-90 (BIA 1974) (quoting S. Rep. No. 81-1515 at 349 (1950)) (holding that alien's receipt of "old age assistance benefits" in California was sufficient to render the alien a "public charge")); *see also Matter of Vindman*, 16 I. & N. Dec. 131, 132 (BIA 1977) (citing regulations in the visa context, and explaining that the "elements constituting likelihood of an alien becoming a public charge are varied . . . [and] are determined administratively"). Indeed, Plaintiffs themselves seek to preserve a *prior* exercise of this delegated interpretive authority by requiring DHS to revert to the "primarily dependent" standard for public charge determinations that appeared for the first time in the 1999 Interim Field Guidance and simultaneous 1999 NPRM. *See* Mot. at 43 (seeking to require Defendants to "operat[e] under the 1999 Field Guidance").

The long history of congressional delegation of definitional authority over the meaning of "public charge" demonstrates the error in Plaintiffs' claim that Congress has, by "reenact[ing] the public-charge [inadmissibility ground] without" adopting a specific definition, foreclosed DHS from doing so. Mot. at 13-18. So although Plaintiffs assert that Congress "incorporated" prior interpretations into the 1952 Act, the legislative history of that enactment states unequivocally that

---

[14] These delegations of authority specific to the public charge ground of inadmissibility are reinforced by the explicit overall delegation of authority by Congress to the Secretary of Homeland Security the authority to "establish such regulations . . . as he deems necessary for carrying out" the INA, 8 U.S.C. § 1103(a)(3). Congress has also provided the Secretary with specific responsibility to carry out the INA and to make public charge inadmissibility decisions, as spelled out in detail in the NPRM and Rule. *See* NPRM at 51124; Rule at 41295.

"its meaning has been left to the interpretation of the administrative officials and the courts." S. Rep. No. 81-1515, at 349. Nothing about the 1990 statute suggests that Congress intended to revoke its delegation of interpretive authority, either. To the contrary, Congress's removal of the separate inadmissibility grounds of "pauper," "beggar" and "vagrant" in 1990 in favor of "public charge" as a catch-all indicates that Congress intended "public charge" to be read broadly and to leave with the Executive Branch the latitude to interpret and apply that term in light of the abolition of poorhouses and almshouses. Those changes, and other revisions to public benefits in ways that have negated the former distinctions among individuals needing different types and degrees of public aid, permitted the simplification of the statute.

Likewise, by its inaction in 1996 and 2013, *see* Mot. at 16., Congress left the public charge provision unchanged. This inaction cannot plausibly be read to withdraw the longstanding delegation to the Executive Branch to exercise definitional authority over the term public charge. Certainly the INS, when it adopted the 1999 Interim Field Guidance and proposed to issue a sweeping new definition of "public charge" through notice-and-comment rulemaking in 1999, did not understand Congress's 1996 action to have altered the statute by withdrawing the long-understood delegation. *See* 1999 NPRM at 28677 ("[T]he proposed rule provides a definition for the ambiguous statutory term 'public charge'"). At a minimum, the likelihood that Congress intended to preserve the delegation means that, under the circumstances, "[c]ongressional inaction lacks persuasive significance" because competing "inferences may be drawn from such inaction." *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 917 (D.C. Cir. 2017). And the more plausible of the competing inferences is that Congress intended for DHS to retain the authority delegated to it to analyze the "totality of the alien's circumstances" to make "a prediction" about the likelihood that an alien will become a public charge, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974), including the delegated authority for DHS to adopt further procedures to guide its officers, aliens, and the public at large in understanding the application of the public charge ground of inadmissibility.

Plaintiffs' "incorporation" theory also fails because the administrative and judicial precedents on which they rely do not define the public charge ground of inadmissibility as requiring permanent

and primary dependence, the definition they urge. All but one of the decisions Plaintiffs cite interpret the public charge provision as it stood *before* Congress relocated the term public charge to overcome the Supreme Court's decision in *Gegiow*. *See* Part II.A, *supra*; Mot. at 16. Indeed, the decision in *Howe* cited by Plaintiffs (interpreting the 1907 Act) explicitly relied on the adjacent-terms analysis that Congress repudiated in the 1917 Act. *See* Mot. at 13 (citing *Howe v. U.S. ex rel. Savitsky*, 247 F. 292 (2d Cir. 1917)). In the remaining case, the court credited the fact that the alien "said she expected to *support herself independently* after a while" and had "a well-to-do sister . . . ready to receive and assist her," facts that suggested the alien would *never* be dependent on public assistance. *Ex Parte Hosaye Sakaguchi*, 277 F. 913, 915, 916 (9th Cir. 1922). Even if Congress had intended to adopt this judicial definition at some point, the interpretations in these opinions provide no support for Plaintiffs' claim that Congress implicitly adopted a standard of "primary dependence."

Nor do the pre-1999 administrative determinations cited by Plaintiffs support their cramped definition. In *Matter of Martinez-Lopez,* for example, then-Attorney General Robert F. Kennedy explained that a "specific circumstance," which he described as any "fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public," is the standard for demonstrating a likelihood to become a public charge. 10 I. & N. Dec. 409, 421 (A.G. 1962) (rejecting argument that an alien's misrepresentation of an offer of employment was sufficient to render the alien deportable). The receipt of public benefits—whether cash or non-cash—for an extended period such as to fall within the 12/36 standard set forth in the Rule readily qualifies as a "specific circumstance" demonstrating that a burden of support has been "cast on the public." *Id.* Similarly, although the applicant in *Matter of A*—, 19 I & N Dec. 867, 870 (BIA 1988), was held not to be deportable based on the past receipt of public benefits, that decision emphasized that such indicia of financial status *may* properly be considered in the totality of the circumstances analysis. The agency merely concluded that a specific type of temporary unemployment—that of "a mother to stay at home to care for her children, especially when the children have not started school"—did not outweigh the applicant's current employment in making a *prospective* determination (now that the children were six

years of age or greater).[15] *Id.*

> ### D.   The Rule Is Not Arbitrary and Capricious.
>
> #### 1.   The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking.

There is "no basis in the Administrative Procedure Act . . . for a requirement . . . [of] more searching review" when an agency changes its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). This is particularly true here, where the "prior policy" to which the Plaintiffs seek to revert is nonbinding guidance that could not possibly foreclose DHS from adopting a different reasonable interpretation through notice-and-comment rulemaking. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005). As the Supreme Court explained in *Fox*, all that DHS was required to do to permissibly change course from the 1999 Interim Field Guidance was to acknowledge that the Rule does enact a policy change, provide a reasoned explanation for the change, and explain how it believes the new interpretation is reasonable. *See generally Fox*, 556 U.S. 514-16. The Rule readily meets these standards, and so DHS is entitled to full deference to its changed interpretations, consistent with its obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64 (recognizing that agencies receive deference to a "changed . . . interpretation of [a] term").

First, the NPRM and Rule acknowledged that DHS was changing course. In the former, DHS announced it was proposing "major changes," *see, e.g.*, NPRM at 51116, and that these changes included "a new definition of public charge." *Id.* at 51158; *see also id.* at 51163 (describing DHS's intent

---

[15] *Matter of Perez*, 15 I. & N. Dec. 136 (BIA 1974) is inapposite for a different reason. That appeal arose in the context of *deportation*, not inadmissibility, and it is widely recognized that "administrative authorities [have] interpreted public charge differently for purposes of the grounds of inadmissibility than for the grounds of deportability." Kate M. Manuel, Cong. Research Serv., *Public Charge Grounds of Inadmissibility and Deportability: Legal Overview*, Summary (Jan. 5, 2016) ("CRS 2016"). The "public charge" ground of deportability for admitted aliens is set forth in a different statutory provision, 8 U.S.C. § 1227(a)(5). As the Board of Immigration Appeals recognized in a different case that same year, the agency viewed it as "incorrect to interpret 'public charge' in Section 212(a)(15)," *i.e.*, in the context of inadmissibility, "as narrowly as in the deportation section." *Matter of Harutunian*, 14 I & N Dec. 583, 589 (BIA 1974); *see id.* at 588 ("[T]he deportation statute must be strictly construed. The rule is otherwise as to exclusion").

to make "a change from the standard" of "primary dependence" set forth in the 1999 Interim Field Guidance). DHS also stated that it would change and "improve upon the 1999 Interim Field Guidance" by altering the treatment of non-cash benefits. *Id.* at 51123. In the Rule, DHS "agree[d]" with commenters that the public charge inadmissibility rule constitutes a change in interpretation from the 1999 Interim Field Guidance," Rule at 41319, and repeatedly explained that it was "redefin[ing]" public charge, and adopting a "new definition" of "public benefit" that would be "broader" than before. *Id.* at 41295, 41297, 41334; *see also id.* at 41347 (explaining that the agency may justifiably change course).

Second, DHS explained the reasons for the changes in policy. DHS described how the "focus on cash benefits" in the 1999 Interim Field Guidance had proved "to be insufficiently protective of the public budget, particularly in light of significant public expenditures on non-cash benefits." NPRM at 51164. DHS quantified the "significant federal expenditure on low-income individuals" specifically associated with "benefits directed toward food, housing and healthcare." NPRM at 51160; *see id.* at Table 10. Recognizing that these benefits are provided to citizens and aliens alike, DHS also examined the substantial participation rate among foreign-born aliens for these programs. *See id.* at 51161 & Table 11. In this analysis, DHS found that public benefits programs provide, on average, thousands of dollars of "assistance to those who are not self-sufficient" and who are aliens, *id.* at 51163, and that millions of aliens receive such benefits: 3.1 million receive Medicaid alone. *Id.* at 51161-62 & Table 12. These statistics reasonably support DHS's conclusion that, under the 1999 Interim Field Guidance, the agency was failing to carry out the principles mandated by Congress that "aliens . . . not depend on public resources to meet their needs," and instead "rely on their own capabilities" and support from families, sponsors, and private organizations. 8 U.S.C. § 1601; *see also* Rule at 41308, 41319 (explaining that the prior guidance "failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective"). This amply demonstrates the reasonableness of DHS's decision to adopt a new definition and approach in exercise of its delegated authority to make public charge inadmissibility determinations.

Plaintiffs' specific discussion of how DHS has "justif[ied] its change in policy," Mot. at 19-20,

merely recites a litany of policy disagreements, rather than identifying any substantive flaw with the analysis in the NPRM and Rule. Plaintiffs claim that "DHS never explains" why it disagrees with the "primary dependence" definition invented in the 1999 NPRM, but in fact, DHS explained its disagreement in light of relevant case law and legislative history, including Congress's delegation of authority to define "public charge," Rule at 41356, and dictionary and historical definitions of the term. *See, e.g.*, NPRM at 51158, Rule at 41349-50. Nor is DHS's discussion of the historical scope of public benefits "without explanation." Mot. at 19. DHS dedicates pages to the discussion of comments on this question, *see* Rule at 41349-51, and its analysis included discussion of specific evidence that Congress intended benefits short of institutionalization to be considered in public charge determinations. *See id.* at 41351 n.323 (discussing old age assistance). Further, the 1999 Interim Field Guidance itself did not limit the scope of considered public benefits only to almshouses, poorhouses, or other benefits akin to institutionalization in 1882, so there is no need for DHS to treat that as the baseline from which it is changing. *See generally* 1999 Interim Field Guidance. Finally, in light of Congress's delegation of authority to DHS to interpret the public charge ground of inadmissibility, DHS is under no obligation—and Plaintiffs cite to none—to "disclose[] . . . the feedback that it received" from other Federal agencies or to ignore the "impact on the federal budget" as part of its analysis. *See* Mot. at 20.

        **2.**      **The 12/36 Standard And The Factors Set Forth In The Rule Are Reasonable.**

Plaintiffs insist that the Rule's standard for determining whether an individual is "likely at any time to become a public charge" is "so de minimis and difficult to apply" that it is "arbitrary" and "irrational." Mot. at 21. Plaintiffs are wrong. The Rule's definition of "public charge" alleviates concerns about *de minimis* use of public benefits by imposing a durational requirement; only if the alien is likely to receive benefits for more than 12 months in a 36-month period will the public charge test be met. Rule at 41295. It was entirely rational for DHS to conclude that an individual who relies on public assistance for a lengthy amount of time to meet his or her basic needs should be defined as a public charge, particularly where Congress's statutory requirement that the inadmissibility ground

apply to a person determined likely "at any time" to become a public charge indicates concern even with short periods of reliance on public assistance. *See* § 1182(a)(4)(A); Rule at 41421-22. Moreover, as discussed above, the plain meaning of public charge does not require permanent or long-term receipt of benefits. *See* Section II.B.

Plaintiffs object that DHS cannot "predict with any precision" whether someone will meet the definition of a public charge. Mot. at 22. But that is an objection to the statute, not the Rule, for the statute requires DHS to make a necessarily predictive judgment about the future, namely, whether an individual "is likely *at any time* to become a public charge." 8 U.S.C. § 1182(a)(4)(A). Likewise, Plaintiffs' claim that the Rule's public charge test is "subjective" reflects Congress's decision to grant discretion to the Executive Branch to decide, in the "opinion" of the deciding officer, whether a person is likely at any time to become a public charge. *Id.* As DHS noted, "officer discretion is not a new concept in USCIS immigration benefits adjudications," and several immigration benefits "are discretionary in nature and involve an assessment and weighting of positive and negative factors." Rule at 41398. In any event, USCIS will issue sub-regulatory guidance to its immigration officers and will conduct training for adjudicators to ensure they correctly apply the public charge test. *Id.* at 41396-97. Lastly, Plaintiffs contend that the Rule gives insufficient guidance on its application to specific circumstances, Mot. at 22-23, but this preview of Plaintiffs' vagueness argument, discussed below, does not show the Rule is arbitrary or capricious. *See* Section II.E.

### 3. DHS Reasonably Responded To Comments And Considered The Aspects Of The Problem Identified By Plaintiffs.

An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Although Plaintiffs insist that DHS did not adequately consider potential harms that may result from the Rule as discussed in comments, the responses that Plaintiffs discuss in their argument do not reveal any failure to satisfy the standard of the APA.

For example, Plaintiffs take issue with the Rule's calculation of the reduction in transfer payments from the federal government due to individuals disenrolling from public benefits. *See* Mot. at 23-24. DHS performed that calculation as part of its regulatory impact analysis required by Executive Orders 12866, 13563, and 13771. NPRM at 51227, 51266. Any claim alleging a failure to adequately perform that analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review."). But even if DHS's cost-benefit analysis were subject to review, it would withstand scrutiny. The principle that "a court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative polices." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003). Courts must be deferential when reviewing "an agency's cost/benefit analysis," *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013), and review is limited to deciding whether DHS's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985). Plaintiffs fail to identify a sufficient basis to overcome the deference due to DHS's cost-benefit analysis. DHS did not, as Plaintiffs suggest, limit its analysis to "noncitizens who intend to adjust status" but instead considered all members of households that include at least one alien. Rule at 41463. Although Plaintiffs claim that DHS's method underestimates the disenrollment impact, they concede that in another way it may also *overestimate* that impact. Mot. at 24. DHS's balancing of the competing uncertainties to arrive at a reasonable middle ground is precisely the type of expertise-driven decision for which Plaintiffs may not insist the Court "substitute its judgment." *Consumer Elecs.*, 347 F.3d 303. [16]

---

[16] The APA, standing alone, does not require a detailed cost-benefit analysis. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009) (upholding agency choice to seek "only to avoid extreme

Next, Plaintiffs claim that DHS failed to "quantify the magnitude of the harm" resulting from the disenrollment impact. Mot. at 24. Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. Nor could they. *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (the "law does not require agencies to measure the immeasurable"); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action was not arbitrary and capricious notwithstanding agency's "failure to quantify" effects). Plaintiffs fail to describe any methodology DHS could have followed to reliably measure the consequences of individuals disenrolling from benefits. "As predicting costs and benefits without reliable data is a primarily predictive exercise, the [agency] need[s] only to 'acknowledge [the] factual uncertainties and identify the considerations it found persuasive' in reaching its conclusions." *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014). DHS did so here. It noted that it is "difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule" and exercised its policy judgment to conclude that the possibility that individuals not subject to the Rule might make unwarranted choices to disenroll from benefits does not override the important benefits likely to ensue from the Rule. Rule at 41312-14. DHS's decision to move forward notwithstanding potential, unquantifiable harms is a quintessential exercise of the agency's policymaking function and is neither arbitrary nor capricious. *See Consumer Elecs.*, 347 F.3d at 303 ("When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive.").  Plaintiffs may not agree with DHS's weighing of the costs and benefits, but that does not mean that DHS ignored costs or that the Rule is arbitrary

---

disparities between costs and benefits"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510-12 & n.30 (1981) ("Congress uses specific language when intending that an agency engage in cost-benefit analysis."); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011) (rejecting argument that "the APA's arbitrary and capricious standard alone requires an agency to engage in cost-benefit analysis"). While the Supreme Court noted in *Michigan v. EPA* that "reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions," 135 S. Ct. 2699, 2707 (2015), it did not require the agency "to conduct a formal cost-benefit analysis," leaving it up to the agency "to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* at 2711.

and capricious. *See id.* (the principle "that a court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies").

Likewise, DHS adequately responded to comments that the Rule will harm public health, healthcare systems, benefits administration, and local economies. *See* Mot. at 25. Far from failing to account for such costs, DHS did consider them and made the reasonable decision to adopt the Rule in its balancing of costs and benefits. *See* Rule at 41310-14, 41469, 41471. For example, as to administrative costs on states, DHS "consider[ed] these costs qualitatively in the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and what the cost of making such changes will be." *Id.* at 41469. And as to impacts on public health, DHS explained that it made a number of changes to the Rule to mitigate some of the concerns raised, such as excluding certain benefits from the scope of the Rule. *Id.* at 41471. Also, contrary to Plaintiffs' claim, Mot. at 25, DHS's belief that the Rule ultimately will have a positive impact on public health by "denying admission or adjustment of status to aliens who are not likely to be self-sufficient" is not inconsistent with the 1999 Interim Field Guidance.  Just as the 1999 Guidance noted that disenrollment from public benefits can have an adverse impact on public health, the Rule similarly acknowledged that potential.  Rule at 41489 (listing "adverse health effects" as potential cost).  But the possibility of adverse health effects from disenrollment does not negate DHS's conclusion that other aspects of the Rule will foster public health benefits. DHS rationally concluded that excluding aliens lacking self-sufficiency and encouraging aliens already present in the United States to become self-sufficient – *i.e.*, capable of funding their health care, dietary requirements, etc. – will strengthen public safety, health, and nutrition overall.

Last, there is nothing "pro forma" about DHS's responses to comments that the Rule is vague and discriminatory. Mot. at 25-26. As to vagueness, DHS explained that the NPRM had "provided specific examples of various concepts and laid out in great detail the applicability of the rule to different classes of aliens," and "also provided an exhaustive list of the additional non-cash public benefits that would be considered[.]" Rule at 41321. DHS also discussed the various changes it made

to address the vagueness concerns, including revising the list of public benefits, simplifying the benefits threshold, and deciding not to consider receipt of benefits not listed in the Rule. *Id.* Further, DHS intends to provide "clear guidance to ensure that there is adequate knowledge and understanding among the regulated public regarding which benefits will be considered and when, as well as to ensure that aliens understand whether they are or are not subject to the public charge ground of inadmissibility." *Id.* Also, DHS extensively addressed comments that the Rule violates equal protection by describing the legitimate purposes of the Rule and explaining how it complies with applicable legal precedents. *Id.*

### E. The Rule Provides Fair Notice And Comports With Due Process.

Plaintiffs' claim that the Rule is unconstitutionally vague, Mot. at 26-33, is even more untenable than Plaintiffs' other claims. As Plaintiffs acknowledge, the "void for vagueness" doctrine on which they rely is a "principle of due process" under the Fifth Amendment of the Constitution, which requires that "[n]o person . . . be deprived of life, liberty, or property, without due process of law." Mot. at 26 (quoting *Grayned v. City of Rockford*, 408 U.S. 104 (1972) & U.S. Const. amend. V). As a threshold matter, "a due process claim requires the deprivation of some cognizable interest or property," and it is well-established in this Circuit that "[a]liens do not have a property interest or right to an adjustment of status." *Igwebuike v. Caterisano*, 230 Fed. Appx. 278, 285 (4th Cir. 2007); *see also Dekoladenu v. Gonzales*, 459 F.3d 500, 508 (4th Cir. 2006), *overruled on other grounds*, *Dada v. Mukasey*, 554 U.S. 1 (2008). This is because "requests for adjustment of status are purely discretionary forms of relief," and "no property or liberty interest can exist when the relief sought is discretionary." *Dekoladenu*, 459 F.3d at 508. Therefore, Plaintiffs cannot begin to "make out a due process violation" and their vagueness challenge must be rejected. *Id.*[17]

Plaintiffs urge the Court to overturn this long-established doctrine, proposing to subject "the entire [statutory] scheme" including *all* of "the INA's admissibility and deportability provisions," and

---

[17] Nor is there any cognizable Fifth Amendment interest in an initial decision regarding inadmissibility, because "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

potentially other facets of the INA, "to void-for-vagueness review" under "the most exacting vagueness standard." Mot. at 27, 30. Not surprisingly, the cases relied on by Plaintiffs for this radical argument require no such result. Plaintiffs cite the Fifth Amendment due process right in deportation proceedings recognized in *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903), but more than 100 years after that decision, the right recognized there has *never* been extended to discretionary immigration decisions, even discretionary relief from deportation itself. *See, e.g.*, *Smith v. Ashcroft*, 295 F.3d 425, 431 (4th Cir. 2002). And although *Rusu v. INS*, 296 F.3d 316, 321-22 (4th Cir. 2002), recognized an unspecified liberty interest in asylum hearings, that decision predated explicit Fourth Circuit holdings reiterating that no such interest attaches to adjustment of status. *See Igwebuike*, *Dekoladenu*, *supra*. The Supreme Court decision in *Dimaya v. Sessions* similarly works no such major change, as it is simply another case addressing whether a "*lawful permanent resident* alien" may be "subject to removal." 138 S. Ct. 1204, 1224 (Gorsuch, J., concurring) (2018) (emphasis added).[18]

Even if Plaintiffs could assert a Fifth Amendment due process claim, there is no vagueness problem with the Rule. At its core, the Rule works to resolve the very concerns that motivate vagueness doctrine in the first place by supplying additional "guidelines [and] standards regarding who qualifies as" a public charge that exist only in broad strokes in the public charge statute. *Manning v. Caldwell*, 930 F.3d 264, 274 (4th Cir. 2019). As the Rule explains, the hundreds of pages of material in the NPRM "provided specific examples of various concepts and laid out in great detail the applicability of the rule to different classes of aliens," and the final Rule was revised to provide a "single, objective duration-based threshold applicable to the receipt of all included public benefits." Rule at 41321. This provides far more "fair notice to [aliens] about what conduct is targeted by [the] statutory [public charge]" inadmissibility ground, *Manning*, 930 F.3d at 273, than the abbreviated and non-exhaustive list of enumerated factors in the statute, *see* 8 U.S.C. § 1182(a)(4), or the sweeping and non-specific

---

[18] Justice Gorsuch's concurring opinion, which is controlling under the standard for finding the holding of a divided Court in *Marks v. United States*, 430 U.S. 188 (1977), *see U.S. v. Halstead*, 634 F.3d 270, 277 (4th Cir. 2011), makes clear that his application of the void-for-vagueness doctrine is dependent on the fact that deportation involves "the deprivation of a statutorily afforded liberty interest," *Dimaya*, 138 S. Ct. at 1230, which is lacking here. *See Igwebuike*, *supra*.

"primarily dependent" language set forth in the 1999 Interim Field Guidance. For this reason, as DHS explained, Plaintiffs' vagueness objection is "a byproduct of the statute's requirement that DHS consider a range of minimum factors as part of the public charge inadmissibility determination" and the longstanding "totality of the circumstances" test (that Plaintiffs explicitly urge be *preserved*, *see* Mot. at 43), not the Rule. *See* Rule at 41321. Finally, it is well-established—even in the criminal context— that where a significant public policy interest requires a "predict[ion] of future behavior," there is no vagueness problem with a statute that grants a factfinder "wide discretion to make a predictive judgment," such as through the totality of the circumstances determination at issue here. *Nguyen v. Reynolds*, 131 F.3d 1340, 1353-54 (10th Cir. 1997); *accord Jurek v. Texas*, 428 U.S. 262 (1976).

### F.     The Rule Does Not Discriminate Unlawfully Among Aliens.

Plaintiffs' claim alleging a violation of the equal protection component of the Fifth Amendment is not likely to succeed under any conceivable standard, but particularly not under the highly deferential standard applicable in immigration litigation. It is well-established that rational basis review applies when assessing an equal protection challenge to immigration regulation. *See, e.g.*, *Appiah v. I.N.S.*, 202 F.3d 704, 709-10 (4th Cir. 2000) (applying rational basis review where an alien questioned the constitutionality of an immigration law); *Ameur v. Gates*, 759 F.3d 317, 328 (4th Cir. 2014); *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001) ("We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration."). The Supreme Court's recent decision in *Trump v. Hawaii* reaffirms these principles and makes clear that, at most, rational basis would be the appropriate standard of review in this case for the same reasons as in *Hawaii*: the deference accorded the political branches in this arena. 138 S. Ct. 2392, 2418-19 (2018) ("Because decisions [in the admission and exclusion of foreign nationals] may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" (citation omitted)).

Plaintiffs fall far short of satisfying their heavy burden under rational basis review. Under that standard, courts "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii* at 2420 (noting that "the Court hardly

ever strikes down a policy as illegitimate under rational basis scrutiny"). The policy must only "rationally further[]" a valid government objective. *Appiah*, 202 F.3d at 710. "The burden falls to the party attacking the statute as unconstitutional to 'negative every conceivable basis which might support it.'" *Lewis*, 252 F.3d at 582 (quoting *Madden v. Kentucky*, 309 U.S. 83, 88 (1940)). Here, the Rule easily falls within DHS's broad authority to regulate immigration matters and is indeed rationally related to the government's compelling, statutorily-codified interest in minimizing the incentive of aliens to immigrate to the United States due to the availability of public benefits and promoting the self-sufficiency of aliens within the United States. *See* 8 U.S.C. § 1601; *see also* Rule at 41323. It is certainly "reasonably conceivable" that the Rule will promote these governmental interests. *See Lewis*, 252 F.3d at 584 ("[I]t is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival[.]"). Indeed, not even Plaintiffs contend that the Rule will fail to achieve the desired ends. The Rule is "expressly premised on legitimate purposes," *Hawaii*, 138 S. Ct. at 2421, and it cannot be said that the Rule is "inexplicable by anything but animus," *id.* at 2420.

Rather than address the applicable legal standard, Plaintiffs discuss two of the factors specified in *Arlington Heights v. MHDC*, 429 U.S. 252 (1977) for identifying a discriminatory purpose. Mot. at 34-37. But the *Arlington Hts.* factors are not relevant under the highly deferential rational basis standard of review. And even were the Court to apply those factors, they still would not show a likelihood of success. Plaintiffs assert that the Rule will have a disparate impact on non-European, non-white immigrants, Mot. at 34-35, but *Arlington Hts.* itself reaffirmed that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact" and that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 264-65. Plaintiffs fail to provide such proof. In particular, although Plaintiffs point to alleged statements by various administration officials, Mot. at 35-37, those statements are not part of the "legislative or administrative history" that might be relevant under *Arlington Hts.*, 429 U.S. at 268; *see also Carcano v. Cooper*, 350 F. Supp. 3d 388, 419-20 (M.D.N.C. 2018) (statements made by legislators "in the press and through their social media" about the "purpose and effect" of the

challenged statute "are not 'legislative history'" under *Arlington Hts.* and therefore not relevant). Moreover, the statements are disconnected from the Rule; none suggests that a purpose of the Rule is to discriminate against non-white immigrants. Plaintiffs' claim is ultimately based on speculation that animus may have motivated the Rule, but that speculation does not establish a likelihood of success.

Plaintiffs cite various decisions that have considered the same or similar alleged statements in the context of equal protection claims. Mot. at 37 & n.28. But those decisions generally address the plausibility standard applicable to motions to dismiss, not the "far more demanding" standard for demonstrating a likelihood of success on the merits. *Benitez v. King*, 298 F. Supp. 3d 530, 536 (W.D.N.Y. 2018); *Moonracer, Inc. v. Collard*, 2013 U.S. Dist. LEXIS 159109, at *7 (E.D.N.C. Nov. 6, 2013) ("the plausibility standard applicable to motions under Rule 12(b)(6) is far different from the probability or likelihood of success standard applicable to a motion for preliminary injunction"). The one decision cited by Plaintiffs involving a preliminary injunction motion found only "serious questions on the merits," *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1105 (N.D. Cal. 2018), which is a lesser standard than that applicable in this Circuit. *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds and remanded*, 130 S. Ct. 2371 (2010), *standard reaffirmed in* 607 F.3d 355 (4th Cir. 2010) ("The *Winter* requirement that the plaintiff clearly demonstrate that it will *likely succeed* on the merits is far stricter than the . . . requirement that the plaintiff demonstrate only a grave or serious *question* for litigation."). Moreover, the *Ramos* decision discussed a variety of evidence beyond statements of the sort alleged here. 336 F. Supp. 3d at 1098-1105. Plaintiffs do not cite a single decision in which allegations comparable to those made here were held sufficient to establish a likelihood of success on the merits.

Finally, Plaintiffs fail to show any "[d]epartures from the normal procedural sequence" in the promulgation of the Rule that could suggest discriminatory intent. *Arlington Hts.*, 429 U.S. at 267. Their assertion that the Rule is "at odds with how the public-charge inadmissibility ground has been interpreted for over a century," Mot. at 38, misstates history for the reasons discussed above in Section II(A)-(C). And although they claim that "DHS failed to rely on the expertise of benefit-granting

agencies in drafting the Rule," Mot. at 38, they elsewhere admit that DHS stated that it "consulted with the relevant Federal agencies regarding the inclusion and consideration of certain . . . public benefits," *id.* at 20. Plaintiffs effectively concede that they do not know "the nature of the feedback that [DHS] received," and their claim that DHS "relies primarily on its own beliefs and speculation" is unsupported. *Id.*

### III.   Plaintiffs Have Not Demonstrated Irreparable Harm.

"Courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor," and a "plaintiff seeking a preliminary injunction must demonstrate…that he is likely to suffer irreparable harm in the absence of preliminary relief…." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter,* 555 U.S. at 20). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). "Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)). Moreover, Plaintiffs must show that they are "*likely* to suffer *irreparable* harm before a decision on the merits can be reached." *Henderson v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 440 (4th Cir. 2018) (quoting Winter, 555 U.S. at 22) (emphasis in original). Thus, the irreparable harm standard places the burden on the Plaintiff to make a showing that is similar to but more demanding than the standing inquiry.

### A.   CASA de Maryland Cannot Establish Irreparable Harm

As discussed *supra* at II. A, to the extent Plaintiff CASA purports to bring claims on behalf of its membership, it cannot establish representational standing because the only individual members it has identified do not have standing to bring their own claims. Consequently, CASA cannot rely on alleged harms as a representative of its members in order to establish irreparable harm. In addition, even if the individual Plaintiffs did have standing, they could not provide the basis for CASA to rely on alleged injuries of *other* members caused by forgoing or disenrolling from public benefits, Mot. at 38-39, because the individual Plaintiffs have neither used, intended to use, forgone nor disenrolled

from any public benefits. *See generally* Aguiluz Decl.; Camacho Decl. And even if CASA had properly established representational standing, it has not met its burden to demonstrate that the alleged harms to members are irreparable, could not be rectified after final judgment, or are likely before a decision on the merits. Indeed Plaintiffs have relied exclusively on conclusory assertions that CASA's members "will be irreparably harmed by forgoing benefits," Mot. at 39, without alleging any facts in support of any of these elements.

CASA's claims of irreparable harm to itself also fall short for the same reasons that they cannot establish organizational standing. *See supra* II.A.  CASA alleges that it has incurred costs and reallocated resources to educate and counsel members about the effects of the Rule, and that it anticipates reallocating resources to provide services to individuals who disenroll from public benefits. One reason this is insufficient is that providing education and counseling concerning immigration issues is concededly a core organizational purpose and activity of Plaintiff CASA. Plaintiff's "core purpose as an organization is pursuing precisely the type of advocacy it undertook here" and consequently "[a]ny resources [CASA] spent . . . seem very much in line with [CASA's] core mission rather than a diversion of resources away from it." *Knowledge Ecology Int'l*, 2019 WL 1585285, at *6; Thus it has suffered no "concrete and particularized injury" that can satisfy the irreparable injury standard. *See id.* at *3*; see also,* e.g., *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285-86 (3d Cir. 2014) ("additional expenditures . . . consistent with [an organization's] typical activities" are not an injury); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (actions that did not "differ from the [organization]'s routine . . . activities" did not confer standing). In addition, Plaintiffs have neither alleged nor provided any support for the proposition that their anticipated future diversion of resources to provide substitute support services will occur before the case can be decided on the merits. Finally, to the extent CASA alleges its mission has been frustrated because it has shifted its organizational focus from affirmative activities to defensive activities, "an injury to organizational purpose, without more, does not provide a basis for standing," let alone meet the more demanding standard for irreparable harm. S. *Walk*, 713 F.3d at 183.

## B.    The Individual Plaintiffs Cannot Establish Irreparable Harm

The individual Plaintiffs are also unable to establish any irreparable harm. As discussed *supra*,

these plaintiffs do not have standing and their claims are not ripe. Even if these Plaintiffs had established standing or ripeness, their efforts to establish irreparable harm fall short for numerous reasons. They have failed to demonstrate that the alleged effects of the Rule on them are harms at all, much less that they could not be resolved by final judgment or that they would be so immediate that the harm would occur before a decision could be reached on the merits.

First, the individual Plaintiffs have offered no support for their assertion that an individual's choice to take account of a statutory or regulatory scheme or arrange his or her conduct to obtain a particular result under that scheme can be considered a harm. Every person must direct their conduct to comply with the requirements or all civil and criminal laws. To adopt Plaintiffs' suggested definition of harm, in addition to being illogical, would eviscerate the requirement of irreparable harm and the concept of standing more generally.

Second, even if the individual plaintiffs had alleged some cognizable harm, they admit that they are not now applying for adjustment of status nor do they have any concrete plans to apply for adjustment of status at any identifiable future point. Mot. 40 ("Plaintiffs would be subject to a public-charge determination *when and if* they apply to adjust status") (emphasis added). Plaintiffs also are not the current recipients of any public benefits nor do they currently have any immediate or concrete plans to forgo or disenroll from any public benefits or to take any other detrimental actions of any kind. *See id.* at 41-42. Any possible harms to these plaintiffs are thus inherently "remote and speculative," and "the possibility of irreparable harm does not constitute a "clear showing" that the plaintiff is entitled to relief." *Di Biase*, 872 F.3d at 235; *see also Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017) (Plaintiff "must show that the likelihood of irreparable harm rises above the threshold of mere possibility and is likely to occur if the request is denied."). [19]

---

[19] Plaintiffs' attempt to rely on *Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018), for the proposition that a vague future intention to potentially engage in some conduct related to a regulatory scheme establishes standing or irreparable injury is unavailing. Plaintiffs in *Kenny* alleged that they were subject to likely arrest or criminal prosecution and/or chilling of their First Amendment rights under a criminal law

Third, Plaintiffs have neither alleged nor provided any support for the proposition that the harms they allege, should they be found to be cognizable, cannot be remedied at final judgment. *See Mt. Valley Pipeline*, 915 F.3d at 216. Finally, Plaintiffs have neither alleged nor provided any support for the implied assertion in their motion that the alleged harms to the individual Plaintiffs would be realized before a final decision on the merits, which could be rendered on record-review in a matter of months. *See* Mot. at 41-42 (alleging financial uncertainty to Plaintiffs related to college programs for which they have not even applied.)

### C.  None of the Plaintiffs Can Establish Irreparable Harm on the Basis of Alleged Constitutional Violations.

Plaintiffs' assertion that they have demonstrated a violation of their Fifth Amendment rights is incorrect, *see supra*, and their claim that such allegations presumptively establish irreparable harm does not comport with the law. Plaintiffs rely for this proposition on *Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987), a Fourth Amendment case. *See id.* However, the case law allowing such a presumption of harm does not apply with the same force in cases not involving First and Fourth Amendment claims. *See, e.g., Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484-85 (1st Cir. 2009) (noting that an automatic finding of irreparable harm for a constitutional violation has been generally reserved for "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief" and that "it cannot be said that violations of plaintiffs' rights to due process and equal protection automatically result in irreparable harm" (citation and emphasis omitted)); *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however."); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm . . .."). Thus,

---

that necessarily controlled their conduct as public school students. *Id.* at 284. Conversely, the Rule does not require Plaintiffs to do or refrain from doing anything nor are they under any obligation to engage in the adjustment of status process to which the Rule applies. Thus, Plaintiffs have demonstrated neither a sufficiently imminent intention to engage in a prohibited course of conduct nor any credible threat of prosecution from engaging in that conduct. *See id.* at 288-89.

the fact that Plaintiffs have alleged an equal protection violation cannot by itself establish that they will be irreparably harmed absent an injunction.

## IV.    The Remaining Equitable Factors Require Denial of Plaintiffs' Motion.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *See Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019). These two factors merge when the government is a party, *Red Wolf Coal. v. U.S. Fish and Wildlife Serv.*, 210 F. Supp. 3d 796, 806 (E.D.N.C. 2016), but Plaintiffs have not made a sufficient showing to meet the standard for either factor. Plaintiffs assert that the balance of equities and public interest favor an injunction because the rule will further chill their members' use of public benefits, will impose further education and counseling costs on CASA, and will "force" the individual Plaintiffs "to make different life choices." Mot. at 43. Conversely, they allege that the harms to Defendants will be "virtually nonexistent" because injunction will allegedly preserve the status quo. *Id.*[20]

This analysis is facially incorrect and self-serving. The harms alleged to CASA's membership are speculative and CASA lacks standing to assert them. The harms alleged to CASA itself, as described *supra*, cannot properly be considered harms at all because they do not require a diversion of resources from the organization's core mission or otherwise harm that mission. The harms alleged to the individual Plaintiffs, to the extent they can even be considered cognizable harms, are wholly speculative and lacking in any immediacy. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have

---

[20] Plaintiffs also contend that the balance favors an injunction because there is a public interest in preserving the separation of powers by preventing executive action that invades legislative powers and no public interest in allowing unconstitutional regulatory action. Mot. at 43. However, there is a countervailing interest in preventing judicial intrusion into executive powers. Defendants, as the federal regulators, are also interested in the lawful and constitutional creation of their regulations, which was undertaken here, so both of these considerations are merely neutral in the balance.

made the assessment in their expertise that the existing Field Guidance referred to by Plaintiffs is insufficient or inappropriate to serve the purposes of proper immigration enforcement. Therefore, imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to continue before a determination on the merits would significantly harm Defendants.

Plaintiffs' speculative and non-cognizable harms have no weight in the balance of hardships compared to the Defendants' interest in avoiding roadblocks to administering the national immigration system. Consequently, Plaintiffs have failed to demonstrate that the balance of hardships tips in their favor or that the public interest favors injunction. On this ground alone, their motion for a preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

## V.      Any Injunction Should Be Narrowly Tailored To Any Irreparable Harms Suffered By The Plaintiffs In This Action.

Were the Court to order a preliminary injunction or a stay of the effective date of the Rule, it should be limited to redressing only any established injuries to the Plaintiffs who establish standing and irreparable harm. Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Plaintiffs have requested a preliminary injunction (or, in the alternative, a stay of the effective date), but have neither requested nor alleged any facts in support of a nationwide injunction or a stay with that effect. Equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Accordingly, Courts of Appeals have repeatedly vacated or stayed the nationwide scope of injunctions, including in a challenge to a federal immigration rule. *See, e.g., East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) ("Under our case law . . . all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"); *see also California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (collecting cases).

Relief under 5 U.S.C. § 705 is similarly limited, as that provision permits a court to stay the

effective date of an agency action only "to the extent necessary to prevent irreparable injury." *Id.* Although Plaintiffs have requested a stay of the effective date of the Rule without limitation, narrower relief is both available under § 705 and required by equitable principles applicable to extraordinary forms of relief. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (indicating that courts should consider any "brief[ing] [regarding] how [to] craft a limited stay"); 5 U.S.C. § 705 (Courts "may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review proceedings." (emphasis added)). Plaintiffs do not dispute that relief under § 705 is governed by equitable principles under the same standards as govern preliminary injunctions, and nothing in § 705 speaks clearly enough to work "a major departure from the long tradition of equity practice." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

Here, Plaintiffs have not established that nationwide relief is necessary to remedy their alleged harms. The Plaintiffs are a membership organization with an identified set of members in just three states and the District of Columbia, *see* Compl. ¶ 14, and two individuals. Any injunction should be limited to the individual Plaintiffs and to any clients of the organizational Plaintiff for whom Plaintiff has demonstrated injury and irreparable harm, and even then, only after the Court has conducted the required balancing of any demonstrated harm against the other equitable considerations. *Winter*, 555 U.S. at 26. A nationwide injunction that applies to countless individuals who are neither Plaintiffs here nor members of the plaintiff organization, or to members who lack any non-speculative irreparable harm, is not "narrowly tailored to remedy the specific harm shown." *East Bay*, 934 F.3d at 1026.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.


Dated: October 1, 2019                          Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General

                                                ROBERT K. HUR
                                                United States Attorney

                                                ALEXANDER K. HAAS

Director, Federal Programs Branch

/s/   *Joshua M. Kolsky*
ERIC J. SOSKIN
Senior Trial Counsel
KERI L. BERMAN
KUNTAL V. CHOLERA
JOSHUA M. KOLSKY, DC Bar. No. 993430
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington DC 20005
Tel: (202) 305-7664
Fax: (202) 616-8470
E-mail: joshua.kolsky@usdoj.gov