**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CASA de Maryland, Inc., et al.,

                                    *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
et al.,

                                    *Defendants*.

Civil Action No. 8:19-cv-2715-PWG

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

   I.    PLAINTIFFS SATISFY JURISDICTIONAL AND PRUDENTIAL STANDING ......... 1

     A.  The Individual Plaintiffs Have Article III Standing ......................................................... 1

     B.  CASA Has Article III Standing ...................................................................................... 5

     C.  Plaintiffs' Claims Are Ripe........................................................................................... 7

     D.  Plaintiffs Fall Within the Zone of Interests.................................................................. 9

   II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................. 10

     A.  The Public Charge Rule Is Inconsistent with the Meaning of "Public Charge" ........... 10

     B.  Congress Has Never Departed from the Plain Meaning of "Public Charge" ................ 14

     C.  DHS Acted Arbitrarily and Capriciously in Enacting the Public Charge Rule ............. 16

     D.  Defendants Misconstrue Plaintiffs' Void-for-Vagueness Claim .................................. 17

     E.  *Arlington Heights* Governs Plaintiffs' Equal Protection Claim..................................... 21

   III.  PLAINTIFFS SATISFY THE OTHER PRELIMINARY INJUNCTION FACTORS... 22

     A.  Plaintiffs Will Suffer Irreparable Harm ....................................................................... 22

     B.  The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor ....................... 24

   IV.  THE COURT SHOULD GRANT NATIONWIDE RELIEF .......................................... 24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ............................................................................................. 23

*Ameur v. Gates*,
   759 F.3d 317 (4th Cir. 2014) ............................................................................... 21

*Appiah v. INS*,
   202 F.3d 704 (4th Cir. 2000) ............................................................................... 21

*Attias v. Carefirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017) ............................................................................... 3

*Baltimore v. Trump*,
   No. CV ELH-18-3636, 2019 WL 4598011 (D. Md. Sept. 20, 2019) ......................... 6, 8, 9, 22

*Batalla Vidal v. Nielsen*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) .................................................................... 9

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
   924 F.3d 684 (4th Cir. 2019) ................................................................................. 7

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
   284 F. Supp. 3d 758 (D. Md. 2018) ....................................................................... 7

*CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018) ............................................. 21

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................. 10

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ............................................................................................... 3

*Clarke v. Securities Industry Ass'n*,
   479 U.S. 388 (1987) ............................................................................................... 9

*Comcast Corp. v. FCC*,
   600 F.3d 642 (D.C. Cir. 2010) ............................................................................. 15

*Cuomo v. Clearing House Ass'n, LLC*,
   557 U.S. 519 (2009) ............................................................................................. 16

*Dekoladenu v. Gonzales*,
   459 F.3d 500 (4th Cir. 2006) ............................................................................... 19

*Ex parte Horn*,
   292 F. 455 (W.D. Wash. 1923) ............................................................................. 12

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................. 16

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ............................................................. 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................ 4

*Gegiow v. Uhl*,
    239 U.S. 3 (1915) ............................................................................... 12

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ........................................................................... 16

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ..................................................................... 5, 23

*Henry v. Greenville Airport Comm'n*,
    284 F.2d 631 (4th Cir. 1960) ............................................................ 24

*Hernandez v. Ashcroft*,
    345 F.3d 824 (9th Cir. 2003) ............................................................ 18

*Igwebuike v. Caterisano*,
    230 F. App'x 278 (4th Cir. 2007) ..................................................... 19

*In re Feinknopf*,
    47 F. 447 (E.D.N.Y. 1891) ............................................................... 13

*Inhabitants of Guilford v. Inhabitants of Abbott*,
    17 Me. 335 (1840) ............................................................................. 13

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) .......................................................................... 15

*Jurek v. Texas*,
    428 U.S. 262 (1976) .......................................................................... 20

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ........................................................................... 19

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) .............................................................. 5

*Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC*,
    713 F.3d 187 (4th Cir. 2013) .............................................................. 8

*Lewis v. Thompson*,
    252 F.3d 567 (2d Cir. 2001) ............................................................. 21

*Liu v. Mund*,
    686 F.3d 418 (7th Cir. 2012) ............................................................ 15

*Make the Rd. N.Y. v. McAleenan*,
    No. 19-CV-2369 (KBJ), 2019 WL 4738070 (D.D.C. Sept. 27, 2019) ............ 24, 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)......................................................................................... 9

*Mejia v. Sessions*,
866 F.3d 673 (4th Cir. 2017) ......................................................................... 19

*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) ........................................................................... 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)......................................................................................... 17

*Nat'l Audubon Soc'y, Inc. v. Wheeler*,
163 F. App'x 594 (9th Cir. 2006) .................................................................... 4

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
No. CV TDC-18-1568, 2019 WL 3945979 (D. Md. Aug. 21, 2019) ................ 6, 7

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ..................................................................... 24

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998)......................................................................................... 8

*People ex rel. Durfee v. Comm'rs of Emigration*,
27 Barb. 562 (N.Y. Gen. Term 1858) ...................................................... 13, 14

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville*,
5 Pa. Super. 516 (1897)................................................................................. 13

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
908 F.3d 476 (9th Cir. 2018) ......................................................................... 21

*Rodriguez v. Gonzales*,
451 F.3d 60 (2d Cir. 2006) ............................................................................ 18

*Ross v. Meese*,
818 F.2d 1132 (4th Cir. 1987) ....................................................................... 23

*Rusu v. INS*,
296 F.3d 316 (4th Cir. 2002) ......................................................................... 19

*Selgeka v. Carroll*,
184 F.3d 337 (4th Cir. 1999) ......................................................................... 19

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018)................................................................................... 18

*Smith v. Aschroft*,
295 F.3d 425 (4th Cir. 2002) ......................................................................... 19

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) ................................................................. 5, 6, 7

*Town of Hartford v. Town of Hartland,*
    19 Vt. 392 (1847) ................................................................................................ 13

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ..................................................................................... 21

*Tuilaepa v. California,*
    512 U.S. 967 (1994) ......................................................................................... 20

*United States ex rel. Iorio v. Day,*
    34 F.2d 920 (2d Cir. 1929) .............................................................................. 12

*United States v. Lipkis,*
    56 F. 427 (S.D.N.Y. 1893) .............................................................................. 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .................................................................................. 21, 22

**Federal Statutes**

5 U.S.C. § 705 .............................................................................................................. 1, 25

8 U.S.C. § 1182 ................................................................................................. 2, 3, 15, 18

8 U.S.C. § 1255 ..................................................................................................................... 18

8 U.S.C. § 1601 ..................................................................................................................... 15

8 U.S.C. § 1611 ..................................................................................................................... 15

8 U.S.C. § 1621 ..................................................................................................................... 15

8 U.S.C. § 1641 ..................................................................................................................... 15

Act of Aug. 3, 1882,
    ch. 376, § 1, 22 Stat. 214 .................................................................................. 13

Act of Feb. 5, 1917,
    ch. 29, § 3, 39 Stat. 874 .................................................................................... 11

Act of Mar. 26, 1910,
    ch. 128, § 2, 36 Stat. 263 .................................................................................. 12

Illegal Immigration Reform Responsibility Act of 1996 (IIRIRA),
    Pub. L. No. 104-208, 110 Stat. 3009 ............................................................... 14

Immigration Act of 1990,
    Pub. L. No. 101-649, § 601(a)(4), 104 Stat. 4978 ........................................... 12

Personal Responsibility and Work Opportunity Act of 1996 (the "Welfare Reform Act"),
    Pub. L. No. 104-193, 110 Stat. 2105 ............................................................... 14

**Federal Regulations and Rules**

8 C.F.R. § 1003.1 ................................................................................................................ 14

Inadmissibility and Deportability on Public Charge Grounds,
   64 Fed. Reg. 28,676 (proposed May 26, 1999) .......................................... 10, 11

Inadmissibility on Public Charge Grounds,
   83 Fed. Reg. 51,114 (proposed Oct. 10, 2018) ................................................ 16

Inadmissibility on Public Charge Grounds,
   84 Fed. Reg. 41,292 (Aug. 14, 2019).................................................... passim

## Administrative Decisions

*Matter of A-,*
   19 I. & N. Dec. 867 (BIA 1988) ............................................................... 15

*Matter of Arrabally & Yerrabelly,*
   25 I. & N. Dec. 771 (BIA 2012) ................................................................ 3

*Matter of Martinez-Lopez,*
   10 I. & N. Dec. 409, 421 (Att'y Gen. 1964) ............................................. 14

## Legislative History

*H.R. 2202 – Immigration Control and Financial Responsibility Act of 1996,*
   Congress.gov, https://perma.cc/S5V4-5TGG ............................................. 14

H.R. Doc. No. 64-886 (Mar. 11, 1916)............................................................ 12

H.R. Rep. No. 104-828 (1996) (Conf. Rep.)................................................ 14, 15

H.R. Rep. No. 104-863 (1996) (Conf. Rep.).................................................... 14

S. Rep. 113-40 (2013)....................................................................................... 15

## State Statutes

1847 N.Y. Laws
   ch. 195, § 4................................................................................................ 14

## Other Authorities

Andrew Bremberg,
   Memo. for the President re: Executive Order on Protecting Resources by Ensuring Our
   Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017)................... 22

*Century Dictionary & Cyclopedia* (1911) ................................................... 12

*Dictionary of American and English Law* (1888) ....................................... 11

USCIS, *Approximate Active DACA Recipients: Country of Birth* (Sept. 4, 2017),
   https://perma.cc/3BH4-WGBG................................................................... 2

*Webster's Third New International Dictionary of the English Language* (1986) ....................... 11

## INTRODUCTION

The challenged Rule discards a clear interpretation of the public-charge exclusion that is based on the Immigration and Nationality Act (INA)'s plain language and has guided immigration officials for over a century.  In place of this settled understanding, the Department of Homeland Security (DHS)'s new Rule would prevent noncitizens from obtaining lawful-permanent-resident (LPR) status based on an "inherently subjective" prediction about whether they are likely at any point in the rest of their lives to receive even a small amount of public benefits to which they would be legally entitled.  Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292, 41,315 (Aug. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 212–14, 245, 248) [hereinafter Public Charge Rule or Rule].  Defendants have failed to demonstrate how the Rule passes muster under the Administrative Procedure Act or the U.S. Constitution.  They also have not refuted the evidence that the Rule substantially harms the Individual Plaintiffs by forcing them to alter their financial and life choices and also harms CASA de Maryland, Inc. (CASA) by frustrating its mission and diverting its resources away from its affirmative efforts to improve conditions for low-income immigrant communities.  The Court therefore should grant Plaintiffs' motion for a preliminary injunction or postpone the Rule's effective date under 5 U.S.C. § 705.

## ARGUMENT

## I.      PLAINTIFFS SATISFY JURISDICTIONAL AND PRUDENTIAL STANDING

### A.      The Individual Plaintiffs Have Article III Standing

Defendants first contend that the Individual Plaintiffs, Ms. Camacho and Mr. Aguiluz, do not have standing because they have not alleged that they "will certainly and imminently be subject to an adverse public charge determination."  Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. (Opp'n) 7, ECF. No. 52.  Defendants fundamentally misconstrue the nature of the injury that Plaintiffs have asserted.  Ms. Camacho and Mr. Aguiluz are not harmed only if they

are subject to an adverse public-charge determination under DHS's unlawful rule.  They are being harmed *right now* by being compelled to make decisions that are otherwise contrary to their own best interests because of the Rule's unlawful, vague, and unfair standard.  They therefore have satisfied the requirements of Article III standing.

Ms. Camacho and Mr. Aguiluz have lived in the United States since they were seven and eight years old, respectively, and they desire to stay in the country that is their home.  Camacho Decl. ¶¶ 3, 8; Aguiluz Decl. ¶¶ 3, 8.  Although they currently have some protection from removal under the Deferred Action for Childhood Arrivals (DACA) program, DACA protections are inherently limited and temporary—especially now, as the government is seeking to end the program.  Absent congressional action, obtaining LPR status is Ms. Camacho's and Mr. Aguiluz's only path to building a permanent, secure home in the United States, and both have expressed the intention to adjust their status.  Camacho Decl. ¶ 8; Aguiluz Decl. ¶ 8.  It is therefore critical for them to maintain their eligibility for LPR status, and avoiding triggering any inadmissibility ground is an essential element of that effort.

Contrary to Defendants' assertions, Ms. Camacho's and Mr. Aguiluz's intentions to become LPRs are not merely speculative.  Their current lack of lawful immigration status does not bar their future adjustment of status through existing legal channels—such as through a U.S. citizen spouse or an employment-based petition.[1]  Indeed, as of September 2017, nearly 40,000 DACA recipients had adjusted to LPR status.  *See* USCIS, *Approximate Active DACA Recipients: Country of Birth* 5 (Sept. 4, 2017), https://perma.cc/3BH4-WGBG.

Defendants raise the specter that Plaintiffs may be inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (excluding noncitizens "present in the United States without being admitted or

---

[1] Contrary to defendants' suggestions, plaintiffs do not contend that DACA or advance parole provide a basis for adjustment of status.  *See* Opp'n 7, 13 n.6.

paroled") or *id.* § 1182(a)(9)(B)(i) (excluding noncitizens who were "unlawfully present in the

United States" for more than 180 days, depart the United States, and seek readmission).  *See*

Opp'n 12–13.  But these provisions are inapplicable here.  Since obtaining DACA status, Ms.

Camacho and Mr. Aguiluz each have left the country only once and only after obtaining advance

parole.  Camacho Decl. ¶¶ 6, 7; Aguiluz Decl. ¶¶ 6, 7.  Having returned to the United States on

advance parole, the § 1182(a)(6)(A)(i) inadmissibility ground does not apply to them because

they now have been "admitted or paroled."  Furthermore, neither Ms. Camacho nor Mr. Aguiluz

is inadmissible under § 1182(a)(9)(B)(i) because a departure under a grant of advance parole

does not count as a "departure" under § 1182(a)(9)(B), as required to trigger this provision.  *See*

*Matter of Arrabally & Yerrabelly*, 25 I. & N. Dec. 771, 771 (BIA 2012).  And, in any case, to the

extent that Ms. Camacho or Mr. Aguiluz attempt to adjust status based on the petition of an

immediate relative, any § 1182(a)(9)(B)(i) bar could be waived.  *See* 8 U.S.C.

§ 1182(a)(9)(B)(v).

Because a pathway to LPR status is an attainable goal for Ms. Camacho and Mr. Aguiluz,

they must take actions *now* to protect against an adverse public-charge determination and

maintain their eligibility to adjust status when that opportunity becomes available.  *Cf. Attias v.*

*Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (accepting as a sufficient injury in fact that

"the plaintiffs now face a substantial risk of identity theft" at some point in the future "as a result

of CareFirst's alleged negligence in [a] data breach").  *Clapper v. Amnesty International USA* is

therefore inapposite, as Plaintiffs' claims do not depend on "a highly attenuated chain of

possibilities" dependent on the actions of third parties.  568 U.S. 398, 410 (2013).

Defendants also argue that the Individual Plaintiffs lack standing because the financial

harms they are now suffering are not specifically and directly required by the Public Charge

Rule.  Their argument betrays multiple misunderstandings of both the Rule itself and Plaintiffs'

injuries.  First, Defendants suggest that forgoing student loans is not a harm caused by the Rule because student loans are not covered benefits under it.  Opp'n 7–8 & n.4.  But financial liabilities *are* a factor in a public-charge determination, so student loans would be considered, just under a different sub-factor.  84 Fed. Reg. at 41,503 (to be codified at 8 C.F.R. § 212.22(b)(4)(D)).  The harm that Plaintiffs face, moreover, is not merely forgoing student loans—it is forgoing the educational and career opportunities for which student loans likely would be required, which Defendants do not address.[2]  *See* Aguiluz Decl. ¶ 23.

Second, the Public Charge Rule does not merely consider whether an applicant already is receiving or has received benefits, as Defendants' argument would suggest.  Opp'n 8.  Rather, the Rule looks to a wide range of financial and life circumstances to determine if applicants are likely to receive the enumerated benefits *in the future*.  Based on the criteria that DHS has laid out in the Rule, the Individual Plaintiffs are forced to make decisions *now* to avoid accruing additional negative circumstances—by, for example, increasing their financial liabilities or decreasing their savings—that will factor into their public-charge determinations when they do apply to adjust status.  There is nothing "conjectural," "hypothetical," or "speculative" about that.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (finding "reasonable" and therefore a sufficient injury-in-fact for standing "the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms").  Such steps are reasonable and predictable reactions to maintain Plaintiffs' eligibility to become LPRs when they are able to do so.

---

[2] Plaintiffs' injuries are therefore unlike those in *National Audubon Soc'y, Inc. v. Wheeler*, 163 F. App'x 594, 595 (9th Cir. 2006), in which the plaintiffs did not allege any concrete or "financial" injury beyond "voluntary cessation of their preferred method of trapping."

4

Finally, the fact that the Individual Plaintiffs do not know if their decisions ultimately will lead to an adverse public-charge determination does not make their claim speculative. Rather, this uncertainty is at the very heart of their vagueness claim and is the *reason* they are being broadly chilled in their decision-making today.

**B.      CASA Has Article III Standing**

CASA has organizational standing because the Public Charge Rule frustrates its mission and diverts its resources.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) ("An organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission.").  As explained in Plaintiffs' motion and the accompanying declaration of George Escobar, CASA's mission has been frustrated by the Rule because CASA has had to divert its resources from seeking to improve conditions for low-income immigrant communities in order to respond to the effects of the Public Charge Rule.  *See* Escobar Decl. ¶¶ 22–23.  CASA already has reallocated significant resources to combat the Rule's chilling effects through public education and individual legal and health-services counseling, including devoting the work of numerous employees and volunteers to conducting educational outreach about the Rule.  *Id.* at ¶¶ 16–20.  The complexity of the Rule also has required extensive training for staff and has reduced the number of individuals CASA is able to serve on a daily basis.  *Id.* at ¶¶ 17, 19.

The harms to CASA are unlike the more abstract harms asserted in both *Lane* and *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013).  In *Lane*, the plaintiff organization engaged only in general policy advocacy and education, and the court concluded that the organization's own decision to address the policy at issue was insufficient to confer standing.  *See Lane*, 703 F.3d at 675.  By contrast, CASA is "not merely in the business of advising the public about potential changes in the law; rather, [it]

5

affirmatively engage[s] in advising specific members on" applying for public benefits and adjustment of status. *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, No. CV TDC-18-1568, 2019 WL 3945979, at *5 (D. Md. Aug. 21, 2019). Moreover, CASA has had to expend "additional resources" in order to "properly advise specific members" on these matters, unlike in *Lane*. *Id.* This also distinguishes CASA from the organizational plaintiff in *Southern Walk*, which failed to "allege any economic injury to itself" or diversion of resources caused by the contract provision it challenged, defeating its claim to standing. 713 F.3d at 183.

CASA's injuries are comparable to those which this court has found sufficient for organizational standing. In *National Federation of the Blind*, the court identified multiple harms that CASA likewise has suffered here: First, "[p]laintiffs expended resources to identify, inform and advise their members about, and respond to Defendants' unlawful actions," including being "forced to go above and beyond its normal activities to reach out and assist members" who might be adversely affected by new agency practices. 2019 WL 3945979, at *5 (internal quotation marks omitted). Second, plaintiff organizations had to "expend resources to retrain" members, update training materials, and alter "recommendations and advice," which "required additional expenditures on staff and diverted resources from direct assistance to members," thereby shifting "time and resources" the organizations "otherwise could have dedicated to their other efforts" to achieve their missions. *Id.*; *see also Baltimore v. Trump*, No. CV ELH-18-3636, 2019 WL 4598011, at *18 (D. Md. Sept. 20, 2019) (concluding that Baltimore had standing to challenge the State Department's changes to the Foreign Affairs Manual relating to the public-charge inadmissibility ground because the City was "compelled to reallocate its finite resources in response to the FAM for the purpose of combatting the injurious effects that the FAM will have on its residents, and the public programs it administers").

What is more, CASA itself has been found to satisfy the requirements for organizational

standing in an analogous case challenging the decision to rescind DACA.  *See Casa De Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 771 (D. Md. 2018) ("Casa De Maryland . . . [is] . . . directly focused on aiding immigrants and their communities. The fact that one of their primary functions has been assisting their members with 'tens of thousands of DACA initial and renewal applications' is sufficient for standing in and of itself."), *aff'd in part, vacated in part, rev'd in part,* 924 F.3d 684 (4th Cir. 2019); *see also* 924 F.3d at 701 n.14 (noting that the government did not appeal the district court's determination that all plaintiffs have standing). CASA likewise has satisfied the requirements of organizational standing here.

Additionally, CASA has satisfied the requirements of representational standing.  The Individual Plaintiffs are CASA members and have standing in their own right, *see supra*, as do other CASA members who intend to adjust status, some of whom exhibit a less favorable mix of positive and negative factors than the Individual Plaintiffs and some of whom already have given up health insurance purchased under the Affordable Care Act and benefits for their U.S. citizen children out of confusion about the Rule's applicability.  *See* Escobar Decl. ¶¶ 14–15, 25–26. Moreover, "the interests [CASA] seeks to protect are germane to" its purpose—improving the quality of life in low-income immigrant communities by providing, inter alia, legal services to assist in immigration-benefit applications, *id.* ¶¶ 4–5—and "neither the claim[s] nor the relief sought require[] the participation" of any individual members in the suit, as the claims are purely legal challenges and the relief sought—vacatur of the Rule—would apply equally to all members.  *S. Walk*, 713 F.3d at 184; *see also Casa De Md.*, 284 F. Supp. 3d at 771 (finding standing on behalf of DACA-recipient members); *Nat'l Fed'n of the Blind*, 2019 WL 3945979, at *6 (finding representational standing).

## C.     Plaintiffs' Claims Are Ripe

Plaintiffs' claims are ripe for the same reasons they have standing, and Defendants'

counterarguments are unavailing.  First, the issue is fit for judicial decision, and no further

factual development is required.  The Rule is DHS's final action, so the legal issues are final and

not dependent on any future uncertainties.  *See Baltimore*, 2019 WL 4598011, at *21 (finding

Baltimore's challenge to the State Department's public-charge regulations fit for resolution).

Defendants claim that CASA's injuries depend on the future actions of its members and that

CASA has not demonstrated that its members will act as anticipated.  Opp'n 10.  But CASA's

members already have been chilled by the public charge rule, *see* Escobar Decl. ¶¶ 10–16, and

CASA has expended resources to address that chilling effect.  Defendants have provided no

reason to believe that this state of affairs will change.  *See Lansdowne on the Potomac*

*Homeowners Ass'n v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198–99 (4th Cir. 2013)

(finding claim ripe when defendants suggested, without support in the record, that circumstances

could change in the future).  As to the Individual Plaintiffs, as explained above, the Public

Charge Rule is causing injury now by affecting current financial and other life decisions.

Second, delayed review would cause hardship to CASA because it already is facing

frustration of its mission and diversion of its resources due to the Public Charge Rule.  *See*

*Baltimore*, 2019 WL 4598011, at *21 (finding hardship where the City already was bearing "the

financial costs of the defendants' unlawful action"). This case is therefore wholly unlike *Ohio*

*Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998), where no agency actions flowed

directly from the policy at issue.  Delaying review also would cause hardship to the Individual

Plaintiffs, who must make decisions that will be affected by the Rule well before the alternatives

proposed by Defendants—when they apply to adjust status or are denied adjustment of status

based on a public charge determination.  *See Miller v. Brown*, 462 F.3d 312, 321 (4th Cir. 2006)

(finding challenge to open primary law ripe because "waiting until the last minute to seek a final

rule [would] severely diminish the effectiveness" of plaintiffs' campaign decisions).

D.        **Plaintiffs Fall Within the Zone of Interests**

The zone-of-interest "prudential standing test . . . 'is not meant to be especially demanding[,]'" especially in the context of the APA, where Congress sought "to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987)). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

Defendants contend that *only* those noncitizens who are improperly deemed inadmissible as public charges "fall within the zone of interests protected" by the INA's public-charge inadmissibility ground. Opp'n 11–12. This miserly scope is inconsistent with the broad approach taken in the case law, and Plaintiffs easily fall within the zone of interests under *Patchak*. First, as noncitizens residing in the United States, the Individual Plaintiffs, whom advance parole renders eligible to seek adjustment of status in the future, are directly regulated by the INA's inadmissibility grounds, including the public-charge provision. Additionally, as noted above, the Individual Plaintiffs are not barred by other inadmissibility grounds, as defendants suggest. *See* Opp'n 12–13. As to CASA, its members are regulated by the public-charge provision, and its interests in serving low-income immigrant communities by providing legal and educational services, as well as assistance in applying for public benefits, are directly affected by the public charge rule. *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 269 n.3 (E.D.N.Y. 2018) (concluding that a membership-based immigration group was within the zone of interests in a challenge to the rescission of DACA because the organization was "directly affected by Defendants' actions"); *see also Baltimore*, 2019 WL 4598011, at *25 (concluding that Baltimore fell within the zone of interests of the public-charge provision as a local social

9

services provider).[3]  Indeed, DHS itself recognizes that non-profit service providers, like CASA, are among those that will be affected by the Rule.  *See* 84 Fed. Reg. at 41,301.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   The Public Charge Rule Is Inconsistent with the Meaning of "Public Charge"

No case or administrative decision identified by Defendants has deemed a noncitizen inadmissible on public-charge grounds based on her perceived likelihood of receiving some public assistance in the future but not enough to be considered primarily dependent on the government for subsistence.  In 1999, the Immigration and Naturalization Service (INS) distilled the primarily dependent standard from "the facts found in the deportation and admissibility cases" dating back more than a century.  Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28,677 (proposed May 26, 1999) (to be codified at 8 C.F.R. pts. 212, 237) [hereinafter 1999 Proposed Rule].  This consistency is no accident.  As INS recognized, the primarily dependent standard is the only interpretation of the term "public charge" that can be reconciled with the "plain meaning" of the INA's text and "the historical context of public dependency when the public charge immigration provisions were first enacted."[4]  *Id.*  Defendants have offered no persuasive evidence to the contrary.

In fact, Defendants concede that "public charge" means something narrower than merely "non-affluent."  Opp'n 11.  Based on that fact alone, Plaintiffs are likely to succeed on the

---

[3] *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996), is not to the contrary, as it held only that *general* objections to immigration are insufficient to bring an organization within the zone of interests.

[4] Although INS considered the term's meaning "ambiguous" when read in a vacuum, the agency interpreted the statutory provision by consulting dictionaries to ascertain the "ordinary or natural meaning" of the word "charge" and considering the historical record.  1999 Proposed Rule, 64 Fed. Reg. at 28,677.  Such modes of analysis are the "traditional tools of statutory construction" meant to ascertain congressional intent and do not reflect the exercise of agency discretion. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

merits.  According to research by the Center on Budget and Policy Priorities, about half of U.S.-born citizens received one or more of the public benefits considered under the Public Charge Rule at some point between 1997 and 2017.  Pls.' Mot. for Prelim. Inj. & Supporting Mem. (Mot.) 21 n.9, ECF No. 28.  Because of the Rule's de minimis threshold for what constitutes a public charge, determinations under the Rule would boil down to a judgment about which half of the U.S.-born citizen population a noncitizen is likely to resemble over her entire lifetime.  Only the affluent are secure from such an expansive public-charge inquiry.  Accordingly, the Rule permits the exclusion of noncitizens who even Defendants agree do not fall within the scope the public-charge ground of inadmissibility.

Ordinary tools of statutory construction confirm that the primarily dependent standard is the correct way to interpret the public-charge ground of inadmissibility.  Only one of the 19th century dictionary definitions that Defendants claim elucidate the meaning of "public charge" refers to human beings as opposed to property.[5]  Opp'n 13–14.  And that definition equates the term "charge" with "pauper."  *Id.* at 13 (quoting *Dictionary of American and English Law* (1888)).  As Defendants acknowledge, "pauper" means "[a] very poor person; a person *entirely destitute*."  *Id.* at 14 (emphasis added) (quoting *Century Dictionary & Cyclopedia* (1911)).

Defendants fare no better in attempting to reframe the legislative history as inconsistent with the primarily dependent standard.  They argue that Congress meant to disassociate the term "public charge" from the terms "pauper" and "professional beggars" by separating the former from the latter two in the Immigration Act of 1917.  *See* Opp'n 14; Act of Feb. 5, 1917, ch. 29, §

---

[5] That is fully consistent with INS's analysis of the issue in 1999.  *See* 1999 Proposed Rule, 64 Fed. Reg. at 28,677 ("The word 'charge' has many meanings, but the *one* that can be applied unambiguously to a person and best clarifies the phrase 'become a public charge' is 'a person or thing committed or entrusted to the care, custody, management, or support of another.'") (emphasis added) (quoting *Webster's Third New International Dictionary of the English Language* 377 (1986)).

3, 39 Stat. 874, 875–76. But according to the letter to Congress from Secretary of Labor W. B. Wilson cited by Defendants, Opp'n 17 n.11, the purpose of that rearrangement was to "associate [the public-charge ground of inadmissibility] in the law with a provision the economic object of which is unmistakable, and disassociate it from the provisions the immediate objects of which are of a *sanitary* nature," H.R. Doc. No. 64-886, at 4 (Mar. 11, 1916) (emphasis added). The appearance of the public-charge exclusion in a section of the Immigration Act of 1910 that was focused mostly on physical and mental disabilities, *see* Act of Mar. 26, 1910, ch. 128, § 2, 36 Stat. 263, 263–64, led the Supreme Court to conclude that noncitizens could not be excluded on public-charge grounds based on a prediction that they were likely to become impoverished in the future based on the local economic conditions where they intended to settle, *Gegiow v. Uhl*, 239 U.S. 3, 8 (1915). By decoupling the public-charge ground of inadmissibility from the "sanitary" exclusions, Congress made clear that immigration officials could exclude noncitizens deemed likely to "become *destitute*" in the future even if they were physically and mentally able to work. *United States ex rel. Iorio v. Day*, 34 F.2d 920, 922 (2d Cir. 1929) (emphasis added). But this rearrangement did not change the fact that the public-charge ground of inadmissibility, "however construed, overlaps other provisions; e.g., paupers, vagrants, and the like." *Id.* at 922.[6] Congress later corrected this superfluity by eliminating the grounds of inadmissibility that "overlap[ped]" with the public-charge exclusion. Immigration Act of 1990, Pub. L. No. 101-649, § 601(a)(4), 104 Stat. 4978, 5072 (codified as amended at 8 U.S.C. § 1182).

Defendants are also wrong to downplay the Immigration Act of 1882's creation of an "immigrant fund" in the same statute that introduced the public-charge ground of inadmissibility

---

[6] *Ex parte Horn*, 292 F. 455, 458 (W.D. Wash. 1923), addressed whether a noncitizen could be excluded on public-charge grounds based on his likelihood of being imprisoned, not the degree of reliance on public assistance necessary to render someone a public charge.

into federal law.  Act of Aug. 3, 1882, ch. 376, § 1, 22 Stat. 214, 214.  The fund was created for "the care of immigrants *arriving* in the United States," *id.* (emphasis added), and not to "assist states, localities, and private charities with support for aliens who had *already entered* the United States," Opp'n 18 (emphasis added).  Because Congress provided temporary and limited public assistance for noncitizens upon arrival, it could not have meant that a noncitizen's perceived likelihood of receiving public assistance of that sort should render her inadmissible.

The cases that Defendants identify as extending the public-charge ground of inadmissibility to those "earning a modest living" do nothing of the sort.  Opp'n 15.  In *United States v. Lipkis*, 56 F. 427 (S.D.N.Y. 1893), the court upheld the exclusion of a noncitizen on public-charge grounds due to "the *extreme poverty* of the appearance and surrounding of [her] family at their rooms."  *Id.* at 427 (emphasis added).  And in *In re Feinknopf*, 47 F. 447, 447 (E.D.N.Y. 1891), the court's consideration of past receipt of public assistance outside of the almshouse context as evidence relevant to a public-charge determination does not establish that the court would have deemed a noncitizen likely to become a public charge based only on her perceived likelihood of receiving such assistance in the future.  The cases cited by Defendants that interpret state "poor laws," Opp'n 16, 19, also fail to bolster their interpretation of "public charge" because the indigent individuals exhibited circumstances that would have rendered them likely to become primarily dependent on the government for subsistence.[7]  And the statute at issue in *People ex rel. Durfee v. Comm'rs of Emigration*, 27 Barb. 562 (N.Y. Gen. Term 1858),

---

[7] *Inhabitants of Guilford v. Inhabitants of Abbott*, 17 Me. 335, 335 (1840) (80 year-old man who had "no regular or stated business" and periodically was "deranged in mind"); *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, 5 Pa. Super. 516, 523–24 (1897) (an "unmarried woman" who was a "cripple" and had been "obliged to abandon her work" as a teacher after 50 years due to illness); *Town of Hartford v. Town of Hartland*, 19 Vt. 392, 397–98 (1847) (a "sickly" "widow" with "children . . . of tender age" who was "subject to fits" and who had no "legal claim" to either the cow or rental income).

specifically provided that a municipality could be reimbursed by the state for "any *expense or charge* which may be incurred for the maintenance or support" of immigrants.  *Id.* at 570 (quoting 1847 N.Y. Laws ch. 195, § 4).  Thus, the case does not stand for the proposition that an individual can be considered likely to become a public charge based on her perceived likelihood of accepting temporary aid in the future.[8]

### B.   Congress Has Never Departed from the Plain Meaning of "Public Charge"

Neither the Illegal Immigration Reform Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009, nor the Personal Responsibility and Work Opportunity Act of 1996 (the "Welfare Reform Act"), Pub. L. No. 104-193, 110 Stat. 2105, have altered the meaning of "public charge."  Confusingly, Defendants contend that IIRIRA "expand[ed] the public charge ground of inadmissibility" in response to congressional dissatisfaction with the "negligible number of aliens who . . . have been *deported*" on public-charge grounds."  Opp'n 1 (emphasis added) (quoting H.R. Rep. No. 104-828, at 240–41 (1996) (Conf. Rep.)).  But the conference report that Defendants cite for that proposition was associated with a version of IIRIRA that never became law.  *See H.R. 2202 – Immigration Control and Financial Responsibility Act of 1996*, Congress.gov, https://perma.cc/S5V4-5TGG (last visited Sept. 29, 2019).[9]  Moreover, the only changes that the enacted version of IIRIRA made to the public-charge exclusion were (1) to

---

[8] Even if Defendants are correct that the term "public charge" is ambiguous, the executive branch has already adopted a binding definition that forecloses that in the Public Charge Rule.  *See* 8 C.F.R. § 1003.1(g)(1).  Contrary to Defendants' selective quotation of *Matter of Martinez-Lopez*, Opp'n 23, the Attorney General held that a noncitizen cannot be excluded on public-charge grounds based on a mere "possibility that the alien will require public support" and that a "healthy person in the prime of life cannot ordinarily be considered likely to become a public charge."  10 I. & N. Dec. 409, 421 (Att'y Gen. 1964).  The Public Charge Rule cannot be reconciled with this standard.

[9] The conference report that accompanied the final version of IIRIRA did not label its changes to the public-charge ground of inadmissibility an "expansion."  H.R. Rep. No. 104-863, at 690 (1996) (Conf. Rep.).

codify the factors already being used by immigration officials to render public-charge

determinations; and (2) to require certain noncitizens seeking admission or adjustment of status

to submit affidavits of support with their application.  8 U.S.C. § 1182(a)(4)(B)–(D); *see also*

*Matter of A-*, 19 I. & N. Dec. 867, 869 (BIA 1988).  Neither of those changes altered the

definition of "public charge" or evinced any abandonment of the primarily dependent standard.

Unlike IIRIRA, the Welfare Reform Act made zero changes to the public-charge statute.

Still, Defendants insist that Congress implicitly altered the meaning of "public charge" through

the Act's policy statement that identifies "self-sufficiency" as a "basic principle of United States

immigration law."  Opp'n 3, 16, 25, 34; 8 U.S.C. § 1601.  But the Welfare Reform Act furthered

its "self-sufficiency" goals by precluding most noncitizens who lack LPR status from receiving

most if not all of the benefits at issue in the Public Charge Rule.  *See* 8 U.S.C. §§ 1611, 1621(a),

(d), 1641(b).  Even if the Act lacked provisions that operationalized its "self-sufficiency" goals,

"[p]olicy statements are just that—statements of policy.  They are not delegations of regulatory

authority."  *Comcast Corp. v. FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010).  Had Congress intended

to alter the public-charge ground of inadmissibility or to empower the executive branch to do so,

Congress could have done so explicitly.  *Cf. Liu v. Mund*, 686 F.3d 418, 422 (7th Cir. 2012)

("[S]elf-sufficiency, though mentioned briefly in the House Conference Report on [IIRIRA] as a

goal, is not the goal stated in the statute; the stated statutory goal . . . is to prevent the admission

to the United States of any alien who 'is likely at any time to become a public charge.'").

Congress's express rejection of proposed expansions of the public-charge inadmissibility

and deportation grounds underscores that neither IIRIRA nor the Welfare Reform Act implicitly

altered the meaning of the term "public charge."  *See* H.R. Rep. No. 104-828, at 137–40 (1996)

(Conf. Rep.); S. Rep. 113-40, at 63 (2013).  "Congress does not intend *sub silentio* to enact

statutory language that it has earlier discarded in favor of other language."  *INS v. Cardoza-*

15

*Fonseca*, 480 U.S. 421, 442–43 (1987); *see also Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 533 (2009) (rejecting a regulatory "attempt[] to do what Congress declined to do").  Because the Public Charge Rule cannot be reconciled with the plain meaning of the INA, Plaintiffs are likely to succeed on their APA claims.

      **C.**      **DHS Acted Arbitrarily and Capriciously in Enacting the Public Charge Rule**

By failing to provide "a reasoned explanation . . . for disregarding the facts and circumstances" that support the primarily dependent standard, DHS acted arbitrarily in enacting the Public Charge Rule.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Defendants' only justification for the Public Charge Rule's radical reshaping of immigration policy is that the primarily dependent standard is "insufficiently protective of the public budget." Opp'n 25.  But the Welfare Reform Act demonstrates that Congress is fully capable of restricting noncitizens' access to public benefits when it wishes to do so, and it nevertheless has made the programs at issue in the Rule available to noncitizens—albeit mostly only for those who secure LPR status.  DHS's decision to assign itself the role of fiscal watchdog is not a reasoned basis for abandoning the interpretation of "public charge" that has governed for over a century. Moreover, DHS's own statistics show that noncitizens do not participate in the enumerated benefit programs at a rate that is meaningfully different from the U.S. population as a whole. Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,162, tbl. 11 (proposed Oct. 10, 2018) (to be codified at 8 C.F.R. pts 103, 212–14, 245, 248).  DHS's entire justification for its transformation of the public-charge ground of inadmissibility is that the country's noncitizen population is not significantly *less* reliant on public benefits than the rest of the population.

The scant explanation provided for the Public Charge Rule is made worse by DHS's failure to disclose any input from the benefit-granting agencies that, unlike DHS, have expertise in the programs at issue in the Rule.  *See Gonzales v. Oregon*, 546 U.S. 243, 269 (2006) (holding

16

that deference to the Attorney General's medical judgment was "tempered" due to his "lack of expertise in the area and the apparent lack of consultation with anyone outside of the Department of Justice who might aid in a reasoned judgment").  Although Defendants are correct in the technical sense that DHS is "under no obligation" to disclose any feedback it received from benefit-granting agencies, Opp'n 26, its failure to do so means that the Public Charge Rule cannot be evaluated based on any informed analysis of whether it actually serves its purported purposed of increasing "self-sufficiency" among noncitizens.

DHS also acted arbitrarily and capriciously by failing to "consider . . . important aspect[s] of the problem" before it.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Typifying DHS's outcome-oriented response to concerns raised about the Rule during the notice-and-comment period is its response to numerous comments explaining that the Rule will harm public health.  *See* Mot. 25 n.13.  Defendants fail to rehabilitate DHS's unsupported conclusion that the Rule will "ultimately strengthen public safety, health, and nutrition," contrary to the extensive evidence in the comments.  84 Fed. Reg. at 41,314.  DHS reached this counterintuitive and unsupported conclusion despite admitting that the Rule will lead to widespread disenrollment and non-enrollment from public benefits.  *Id.* at 41,463.  But, according to Defendants, this conclusion was "rational[]" because "excluding aliens lacking self-sufficiency and encouraging aliens already present in the United States to become self-sufficient . . . will strengthen public safety, health, and nutrition overall."  Opp'n 30.  Such evidence-free dismissal of serious concerns raised by comments and DHS's own analysis does not demonstrate genuine consideration.  *See State Farm*, 463 U.S. at 43.

### D.      Defendants Misconstrue Plaintiffs' Void-for-Vagueness Claim

Plaintiffs seek no "new right" of any sort; nor do they wish to preclude immigration officials' "consideration of [noncitizens'] financial status" during admissibility proceedings.

17

Opp'n 2.  All that Plaintiffs seek is fair notice as to how noncitizens should accord their conduct in order to maintain their admissibility and protection from arbitrary public-charge determinations.  *Cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (plurality op.).[10]  There is nothing "radical" about Plaintiffs' desire for clarity from DHS about how noncitizens can preserve their ability to remain in the United States.  Opp'n 32.

Defendants argue that Plaintiffs' void-for-vagueness claim cannot even get off the ground because noncitizens have no property or liberty interest in obtaining the discretionary benefit of adjustment of status.  *Id.* at 31–32.  This argument conflates two "distinct" components of adjustment-of-status decisions.  *Rodriguez v. Gonzales*, 451 F.3d 60, 62 (2d Cir. 2006).  In order to adjust status, a noncitizen must first "show[] that he meets the statutory eligibility requirements," *id.*, among them, admissibility, 8 U.S.C. § 1255(a).  If a noncitizen meets these requirements, then U.S. Customs and Immigration Services (USCIS) exercises its discretion to determine whether to grant or deny the benefit.  *Rodriguez*, 451 F.3d at 62.  But the two stages are analytically separate.  "The first step in adjudicating a petition for adjustment of status is the nondiscretionary determination of statutory eligibility, followed by a discretionary determination regarding whether an eligible applicant is actually permitted to adjust status."[11]  *Hernandez v. Ashcroft*, 345 F.3d 824, 845 (9th Cir. 2003).  Plaintiffs' void-for-vagueness claim focuses exclusively on the nondiscretionary component of adjustment-of-status decisions.

---

[10] Defendants are incorrect that the petitioner's LPR status was essential to Justice Gorsuch's concurrence in the judgment in *Dimaya*.  Opp'n 32 & n.18.  Justice Gorsuch refused to join the part of the plurality opinion setting forth the parameters of void-for-vagueness doctrine because he took a *broader* view of the doctrine, preferring to assess all civil and criminal laws under the same stringent fair-notice standard.  *See* 138 S. Ct. at 1228, 1231 (Gorsuch, J., concurring).

[11] Immigration officials have discretion to determine what *evidence* is relevant to a public-charge determination, *see* 8 U.S.C. § 1182(a)(4)(A) (excluding noncitizens who are "in the opinion of the Attorney General . . . likely at any time to become a public charge"), but that does not mean they have discretion to deem a noncitizen inadmissible irrespective of what that evidence shows.

None of the cases cited by Defendants addresses the applicability of due-process safeguards in the context of admissibility determinations conducted on U.S. soil.[12]  Instead, each concerns the grant or denial of discretionary relief in immigration proceedings.  *See Igwebuike v. Caterisano*, 230 F. App'x 278, 285 (4th Cir. 2007) (per curiam) (adjustment of status); *Dekoladenu v. Gonzales*, 459 F.3d 500, 502, 508 (4th Cir. 2006) (motion to reopen removal proceedings after remaining in the United States after a voluntary departure date) , *overruled on other grounds by Dada v. Mukasey*, 554 U.S. 1 (2008); *Smith v. Aschroft*, 295 F.3d 425, 431 (4th Cir. 2002) (waiver of deportation).  Even assuming that those decisions bind lower courts reviewing adjustment-of-status decisions,[13] they have no bearing on Plaintiffs' claim that the Public Charge Rule renders a ground of inadmissibility unconstitutionally vague.  To the extent, however, that the Court concludes that the Rule implicates no due-process interests, the Rule's vagueness also renders it arbitrary and capricious.

With respect to the substance of the void-for-vagueness claim, Defendants barely contest that the Public Charge Rule fails to provide fair notice to noncitizens or to preclude immigration officials from making arbitrary public-charge determinations.  That is unsurprising given DHS's

---

[12] Plaintiffs' void-for-vagueness claim is limited to admissibility determinations for noncitizens who are already present in the United States, Compl. ¶ 1 n.2; Mot. 1 n.1, and therefore does not extend to noncitizens "seeking *initial* admission to the United States," Opp'n 31 n.17 (emphasis added) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).

[13] *Igwebuike* is an unpublished, nonprecedential decision.  230 F. App'x at 279.  And because the relief sought by the petitioner in *Dekoladenu* was the reopening of his removal proceedings (albeit for the purpose of submitting an application for adjustment of status), the court's statement concerning the lack of a due-process interest in adjustment of status was arguably dicta.  459 F.3d at 502, 508.  Moreover, the Fourth Circuit has held that noncitizens have a liberty interest in asylum, *Rusu v. INS*, 296 F.3d 316, 321 & n.8 (4th Cir. 2002), which, like adjustment of status, is a discretionary immigration benefit, *Mejia v. Sessions*, 866 F.3d 573, 578 (4th Cir. 2017); *see also Selgeka v. Carroll*, 184 F.3d 337, 342 (4th Cir. 1999) (holding that "minimum due process" safeguards apply to asylum hearings because "[w]hen Congress directs an agency to establish a procedure, . . . it can be assumed that Congress intends that procedure to be a fair one" (internal quotation marks omitted)).

admission that public-charge determinations under the Rule will be "inherently subjective," "will vary," and will "not [be] governed by clear data." 84 Fed. Reg. at 41,315; 41,397. Neither the "hundreds of pages" in which DHS attempts to demystify and justify the Rule, Opp'n 32, nor the "additional guidelines" it provides, *id.* (internal quotation marks omitted), nor the marginal revisions made to the NPRM have cured the inherent vagueness of the Rule's standard. The Rule's de minimis threshold, complicated assortment of relevant factors, and unclear weighting scheme all operate together to unfetter public-charge determinations. As Defendants acknowledge, "DHS cannot 'predict with any precision' whether someone will meet the [Rule's] definition of a public charge." Opp'n 27 (quoting Mot. 22). USCIS's promised "sub-regulatory guidance" will not cure this foundational flaw.[14] *See id.*

And, despite Defendants' insistence that this vagueness is a product of the INA and not the Rule, Opp'n 33, the interpretation of "public charge" distilled in the 1999 Field Guidance does not suffer from such vagueness. The Field Guidance renders inadmissible on public-charge grounds only those noncitizens deemed likely to receive those benefits for which recipients have sustained histories of unemployment (Temporary Assistance for Needy Families (TANF), cash assistance, and General Assistance) or benefits that are reserved for those whose blindness, disability, or agedness prevent them from being able to earn a living (Supplemental Security Income (SSI) and institutionalization for long-term care at public expense). Compl. ¶¶ 62–65.

---

[14] The Public Charge Rule does not find safe harbor under *Jurek v. Texas*, 428 U.S. 262 (1976), and its progeny. To be sufficiently non-vague, forward-looking aggravating factors in the capital-punishment context require a "common-sense core of meaning . . . that criminal juries should be capable of understanding." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (quoting *Jurek*, 428 U.S. at 279 (White, J., concurring in the judgment)). Even if that standard has application outside of the criminal sentencing or parole context, the Public Charge Rule fails to provide immigration officials with a "common-sense . . . core meaning" concerning what distinguishes noncitizens who are likely to receive a small amount of public benefits during their lifetimes from those who are not. *See id.*

Public-charge determinations under the Field Guidance are therefore more objective assessments of whether noncitizens display readily observable attributes that would make them likely to rely on the government for all or mostly all of their basic needs.  Accordingly, the public-charge ground of inadmissibility clearly can be interpreted in a non-vague manner.  DHS has simply chosen a different, constitutionally impermissible approach.

E.      *Arlington Heights* **Governs Plaintiffs' Equal Protection Claim**

Defendants contend that *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), rather than *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), provides the correct framework for analyzing Plaintiffs equal-protection claim.  Opp'n 33–34.  But this court rejected that argument in *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 322–25 (D. Md. 2018); *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 519–20 (9th Cir. 2018), *cert. granted*, No. 18-587.  Because Plaintiffs' claims concern "residents who have lived in the United States for years and have established deep connections . . . to this country" and because the Public Charge Rule does not implicate "national security or foreign policy concerns," *Hawaii*'s forgiving rational-basis standard does not apply.  *CASA*, 355 F. Supp. 3d at 322–24.[15]

Contrary to Defendants' assertions, the disparate impact of a challenged policy is among the *Arlington Heights* factors.  429 U.S. at 266 ("[t]he impact of the official action . . . may provide an important starting point" for identifying discriminatory intent).  And even if administration officials' statements are not part of the Rule's "administrative history," the *Arlington Heights* factors are not exhaustive, and the statements at issue provide strong evidence

---

[15] The cases cited by Defendants in support of the rational-basis standard do not involve discrimination on the basis of race and ethnicity.  *Ameur v. Gates*, 759 F.3d 317, 328 (4th Cir. 2014); *Lewis v. Thompson*, 252 F.3d 567, 572 (2d Cir. 2001); *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000).  They are therefore inapposite.

of discriminatory intent.  *Id.* at 268.  Moreover, a direct line can be traced from President Trump

to the Public Charge Rule because a draft executive order would have required DHS to broaden

its definition of "public charge."  *See Baltimore v. Trump*, No. CV ELH-18-3636, 2019 WL

4598011, at *19 (D. Md. Sept. 20, 2019) (citing Andrew Bremberg, Memo. for the President re:

Executive Order on Protecting Resources by Ensuring Our Immigration Laws Promote

Accountability and Responsibility (Jan. 23, 2017)).  Although the draft order never went into

effect, DHS "got the message" and enacted a Rule rooted in the President's discriminatory

animus.  *Id.*  Plaintiffs are therefore likely to succeed on their equal-protection claim.

## III.    PLAINTIFFS SATISFY THE OTHER PRELIMINARY INJUNCTION FACTORS

### A.    Plaintiffs Will Suffer Irreparable Harm

As demonstrated in detail in its motion, *see* Mot. 38–43, Plaintiffs will suffer irreparable

harm if the Rule is permitted to go into effect.  Most of Defendants' arguments regarding

irreparable harm to CASA merely rehash their standing arguments.  As there, Defendants

attempt to bifurcate the frustration of CASA's mission from the diversion of its resources to say

that each alone is insufficient.  But this is not a case of one or the other.  CASA's mission has

been frustrated because it has had to divert resources to additional services for its members to

counteract the Rule's broad chilling effect on participation in public benefits programs that are

important to CASA's members' health and stability.  Its mission will continue to be frustrated,

and its resources diverted, if the Rule is permitted to go into effect because the chilling effect

will only get worse.  *See* Escobar Decl. ¶¶ 12–21.  This harm is irreparable: the need to respond

to the Rule has forced CASA to cancel previously planned affirmative advocacy for expanded

local healthcare coverage—an effort that depends on political momentum and the legislative

cycle and cannot easily be replicated.  *Id.* ¶¶ 22–23.  Moreover, that an organization's actions in

response to government action are broadly consistent with its mission cannot be enough to defeat

organizational standing or undermine a claim of irreparable harm.  It would be a rare organization indeed that reaches so far outside its mission.  *See Havens Realty*, 455 U.S. at 379 (recognizing harm where organization "had to devote significant resources to . . . counteract" defendants' conduct without suggesting actions outside its core activities are required).

The Individual Plaintiffs have shown that the Public Charge Rule will force them to make detrimental decisions about their lives and to do so immediately.  For example, Mr. Aguiluz will apply to bachelor's degree programs this academic year as he finishes his associate's degree. Aguiluz Decl. ¶ 22.  In order to maximize his likelihood of obtaining a positive public-charge determination, he plans to apply only to public colleges to avoid taking on excess student debt, even if a different school would be a better fit or present better opportunities for him.  *Id.* ¶ 23. Defendants' arguments fail to address the true nature of this harm, which is neither remote nor speculative, and which cannot be remedied after Mr. Aguiluz makes decisions about where to apply and attend (as is likely to occur before this litigation runs its course).  Ms. Camacho also intends to pursue her bachelor's degree in the near future and will have to decide whether to take on student loans and whether to attend school part-time in order to maintain her employment. Camacho Decl. ¶¶ 9, 19. Moreover, Defendants are incorrect that making decisions in order to comply with a regulatory regime cannot qualify as a harm. Opp'n 38.  Where regulations impose significant costs on those they regulate at the risk of serious consequences, pre-enforcement injunctive and declaratory relief is appropriate.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Finally, Defendants contend that only certain constitutional violations automatically require a finding of irreparable harm. Opp'n 39.  Defendants have cited no Fourth Circuit case that qualifies the categorical language of *Ross v. Meese* that "the denial of a constitutional right" itself "constitutes irreparable harm for purposes of equitable jurisdiction."  818 F.2d 1132, 1135

23

(4th Cir. 1987).  Moreover, the Fourth Circuit has applied this rule in the context of an equal

protection violation.  *See Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960)

("The District Court has no discretion to deny relief by preliminary injunction to a person who

clearly establishes by undisputed evidence that he is being denied a constitutional right.").

Defendants' out-of-circuit precedent is therefore irrelevant.

### B.   The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor

The public interest and balance of the equities weigh strongly in favor of maintaining the

status quo during this litigation.  As explained above, Defendants are incorrect that the harms to

Plaintiffs are speculative and not cognizable.  Moreover, there is a significant public interest in

fair notice and equal application of the laws, as well as in avoiding the dire public health

consequences that the Rule's chilling effect will create.  Although Defendants claim that they

will be harmed by "an impediment" to administering immigration law as they see fit, Opp'n 40,

nowhere do Defendants point to any serious harm they will endure by administering the

primarily dependent standard during the pendency of this litigation.  They do not, for example,

argue that the standard is unworkable or that the rate of erroneous decision-making too high.  It

is therefore "unlikely that the issuance of . . . an injunction would harm DHS or the public to

such an extent that that injury would outweigh the benefits of preserving the status quo while this

matter is under review." *Make the Rd. N.Y. v. McAleenan*, No. 19-CV-2369 (KBJ), 2019 WL

4738070, at *3 (D.D.C. Sept. 27, 2019).

### IV.   THE COURT SHOULD GRANT NATIONWIDE RELIEF

The Court should either grant a nationwide injunction or postpone the Rule's effective

date under 5 U.S.C. § 705.  Defendants do not dispute the principle that, in APA cases, "the

ordinary result is that the rule[] [is] vacated—not that [its] application to the individual

petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

24

1409 (D.C. Cir. 1998).  Instead, Defendants suggest that "narrower relief" is available under § 705 or equitable principles, but they fail to suggest any realistic approach for such relief. Although they claim that relief could be limited to "the individual Plaintiffs and to any clients of the organizational Plaintiff for whom Plaintiff has demonstrated injury and irreparable harm," Opp'n 42, this approach is patently unworkable.  Many of CASA's noncitizen members are making decisions in the shadow of this Rule.  Must each member come to the Court to be exempted from the Public Charge Rule?  Must each member applying for adjustment of status likewise seek dispensation from the much more onerous application requirements that would be in place?  Defendants fail to answer these and other questions.

A geographically limited injunction also would not fully remedy the harm to CASA. Such an injunction would engender only continued confusion on the part of CASA's members and therefore would do little to alleviate the Rule's chilling effect that CASA has been working to combat. Moreover, a geographically limited injunction would impose an additional burden on CASA and its members, who would have to consider the impact of the Rule on decisions about relocation based on employment or other opportunities outside of the states in which the injunction applies.  *See Make the Rd. N.Y.*, 2019 WL 4738070, at *47 (finding a geographically limited injunction of immigration procedures unworkable in practice).

However, if the Court is inclined to grant a more limited injunction, it should not require individual showings of harm and should extend the injunction at least to Maryland, Pennsylvania, Virginia, and the District of Columbia, where CASA's members are located.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.  In the alternative, the Public Charge Rule's effective date of October 15, 2019, should be postponed under 5 U.S.C. § 705.

25

Respectfully submitted,

/s/ *Jonathan L. Backer*
Jonathan L. Backer (D. Md. 20000)
Amy L. Marshak*
Joshua A. Geltzer*
Mary B. McCord*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
  AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-9835
jb2845@georgetown.edu

*Attorneys for Plaintiffs*

*Admitted pro hac vice

Dated:  October 7, 2019

26