**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

CASA DE MARYLAND, INC., et al.,
                              \*

    **Plaintiffs,**
                              \*

**v.**                                     **Case No.: PWG-19-2715**
                              \*

DONALD J. TRUMP, et al.,
                              \*

    **Defendants.**
                              \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION AND ORDER

This case arises out of a challenge to the Department of Homeland Security's ("DHS") newly adopted immigration rule regarding "public charge" admissibility determinations, scheduled to take effect on October 15, 2019. Section 212(a)(4) of the Immigration and Naturalization Act ("INA") (codified at 8 U.S.C. § 1182(a)(4)(A)) authorizes the U.S. Customs and Immigration Services ("USCIS") to deny admission to the United States of anyone likely to be a "public charge." Congress first introduced this provision in the Immigration Act of 1882. DHS's new rule defines "public charge" as someone who immigration officials determine will likely receive 12 months of public benefits, including non-cash benefits, in a 36-month span at any point in their life. Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248 (the "Public Charge Rule" or "Rule").

Plaintiffs Angel Aguiluz, Monica Camacho Perez (collectively, the "Individual Plaintiffs"), and CASA de Maryland, Inc. ("CASA") bring this action against Defendants Donald J. Trump, in his official capacity as President of the United States, Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security, the U.S. Department of Homeland

Security, and Kenneth T. Cuccinelli II, in his official capacity as Acting Director, U.S. Citizenship and Immigration Services. ECF No. 27. Plaintiffs argue that the Public Charge Rule violates the Administrative Procedures Act ("APA") and the Fifth Amendment to the U.S. Constitution. Pending before me is Plaintiffs' motion for a preliminary injunction and to postpone the effective date of the Rule. ECF No. 28. The issues have been fully briefed and a hearing was held on the motion.[1] For the reasons discussed below, Plaintiffs' motion is granted. DHS is enjoined from enforcing the Public Charge Rule and the effective date of the Rule is postponed on a nationwide basis during the pendency of this case.[2]

## Background

The public charge admissibility provision first appeared in the Immigration Act of 1882. That Act denied admission to the United States of "any convict, lunatic, idiot, or any other person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214, 214 ("1882 Act"). Between 1882 and the INA's enactment in 1952, the public charge admissibility ground continued to appear in U.S. Immigration statutes.[3]

---

[1] *See* ECF Nos. 28, 52, 59, 60, 61. A hearing was held on October 10, 2019. Multiple *amici* also filed briefs. *See* ECF Nos. 36-1, 39-1, 43-1, 56-1.

[2] At the time of filing, three other federal district courts also have enjoined the Public Charge Rule. *See Make the Road New York v. Cuccinelli*, 19-cv-7993-GBD, 19-cv-7777-GBD (consolidated) (S.D.N.Y. Oct. 11, 2019) (nationwide injunction); *State of Washington v. U.S. Dept. Homeland Security*, 19-cv-5210-RMP (E.D. Wa., Oct. 11, 2019) (same); *City and County of San Francisco v. U.S. Citizenship and Immigration Services*, 19-cv-04717-PJH, 19-cv-4980-PJH, 19-cv-4975-PJH (consolidated) (N.D. Cal., Oct 11, 2019) (injunction as to San Francisco City or County, Santa Clara County, California, Oregon, the District of Columbia, Maine, and Pennsylvania). At least two other cases challenging the Public Charge Rule are pending. *See Mayor and City Council of Baltimore v. United States Department of Homeland Security*, 19-cv-4717-PJM (D. Md.); *Cook County, Illinois v. McAleenan*, 19-cv-6335-GF (N.D. Ill.).

[3] *See* Act of Mar. 8, 1891, ch. 551, § 1, 26 Stat. 1084, 1084 (denying admission to "[a]ll idiots, insane persons, paupers or persons likely to become a public charge"); Act of Feb. 20, 1907, ch. 1134, § 13, 34 Stat. 898, 902 (charging shipmasters with verifying under oath that each noncitizen passenger was not "an idiot, or imbecile, or a feeble-minded person, or insane person, or a pauper,

During this time, the meaning of the term "public charge" was the subject of interpretation by federal courts, as well as Board of Immigration Appeals and Attorney General opinions. *See* discussion of cases in Part III, *infra*. For example, in a 1964 immigration opinion, Attorney General Robert F. Kennedy summarized the history of cases interpreting the public charge admissibility provision, concluding that "[t]he general tenor of the holdings is that the statute requires more than a showing of a possibility that the alien will require public support" and that "[a] healthy person in the prime of life cannot ordinarily be considered likely to become a public charge." *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421–22 (AG 1964). Rather, to be a public charge, "[s]ome specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public, must be present." *Id.*

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, Title IV, 110 Stat. 2260 (codified as amended at 8 U.S.C. § 1601 *et seq.*) (the "Welfare Reform Act."). The bill significantly limited the public benefits that non-Legal Permanent Residents and undocumented immigrants could receive. *See* 8 U.S.C. §§ 1611, 1621(a), (d), 1641(b). The Welfare Reform Act also included several policy statements, including, "Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes"; "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs"; and "[T]he

---

or . . . likely to become a public charge"); Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 874, 875–76 (denying admission to "[a]ll idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . paupers; professional beggars; vagrants; persons not comprehended within any of the foregoing excluded classes who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; [and] . . . persons likely to become a public charge").

availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(1)-(2).

Later that year, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674–75 (1996) ("IIRIRA"). IIRIRA amended the public charge provision of the INA by codifying five factors that were relevant to public charge determinations: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. 8 U.S.C. § 1182(a)(4)(B)(i). IIRIRA also authorized immigration officials to consider affidavits from sponsors that pledged financial support to the noncitizen if admitted. *Id.* § 1182(a)(4)(B)(ii).

In 1999, the Immigration and Naturalization Service ("INS"), predecessor to USCIS, issued a notice of proposed rulemaking and field guidance defining the term public charge. Notice of Proposed Rulemaking, Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (May 26, 1999) (to be codified at 8 C.F.R. pts. 212 & 237) ("1999 Proposed Rule"); Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (Mar. 26, 1999) ("1999 Field Guidance"). The purpose of the 1999 Rulemaking and Field Guidance was to alleviate "considerable public confusion about whether the receipt of Federal, State, or local public benefits for which an alien may be eligible renders him or her a 'public charge' under the immigration statutes governing admissibility, adjustment of status, and deportation" following the passage of the Welfare Reform Act and IIRIRA. 1999 Proposed Rule, 64 Fed. Reg. at 28676. The 1999 Proposed Rule and Field Guidance defined the term "public charge" to mean "an alien who is likely to become primarily dependent on the Government for subsistence as demonstrated by either (i) The receipt of public cash assistance for income maintenance purposes, or (ii) Institutionalization for long-term care at Government expense (other

than imprisonment for conviction of a crime)." 1999 Proposed Rule, 64 Fed. Reg. at 28,681; 1999 Field Guidance, 64 Fed. Reg. at 28,689. INS adopted this definition "based on the plain meaning of the word 'charge,' the historical context of public dependency when the public charge immigration provisions were first enacted more than a century ago, and the expertise of the benefit-granting agencies that deal with subsistence issues." 1999 Proposed Rule, 64 Fed. Reg. at 28,677. INS also explained that the "primary dependent" definition was "consistent with factual situations presented in the public charge case law." *Id.* Although the 1999 Proposed Rule was never finalized, the 1999 Field Guidance has governed public charge admissibility determinations since that time.

In 2018, DHS initiated a proposed rulemaking to redefine the public charge admissibility standards. Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 ("2018 Proposed Rule"). The 2018 Proposed Rule rescinded the 1999 Proposed Rule and Field Guidance and sought to redefine the term "public charge." In a 60-day span, DHS received 266,077 comments, "the vast majority of which opposed the rule." 84 Fed. Reg. at 41,297.

On August 14, 2019, DHS issued the final version of the Public Charge Rule. 84 Fed. Reg. 41,292. The Rule defines public charge as any noncitizen who is "more likely than not at any time in the future" to "receive[ ] one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period." 84 Fed. Reg. at 41,501. The Rule significantly expands the public benefits that are included in this determination, including non-cash benefits such as the Supplemental Nutrition Assistance Program ("SNAP"), Medicaid, and housing assistance programs. *Id.* Multiple benefits received in one month count as receiving multiple months of benefits. *Id.* at 41,401. This determination is made based on a totality of the circumstances, and requires a USCIS officer to consider a list of factors that are "heavily weighted negative,"

"negative," "positive," and "heavily weighted positive." *Id.* at 41,397. As the basis for its change in position, DHS relies heavily on the policy statements included in the Welfare Reform Act. *See, e.g., id.* at 41355–56 ("[A]lthough the INA does not mention self-sufficiency in the context of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements elsewhere in Title 8 of the United States Code (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which were enacted within a month of each other."); *id.* at 41,366 ("[T]he inclusion of the designated benefits into the public benefits definition, is consistent with congressional statements in 8 U.S.C. 1601 concerning self-sufficiency of foreign nationals.") The Rule is scheduled to take effect October 15, 2019.

Plaintiffs brought this challenge arguing that the Rule violates the APA because it is "not in accordance with the law . . . [and] in excess of statutory . . . authority" and is "arbitrary and capricious." 5 U.S.C. 706(2)(A); 5 U.S.C. 706(2)(C). ECF No. 27 at 56–57. Plaintiffs also argue that the Rule violates the Due Process Clause and Equal Protection component of the Fifth Amendment to the U.S. Constitution. *Id.* at 58–60. At issue here is Plaintiffs' motion for a preliminary injunction or to postpone the effective date of the Rule during the pendency of this case. ECF No. 28.

## Discussion

The purpose of a preliminary injunction is "to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). To obtain a preliminary injunction, the plaintiff must "establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest."

*Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). The plaintiff must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated and remanded on other grounds*, 559 U.S. 1089 (2010). Where the government is a party, the final two factors merge. *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (quoting *Pursuing Am. Greatness v.* FEC, 831 F.3d 500, 511 (D.C. Cir. 2016). As a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Section 705 of the APA authorizes a court to stay the effective date of an administrative rule pending judicial review to prevent irreparable harm. 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.") Courts apply the same factors regarding a motion for a preliminary injunction discussed above to an application for a Section 705 stay. *See Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016); *Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009); *Schwartz v. Covington*, 341 F.2d 537, 538 (9th Cir. 1965); *Assoc. Sec. Corp. v. SEC*, 283 F.2d 773, 774–75 (10th Cir. 1960); *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990) ("The standard is the same whether a preliminary injunction against agency action . . . or a stay of that action is being sought . . .").

## I. Justiciability

This Court may adjudicate only "cases" and "controversies." U.S. Const. art. III, § 2. This "constraint of Article III" has two distinct but overlapping facets that must be satisfied for a federal district court to have subject matter jurisdiction: standing (which addresses who may sue) and ripeness (which addresses the timing of when a party may bring a suit). *See South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013)). The analysis of both issues is similar. *See id.* (citing *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citing Erwin Chemerinsky, *Federal Jurisdiction* § 2.4 (4th ed. 2003))).

### A. Standing

Defendants argue that CASA and the Individual Plaintiffs do not have standing, and therefore this Court lacks subject matter jurisdiction. ECF No. 52 at 7–9. Each of the elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "Thus, when a defendant challenges a plaintiff's standing, we analyze the challenge differently depending on the stage of litigation at which the challenge is brought and the substance of the defendant's arguments." *Id.* When, as here, "'standing is challenged on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181–82 (4th Cir. 2013)). Therefore, to analyze standing, the plaintiffs' allegations in their complaint will be accepted as true.

To establish standing, a plaintiff must have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," "fairly traceable to the challenged action of the defendant," and "likely . . . [to] be redressed by a favorable decision." *Bishop v. Bartlett,* 575 F.3d 419, 423 (4th Cir. 2009)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (same).

An organization can establish standing in either or both of two ways: representational standing for harms to its members and organizational standing for harms that it suffers. To establish representational standing, an organization must establish that: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *S. Walk*, 713 F.3d at 184. "[T]o show that its members would have standing, an organization must make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.*

To establish organizational standing, an organization must establish that it "suffer[ed] an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) ("An organization has 'direct standing to sue [when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission.'") (quoting *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir.2012)); *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D. C. Cir. 1995) ("[T]he organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action") (quoting *American Legal Foundation v. FCC*, 808 F.2d 84, 91

(D.C.Cir.1987)). "[A]n injury to organizational purpose, without more, does not provide a basis for standing." *S. Walk*, 713 F.3d at 183. And a diversion of resources does not constitute a harm if "it results not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices." *Lane*, 703 F.3d at 675 (quoting *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994)) (internal quotation marks omitted).

CASA alleges that it has suffered an injury in fact because the Public Charge Rule frustrates its mission and diverts its resources. CASA's mission is "to create a more just society by building power and improving the quality of life in low-income immigrant communities." ECF No. 27 at ¶ 14. CASA offers social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, and Pennsylvania. *Id.* CASA alleges that its mission has been frustrated, as it "has had to shift its organizational focus from an affirmative posture—seeking to improve conditions for immigrant families (for example, by lobbying state legislatures to enact laws expanding medical benefits available to immigrants)—to a defensive one—seeking to mitigate the harm of the Public Charge Rule on the communities it serves." *Id.* at ¶ 123. Likewise, CASA alleges that it "has incurred significant costs in advising its members" on the Public Charge Rule and "will continue to incur such costs" while the Public Charge Rule is in effect. ECF No. 27 at ¶ 121. For example, CASA states that is has "devoted significant resources to educating its members about the Rule and its expected impacts on immigrant families." *Id.* at ¶ 15. "This diversion of resources has come at the expense of other time-sensitive work; for example, reducing advocacy for health-care expansion efforts at the state level in Maryland and at the local level in Prince George's County, Maryland. *Id.* at ¶ 123. CASA is also

10

"redirect[ing] its resources to ensure that its members who are chilled from participating in public benefits programs have access to the supportive services they need to thrive." *Id.* at ¶ 124.

In *Havens Realty Corp. v. Coleman*, the Supreme Court affirmed the Fourth Circuit's finding that an organizational plaintiff, HOME, had standing where the organization's mission had been frustrated by the defendants' racial steering practices. 455 U.S. 363, 366, 370 (1982). HOME's mission was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area" and its membership was "multi-racial and include[d] approximately 600 individuals." *Id.* at 368. HOME's activities "included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Id.* HOME alleged that it was "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and that it "had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices." *Id.* at 379. Based on these allegations, the Supreme Court found that "there can be no question that the organization has suffered injury in fact" and that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests . . . ." *Id.*

The injury in *Havens Realty* is similar to CASA's injury here. Both organizations were focused on improving opportunities for marginalized communities; both conducted a variety of activities to further that mission including counseling members; and both alleged that they had to spend significant resources to counteract the effect of the defendants' actions, which they viewed as inimical to their organizations' missions.

Several recent decisions from this Court also support CASA's standing. In *Casa De Md. v. U.S. Dep't of Homeland Sec.*, this Court found that the very same organizational plaintiff—CASA—had standing to challenge the proposed rescission of the Deferred Action for Childhood Arrivals ("DACA") program on the grounds that it violated the APA and the Fifth Amendment. 284 F. Supp. 3d 758, 771 (D. Md. 2018) *aff'd in part, vacated in part on other grounds, rev'd in part on other grounds*, 924 F.3d 684 (4th Cir. 2019).[4] In finding that CASA had organizational standing, the court noted, "Casa De Maryland . . . [is] . . . directly focused on aiding immigrants and their communities. The fact that one of their primary functions has been assisting their members with 'tens of thousands of DACA initial and renewal applications' is sufficient for standing in and of itself." *Id.* The same is true here. CASA has advised over one thousand of its members on the impacts of the Public Charge Rule, which adopts a sweeping expansion of the definition of the term public charge and uproots over two decades of agency policy. The immediacy of the Rule's scheduled effective date has forced CASA to "redirect its resources to ensure that its members who are chilled from participating in public benefits programs have access to the supportive services they need to thrive." ECF No. 27 at ¶¶ 122, 124.

Similarly, in *Baltimore v. Trump*, this Court found that Baltimore had standing to challenge the State Department's changes to the Foreign Affairs Manual ("FAM") relating to the public charge inadmissibility ground[5] because the City was "compelled to reallocate its finite resources in response to the FAM for the purpose of combatting the injurious effects that the FAM will have

---

[4] Plaintiffs' standing was not raised on appeal. Reviewing the issue de novo, the Fourth Circuit found that the individual plaintiffs in that case had standing, so did not consider whether the organizational plaintiffs also had standing. *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 701 n.14 (4th Cir. 2019).

[5] The State Department is responsible for public charge inadmissibility determinations at consular offices.

on its residents, and the public programs it administers" at the expense of other public programs. 18-cv-3636-ELH, 2019 WL 4598011, at *18 (D. Md. Sept. 20, 2019). The same principle applies here. CASA has reallocated its finite resources including 15 part-time health promoters and 15 to 20 community organizers to address the effects of the Public Charge Rule at the expense of other time-sensitive activities, including lobbying efforts at the state and local level in Maryland. *See* ECF No. 27 at ¶¶ 122–24.

The Government argues that CASA has voluntarily diverted its resources, and this does not constitute an injury because it was the result of CASA's "own budgetary choices." ECF No. 52 at 8–9 (quoting *Lane*, 703 F.3d at 674). Further, the Government argues that there was no genuine diversion because CASA is in the business of educating immigrant communities about relevant immigration laws and providing legal education services, and the funds spent were in line with CASA's core mission. *Id.* at 9. But this argument is too clever by half, as it ignores the fact that the only reason for CASA's reallocation of its resources is that DHS has adopted a definition of the public charge rule that is dramatically more threatening to its members, and, in response, CASA has had to divert resources that otherwise would have been expended to improve the lives of its members in ways unrelated to the issues raised by the public charge inquiry. Thus, the circumstances in this case differ from those in cases where there was no standing because the organization elected to allocate its resources in furtherance of its core mission. In *Lane*, two individual plaintiffs and an organization challenged federal and state laws that restricted the interstate transfer of handguns. 703 F.3d at 669. The organization alleged that it had suffered an injury in fact because its resources were "taxed by inquiries into the operation and consequences of interstate handgun transfer provisions." *Id.* at 675. The Fourth Circuit found that this "mere expense" did not constitute an injury in fact because it was a budgetary choice. *Id.* But unlike the

organization in *Lane*, CASA alleges that the diversion of its resources frustrated its mission by preventing it from continuing an affirmative advocacy posture, including, for example, advocating on public health issues at the state and local level in Maryland. *See* ECF No. 27 at ¶¶ 122–24. Thus, CASA's allegations are more like those in *Havens Realty*, *Casa De Md. v. U.S. Dep't of Homeland Sec.*, and *Baltimore v. Trump*.

Therefore, based on CASA's allegations in its complaint, taken as true for the purposes of this motion, CASA has established injury in fact. The injuries are also fairly traceable to the Defendant's actions in enacting the Public Charge Rule. But for the Rule, CASA's mission would not have been frustrated and its resources would not have been diverted as alleged. The alleged injury also can be redressed by Plaintiffs' proposed relief of setting aside the Rule as unlawful and enjoining DHS from enforcing the Rule. Therefore, CASA has established organizational standing.

Because this Court finds that CASA has organizational standing, it need not consider whether it also has representational standing or whether the Individual Plaintiffs have standing. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("'[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'") (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). Those issues will be addressed when the Court rules on any motion to dismiss that the Defendants may file.

### B. Ripeness

"To determine whether the case is ripe, we 'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting *Franks v. Ross,* 313 F.3d 184, 194 (4th Cir. 2002);

*Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 733 (1998)) (internal quotation marks omitted). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (citing *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir. 1992)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." *Id.* (citing *Charter Bank*, 976 F.2d at 208–09). "When considering hardship, we may consider the cost to the parties of delaying judicial review." *Id.* (citing *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119, 1124 (4th Cir. 1977)).

Here the case is fit for judicial review as it presents purely legal questions: whether the Public Charge Rule violates the APA or the Fifth Amendment. *Cf. Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) ("This case is fit for judicial review. The only issue in the case is whether Virginia's open primary law violates the plaintiffs' First Amendment rights to freely associate, which presents a purely legal question."). The Public Charge Rule is final, and is scheduled to go into effect on October 15, 2019. Therefore the case does not depend on future uncertainties.

With respect to the hardship prong, CASA is already experiencing harms through the frustration of its mission and diversion of funds at the expense of other time-sensitives activities as described above. CASA will continue to bear these costs if judicial review is delayed. *Cf. Mayor and City Council of Balt. v. Trump*, 18-3636-ELH, 2019 WL 4598011, at *21 (D. Md. Sept. 20, 2019) ("The primary injury alleged by the City . . . is that [it] must bear the financial costs of the defendants' unlawful action.").

Defendants argue that the case is not ripe for review with respect to CASA's claims because they are "premised on the decisions of its members who are not parties to this suit" and the Rule

"does not create adverse consequences of a strictly legal kind" for CASA. ECF No. 52 at 11–12. But defendants either misunderstand or mischaracterize CASA's organizational harms. They do not depend on the actions of third parties or require further factual development. They are premised on the current and ongoing frustration of CASA's mission and the diversion of its resources. These are harms stemming directly from the enactment of the Public Charge Rule.

Therefore, this case is ripe for review.

## II.  Zone of Interest

"[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) ("*Patchak*") (quoting *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Importantly, this test "'is not meant to be especially demanding.'" *Id.* at 225 (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). The test is applied "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Id.* (quoting *Clarke*, 479 U.S. at 399. The test "do[es] not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Id.* (quoting *Clark*, 479 U.S. at 399–400). A plaintiff need only establish that it is "arguably" within the zone of interest, such that "the benefit of any doubt goes to the plaintiff." *Id.* "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clark*, 479 U.S. at 399).

Although the zone of interest test has sometimes been called a prudential standing limitation, the Supreme Court recently clarified that this is a "misnomer" and should not be treated as such. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (citing *Association of Battery Recyclers, Inc. v. EPA,* 716 F.3d 667, 675–676 (2013) (Silberman, J., concurring opinion). Instead, "[w]hether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.*

The Fourth Circuit has adopted a two-part test when determining if the plaintiff falls within the zone of interest of a statutory provision. First, the reviewing court must "discern the interest arguably to be protected by the statutory provision at issue" and second, "inquire whether the plaintiff's interest affected by the agency action are among them." *TAP Pharmaceuticals v. U.S. Dept. of Health & Human Services*, 163 F.3d 199, 203 (4th Cir. 1998); *see also Pye v. United States*, 269 F.3d 459 (4th Cir. 2001).

Under the first prong of the Fourth's Circuit's test, Section 212(a)(4) of the INA states, "Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." The plain language of this provision indicates that the interests to be regulated are the health and economic status of immigrants who are granted admission to the United States.

As to the second prong, CASA's interests affected by the agency action are clearly among the interests to be regulated by the statute. CASA's mission is "to create a more just society by building power and improving the quality of life in low-income immigrant communities" and it provides "social, health, job training, employment, and legal services to immigrant communities"

in support of that mission. ECF No. 27 at ¶ 14. These are squarely within the bounds of Section 212(a)(4)'s interest in the health and economic status of immigrants admitted in the United States. They are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Patchak*, 567 U.S. at 225 (internal quotation marks and citation omitted); c*f. E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018) ("Although the Organizations are neither directly regulated nor benefitted by the INA, we nevertheless conclude that their interest in 'provid[ing] the [asylum] services [they were] formed to provide' falls within the zone of interests protected by the INA.").

Further, the Public Charge Rule acknowledges the very role played by non-profits like CASA in providing services related to the Rule. *See* 84 Fed. Reg. at 41,301 ("[I]mmigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, [and] non-governmental organizations . . . among others, may need or want to become familiar with the provisions of this final rule . . . to provide information to those foreign-born non-citizens that might be affected by a reduction in federal and state transfer payments."). DHS's use of this language would be curious indeed if the interests of non-profit organizations like CASA were so marginally related to the new Rule as to fall outside the zone of interest. If they were not within the zone, why bother to address them? Therefore, the Rule itself provides further support that CASA is within Section 212(a)(4)'s statutory concern of regulating the health and economic welfare of immigrants who are granted LPR status. *Cf. Patchak*, 567 U.S. at 226 ("The Department's regulations make this statutory concern . . . crystal clear.").

Therefore, CASA has demonstrated that it is "arguably within the zone of interests" of Section 212(a)(4) of the INA.

This case is similar to *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018). There the court found that an immigrants' rights organization was within the zone of interest of the INA in a case challenging the proposed rescission of the DACA program where "DACA recipients are members, clients, and employees" of the organization, which "advocates for immigrants' rights." *Id.* at 270 n.3. Further, the court in *Make the Road New York v. Cuccinelli* found that the same immigrants' rights organization was within the INA's zone of interest in a challenge to the Public Charge Rule. 19-cv-7993-GBD, at *12 (S.D.N.Y. Oct. 11, 2019). There the court explained, "Plaintiffs plainly fall within the INA's zone of interests. The interests of immigrants and immigrant advocacy organizations such as Plaintiffs are inextricably intertwined." *Id.*; *but see La Clinica de La Raza v. Donald Trump*, 19-cv-4980-PJH, at *72 (N.D. Cal. Oct. 11, 2019) (finding that organizational plaintiffs in another case challenging the Public Charge Rule failed to establish they were within the zone of interests where they "simply fail[ed] to explain how their interests relate to § 1182(a)(4)'s purpose of excluding immigrants likely to become public charges.")

Defendants argue that it is only "aliens improperly determined inadmissible" that are within the zone of interests of the statute. ECF No. 52 at 11. But such a myopic view is not supported by the case law interpreting the zone of interest test. As the Supreme Court explained, the test "do[es] not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Patchak*, 567 U.S. at 225 (quoting *Clark*, 479 U.S. at 399–400). Therefore, the zone of interests need not be drawn so narrowly as to encompass only aliens that have received an adverse determination under the statute. Instead, the test only excludes plaintiffs whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

Defendants tout *INS v. Legalization Assistance Project*, in which Justice O'Connor as Circuit Justice for the Ninth Circuit, granted a stay after finding that four Justices likely would conclude that an immigrants' rights organization was outside the zone of interests of provisions of the Immigration Reform and Control Act ("IRCA"). 510 U.S. 1301, 1304 (1993) (O'Connor, J., in chambers) ("As a Circuit Justice dealing with an application like this, I must try to predict whether four Justices would vote to grant certiorari should the Court of Appeals affirm the District Court order without modification; try to predict whether the Court would then set the order aside; and balance the so-called 'stay equities.' This is always a difficult and speculative inquiry, but in this case it leads me to conclude that a stay is warranted.") (internal citation omitted). In making this determination, Justice O'Connor found that the relevant IRCA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations" and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"). *Id.* at 1305.

But that case involved a challenge on various statutory and constitutional grounds to INS policies and regulations interpreting the IRCA. *See Legalization Assistance Project of Los Angeles Cty. Fed'n of Labor (AFL-CIO) v. I.N.S.*, 976 F.2d 1198, 1202 (9th Cir. 1992) (explaining case background). Here, the plaintiffs bring a challenge under the APA regarding the Public Charge Rule.[6] Although it is true that the focus of the zone of interest test remains on the relevant statutory

---

[6] The Plaintiffs also bring a challenge under the Due Process Clause and Equal Protection Component of the Fifth Amendment. The application of the zone of interest test to challenges based on the Constitution is unclear. *See Sierra Club v. Trump*, 929 F.3d 670, 700–02 (9th Cir. 2019) (discussing question of whether zone of interest tests applies to Constitutional claims following *Clinton v. City of New York*, 524 U.S. 417 (1998) and *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). This question is not analyzed at this time, as the

provision in both cases, as distinct from the APA, that does not render the context of an APA challenge irrelevant to the zone of interest inquiry, as actions brought under the APA are afforded "generous review" that "may not do [] for other purposes." *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Sierra Club v. Trump*, 929 F.3d 670, 703 n.26 (9th Cir. 2019) (explaining that *Bennett* instructed that "when analyzing whether a plaintiff falls within the zone of interests of a particular statute, courts should be particularly lenient if a violation of that statute is being asserted through an APA claim.").

Moreover, in *INS*, Justice O'Connor was writing not for the full Court, but as a Circuit Justice deciding whether to grant a petition to stay a lower court order, and engaged in the "speculative" and "difficult" task of predicting what the full Court would find if it took up the issue. But here, we need not resort to speculation, as the Court has spoken, and far more recently than in *INS*. Indeed, in *Patchak*, the Supreme Court explained that "[w]e apply the test in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" 567 U.S. at 225 (quoting *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 399–400 (1987)). The Court further explained that the test "is not meant to be especially demanding" and that it "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* Applying this standard, and for the reasons discussed above, CASA has established that it is arguably within the zone of interests of Section 212(a)(4) of the INA.

---

Court finds the Plaintiffs' claims under the APA are sufficient to establish likelihood of success on the merits. *See* Section III, *infra*.

## III.    Likelihood of Success on the Merits

Plaintiffs argue that this Court should enjoin the Public Charge Rule from going into effect because it is "not in accordance with law." ECF No. 28 at 10 (quoting 5 U.S.C. § 706(2)(A)). Here we must use the Supreme Court's *Chevron* framework to determine whether this Court should defer to DHS's interpretation of the INA. Under *Chevron* Step One, a court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If so, the court "must give effect to the unambiguously expressed intent of Congress.'" *Id.* at 843. But, if the court finds that the statute is silent or ambiguous with respect to the specific issue, under *Chevron* Step Two, "a reviewing court must respect the agency's construction of the statute so long as it is permissible." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

For the reasons discussed below, the Plaintiffs have established a likelihood of success on the merits that under *Chevron* Step One Congress has spoken directly to the issue here and precluded DHS's definition of Public Charge. Alternatively, for the same reasons, the Plaintiffs have established a likelihood of success on the merits that the Public Charge Rule fails at *Chevron* Step Two as an impermissible reading of the statute. Therefore, Plaintiffs have demonstrated a likelihood of success of showing that the Public Charge Rule is "not in accordance with law" in violation of 5 U.S.C. § 706(2)(A).

To begin, it is not contested that Congress has not explicitly defined the meaning of "public charge" in INA Section 212(a)(4). Nor is it disputed that DHS has some authority to interpret the meaning of "public charge." Indeed, Plaintiffs point to the 1999 Field Guidance as a permissible interpretation of the term. Defendants argue the same with respect to DHS's definition in the Public Charge Rule. Therefore, under *Chevron* Step One, the question here is whether Congress

unambiguously *precluded* DHS's definition of the term public charge in the Public Charge Rule: the likely receipt of 12 months of benefits within a 36 month span, including short term non-cash benefits. *See FDA v. Brown & Williamson*, 529 U.S. at 133 (finding where the statutory provisions were not defined that "Congress has directly spoken to the issue here and precluded the FDA's jurisdiction to regulate tobacco products").

We look first to the plain language of the statute. *See Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1569 (2017). "In the absence of" a statutory definition of a term, courts "construe a statutory term in accordance with its ordinary or natural meaning," including by looking to relevant dictionary definitions. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). As it first appeared in 1882, the Immigration Act prohibited the entry to the United States of "any convict, lunatic, idiot, or any other person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214, 214. In 1891, Congress amended this provision to exclude "[a]ll idiots, insane persons, paupers or persons likely to become a public charge." Act of Mar. 8, 1891, ch. 551, § 1, 26 Stat. 1084, 1084.

Plaintiffs offer two contemporary dictionary definitions. Webster's 1828 dictionary defined a "charge" as "The person or thing committed to another[']s custody, care or management; a trust." *Charge*, Webster's Dictionary (1828 online ed.). Similarly, Webster's 1886 dictionary defined a "charge" as a "person or thing committed or intrusted to the care, custody, or management of another; a trust." *Charge*, Webster's Dictionary (1886 ed.) Therefore these definitions indicate that to be a public charge requires that the Government has taken care, custody, or management of a person. This suggests something more than temporary receipt of benefits as defined in the Public Charge Rule. Instead, it indicates something closer to the "primary dependent" standard enacted in the 1999 Field Guidance.

Defendants cite Stewart Rapalje et al., Dict. of Am. and English Law (1888). That dictionary defines "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." *Id.* But that definition supports Plaintiffs. As Defendants concede, "When Congress originally enacted the public charge inadmissibility ground, the term 'pauper' was in common use for a destitute person in extreme poverty." ECF No. 52 at 14. This indicates that "public charge" requires a higher level of Government reliance than the "12/36" standard defined in the Public Charge Rule. Defendants also point to Frederic Jesup Stimson, Glossary of the Common Law (1881), which defines "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt." But that also misses the mark, as it defines charge in the context of a financial burden to property, instead of relating to the self sufficiency of an individual like the other definitions. Therefore the weight of these early dictionary definitions favors the Plaintiffs.

Courts should also look to the context of the statue as a whole to derive legislative intent. *See FDA v. Brown & Williamson*, 529 U.S. at 132 ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.") In addition to the public charge admissibility provision, the Immigration Act of 1882 created an "immigrant fund" that provided for the "care of immigrants arriving in the United States, [and] for the relief of such." 1882 Act at § 1. The Act also empowered immigration officials "to provide for the support and relief of such immigrants therein landing as may fall into distress or need public aid." *Id.* at § 2. This indicates that Congress did not mean public charge to include merely the receipt of temporary benefits. *See FDA v. Brown & Williamson*, 529 U.S. at 132 ("A court must . . . interpret the statute 'as a symmetrical and coherent regulatory scheme,' . . . and 'fit, if possible, all parts into an

harmonious whole.'") (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) and *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)).  Therefore the broader context of the Immigration Act of 1882 also supports Plaintiffs' argument.

Defendants point to a statement of Representative Warner in 1894 that "[i]t will not do for [an alien] [to] earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge."  26 Cong. Rec. 657 (1894).  However, the legislative debate in 1882 at the time of the Act indicated that Congress was concerned with preventing foreign nations from "'send[ing] to this country blind, crippled, lunatic, and other infirm paupers, who ultimately become *life-long dependents* on our public charities.'"  13 Cong. Rec. 5108-10 (June 19, 1882) (statement of Rep. Van Voorhis) (emphasis added).  This provides a stronger indication of Congress's intent at the time of the 1882 Act.  Further, the creation of the immigrant fund in 1882 as discussed indicates that Congress's intention in 1882 was not that expressed by Representative Warren more than a decade later.

Federal case law interpreting the public charge provision also supports Plaintiffs' argument.  In *Gegiow v. Uhl*, the Supreme Court considered the question of whether someone could be denied admission to the United States as a public charge based on the conditions of local labor markets.  239 U.S. 3, 9–10 (1915).  Based on the plain language of the Immigration Act of 1907, which had reenacted the public charge provision, the Court found that the term "likely to become a public charge" should be read to exclude immigrants based on *permanent* personal characteristics:

> 'Persons likely to become a public charge' are mentioned between paupers and professional beggars, and along with idiots, persons dangerously diseased, persons certified by the examining surgeon to have a mental or physical defect of a nature to affect their ability to earn a living, convicted felons, prostitutes, and so forth. The persons enumerated, in short, are to be excluded on the ground of permanent

personal objections accompanying them irrespective of local conditions unless the one phrase before us is directed to different considerations than any other of those with which it is associated.  Presumably it is to be read as generically similar to the others mentioned before and after.

*Id.* at 10.

Defendants point out that following the *Gegiow* decision, Congress amended the public charge provision in the Immigration Act of 1917, separating "public charge" from the terms "pauper" and "professional beggar."  Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 874, 875–76 (denying admission to "[a]ll idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . paupers; professional beggars; vagrants; persons not comprehended within any of the foregoing excluded classes who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; [and] . . . persons likely to become a public charge").  According to the Secretary of Labor, the purpose of the change was to "associate [public charge] in the law with a provision the economic object of which is unmistakable, and disassociate it from the provisions the immediate objects of which are of a sanitary nature."  H.R. Doc. No. 64-886, at 4 (Mar. 11, 1916).  But this change provides little support for Defendants' position.  In *U.S. ex rel. Iorio v. Day*, Judge Learned Hand explained that following the amendments, the public charge clause "however construed, overlaps other provisions; e.g., paupers, vagrants, and the like" and that "[i]t is certainly now intended to cover cases like *Gegiow* . . ., where the occasion leads to the conclusion that the alien will become destitute, though generally capable of standing on his own feet."  34 F.2d 920, 922 (2d Cir. 1929).  In other words, the term "public charge" still overlaps with the term "paupers" in the statute and the amendment simply clarified that the term public charge covers people that would become "destitute" due to the inability to work in a local

economy.  The definition of "public charge" in the Public Charge Rule, however, would exclude immigrants based on their receipt of a small amount of benefits—much less than the level required to support someone who is "destitute" and unable to work.  *See* ECF No. 27 at ¶ 69 ("[T]he average monthly SNAP benefit per person in 2018 was $126.96, meaning that a noncitizen could be denied a green card if a USCIS officer were to deem her likely to receive little more than $1,500 in SNAP benefits within a 36-month period.") (citing U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program Participation and Costs* (Aug. 2, 2019), https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAPsummary-8.pdf).

Executive branch immigration opinions also support Plaintiffs' argument.  For example, in *Matter of Martinez-Lopez*, Attorney General Robert F. Kennedy summarized the meaning of the public charge admissibility provision as follows:

> The provision in the immigration laws excluding aliens likely to become public charges had its origin in section 2 of the Immigration Act of 1882, 22 Stat. 214, and has been continued in all subsequent immigration statutes.  It has been the subject of extensive judicial interpretation.  *The general tenor of the holdings is that the statute requires more than a showing of a possibility that the alien will require public support.*  Some specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public, must be present.  *A healthy person in the prime of life cannot ordinarily be considered likely to become a public charge*, especially where he has friends or relatives in the United States who have indicated their ability and willingness to come to his assistance in case of emergency.

10 I. & N. Dec. 409, 421–22 (AG 1964) (citing *Ex parte Mitchell*, 256 Fed. 229 (N.D.N.Y. 1919); *Ex parte Hosaye Sakaguchi*, 277 Fed. 913, 916 (9th Cir. 1922); *U.S. ex rel. Mantler v. Commissioner of Immigration*, 3 F.2d 234 (2nd Cir. 1924); *Ex parte Turner*, 10 F.2d 816, 817 (S.D.Cal. 1926); *Ex parte Sturgess*, 13 F.2d 624, 625 (6th Cir. 1926); *Gabriel v. Johnson*, 29 F.2d 347, 349 (1st Cir. 1928); *U.S. ex rel. Minuto v. Reimer*, 83 F.2d 166, 168 (2nd Cir. 1936) (emphasis added).  The Public Charge rule is wholly inconsistent with this interpretation of the public charge

admissibility standard.  While these cases established that the public charge provision requires "more than a showing of a possibility that the alien will require public support," that is precisely how the Rule now defines public charge.  And even though "[a] healthy person in the prime of life cannot ordinarily be considered likely to become a public charge" the Rule defines public charge so expansively that it could cover as much as 50% of the U.S. population.  *See* ECF No. 27 ¶ at 68 (citing Danilo Trisi, Ctr. on Budget & Policy Priorities, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means the Chance to Come to or Stay in the U.S.* 4–5 (May 30, 2019), https://www.cbpp.org/sites/default/files/atoms/files/5-30-19pov.pdf ("Approximately 43 to 52 percent of U.S.-born individuals present in the PSID survey in 2017 participated in either SNAP, Medicaid, TANF, SSI, or housing assistance over the 1997-2017 period.")).

Further, *Matter of Martinez-Lopez* is binding on DHS.  *See* 8 C.F.R. § 1003.1(g)(1) ("Except as Board decisions may be modified or overruled by the Board [of Immigration Appeals] or the Attorney General, decisions of the Board and decisions of the Attorney General are binding on all officers and employees of DHS or immigration judges in the administration of the immigration laws of the United States.")  The Government has presented no evidence that this opinion has been overturned.  Therefore on this point alone Plaintiffs have raised a serious question as to whether the Public Charge Rule is "not in accordance with the law."  5 U.S.C. § 706.

Indeed, in the 2018 Proposed Rule, the final Public Charge Rule, and its Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction, the Government cites *no cases* in which the reviewing court or agency concluded that an alien's receipt of benefits that would not have counted in determining whether an immigrant was a public charge as defined by the 1999 Field Guidance, but which do fall within the scope and duration of the new Rule's definition, constituted a public

charge. Instead, Defendants largely cite cases outside of the public charge admissibility context for the proposition that a small amount of public benefits can qualify someone as a public charge. But in fact, many of these cases support Plaintiffs. *See, e.g.*, *Town of Hartford v. Town of Hartland*, 19 Vt. 392, 397–98 (Vt. 1847) (concerning widow who was "sickly and subject to fits" with children "of tender age" and "little reliance for support could therefore be placed upon the personal efforts or labor of the family"); *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, 5 Pa. Super. 516 (Pa. Super. Ct. 1897) (concerning "unmarried woman" who was a "cripple" and "forced to abandon her work" after teaching 50 years and who became a public charge after a friend submitted a complaint under oath stating she was "poor and indigent and unable to procure the necessaries of life by reason of sickness and other infirmities"). At best, Defendants cite a 1929 immigration treatise that defines public charge as "any maintenance, or financial assistance, rendered from public funds." Arthur Cook *et al.*, Immigration Laws of the U.S., § 285 (1929). But this definition carries little weight compared to contemporary federal court and binding executive branch opinions interpreting the term to the contrary.

Congress also has rejected multiple attempts to define "public charge" in the way that DHS now does through administrative rulemaking. The Supreme Court has repeatedly considered rejected legislative proposals as one tool in determining legislative intent. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. at 144; *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441–43 (1987); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). Here, in the lead up to the 1996 passage of IIRIRA, under the House-passed conference report, an immigrant could be deported if he or she received federal public benefits for 12 months aggregate over seven years. *See* 142 Cong. Rec. S11872, S11882. During final negotiations, that provision was removed under threat of veto "in order to ensure

passage" of the bill. H.R. Rep. 104-828, at 137–40 (statement of Sen. Kyl). This demonstrates that Congress was aware of how it could define public charge in a way that DHS does now and that it rejected that definition. *Cf. Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1570 ("Surrounding provisions of the INA guide our interpretation . . . .") (citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012)). This is particularly significant given the weight that DHS places on the 1996 Welfare Reform Act and IIRIRA in enacting the Public Charge Rule. *See, e.g.*, Public Charge Rule, 84 Fed. Reg. at 41355–56 ("[A]lthough the INA does not mention self-sufficiency in the context of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements elsewhere in Title 8 of the United States Code (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which were enacted within a month of each other."). But in fact, in 1996 Congress considered and rejected the Rule's new approach to the definition of public charge.

And in 2013, the Senate rejected an amendment by then-Senator Sessions to S. 744, a proposed immigration bill, that would have broadened the public benefits considered for public charge determinations to include non-cash benefits. *See* S. Rep. No. 113-40 at 42, 63 (2013). Senators who opposed the proposed amendment "cited the strict benefit restrictions and requirements already included in both S. 744 and existing law, and the amendment was rejected by voice vote." *Id.* at 42. This is precisely what the DHS's Public Charge Rule does through administrative regulation. Although S. 744 ultimately failed when the House did not pass its version of the bill, this demonstrates that Congress was aware of the benefits that were included in the public charge determination, knew how to change them if they could muster the votes to do so, and specifically rejected a proposal to include non-cash benefits in public charge determinations.

Again this is significant given the reliance that DHS places on Congressional intent. *See* Public Charge Rule, 84 Fed. Reg. at 41,366 ("[T]he inclusion of the designated benefits into the public benefits definition, is consistent with congressional statements in 8 U.S.C. 1601 concerning self-sufficiency of foreign nationals.") Taken together, these rejected legislative proposals provide additional indication that DHS's interpretation of public charge is contrary to the meaning intended by Congress.

The 1999 Proposed Rule and Field Guidance provide further support for Plaintiffs' arguments. The DOJ explained that its adoption of the "primary dependent" definition was "based on the plain meaning of the word 'charge,' the historical context of public dependency when the public charge immigration provisions were first enacted more than a century ago, and the expertise of the benefit-granting agencies that deal with subsistence issues." 1999 Proposed Rule, 64 Fed Reg. at 28,677. The DOJ also explained that its definition was "consistent with factual situations presented in the public charge case law." *Id.* In the 2018 Proposed Rule and final Rule, DHS argues that "INS's reasoning nor any evidence provided, forecloses the agency adopting a different definition consistent with statutory authority." 84 Fed Reg. at 41350 n.310; 83 Fed Reg at 51133.

In sum, traditional tools of statutory interpretation provide the following evidence that supports Plaintiffs' argument that the definition of "public charge" in the Rule is precluded by the meaning of term as enacted by Congress: 1) dictionary definitions during the time the public charge rule was first enacted; 2) the history and context of the Immigration Act of 1882, including the creation of an immigrant fund; 3) federal court precedent, including from the Supreme Court, interpreting the meaning of public charge; 4) binding executive branch precedent interpreting the meaning of public charge; 5) Congress's rejection of a similar definition of public charge in 1996 when enacting IIRIRA and the rejection of including non-cash benefits in public charge

determinations in 2013; and 6) affirmance of this history and case law in the 1999 Proposed Rule and Field Guidance.  In the face of this evidence, the Government primarily relies on the argument that none of this forecloses its definition.

Based on this record, Plaintiffs have demonstrated a likelihood of success on the merits that the definition of public charge in the Rule is "unambiguously foreclosed" by Congress's intention at *Chevron* Step One, and is therefore "not in accordance with law" in violation of 5 U.S.C. § 706.  *Cf. Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1572 (2017) ("We have no need to resolve whether the rule of lenity or *Chevron* receives priority in this case because the statute, read in context, unambiguously forecloses the Board's interpretation.")

If a reviewing court determines that the term public charge is ambiguous under *Chevron* Step One, this Court must defer to DHS's interpretation of the statute in the Public Charge rule, "so long as it is permissible."  *FDA v. Brown & Williamson*, 529 U.S. at 132.  But for the same reasons as discussed above, the Plaintiffs have demonstrated a likelihood of success in showing that the Public Charge Rule is not a permissible construction of the statute.  In other words, the record above indicates that the Rule likely is outside the bounds of any ambiguity.  Therefore Plaintiffs have also demonstrated a likelihood of success on the merits that the definition of public charge in the Rule is an impermissible reading of the INA at *Chevron* Step Two, and is therefore "not in accordance with law" in violation of 5 U.S.C. § 706.  *Cf. Whitman v. Am. Trucking Associations*, 531 U.S. 457, 481 (2001) ("[W]e find the statute to some extent ambiguous. We conclude, however, that the agency's interpretation goes beyond the limits of what is ambiguous and contradicts what in our view is quite clear. We therefore hold the . . . policy unlawful.").

Plaintiffs also argue that the rule is arbitrary and capricious, and violates the Due Process Clause and Equal Protection Components of the Fifth Amendment.  Because I find that CASA is

likely to prevail on its claim that the Public Charge Rule is "not in accordance with law" in violation of 5 U.S.C. § 706, I do not address these arguments for purposes of determining whether to issue a preliminary injunction.

## IV.     Likely to Suffer Irreparable Harm

A "plaintiff seeking a preliminary injunction must demonstrate . . . that he is likely to suffer irreparable harm in the absence of preliminary relief . . . ." *Winter*, 555 U.S. at 20.  "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  "Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012).

As discussed above, CASA has established that it is suffering an injury in fact based on frustration of its mission and diversion of its resources.  At least some of these harms are irreparable, as they are based on time sensitive advocacy.  For example, CASA alleges that it "has had to reduce its advocacy for health-care expansion efforts at the state level in Maryland and at the local level in Prince George's County, Maryland" which are "necessarily time-sensitive, as they are dependent on political will and the legislative cycle" and "cannot simply be undertaken with equal efficacy at a different time."  ECF No. 27 at ¶ 123.  Further, CASA argues that it will need to continue redirecting its efforts as an organization to address the Public Charge Rule if it is not granted an injunction.  ECF No. 28 at 28.  These allegations, taken as true for the purposes of this motion, establish that CASA will be irreparably harmed in the absence of a preliminary

injunction.  *Cf. League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (obstacles to organization's mission dependent on election cycle constituted irreparable harm).

## V.    The Balance of Equities and Public Interest

CASA must also establish that "the balance of equities" tips in its favor and that "an injunction is in the public interest."  *Winter*, 555 U.S at 20 (2008).  Where, as here, the government is a party, these factors merge.  *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (quoting *Pursuing Am. Greatness v.* FEC, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Plaintiffs argue that if a preliminary injunction is not granted, it will continue to suffer a frustration of its mission and diversion of its resources because of the Public Charge Rule.  *See* ECF No. 28 at 43.  Defendants argue that the government has a substantial interest in administering the national immigration system.  *See* ECF No. 58 at 40.  While this is true, preserving the status quo would not create a significant break in the enforcement of the immigration laws.  Rather, it would allow DHS to continue administering the public charge admissibility standards in the way that it has done for arguably more than a century and at least since 1999 when the INS issued its Field Guidance.  Therefore the balance of equities tips in favor of Plaintiffs and it is in the public interest to preserve the status quo and grant a preliminary injunction.

## VI.    Remedy

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam). However, the scope of the relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  "An

injunction should be carefully addressed to the circumstances of the case." *Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544 (4th Cir. 2012). Nonetheless, "[n]ationwide injunctions are appropriate if necessary to afford relief to the prevailing party." *Id.*

Several factors weigh in favor of national injunction in this case. First, a nationwide injunction is appropriate to provide complete relief to CASA. CASA has over 100,000 members located in Maryland, Virginia, D.C., and Pennsylvania. ECF No. 27 at ¶ 14. But the Rule also applies to all ports of entry in the United States, such that if CASA's members are traveling and enter through a port of entry outside of this geographic area, they could be subject to a Public Charge determination. More generally, if the Rule is only enjoined as to part of the country, that may create further confusion among CASA's membership. The upshot is that the alleged harms to CASA *as an organization* will continue while the Rule remains in effect, frustrating CASA's mission and causing it to continue to divert resources. *Cf. East Bay Sanctuary Covenant v. Trump*, 354 F.Supp. 3d 1094, 1120 (N.D. Cal. 2018) ("The Organizations' harms are not limited to their ability to provide services to their *current* clients, but extend to their ability to pursue their programs writ large . . . .)

Second, the ordinary remedy in APA challenges to a rulemaking is to set aside the entire rule if defective. *See Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'") (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)); *Pennsylvania v. President United States*, 930 F.3d 543, 575–76 (3d Cir.

2019), *as amended* (July 18, 2019) ("[O]ur APA case law suggests that, at the merits stage, courts invalidate—without qualification—unlawful administrative rules as a matter of course, leaving their predecessors in place until the agencies can take further action. . . . [B]y enjoining enforcement of the Rules we provide a basis to ensure that a regulation that the States have shown likely to be proven to be unlawful is not effective until its validity is finally adjudicated.") Plaintiffs have established likelihood of success on the merits that the Public Charge Rule is "not in accordance with law" in violation of Section 706 of the APA. A nationwide preliminary injunction ensures that the Rule is not effective until its validity is fully adjudicated.

Finally, the Fourth Circuit has recognized that "nationwide injunctions are especially appropriate in the immigration context, as Congress has made clear that 'the immigration laws of the United States should be enforced vigorously and *uniformly*.'" *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir.), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) (quoting *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (emphasis in original)); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."); *but see E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (limiting injunction in immigration context to the Ninth Circuit where district court "fail[ed] to consider whether nationwide relief is necessary to remedy Plaintiffs' alleged harms."). The Public Charge Rule presents a major change in the immigration policy of the United States. A limited geographical injunction could create a patchwork of immigration policies applied across the nation. This is particularly serious, where, as here, dramatically different policies would be enforced depending on location. Therefore, preserving the "the vigorous and uniform enforcement

of immigration laws" weighs in favor of a nationwide injunction, particularly given that the nationwide scope of the immigration policies is tied to Plaintiffs' alleged harms.

The Fourth Circuit instructed that this Court should be cautious in issuing nationwide injunction, because they could preclude other circuits from ruling on issues. *Virginia Soc'y for Human Life*, 263 F.3d at 393. "Such a result conflicts with the principle that a federal court of appeals's decision is only binding within its circuit." *Id.* (citing *United States v. Glaser,* 14 F.3d 1213, 1216 (7th Cir.1994); *Right to Life of Dutchess County, Inc. v. FEC,* 6 F.Supp.2d 248, 252 (S.D.N.Y.1998) (*RLDC* )). "A contrary policy would 'substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.'" *Id.* (quoting *United States v. Mendoza,* 464 U.S. 154, 160 (1984). A nationwide injunction could also "deprive the Supreme Court of the benefit of decisions from several courts of appeals." *Id.*

These important concerns are mitigated in this case. Three other federal district courts have already considered challenges to the Public Charge Rule and issued injunctions and at least two other challenges are pending. *See* note 2, *supra*. Accordingly, at least the Second, Fourth, Seventh, and Ninth Circuits will have an opportunity to review these issues if the parties in these cases should appeal. Therefore a nationwide injunction here will not thwart the development of this legal issue or deprive the Supreme Court of the benefit of decisions from several courts of appeals.

Therefore, a nationwide preliminary injunction is appropriate in this case.

This Court also should consider whether the preliminary injunction should apply to the President himself. Neither party has raised this issue. However, in *Int'l Refugee Assistance Project v. Trump*, the Fourth Circuit vacated a preliminary injunction against the President, finding it to be unwarranted. 857 F.3d at 605. The Fourth Circuit explained that "in general, 'this court

has no jurisdiction of a bill to enjoin the President in the performance of his official duties'" and that a "grant of injunctive relief against the President himself is extraordinary, and should . . . raise[ ] judicial eyebrows." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (opinion of O'Connor, J.)). Therefore "such relief should be ordered only in the rarest of circumstances." *Id.* Here a preliminary injunction against the President is not necessary to preserve the status quo and prevent irreparable harm to CASA. CASA has established a likelihood of success on the merits that the Public Charge Rule violates the APA. DHS and its officers and employees are enjoined from enforcing the Public Charge Rule during the pendency of this litigation. This does not present the "rarest of circumstances" in which a preliminary injunction should extend to the President.

As an alternative or in addition to a preliminary injunction, Plaintiffs request that this Court postpone the effective date of the Rule. 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.") The standard for a preliminary injunction and a stay pursuant to 5 U.S.C. § 705 are the same. *See Texas v. EPA*, 829 F.3d 405, at 424, 435 (5th Cir. 2016); *Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990); *Schwartz v. Covington*, 341 F.2d 537, 538 (9th Cir. 1965); *Assoc. Sec. Corp. v. SEC*, 283 F.2d 773, 774–75 (10th Cir. 1960); *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam). Therefore, for the reasons discussed above, the effective date of the Rule is postponed during the pendency of this case.

## Conclusion

For the foregoing reasons, CASA de Maryland has made a "clear showing" that it should be granted a preliminary injunction and stay of the effective date of the Public Charge Rule. *Winter*, 555 U.S. at 22.

\*     \*     \*

**<u>ORDER</u>**

For the reasons stated in this Memorandum Opinion, it is, this <u>14th</u> day of <u>October</u>, <u>2019</u>, hereby ORDERED that Plaintiffs' Corrected Motion for Preliminary Injunction, ECF No. 28, IS GRANTED as follows:

1. Pursuant to Federal Rule of Civil Procedure 65(a), Defendants U.S. DEPARTMENT OF HOMELAND SECURITY, KEVIN K. McALEENAN, in his official capacity as Acting Secretary of Homeland Security, and KENNETH T. CUCCINELLI II, in his official capacity as Acting Director, U.S. Citizenship and Immigration Services, are ENJOINED from

   a. Enforcing, applying, or treating as effective, or allowing persons under their control to enforce, apply, or treat as effective, the Public Charge Rule; and

   b. Implementing, considering in connection with any application, or requiring the use of any new or updated forms whose submission would be required under the Rule, including the new Form I-944, titled "Declaration of Self Sufficiency," and the updated Form I-485, titled "Application to Register Permanent Residence of Adjust Status"; and,

2. Pursuant to 5 U.S.C. § 705, the effective date of the Rule is POSTPONED pending further Order of the Court.

_____/S/_____

Paul W. Grimm
United States District Judge
