## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA de Maryland, Inc., *et al.*

*Plaintiffs*,

v.

Donald J. Trump, in his official capacity as
President of the United States, *et al.*

*Defendants*.

No. 8:19-cv-2715-PWG

### MOTION FOR STAY OF INJUNCTION PENDING APPEAL
### AND MEMORANDUM OF LAW

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.      THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS ............................2

II.     THE REMAINING FACTORS FAVOR A STAY ............................................................6

III.    THE COURT SHOULD AT LEAST STAY THE INJUNCTION IN PART...................7

CONCLUSION ............................................................................................................................... 8

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cook Cty. v. McAleenan*,

    No. 19 C 6334, 2019 WL 5110267 (N.D. Ill. Oct. 14, 2019) ...................................................... 7

*Casa De Maryland, Inc. v. Trump*,

    No. PWG-19-2715, 2019 WL 5190689 (D. Md. Oct. 14, 2019) ................................................ 8

*City & Cty. of San Francisco v. USCIS*,

    No. 19-CV-04717-PJH, 2019 WL 5100718 (N.D. Cal. Oct. 11, 2019) ..................................... 8

*City of Milwaukee v. Illinois & Michigan*,

    451 U.S. 304 (1981) .................................................................................................................... 4

*Clapper v. Amnesty Int'l USA*,

    568 U.S. 398 (2013) .................................................................................................................... 3

*E. Bay Sanctuary Covenant v. Barr*,

    934 F.3d 1026 (9th Cir. 2019) .................................................................................................... 8

*Ex Parte Horn*,

    292 F. 455 (W.D. Wash. 1923) ................................................................................................. 5

*Gegiow v. Uhl*,

    239 U.S. 3 (1915) .................................................................................................................... 5, 6

*Lane v. Holder*,

    703 F.3d 668 (2012) .................................................................................................................... 2

*Maryland v. King*,

    567 U.S. 1301 (2012) .................................................................................................................. 6

*Matter of Martinez-Lopez*,

    10 I. & N. Dec. 409 (A.G. 1962) ........................................................................................... 4, 5

*Nken v. Holder*,

    556 U.S. 418 (2009) .................................................................................................................... 2

iii

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,

    531 U.S. 159 (2001) ................................................................................................ 4

*U.S. ex rel. Iorio v. Day*,

    34 F.2d 920 (2d Cir. 1929) ................................................................................. 5, 6

**Statutes**

8 U.S.C. § 1182(a)(4) ............................................................................................. 3, 4

8 U.S.C. § 1601 ...................................................................................................... 4, 6

8 U.S.C. § 1601(7) ...................................................................................................... 1

Pub. L. No. 104-208, 110 Stat 3009 (1996) ............................................................. 6

**Regulations**

84 Fed. Reg. 41292 (Aug. 14, 2019) ......................................................................... 1

**Legislative Material**

S. Rep. No. 64-352 (1916) ......................................................................................... 5

**Other Authorities**

Stewart Rapalje et al., Dict. Of Am. and English Law (1888) ................................... 4

## INTRODUCTION

The federal government respectfully moves to stay pending appeal the Court's order granting a nationwide preliminary injunction. ECF No. 65. At the least, the Court should issue a stay limiting its injunction consistent with Defendants' written proposal (limited to the geographic territories in which the Plaintiffs either reside or principally operate). *See* ECF No. 61. All the factors justifying a stay are met here. The government is likely to succeed on appeal both because the Plaintiffs lack standing and do not fall within the zone of interests of the relevant statute, and because the Department of Homeland Security ("DHS") rule—*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41292 (Aug. 14, 2019) ("Rule")—is fully consistent with the Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA"). The government will also suffer irreparable harm in the absence of a stay. As things stand, DHS may be forced to grant lawful permanent resident ("LPR") status to aliens likely at any time to become public charges under the Rule and depend on public resources designated as public benefits for purposes of a public charge inadmissibility determination under the Rule. And it will be compelled to grant such status even to aliens who are not parties to this lawsuit, and who have no connection to Plaintiff CASA de Maryland, Inc. ("CASA"). This state of affairs irreparably harms the government (and hence the public), who, as Congress has confirmed, has a "compelling … interest" in ensuring that "aliens be self-reliant." 8 U.S.C. § 1601(7).

Such an ongoing and significant intrusion into DHS's authority over who is entitled to adjust immigration status is particularly unwarranted here, where the only alleged injuries Plaintiffs would face during this litigation stem from their voluntary choices predicated on speculation concerning the Rule. Even if these purported injuries could give Plaintiffs standing (they cannot), they certainly would not justify inflicting such substantial harm on DHS, especially as it is likely to prevail on appeal.

This Court should therefore stay its injunction of the Rule pending the resolution of the government's appeal. At a minimum, it should issue a stay limiting its injunction consistent with

Defendants' written proposal. *See* ECF No. 61.[1]

## ARGUMENT

In considering whether to grant a stay pending appeal, the Court must consider four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). All four factors favor a stay here.

## I.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

The government respectfully submits that notwithstanding the Court's decision, it is likely to succeed on the merits of its appeal. As Defendants explained in their Opposition to Plaintiff's Motion for a Preliminary Injunction and at oral argument, Plaintiffs are neither the appropriate parties to challenge the Rule nor have presented tenable objections to it. ECF No. 52 (PI Opp.) 6-36. The Court's conclusions to the contrary are unlikely to withstand appellate review.

**A.**    At the outset, the Court only assessed the standing of CASA, and relied on an organizational standing theory. The Court concluded that CASA has suffered a cognizable injury—and has ripe claims—on the theory that it spent resources in response to the Rule in order to further its organizational mission. Op. 10-13. But the Fourth Circuit has held that a diversion of funds does not constitute an Article III injury when it is caused by an organization's "own budgetary choices." *See Lane v. Holder*, 703 F.3d 668 (2012); PI Opp. 8-9. The Court reasoned that CASA was "required" to divert these funds towards addressing the Rule since the Rule allegedly affects CASA's ultimate mission. Op. 10. However, the Fourth Circuit rejected this very argument in *Lane*. The organizational plaintiff there claimed that the statute at issue was inconsistent with its ultimate mission, its members requested its assistance to address the statute, and it diverted resources which "reduc[ed] the funds available for other purposes." *Lane*, 703 F.3d at 671, 675. *Lane* concluded that these allegations were insufficient. *See id.* The statute or rule at issue must directly interfere with an organization's activities. *See id.* It is not enough that an organization choose to allocate funds to one program over another because it believes this best

---

[1] Defendants conferred with Plaintiffs, who oppose this motion.

promotes its ultimate mission. *See id.* at 674-75. Additionally, the individual Plaintiffs lack standing for the reasons identified by the Defendants in their Opposition, but not discussed by the Court. PI Opp. 7-8. Specifically, neither individual Plaintiff has alleged an imminent intention to apply for an adjustment of status. Nor has either alleged that she or he has elected to forgo certain public benefits that would ensure an adverse public charge determination. Plaintiffs allege only that they have made, or will make, certain decisions due to their speculation concerning the Rule, which is precisely the type of self-inflicted injury the Supreme Court found insufficient in *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013) ("respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

Additionally, Plaintiffs claims are not ripe. Although CASA alleges that it has previously allocated resources to address the Rule, there is no allegation that it plans to channel any further resources. PI Opp. 10 Similarly, the individual Plaintiffs have expressed no intention to imminently apply for an adjustment of status, nor have they specifically alleged that they will be forced to make any decision (*e.g.*, concerning public benefit receipt) based on the Rule in the immediate future. *Id.*

In any event, even if Casa had Article III standing, and had advanced ripe claims, it would fall outside the zone of interests governed by 8 U.S.C. § 1182(a)(4). *See* PI Opp. 11-13. The Court observed that the "interests to be regulated" by the INA's public charge inadmissibility provision "are the health and economic status of immigrants who are granted admission," and that CASA seeks to protect these interests as well. Op. 17. But the Court's conclusion supports Defendants. That CASA seeks to protect immigrant's interests does not mean those interests transform into CASA's. CASA's interests may be derivative of immigrants' interests, but that does not mean they fall within the zone of interests of the INA's public charge provision.

**B.**     On the merits, this Court held that the Rule exceeds Defendants' statutory authority primarily on the ground that "Congress unambiguously precluded DHS's definition of the term public charge in the Public Charge Rule"—the 12/36 standard. Op. 22-23. In support, the Court

first canvassed relevant dictionary definitions to discern the term's "ordinary or natural meaning," and then concluded that the Rule is inconsistent with this authority. To start, none of the definitions relied upon by the Court is so precise as to foreclose the Rule's definition; certainly not precise enough to evince a Congressional intent to "unambiguously" foreclose it. As Defendants demonstrated, the 12/36 standard falls squarely within the historically broad understanding of the term public charge. The term was defined to generally include anyone that is "an obligation or liability." Stewart Rapalje et al., Dict. Of Am. and English Law (1888); *see also* PI Opp. 13-14. The Court relied on definitions which, as the Court summarized, state that a "public charge" includes a person that the "Government has taken care" of. Op. 23. But this definition is silent on the level of care necessary to transform someone into a public charge. What matters is that *no* historical source cited by Plaintiffs, or the Court, uses the definition promoted by Plaintiffs: a person who is "permanently and primarily dependent on the government." PI Opp. 14-15. Additionally, Congress' express policy statements indicate that it did not intend to foreclose the Rule's definition. The 12/36 standard implements the express "principle of United States immigration law" of "[s]elf-sufficiency," 8 U.S.C. § 1601—and the specific requirement that "[a]ny alien who … is likely at any time to become a public charge is inadmissible," 8 U.S.C. § 1182(a)(4)—by ensuring that aliens who seek admission or an adjustment of status have not received or will not receive public benefits for an extended period.

The Court also observed that Congress had rejected proposed expansions of the statutory term "public charge" in 1996 and 2013. Op. 29-31. But "[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute," because "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001) (citation omitted). For that reason, "unsuccessful attempts at legislation are not the best of guides to legislative intent" as a general matter, and "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 332 n.24 (1981) (citations omitted).

The Court's reliance on then-Attorney General Robert Kennedy's discussion in *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (A.G. 1962), is also misplaced. In the Court's view, *Matter of Martinez-Lopez* indicates that the public charge provision "requires more than a showing of a possibility that the alien will require public support." Op. 28. But that discussion does not speak to the *definition* of public charge, but rather the *predictive standard* that relevant immigration personnel must use when making a public charge inquiry. The Rule expressly states that immigration officials must conclude that an alien is "more likely than not" to become a public charge, which is consistent with General Kennedy's conclusion.

The Court also believed that Congress' establishment of an "immigrant fund" in the Immigration Act of 1882 forecloses the Rule's definition. But it made perfect sense to create this fund while simultaneously establishing the public charge ground of inadmissibility: Congress recognized that there was a policy issue, and established a prospective measure to deal with future public charges (the public charge provision) and a retroactive measure to deal with those that had already immigrated and become public charges (the "immigrant fund").

Finally, the Court invoked the Supreme Court's decision in *Gegiow v. Uhl*, 239 U.S. 3 (1915), where the Supreme Court stated that the term "public charge" must be interpreted consistently with the terms it is surrounded by (including, for example, "paupers"). Op. 25-26. As the Court acknowledged, however, Congress then amended the statute to move "public charge" away from those surrounding terms. Op. 26; *see also* S. Rep. No. 64-352, at 5 (1916) (1917 Act relocated the term "public charge" to "overcome recent decisions of the courts limiting the meaning of the description of the excluded class because of its position between other descriptions conceived to be of the same general and generical nature. (See especially Gegiow v. Uhl)"). As other courts have recognized, that amendment effectively overruled *Gegiow*. *See*, *e.g.*, *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"). According to the Court, though, the amendment did not reflect an intention to *fully* disassociate the term "public charge" from "paupers." Op. 6 (citing *U.S. ex rel. Iorio v. Day*, 34 F.2d 920 (2d Cir. 1929)). But in *Iori* the Second Circuit

concluded only that there may be "overlap[]" between the terms in the sense that those who are inadmissible as "paupers" or "vagrants" may also be inadmissible as "public charges." 34 F.2d at 922. The court never said that the terms share a common meaning, or that the definition of one informs the definition of the other. Additionally, *Gegiow* is not instructive for a separate reason. It construed the 1907 statute, and thus would not control the meaning of "public charge" in Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996), enacted eight decades later.[2]

## II.    THE REMAINING FACTORS FAVOR A STAY

Both the government and the public will be irreparably harmed if the nationwide injunction is not stayed. The federal government sustains irreparable injury whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people," *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). That injury is particularly acute here because the Court's injunction will require DHS, on a nationwide basis, to grant lawful permanent resident status to aliens who are likely at any time to become public charges under the Rule and who depend on public resources designated as public benefits for purposes of a public charge inadmissibility determination under the Rule to meet their needs. *See* 8 U.S.C. § 1601 ("principle of United States immigration law" of "[s]elf-sufficiency"); *Id.* § 1601(2)(A) ("[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs."). DHS estimates that roughly 382,264 people apply for an adjustment of status and are subject to a public charge inquiry each year. *See* Declaration of Daniel Renaud, Exh. 1, ¶ 4; Rule at 41497, 41464. If the Rule remains enjoined, some subset of this population will receive an adjustment of status that otherwise would not under the Rule's more thorough review process. Renaud Decl. ¶ 4. DHS currently has no practical means of revisiting these determinations made under the prior guidance, and subjecting them to the Rule, if the injunction against the Rule is

---

[2] *Gegiow*'s holding is also narrow. It concluded only that an alien could not be classified as a public charge based solely "on the ground that the labor market in the city of his immediate destination is overstocked," *Gegiow*, 239 U.S. at 9-10; *see id.* at 8-9 ("the only ground for the order was the state of the labor market at Portland at that time").

ultimately vacated. *Id.* And because those persons, by definition, are likely to receive government benefits in the future, the injunctions will inevitably result in the additional expenditure of government resources, precisely the harm that Congress and the rule seek to prevent. Moreover, every day the effective date of the Rule remains stayed, the Rule's future effectiveness is reduced: any public benefits received by aliens submitting status adjustment applications before the Rule takes effect will be counted only if they would have been covered by the 1999 Interim Field Guidance, Rule 41321, which means that even if the government ultimately prevails, the Rule's future operation will be irreparably undermined.

The injunction also imposes significant administrative burdens on Defendants and needless uncertainty on the aliens Plaintiffs claim to support. For instance, USCIS has devoted significant time to preparing implementation of the Rule, including preparing training for the relevant officers at its National Benefit Center as well as across 88 Field Offices. *Id.* ¶ 5. The rollout of such widespread training cannot happen overnight, and USCIS will be forced to start much of the process over again if and when the injunction is vacated. *Id.* USCIS also hired contractors to enter the significant amount of data required on its new forms associated with the Rule. *Id.* ¶ 6. If the injunction is not stayed in the near future, contractors are likely to seek other employment, which will only further impede USCIS's ability to implement the Rule if and when the injunction is vacated. *Id.*

On the other side of the ledger, Plaintiffs will not suffer any irreparable injury. Their alleged harms stemming from their voluntary decisions are insufficient to create standing, *see supra* Pt. I.A, much less satisfy the more exacting requirements to establish irreparable injury, *see* PI Opp. 34-37. And even if the Court accepts that the Rule will *eventually* cause Plaintiffs irreparable injury—*e.g.*, through a future diversion of resources—they have provided no evidence that the Rule will irreparably harm them *during the pendency of an appeal*. *See* PI Opp. 37. And even then, if it were clear that a stay would somehow irreparably harm these States, any such injuries would be substantially outweighed by the harms to the government fisc (and the public) associated with the threat of mandating the ongoing admission of aliens likely to become public

charges under the Rule.

## III.   THE COURT SHOULD AT LEAST STAY THE INJUNCTION IN PART.

At a minimum, the Court should stay its injunction insofar as it sweeps more broadly than necessary to redress Plaintiffs' alleged injuries. *See* PI Opp. 41-42. Indeed, district courts in two related challenges have limited the scope of their injunctions to particular jurisdictions—namely, California, Oregon, Maine, Pennsylvania, Illinois, and the District of Columbia. *See Cook County v. McAleenan*, No. 19 C 6334, 2019 WL 5110267, at *14 (N.D. Ill. Oct. 14, 2019); *San Francisco*, 2019 WL 5100718, at *51-53. Yet those decisions have been rendered largely academic by the scope of this Court's injunction.

The Court sought to justify the injunction's scope by first claiming that CASA has many members, and some maybe "travel[] and enter through a port of entry outside of" CASA's "geographic area." Op. 35. But that an unidentified number of CASA members may be affected in other geographic areas is a tenuous basis for issuing an injunction applying in all fifty States. The Court also sought to justify its injunction's scope on the theory that immigration enforcement requires uniformity, Op. 36-37, but "a nationwide injunction is not 'appropriate simply because this case presents a rule that applies nationwide,'" even when the rule is "an immigration policy." *San Francisco*, 2019 WL 5100718, at *53 (quoting *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019)). Here, a universal injunction would be particularly inappropriate given that Plaintiffs include only two individuals, and an organization that principally operates in one State.

For the same reasons, the Defendants request that the Court stay its grant of a section 705 administrative stay. *See Casa De Maryland, Inc. v. Trump*, No. PWG-19-2715, 2019 WL 5190689, at *19 (D. Md. Oct. 14, 2019) ("The standard for a preliminary injunction and a stay pursuant to 5 U.S.C. § 705 are the same.").

## CONCLUSION

The government respectfully requests that the Court stay its preliminary injunction either in whole or in part, and stay its grant of a section 705 stay, pending final resolution of the

government's appeal.

Dated:  October 25, 2019

GEOFFREY S. BERMAN
United States Attorney

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

/s/ *Joshua M. Kolsky*
ERIC J. SOSKIN
Senior Trial Counsel
KERI L. BERMAN
KUNTAL V. CHOLERA
JOSHUA M. KOLSKY, DC Bar No. 993430
U.S. Dept. of Justice, Civil Division,
Federal Programs Branch
1100 L Street, N.W., Rm. 12002
Washington, DC 20001
Phone: (202) 305-7664
Fax: (202) 616-8470
Email: joshua.kolsky@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Joshua M. Kolsky*
JOSHUA M. KOLSKY
